UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**,<br>600 Pennsylvania Avenue, NW<br>Washington, DC 20580<br><br>    Plaintiff,<br><br>        v.<br><br>**KEY INVESTMENT GROUP LLC**, a Delaware limited liability company, also d/b/a Epic Seats; TotalTickets.com LLC; and Totally Tix LLC, 1777 Reisterstown Road, Suite 363, Pikesville, Baltimore Co., Maryland 21208;<br><br>**TOTALTICKETS.COM LLC**, a Florida limited liability company, 2755 East Oakland Park Boulevard, Suite 230, Fort Lauderdale, Florida 33306;<br><br>**TOTALLY TIX LLC**, a Delaware limited liability company, 1777 Reisterstown Road, Pikesville, Baltimore Co., Maryland 21208;<br><br>**FRONT ROSE TIX LLC**, a Maryland limited liability company, 1777 Reisterstown Road, Pikesville, Baltimore Co., Maryland 21208;<br><br>**WLK INVESTMENTS LLC**, a Delaware limited liability company, 33 Nashoba Road, Acton, Massachusetts 01720;<br><br>**YAIR D. ROZMARYN**, individually and as an officer and manager of Key Investment Group LLC, as a member and manager of Front Rose Tix, LLC, and as a manager of TotalTickets.com LLC and Totally Tix LLC, 7906 Humboldt Road, Pikesville, Baltimore Co., Maryland 21208;<br><br>**ELAN N. ROZMARYN**, individually and as an officer and manager of Key Investment Group LLC, as a member and manager of Front Rose Tix, LLC, and as a manager of TotalTickets.com LLC and Totally Tix LLC, 7912 Long Meadow Road, Pikesville, Baltimore Co., Maryland 21208; and | Case No. <u>1:25-cv-02716</u><br><br>**COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF** |

| |
|---|
| **TAYLOR KURTH**, individually and as an officer and de facto manager of Key Investment Group LLC, and as a de facto manager of WLK Investments LLC, TotalTickets.com LLC, and Totally Tix LLC, 33 Nashoba Road, Acton, Massachusetts 01720, <br><br> Defendants. |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1. The FTC brings this action for Defendants' violations of Section 2(a) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(a), and Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a). For these violations, Plaintiff seeks relief, including a permanent injunction and civil penalties, pursuant to Section 2(b) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(b), and Sections 5(m)(1)(A) and 13(b) of the FTC Act, 15 U.S.C. §§ 45(m)(1)(A) and 53(b).

## SUMMARY OF THE CASE

2. Beginning on or around October 2016 to the present, Defendants have used illegal means to purchase hundreds of thousands of tickets from Ticketmaster for performances and events, including concerts, plays, and sporting events. Defendants' purchases have regularly exceeded posted ticket purchasing limits to many popular events, such as Taylor Swift's Eras Tour. Defendants have used thousands of fictitious Ticketmaster accounts, thousands of virtual and traditional credit card numbers, proxy or spoofed IP addresses, and SIM banks to bypass or otherwise avoid security measures, access control systems, or other technological controls or measures on Ticketmaster's websites that would have otherwise blocked or prevented them from violating Ticketmaster's posted ticket purchase limits. Defendants then have resold or offered to resell the illegally purchased tickets on secondary ticketing websites, including Ticketmaster's resale platform. Between November 1, 2022, and December 30, 2023, Defendants purchased at

2

least 379,776 tickets from Ticketmaster at a cost of nearly $57,000,000. Defendants resold a portion of those tickets on secondary marketplaces for approximately $64,000,000, often charging a significant markup to consumers. Defendants' actions have injured consumers, who otherwise may have been able to purchase those tickets in the first instance from Ticketmaster at a lower price. By circumventing Ticketmaster's security measures, access control systems, or other technological controls or measures to buy tickets, and then selling or offering to sell the tickets, Defendants have violated and continue to violate the Better Online Ticket Sales Act and the FTC Act.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

4. Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2), (b)(3), (c)(1), and (c)(2), and 1395(a), and 15 U.S.C. § 53(b).

## PLAINTIFF

5. The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Better Online Ticket Sales Act, 15 U.S.C. § 45c, which Congress enacted in 2016 "[t]o prohibit the circumvention of control measures used by Internet ticket sellers to ensure equitable consumer access to tickets for any given event, and for other purposes." Pub. L. 114-274, pmbl.

## DEFENDANTS

6. Defendant Key Investment Group LLC is a Delaware limited liability company, with its principal place of business at 1777 Reisterstown Road, Suite 363, Pikesville, Baltimore

3

Co., Maryland 21208. Key Investment Group also does business as Epic Seats, TotalTickets.com LLC, and Totally Tix LLC. Key Investment Group is the sole member and owner of both TotalTickets.com and Totally Tix. Key Investment Group transacts or has transacted business in this district and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Key Investment Group has purchased and then subsequently advertised, marketed, distributed, or sold event tickets to consumers throughout the United States.

7. Defendant TotalTickets.com LLC is a Florida limited liability company with its principal place of business at 2755 East Oakland Park Boulevard, Suite 230, Fort Lauderdale, Florida 33306. TotalTickets.com is a wholly owned subsidiary of Key Investment Group. It transacts or has transacted business in this district and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, TotalTickets.com has purchased and then subsequently advertised, marketed, distributed, or sold event tickets to consumers throughout the United States.

8. Defendant Totally Tix LLC is a Delaware limited liability company with its principal place of business at 1777 Reisterstown Road, Pikesville, Baltimore Co., Maryland 21208. Totally Tix is a wholly owned subsidiary of Key Investment Group. It transacts or has transacted business in this district and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, Totally Tix has purchased and then subsequently advertised, marketed, distributed, or sold event tickets to consumers throughout the United States.

9. Defendant Front Rose Tix LLC is a Maryland limited liability company with its principal place of business at 1777 Reisterstown Road, Pikesville, Baltimore Co., Maryland 21208. Front Rose Tix is the majority owner and a member and manager of Key Investment

4

Group. Front Rose Tix transacts or has transacted business in this district and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Front Rose Tix has purchased and then subsequently advertised, marketed, distributed, or sold event tickets to consumers throughout the United States.

10. Defendant WLK Investments LLC is a Delaware limited liability company with its principal place of business at 33 Nashoba Road, Acton, Massachusetts 01720. WLK Investments is an owner, member, and manager of Key Investment Group. It transacts or has transacted business in this district and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, WLK Investments has purchased and then subsequently advertised, marketed, distributed, or sold event tickets to consumers throughout the United States.

11. Defendant Yair D. Rozmaryn is the chief executive officer and a manager of Key Investment Group. He is a member and manager of Front Rose Tix and a manager of TotalTickets.com and Totally Tix. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, or had the authority to control, or participated in the acts and practices of Defendants, including the acts and practices described in this Complaint. Yair D. Rozmaryn is responsible for the overall direction and operation of Key Investment Group, including compliance with the Better Online Ticket Sales Act. He resides in Baltimore County, Maryland, in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

12. Defendant Elan N. Rozmaryn is the chief financial officer and a manager of Key Investment Group. He is a member and manager of Front Rose Tix and a manager of TotalTickets.com and Totally Tix. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, or had the authority to control, or

participated in the acts and practices of Defendants, including the acts and practices described in this Complaint. Elan N. Rozmaryn is responsible for managing the finances of Key Investment Group, including the use of credit to buy tickets on Ticketmaster's websites. He resides in Baltimore County, Maryland, in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

13. Defendant Taylor Kurth is the chief strategic officer and a de facto manager of Key Investment Group. He is a de facto manager of WLK Investments and a de facto manager of TotalTickets.com and Totally Tix. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, or had the authority to control, or participated in the acts and practices of Defendants, including the acts and practices described in this Complaint. Taylor Kurth develops strategic plans for Key Investment Group's ticket-brokering investments and business relationships. He resides in Middlesex County, Massachusetts and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

## COMMON ENTERPRISE

14. At all times relevant to this Complaint, Defendants Key Investment Group, TotalTickets.com, Totally Tix, Front Rose Tix, and WLK Investments (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive or unfair and unlawful acts and practices alleged below. Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common or interrelated ownership, officers, managers, business functions, marketing, employees, office locations, and revenue. In creating and operating their business operations, Corporate Defendants have pursued and benefitted from a shared scheme marked by interdependent economic interests. Because these Corporate Defendants have operated as a

6

common enterprise, each of them is liable for the acts and practices alleged below.

## COMMERCE

15.　At all times relevant to this Complaint, Corporate Defendants, singularly or in any combination, and at the direction of individual defendants Yair D. Rozmaryn, Elan N. Rozmaryn, and Taylor Kurth, have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## THE BETTER ONLINE TICKET SALES ACT

16.　Under the Better Online Ticket Sales Act, it is unlawful for any person to:

(A) "circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules," 15 U.S.C. § 45c(a)(1)(A); or

(B) "sell or offer to sell any event ticket in interstate commerce obtained in violation of [the Better Online Ticket Sales Act] if the person offering to sell or selling the ticket either (i) participated directly in or had the ability to control the conduct in violation of [the Better Online Ticket Sales Act]; or (ii) knew or should have known that the event ticket was acquired in violation of [the Better Online Ticket Sales Act]. 15 U.S.C. § 45c(a)(1)(B).

17.　The Better Online Ticket Sales Act defines an "event" to mean "any concert, theatrical performance, sporting event, show, or similarly scheduled activity, taking place in a venue with a seating or attendance capacity exceeding 200 persons that—(A) is open to the general public; and (B) is promoted, advertised, or marketed in interstate commerce or for which event tickets are generally sold or distributed in interstate commerce." 15 U.S.C. § 45c note, Pub. L. 114-274, § 3.

18. A violation of the Better Online Ticket Sales Act is "a violation of a rule defining an unfair or a deceptive act or practice under Section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B))." 15 U.S.C. § 45c(b)(1). Thus, pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Better Online Ticket Sales Act is an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## DEFENDANTS CIRCUMVENT CONTROL MEASURES ON TICKETMASTER'S WEBSITES TO OBTAIN TICKETS AND THEN SELL OR OFFER TO SELL THOSE TICKETS TO CONSUMERS

19. Corporate Defendants are ticket brokers. Their primary business involves purchasing tickets from ticket issuers and then reselling the tickets to consumers on secondary ticketing websites at a higher price.

20. Defendant Yair D. Rozmaryn is responsible for overseeing Key Investment Group and managing its overall operations.

21. Defendant Elan N. Rozmaryn manages Key Investment Group's accounting department.

22. Defendant Taylor Kurth provides guidance on the dynamics of the ticket brokering business to other officers, managers, and employees of Key Investment Group.

23. Beginning on November 1, 2022, and continuing through December 30, 2023, Defendants made more than 107,265 Ticketmaster ticket purchases. They obtained at least 379,776 event tickets from these purchases. Defendants have made many thousands of Ticketmaster ticket purchases since December 31, 2023, continuing through the present.

24. Ticketmaster is a ticket issuer that has implemented security measures, access control systems, or other technological controls or measures on its websites to enforce posted event ticket purchase limits and to maintain the integrity of posted online ticket purchasing order

rules. These measures have been in place between no later than January 10, 2017, and the present.

25.     Until at least July 2025, Ticketmaster also maintained a "Purchase Policy" that was posted on its website and set forth rules that "applie[d] to any purchases on our Site made on or after January 1, 2021."

26.     Section 7 of the Purchase Policy, titled "Number of Tickets or 'Ticket Limits,'" stated that ticket limits were imposed "to discourage unfair ticket buying practices." This provision specifically required that "each account" used to purchase tickets "be linked to a unique individual[] and must contain valid and verifiable information" and prohibited the use of multiple accounts "to circumvent or exceed published ticket limits." Section 7 further stated that tickets cancelled because the purchaser violated posted ticket limits "may be refunded at face value (excluding fees)," and "[t]his includes orders associated with the same name, e-mail address, billing address, credit card number, or other information."

27.     Section 13 of Ticketmaster's Purchase Policy stated that ticket orders placed via accounts with false or misleading information, including information related to "name, address, email address, phone number, IP address, or other account or billing information" were subject to cancellation.

28.     When purchasing tickets from Ticketmaster, Defendants have regularly circumvented security measures, access control systems, and other technological controls or measures on Ticketmaster's websites by, among other things, using: computer software and technologies designed to do so; thousands of fictitious names, addresses, and phone numbers; thousands of credit card numbers (including some linked to accounts in the names of Key Investment Group employees, or friends and family of Key Investment Group officers or employees); IP proxy services to utilize multiple IP addresses; hundreds of SIM cards; and SIM

9

banks, also known as SIM boxes.

29. By their actions, Defendants have been able to purchase tickets more rapidly and in a greater volume than a consumer who has not been circumventing security measures, access control systems, or other technological controls or measures on Ticketmaster's websites.

30. Defendants have later resold or offered to resell many of the tickets they have purchased from Ticketmaster's websites on secondary ticketing websites, for a profit. From June 10, 2022, through December 21, 2023, Defendants purchased from Ticketmaster at least 321,286 non-sports event tickets to 3,261 live performances, excluding tickets for parking passes. Defendants purchased 15 or more tickets to each of these 3,261 events at a total cost of $46,756,601. Defendants subsequently resold these tickets for $52,418,398.49, netting $5,661,797.49 in revenue.

31. From March 24, 2023, through August 20, 2023, Defendants purchased ten or more tickets to each of 38 Taylor Swift concerts for a total of 2,280 tickets. Defendants paid $744,970.29 for these tickets and resold them for $1,961,980.65, netting $1,217,010.36 in revenue.

32. To give an example from just one Taylor Swift concert, Defendants used 49 different accounts to purchase 273 tickets to Taylor Swift's March 25, 2023, concert at Allegiant Stadium, dramatically exceeding The Eras Tour's 2023 six-ticket limit. Defendants then marked up and resold these tickets, netting $119,227.21 in revenue.

33. For a Bruce Springsteen show at MetLife Stadium on September 1, 2023, Defendants used 277 different accounts to purchase 1,530 tickets, dramatically exceeding Springsteen and the E Street Band's four-ticket limit. Defendants marked up and resold these tickets, netting $20,900.84 in revenue.

## DEFENDANTS CONCEAL THEIR IP ADDRESSES

34.     Since at least January 10, 2017, Ticketmaster has maintained security measures, access control systems, or other technological controls or measures on its websites designed to prevent or block ticket purchasers from making multiple purchases for the same event from the same IP address. An IP address is a unique string of numbers separated by periods that Ticketmaster uses to identify a computer or affiliated computers making purchases. Ticketmaster uses this technological system to enforce posted event ticket purchase limits and to maintain the integrity of its posted online ticket purchasing order rules.

35.     In many instances, between December 1, 2018, and the present date, Defendants have taken steps to conceal their IP addresses when making ticket purchases. For example, at times, Defendants have used rotating IP proxy services. These services have allowed Defendants to hide their actual IP addresses from Ticketmaster.

36.     Defendants have hidden their true IP addresses from Ticketmaster because doing so would allow them to circumvent technological controls on Ticketmaster's websites.

37.     By hiding their true IP addresses from Ticketmaster, Defendants have circumvented security measures, access control systems, or other technological controls or measures that Ticketmaster used on its websites to enforce posted event ticket purchase limits, or to maintain the integrity of posted online ticket purchasing order rules.

## DEFENDANTS CREATE SHAM TICKETMASTER ACCOUNTS
## AND USE THOUSANDS OF CREDIT CARD NUMBERS

38.     Between December 1, 2018, and the present date, Ticketmaster has maintained security measures, access control systems, or other technological controls or measures on its websites designed to prevent individuals from purchasing more tickets than otherwise allowed under its posted event ticket limits. Among other things, these technological measures monitor

11

the following information to verify whether a purchase falls within posted purchase limits: (a) the individual's name, (b) billing address, (c) Ticketmaster accounts, and (d) the IP address and cookies associated with the purchase. From January 1, 2021, through the filing of this Complaint, Ticketmaster also monitored the credit card number used by the purchaser.

39. In many instances, between December 1, 2018, and the present date, Defendants have bypassed these security measures, access control systems, or other technological controls or measures by using Ticketmaster accounts based on sham identities, thousands of virtual and traditional credit card numbers, and IP proxy services.

40. Defendants have used thousands of Ticketmaster accounts to purchase tickets, since Key Investment Group's formation in late 2016. As shown by Figure 1 below, by September 2018, Ticketmaster had determined that Key Investment Group controlled more than 3,100 active and fictitious Ticketmaster accounts. These accounts have typically been controlled by Defendants and not linked to a unique individual, as required by Ticketmaster's policies.



Figure 1: Slide from 2018 PowerPoint prepared by Ticketmaster.

41. In February 2024, after Defendants learned that the FTC was investigating their business practices, Defendants notified Ticketmaster that they had used 19 Ticketmaster accounts, each with a unique email address created or obtained by Key Investment Group, to purchase 61 tickets to a single Bad Bunny concert, in violation of Section 7 of Ticketmaster's Purchase Policy. *See* Attachment A to Complaint, email exchange between Luis Koch, a fake identity used by Key Investment Group, and Ticketmaster, dated February 2, 2024.

42. Defendants have not typically opened Ticketmaster accounts in their own names. From November 15, 2020, through January 16, 2024, Defendants created, purchased, or otherwise obtained from third parties more than 13,000 Ticketmaster accounts. In numerous instances, they created fictitious names for the accounts or knowingly purchased accounts others had created with fictitious names. Defendants' practice of using fictitious names on Ticketmaster accounts continues through the present.

43. In addition to opening their own fictitious Ticketmaster accounts and using the accounts of friends and family members, Defendants have "crowdsourced," i.e., purchased, hundreds of Ticketmaster accounts from individuals unrelated to Key Investment Group. Defendants advertised their crowdsourcing opportunity on physical flyers, including in Baltimore, Maryland, which claimed participants could "Make Money Doing Verified Fan Sign Ups" in just "3 Easy Steps!" First, participants were instructed to make a new Gmail account "with a generic name." Then, participants were instructed to make a new Ticketmaster account using the new generic Gmail account and share the username and password with Defendants. Finally, the flyer told participants they could "Sit back and get paid," earning $5 for the account creation and between $5 and $20 each time they receive a Verified Fan presale code.

44. Defendants do not typically use their business addresses as the primary addresses, shipping addresses, or billing addresses for their Ticketmaster accounts. Instead, they use addresses that are either fake or unrelated to their business.

45. In numerous instances, Defendants use fake phone numbers for their Ticketmaster accounts, using actual numbers connected to their business only when necessary to receive Verified Fan codes or other potentially valuable communications from Ticketmaster.

46. From November 15, 2020, through January 16, 2024, Defendants used thousands of credit card numbers, including virtual credit card numbers, to make purchases through their Ticketmaster accounts.

47. At all times relevant to this Complaint, Defendants have known that if they purchased tickets using their true names, addresses, and IP addresses, then Ticketmaster's security measures could prevent them from making all the purchases they wished to make.

48. Defendants have used thousands of Ticketmaster accounts based on fictitious names and made-up contact information and thousands of credit card numbers to circumvent Ticketmaster's security measures, access control systems, or other technological controls or measures that were designed to prevent ticket purchasers from exceeding posted event ticket purchase limits.

## DEFENDANTS USE HUNDREDS OF SIM CARDS AND SIM BANKS

49. Since at least 2017, Ticketmaster has implemented security measures and access control systems to maintain the integrity of posted online ticket purchasing order rules. These security measures and access control systems have included account verifications. On its website, Ticketmaster explains that account verifications are "an extra layer of protection against bots and other abuse." To verify fan accounts before allowing ticket purchases, Ticketmaster has sometimes required fans to enter codes sent via text message to the phone numbers associated with their Ticketmaster accounts.

50. At times relevant to this Complaint, Defendants have used hundreds of SIM cards and SIM banks or boxes, which are devices that house dozens of SIM cards at a time, to

14

circumvent Ticketmaster's account verification processes. Defendants have used SIM banks or boxes to facilitate the receipt and automate retrieval of account verification codes sent by Ticketmaster to many of the phone numbers associated with Defendants' many ticket-purchasing accounts, frustrating the purpose of Ticketmaster's account verifications.

**THE FTC HAS REASON TO BELIEVE THAT DEFENDANTS ARE VIOLATING AND WILL CONTINUE TO VIOLATE THE BETTER ONLINE TICKET SALES ACT AND THE FTC ACT**

51. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission, because, among other things:

(a) Defendants have been aware of the Better Online Ticket Sales Act since its enactment in December 2016, less than two months after the formation of Key Investment Group, and have since monitored its enforcement, but they have continued to violate the Act;

(b) Defendants reviewed enforcement actions regarding the Better Online Ticket Sales Act in January 2021, providing them with notice of real-world application of the Act, but they did not change their business practices;

(c) in March 2021, one of Key Investment Group's credit card issuers notified the company that it would deactivate its accounts upon reasonable suspicion or detection of Better Online Ticket Sales Act violations, but Defendants did not change their business practices;

(d) in March 2022, Defendants sought legal advice after one of Key Investment Group's banks commissioned an examination of the company's books and records that ultimately questioned whether the company's use of thousands of Ticketmaster accounts based on sham identities violated Ticketmaster's published ticket purchase policies, but Defendants did not change their business practices;

(e) in February 2018, Defendant Taylor Kurth entered a consent decree with the State of

15

Washington regarding his use of software to circumvent, thwart, or interfere with or evade a security measure, access control system, or other control or measure on Ticketmaster's websites in violation of Washington's Ticket Sellers Act, RCW 19.345.020, and yet Kurth and his co-Defendants, who know of the consent agreement, have continued to use business practices designed to circumvent Ticketmaster's posted ticket purchase policies in the operation of the Corporate Defendants; and

(f) despite knowing of the Better Online Ticket Sales Act and its enforcement, Defendants continue to operate their ticket brokering business as they have since late 2016, using sham Ticketmaster accounts and other means to obtain tickets by circumventing security measures, access control systems, or other technological controls or measures on Ticketmaster's websites and then selling or offering to sell those tickets in interstate commerce.

## COUNT I – VIOLATIONS OF THE BETTER ONLINE TICKET SALES ACT AND THE FTC ACT

52.     As alleged in paragraphs 1 through 51, in numerous instances, Defendants have obtained event tickets by circumventing a security measure, access control system, or other technological control or measure that Ticketmaster has used on its websites to enforce posted event ticket limits or to maintain the integrity of posted online ticket purchasing order rules. Defendants have subsequently sold or offered to sell in interstate commerce the tickets they have obtained in this manner.

53.     Therefore, Defendants' acts or practices as set forth in paragraphs 1 through 51 violate the Better Online Ticket Sales Act and the FTC Act.

## CONSUMER INJURY

54.     Consumers are suffering, have suffered, and will continue to suffer substantial

injury as a result of Defendants' violations of the Better Online Ticket Sales Act and the FTC Act. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## CIVIL PENALTIES

55. Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), authorizes this Court to award civil penalties for each violation of the Better Online Ticket Sales Act, 15 U.S.C. § 45c.

56. Defendants violated the Better Online Ticket Sales Act, 15 U.S.C. § 45c, with actual knowledge or knowledge fairly implied on the basis of objective circumstances, as required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

## PRAYER FOR RELIEF

Wherefore, the FTC, requests that this Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act and the Better Online Ticket Sales Act in accordance with Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and Section 2(b) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(b);

B. Impose civil penalties for each violation of the Better Online Ticket Sales Act in accordance with Section 2(b) of that Act, 15 U.S.C. § 45c(b), and Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A); and

C. Award any additional relief as the Court determines to be just and proper.

Dated: August 18, 2025

Respectfully submitted,

/s/ Molly Rucki

Simon Barth (MA Bar No. 706122) *(Special Appearance Request pending)*
P. Connell McNulty (PA Bar No. 87966) *(Special Appearance Request pending)*
Molly Rucki (D. Md. Bar No. 22369)
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
Ph: 202-326-3317 (Barth); 2061 (McNulty); 3774 (Rucki)
Email: sbarth@ftc.gov; pmcnulty@ftc.gov
mrucki@ftc.gov
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION