**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| *Plaintiff,* | |
| v. | Case No. 1:25-cv-02716-GLR |
| **KEY INVESTMENT GROUP LLC, et al.,** | |
| *Defendants.* | |

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................................... 1

LEGAL STANDARDS ................................................................................................................. 3

FACTUAL BACKGROUND ....................................................................................................... 3

   I.  The BOTS Act Was Designed and Enacted to Stop the Use of Bots ................................... 3

      a.  The Legislative History of the Bots Act Clarifies That the Law is About Bots ............ 4

      b.  The FTC Understood the BOTS Act is About Bots ........................................................ 5

      c.  President Trump Understands the BOTS Act is About Bots ........................................... 6

  II.  Key Investment Group and Ticketmaster's Industry-Standard Business Practices ................ 7

ARGUMENT ................................................................................................................................. 8

   I.  Key Investment Group Does Not Violate the BOTS Act ................................................... 8

      a.  The BOTS Act Regulates the Use of Bots ................................................................... 8

      b.  The Complaint's Allegations—Which Do Not Include Bot-Use—Do Not Constitute BOTS Act Violations ..................................................................................................... 9

          i.  Key Investment Group's Alleged Use of Multiple IP Addresses and  Multiple Accounts Do Not Constitute BOTS Act Violations ............................................. 10

         ii.  Key Investment Group's Alleged Use of SIM Cards and SIM Boxes Do Not Constitute BOTS Act Violations ................................................................... 11

  II.  KIG Does Not "Circumvent" ............................................................................................. 13

      a.  Circumvention Cannot Occur When Conduct is Understood and Permitted .............. 13

          i.  Ticketmaster Knew of and Permitted KIG's Conduct ......................................... 15

         ii.  The FTC's Allegations in a Parallel Complaint Against Ticketmaster Confirm the Underlying Complaint is Fatally Flawed ............................................................ 17

      b.  Any Purchase Policy is Irrelevant to a BOTS Act Analysis ....................................... 18

 III.  KIG Did Not Have Actual Knowledge or Knowledge Fairly Implied That its Actions Violated the Bots Act ...................................................................................................... 20

      a.  KIG's Awareness of the BOTS Act Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users ................................................................................... 21

      b.  KIG's Awareness of Three 2021 Consent Decrees Against Recidivist Bot Users Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users ........... 22

      c.  KIG's Receipt of a Notification Regarding the Three 2021 BOTS Act Consent Decrees Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users ........................................................................................................................... 23

      d.  KIG's Request for Legal Advice Regarding a Routine Bank Audit Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users ................. 24

e.    A Washington State Consent Decree Prohibiting the Use of Bots Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users ..................25

f.    The Rule of Lenity Mandates Any Ambiguity as to Civil Penalties be Construed in Favor of KIG........................................................................................................25

IV. The BOTS Act is Unconstitutionally Vague as to KIG and Other Non-Bot Users ..............26

V.  The FTC's Reimagined Reading of the BOTS Act Violates the Major Questions Doctrine 28

CONCLUSION.................................................................................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Akkus v. Rocket Mortg., LLC*,
    715 F. Supp. 3d 726 (D. Md. 2024) (Russell, III, C.J.) ........................................................19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................1, 3, 12

*Beyond Sys., Inc. v. Keynetics, Inc.*,
    422 F. Supp. 2d 523 (D. Md. 2006) ......................................................................................17

*Bittner v. United States*,
    598 U.S. 85 (2023)...............................................................................................................26

*BlueEarth Biofuels, LLC v. Hawaiian Elec. Co.*,
    2011 WL 2116989 (D. Haw. May 25, 2011)........................................................................14

*CGM, LLC v. BellSouth Telecom., Inc.*,
    664 F.3d 46 (4th Cir. 2011) ...................................................................................................9

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.*,
    381 F.3d 1178 (Fed. Cir. 2004)............................................................................................14

*Crespo v. Holder*,
    631 F.3d 130 (4th Cir. 2011) ...............................................................................................13

*EEOC v. United Air Lines, Inc.*,
    1995 WL 103658 (N.D. Ill. Mar. 3, 1995)...........................................................................22

*F.C.C. v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012).............................................................................................................27

*FTC v. Live Nation Ent. Inc.*,
    2:25-cv-08884 (C.D. Cal. Sept. 18, 2025) .............................................................................7

*Gascho v. Glob. Fitness Holdings, LLC*,
    863 F. Supp. 2d 677 (S.D. Ohio 2012) ...............................................................................22

*Goines v. Valley Cmty. Servs. Bd.*,
    822 F.3d 159 (4th Cir. 2016) ...............................................................................................18

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972).............................................................................................................27

*Hornbeck Offshore Transp., LLC v. U.S. Coast Guard*,
    424 F.Supp.2d 37 (D.D.C. 2006)...........................................................................................6

*In re Human Genome Scis. Inc. Secs. Litig.*,
    933 F. Supp. 2d 751 (D. Md. 2013)........................................................................................3

*Mayer Brown LLP v. IRS*,
    562 F.3d 1190 (D.C. Cir. 2009)............................................................................................14

*N. Carolina Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*,
    76 F.4th 291 (4th Cir. 2023) ..................................................................29

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
    767 F. Supp. 3d 243 (D. Md. 2025) .......................................................27

*RLM Commc'ns, Inc. v. Tuschen*,
    831 F.3d 190 (4th Cir. 2016) .................................................................19

*Slattery Skanska Inc. v. Am. Home Assurance Co.*,
    67 A.D.3d 1 (N.Y. App. Div. 2009) .......................................................14

*State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*,
    381 F. Supp. 3d 536 (D. Md. 2019) .........................................................3

*United States v. Cartisim Corp.*,
    No. 2:21-cv-00212 (E.D.N.Y. Jan. 14, 2021) ..............................5, 22, 23

*United States v. Concert Specials, Inc.*,
    No. 2:21-cv-00214 (E.D.N.Y. Jan. 14, 2021) ..............................5, 22, 23

*United States v. Granderson*,
    511 U.S. 39 (1994) ................................................................................26

*United States v. Just In Time Tickets, Inc.*,
    No. 2:21-cv-00215 (E.D.N.Y. Jan. 14, 2021) ..............................5, 22, 23

*United States v. Stratics Networks, Inc.*,
    721 F. Supp. 3d 1080 (S.D. Cal. 2024) ..................................................24

*United States v. Sutton*,
    126 F.4th 869 (4th Cir. 2025) ................................................................13

*W. Virginia v. Env't Prot. Agency*,
    597 U.S. 697 (2022) .........................................................................29, 30

*Washington v. Kurth*,
    No. 18-2-02894-9 (King Cnty. Feb. 2, 2018) ........................................25

*Wells v. Fuentes*,
    126 F.4th 882 (4th Cir. 2025) ...........................................................3, 15

*Whitfield v. Cont. Callers, Inc.*,
    2021 WL 5999265 (D. Md. Dec. 20, 2021)..............................................3

**STATUTES**

15 U.S.C. § 45 ........................................................................................2, 21, 25

15 U.S.C. § 45c ............................................................................... *passim*

17 U.S.C. § 1201 ..................................................................................14

22 U.S.C. § 6217 ..................................................................................14

Pub. L. No. 114-274 ...........................................................................1, 4

## INTRODUCTION

The Federal Trade Commission ("FTC")'s Complaint, ECF 1, attempts to shoehorn the legitimate behavior of Defendants (collectively, "Key Investment Group" or "KIG") into the strict confines of the BOTS Act, 15 U.S.C. § 45c, a statute drafted to prevent users of malicious computer code—colloquially known as bots—from bypassing security measures enforced or maintained by a ticket issuer.[1]

KIG does not use bots. KIG does not circumvent any "security measure, access control system, or other technological control or measure" of Ticketmaster, the "ticket issuer" in this case. 15 U.S.C. § 45c(a)(1)(A). And Ticketmaster does not "enforce" or "maintain" security measures with respect to KIG. *Id.* To the contrary, Ticketmaster knows of, allows, and encourages KIG's use of all KIG-linked accounts.

To conclude KIG violated the BOTS Act, the Court must find ***both*** that: (1) KIG "circumvent[ed] a security measure, access control system, or other technological control or measure" put in place by Ticketmaster "to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules," ***and*** that (2) Ticketmaster actually "enforce[d]" those ticket limits or "maintain[ed] the integrity of those rules." *Id.* The Complaint adequately alleges neither, mandating dismissal at this stage.

The Complaint's allegations of circumvention do not pass the *Iqbal* smell test. The Complaint's three conclusory allegations of BOTS Act violations are grounded in the industry-standard practice of using multiple accounts to purchase tickets. But using multiple accounts does not

---

[1] The FTC's Complaint refuses to call the statute the "BOTS Act," even though the Public Law enacting the statute refers to it as such. Pub. L. No. 114-274, § 1, 130 Stat. 1401, 1401-04 (2016) ("[t]his Act may be cited as the 'Better Online Ticket Sales Act of 2016' *or the 'BOTS Act of 2016.'*") (emphasis added). The acronym, of course, indicates that the BOTS Act is about bots.

and cannot constitute circumvention, especially where, as here, Ticketmaster knew of and approved of KIG's use of the same. *See, e.g.*, Compl. ¶ 40, Figure 1; Attachment A.

The Complaint's contention that KIG had "actual knowledge or knowledge fairly implied" it violated the BOTS Act fares no better. *See* 15 U.S.C. § 45(m)(1)(A) (requiring "actual knowledge or knowledge fairly implied under objective circumstances" to assess civil penalties). The idea that KIG had constructive knowledge that the BOTS Act applied to non-bot users—in the face of contrary legislative history, public understanding, and prior FTC guidance—has no merit.

The FTC's interpretation of the BOTS Act also runs afoul of constitutional precedent. While the Act clearly implicates users of malicious bots, it is, at best, void for vagueness when it comes to other individuals and entities such as KIG, who do not use bots.[2] And, the Major Questions Doctrine prevents the FTC from arrogating power through a novel interpretation of the BOTS Act absent Congress's explicit approval to do so, which Congress has not provided.

In March 2025, President Trump—with Kid Rock by his side—issued an Executive Order charging the FTC with "rigorous[] enforce[ment]" of the BOTS Act. Executive Order No. 14254, 2025 WL 986449.[3] Minutes after the Executive Order's issuance, the FTC sent KIG a Draft Complaint, substantially similar to the Complaint the FTC filed here, threatening to file it unless KIG conceded it violated the BOTS Act (it does not). With its Complaint, the government takes the President's demand too far, expanding the BOTS Act far beyond its written and intended scope.

The FTC's Complaint cannot stand. No amendment can fix the FTC's improper attempt to apply the BOTS Act to KIG, not to mention other legitimate secondary ticket brokers, and every other

---

[2] To be sure, KIG's position is the BOTS Act unambiguously applies only to bots users.

[3] *See also Trump is joined by Kid Rock for the signing of an EO targeting unfair scalping of concert tickets*, WHITE HOUSE (Mar. 31, 2025), https://www.whitehouse.gov/videos/trump-is-joined-by-kid-rock-for-the-signing-of-an-eo-targeting-unfair-scalping-of-concert-tickets/ (Request for Judicial Notice ("RJN"), Exhibit 1).

person or company who purchases tickets from Ticketmaster using more than one account. As such, the Court should dismiss the Complaint, in full and with prejudice.

## LEGAL STANDARDS

A complaint must be dismissed if it "fail[s] to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). A complaint must "state a claim to relief that is plausible on its face . . . [a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).

"[A]n exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). "[I]n the event of a conflict between the bare allegations in the complaint and any exhibit attached, the exhibit prevails" *Wells v. Fuentes*, 126 F.4th 882, 896 (4th Cir. 2025). Additionally, "a court may properly consider documents that are explicitly incorporated into a complaint by reference" "without converting the motion to dismiss to one for summary judgment." *State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*, 381 F. Supp. 3d 536, 552 (D. Md. 2019) (quotation omitted).

"In the context of a motion to dismiss, this Court may take notice of judicial docket entries, pleadings and papers in other cases without converting a motion to dismiss into a motion for summary judgment." *Whitfield v. Cont. Callers, Inc.*, 2021 WL 5999265, at *6 (D. Md. Dec. 20, 2021) (quotation omitted). Courts in this Circuit "routinely take judicial notice of newspaper articles . . . and press releases in order to assess what the market knew at particular points in time, even where the materials were not specifically referenced in the complaint." *In re Human Genome Scis. Inc. Secs. Litig.*, 933 F. Supp. 2d 751, 758 (D. Md. 2013) (quotations omitted).

## FACTUAL BACKGROUND

**I.    The BOTS Act Was Designed and Enacted to Stop the Use of Bots**

In the late aughts and early 2010s, enterprising coders created computer scripts or computer code (software colloquially known as "bots") designed to circumvent security measures, access

control systems, and other technological controls in order to bypass the "virtual waiting room" lines of primary ticket sellers such as Ticketmaster, skip straight to the purchasing page, and purchase hundreds or thousands of tickets before the regular public had a fighting chance to purchase them. *See generally* S. Rep. 114-391, 2016 WL 711589 (Dec. 5, 2016).

When deployed, bots overwhelm websites to unfairly jump to the heads of queues, lock tickets in carts *en masse* as pending purchases, or bypass CAPTCHAs to purchase hundreds or thousands of tickets in a matter of seconds. *Id.* In 2016, Congress acted to stop the scourge of bots.

### a. The Legislative History of the Bots Act Clarifies That the Law is About Bots

The legislative history of the BOTS Act clarifies that the Act was about stopping bad actors from using ***bots*** to subvert the ticketing process. In a Senate Hearing on the BOTS Act in September 2016, Senator Moran explained,

> When you're trying to pick up tickets for the next big event, you're no longer only competing against other eager fans when tickets are released, ***you're now focused— forced to compete against an army of sophisticated ticket bots that overwhelm the ticketing website with brute force, scoop up as many tickets as possible and then resell them on a secondary market at a significant mark-up.***

S. Hrg. 114-614, 2016 WL 4773371 (Sep. 13, 2016) (emphasis added).

On November 30, 2016, a unanimous Senate passed the BOTS Act. Shortly thereafter, a Senate Report explained the BOTS Act's purpose before sending it back to the House. 2016 WL 7115899, at *4 (2016). The Report emphasized, "***this legislation [the BOTS Act] aims to prohibit the use of bots***[.]" *Id.* (emphasis added). Far from stifling the secondary ticket market, the Senate Report explained the BOTS Act "would have a positive impact on the secondary ticket sellers . . ." *Id.*

President Obama signed the BOTS Act into law on December 14, 2016. *See* Pub. L. No. 114-274. Portions of the law are codified at 15 U.S.C. § 45c.

**b.    The FTC Understood the BOTS Act is About Bots**

On April 7, 2017, the FTC put out its first statement on the BOTS Act, in the form of a blog post.[4] The post states, in pertinent part, "[i]t's no coincidence that it's called the BOTS Act ***because the law outlaws the use of computer software like bots that game the ticket system***." *Id.* (emphasis added). The blog post—issued just a few months after the BOTS Act was adopted—showcases the FTC's contemporaneously uniform position that the BOTS Act was about stopping the use of bots.[5]

In 2021, the FTC settled three actions under the BOTS Act with three recidivist bot users. *See* Compl., *U.S. v. Concert Specials, Inc.*, No. 2:21-cv-00214 (E.D.N.Y. Jan. 14, 2021); Compl., *U.S. v. Just In Time Tickets, Inc.*, No. 2:21-cv-00215 (E.D.N.Y. Jan. 14, 2021); Compl., *U.S. v. Cartisim Corp.*, No. 2:21-cv-00212 (E.D.N.Y. Jan. 14, 2021). In each of the three Complaints, the FTC emphasized each defendant bot user was implicated by the BOTS Act because they allegedly used bots to illegally buy up tens of thousands of tickets for popular events before the public could access them, then marked up those tickets to make millions of dollars. *See, e.g., Cartisim*, Compl., ¶ 23 ("By using [] bots, Defendants were able to purchase multiple tickets across multiple Ticketmaster accounts within seconds—something that a consumer abiding by Ticketmaster's security, access control, and other technological measures would be unable to do."). *See also Just in Time*, Compl., ¶ 24; *Concert Specials*, Compl., ¶ 24 (making substantially similar allegations).

In a concurrence approving of the BOTS Act settlements, Acting FTC Chairwoman Rebecca K. Slaughter—a primary drafter of the Act—emphasized again that the BOTS Act is about bots, explaining, "[t]he Act's bipartisan sponsors sought to crack down on the abuses that unscrupulous

---

[4] *See* Lesley Fair, *BOTS Act: That's the Ticket!*, FED. TRADE COMM. (April 7, 2017), https://www.ftc.gov/business-guidance/blog/2017/04/bots-act-thats-ticket (RJN, Exhibit 2).

[5] A blog post is, of course, not precedential. A blog post cannot be used to prove actual knowledge or knowledge fairly implied. But, Ms. Fair's blog post, issued just a few months after the BOTS Act was enacted, showcases the contemporaneously uniform position that the BOTS Act is about bots.

actors inflict on consumers **whose typing fingers were no match for algorithms** in attempting to secure tickets online." 2021 WL 268279, at *1 (emphasis added).[6]

By contrast, the current FTC refuses even to call the BOTS Act by its common name. Instead, the FTC now misleadingly refers to it throughout its Complaint only as "the Better Online Ticket Sales Act," an intentional misdirection from its clear intent.

### c.   President Trump Understands the BOTS Act is About Bots

In March 2025, President Trump issued an Executive Order directing "the FTC [to] rigorously enforce the Better Online Tickets Sales Act, 15 U.S.C. 45c[.]"2025 WL 986449, at *14699, and an accompanying fact sheet. The fact sheet explained: "***the BOTS Act [is] meant to stop scalpers from using bots to purchase tickets***[.]" *Fact Sheet: President Donald J. Trump Will End Price – Gouging by Middlemen in the Entertainment Industry*, WHITE HOUSE (Mar. 31, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-will-end-price-gouging-by-middlemen-in-the-entertainment-industry/ (RJN, Exhibit 3) (emphasis added). The fact sheet, issued earlier this year, underscores that the President's current understanding of the BOTS Act is consistent with Congress's in passing the BOTS Act and the contemporaneous FTC's in providing guidance on same. Namely, the BOTS Act is meant to stop the use of bots.[7]

Minutes after President Trump issued his Executive Order on the BOTS Act, the FTC sent Key Investment Group a draft of the underlying Complaint.

---

[6] *Accord Hornbeck Offshore Transp., LLC v. U.S. Coast Guard*, 424 F.Supp.2d 37, 49-50 (D.D.C. 2006) ("inconsistency" between an agency's "earlier and later' pronouncements" "prevent[s] [the agency's] reasoning from being persuasive").

[7] *See also Trump is joined by Kid Rock for the signing of an EO targeting unfair scalping of concert tickets*, White House (Mar. 31, 2025), https://www.whitehouse.gov/videos/trump-is-joined-by-kid-rock-for-the-signing-of-an-eo-targeting-unfair-scalping-of-concert-tickets/ (RJN, Exhibit 1).

## II.     Key Investment Group and Ticketmaster's Industry-Standard Business Practices

Ticketmaster is an online ticketing platform that allows users to find and buy tickets for "concerts, plays, and sporting events." Compl., ¶ 2. Ticketmaster collects fees on both direct ticket sales and from sales on its resale platform, TradeDesk, where individuals and companies can relist tickets. *See id.*; ¶ 40, Figure 1; ¶ 41, Attachment A.

The Complaint never alleges KIG uses bots. That is because KIG does not use bots. To the contrary, KIG engages in industry-standard business practices, in which humans log onto Ticketmaster and wait in "virtual waiting rooms" along with other consumers. The Complaint never alleges otherwise.

While KIG employees may use multiple accounts, each individual account controlled by KIG does not and has never knowingly exceeded Ticketmaster's ticket limits. The Complaint does not allege otherwise. To the contrary, KIG's use of multiple accounts underlies the Complaint's three supposed BOTS Act violations. But, as the Complaint itself concedes, this conduct does not violate the BOTS Act. Instead, ***Ticketmaster knowingly allows KIG to use multiple accounts and had actual knowledge that each such account was tied to KIG****. See* Compl., ¶ 40, Figure 1; Attachment A.

On September 18, 2025, the FTC and a number of State Attorneys General filed a Complaint against Ticketmaster and its parent Live Nation. *FTC v. Live Nation Ent. Inc.*, 2:25-cv-08884 (C.D. Cal. Sept. 18, 2025) (the "Ticketmaster Complaint"). The FTC's allegations in the Ticketmaster Complaint directly contradict the FTC's allegations in the underlying Complaint here. To cite just one example, the Ticketmaster Complaint alleges that Ticketmaster, "***knowingly allow[ed], and in fact even encourage[d], brokers to use multiple Ticketmaster accounts to circumvent Ticketmaster's own security measures and access control systems***." Ticketmaster Compl., ¶ 15

(emphasis added).[8] In direct contrast, the gravamen of the Complaint in ***this*** action is Key Investment Group violated the BOTS Act "[b]y circumventing Ticketmaster's security measures, access control systems, or other technological controls or measures to buy tickets." Compl., ¶ 2.

The FTC cannot have it both ways. Either Ticketmaster allowed KIG's actions—as alleged in the Ticketmaster Complaint, and as shown in the external materials included in ***this*** Complaint, *see infra,* Section II(a)(i)—or Ticketmaster did not, as the FTC alleges here.

The contradictory allegations of the twin FTC Complaints underscore the absurdity of the FTC's allegations in this case. KIG cannot possibly "circumvent" when Ticketmaster (1) has actual knowledge of KIG's use of multiple accounts, (2) can and does tie all of those accounts to KIG, and (3) has made the affirmative choice to allow KIG to use multiple accounts. Without circumvention, there can be no BOTS Act violation. That should be the beginning and the end of the matter. For any or all of these and the other reasons detailed below, the FTC's Complaint fails as a matter of law.

**ARGUMENT**

## I.    Key Investment Group Does Not Violate the BOTS Act

### a.    The BOTS Act Regulates the Use of Bots

The BOTS Act prohibits

> **circumvent[ing] a *security measure, access control system, or other technological control or measure*** on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules.

15 U.S.C. § 45c(a)(1) (emphasis added). The BOTS Act does not define any of the italicized terms, all of which are key to understanding the statute's reach. Without clear definitions, whether the BOTS

---

[8] *See also FTC Sues Live Nation and Ticketmaster for Engaging in Illegal Ticket Resale Tactics and Deceiving Artists and Consumers about Price and Ticket Limits*, FED. TRADE COMM. (Sep. 18, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/09/ftc-sues-live-nation-ticketmaster-engaging-illegal-ticket-resale-tactics-deceiving-artists-consumers (RJN, Exhibit 4) (Ticketmaster "turn[s] a blind eye as a matter of policy [to brokers,] offer[ing] technological support . . . through a software platform . . . which enables brokers to track and aggregate tickets purchased from multiple Ticketmaster accounts.").

Act applies to non-bot users is ambiguous at best. As such, courts are directed to look to legislative history for guidance. *See*, *e.g.*, *CGM, LLC v. BellSouth Telecom., Inc.*, 664 F.3d 46, 53 (4th Cir. 2011) ("In the face of ambiguities, we [] look to legislative intent.").

The BOTS Act's legislative history underscores that the Act is meant to prevent **bots** from "circumvent[ing] . . . security measure[s], access control system[s], or other technological control[s] or measure[s]." *See supra*, pp. 3-4. The legislative history also clarifies that the Act was aimed at the destruction of the majority of the secondary-ticket market that does not use bots. *Id*. Indeed, the intent of Congress in enacting the BOTS Act mirrors the then-contemporaneous understanding of the Act by the FTC. *Id.*, *supra,* pp. 5-6. To wit, at the time the BOTS Act was adopted, even FTC guidance explained that the Act was about bots. *Id.* The BOTS Act's legislative history is clear and consistent. In 2016, Congress repeatedly and unambiguously stated that the BOTS Act **is about bots**. The FTC cannot now turn a blind eye to Congress's intent.

### b. The Complaint's Allegations—Which Do Not Include Bot-Use—Do Not Constitute BOTS Act Violations

The FTC never alleges KIG uses bots to "circumvent a security measure, access control system, or other technological control or measure." 15 U.S.C. § 45c(a)(1). It cannot do so, because KIG does not and has never used bots.

In the absence of a BOTS Act violation as contemplated by Congress, the Complaint alleges KIG violated the BOTS Act by: (1) "Conceal[ing] IP addresses," Compl., ¶¶ 34-37; (2) "Creat[ing] sham Ticketmaster accounts and us[ing] thousands of credit card numbers," *id.*, ¶¶ 38-48; and (3) "[using] hundreds of SIM Cards and SIM Banks," *id.*, ¶¶ 49-50. Each of these allegations is based in the mistaken contemplation that it is a *per se* BOTS Act violation for a company to use more than one account to purchase tickets. As shown below, this position is absurd. It fails as a matter of law.

In any event, even if true, none of these allegations would allow KIG to "circumvent a security measure, access control system, or other technological control or measure," as the BOTS Act requires to establish liability. 15 U.S.C. § 45c(a)(1). *See infra*, Section II.

### i. Key Investment Group's Alleged Use of Multiple IP Addresses and  Multiple Accounts Do Not Constitute BOTS Act Violations

The Complaint alleges Ticketmaster "has maintained security measures, access control systems, or other technological controls or measures on its websites designed to prevent or block ticket purchasers from making multiple purchases for the same event from the same IP address" to "enforce posted event ticket purchase limits . . . ." Compl., ¶ 34. It goes on to allege KIG used "thousands of Ticketmaster accounts to purchase tickets . . . ." *Id.*, ¶ 40. These positions presume a BOTS Act violation accrues whenever an individual or entity purchases tickets from more than one account, whether or not that account abided by Ticketmaster's per-account ticket limits. This is false.

Every computer has a unique IP address. *See id.*, ¶ 34 ("An IP address is a unique string of numbers separated by periods that Ticketmaster uses to identify a computer or affiliated computers making purchases."). The Complaint alleges here that through the use of multiple IP addresses from a single computer, KIG violated the BOTS Act. But the practical implication of using multiple IP addresses is only that KIG uses multiple accounts. It makes no practical difference whether those accounts stemmed from one or multiple computers. They are separate accounts.

Whether or not KIG used "fictitious Ticketmaster accounts . . .  virtual and traditional credit card numbers [for those accounts], proxy or spoofed IP addresses [to use multiple accounts from a single computer, or] SIM banks," *id.*, ¶ 2, the Complaint confirms Ticketmaster knew since at least 2018 that each such account was connected to KIG, and allowed KIG to continue to use the KIG-linked accounts. *Id.*, ¶ 40, Figure 1. The FTC's contention that KIG "hid[] their true IP addresses from Ticketmaster," *id.*, ¶ 36, is contradicted by the Ticketmaster chart incorporated in its Complaint.

To be clear, the FTC's position as articulated in the Complaint is that a company (***any*** company) or an individual (***any*** individual) who purchases tickets to a single Ticketmaster event from more than one computer, or from more than one account, violates the BOTS Act. Some hypotheticals:

- An executive at a multinational company purchases tickets to a concert from two company accounts on two computers for the company's executive team. Per the FTC, the company has violated the BOTS Act.

- A teenager buys tickets to a Taylor Swift concert from her cell phone and her laptop using two separate accounts. The FTC's position is the teenager has violated the BOTS Act.

In response, the FTC may attempt to pivot from or simply ignore these concrete examples. But these absurd results are the natural conclusion of the FTC's new BOTS Act interpretation.[9] Neither the hypothetical executive or teenager nor KIG can "purchase tickets more rapidly" than consumers who use a single account. *Id.*, ¶ 29. Whether these entities use one or multiple accounts, they do not "circumvent" anything.

Whether or not KIG took "steps to conceal [its] IP addresses when making ticket purchases," Compl., ¶ 35, the effect of those "steps" would only be that KIG employees purchased tickets using more than one account. But using more than one account is not a BOTS Act violation. Using more than one account does not "circumvent" a "security measure, access control system, or other technological control or measure." 15 U.S.C. § 45c. And, Ticketmaster is well aware that all of KIG's supposedly "fictional" accounts are linked to KIG, and can and does tie each such account directly to KIG. *See infra,* Section II(a)(i).

### ii. Key Investment Group's Alleged Use of SIM Cards and SIM Boxes Do Not Constitute BOTS Act Violations

In addition to the industry-standard practice of using multiple accounts, the Complaint alleges KIG engages in the industry-standard practice of "us[ing] hundreds of SIM cards and SIM banks or

---

[9] It bears repeating that this is ***not*** how the FTC understood the BOTS Act in 2017. *Supra*, pp. 5-6.

boxes, which are devices that house dozens of SIM cards at a time . . . to facilitate the receipt and automate retrieval of account verification codes sent by Ticketmaster to many of the phone numbers associated with Defendants' many ticket-purchasing accounts." Compl., ¶ 50. Tellingly, the Complaint does **not** allege that this use allowed KIG to circumvent any security measure. *See id*., ¶¶ 49-50. That is because SIM cards and SIM boxes are hardware (not software). Hardware alone cannot connect to Ticketmaster, and has no ability to circumvent.

A SIM card is a physical, removeable smartcard that stores and receives information. Every modern cellular phone contains a unique SIM card. Those SIM cards are what phones use to accept text messages. *Id.*, ¶ 49 (explaining that "Ticketmaster has sometimes required fans to enter codes sent via text message to the phone numbers associated with their Ticketmaster account."). The Complaint alleges that KIG uses SIM cards and SIM boxes—"devices that house dozens of SIM cards at a time"—to receive text messages from Ticketmaster. *Id.*, ¶ 50.

At base, the FTC's allegations about SIM devices are a reframing of the same core argument—namely, that KIG used multiple accounts. *Id.*, ¶ 49 Using multiple SIM cards or a SIM box is functionally the same as using multiple devices, with each SIM card allowing a user to access a different Ticketmaster account. *Id.*, ¶ 50. And, as discussed in more detail *infra*, Section II(a)(i), Ticketmaster actively permits KIG to run multiple accounts. As such, there can be no BOTS Act violation. *Id.*, ¶ 40, Figure 1; Attachment A.

In any event, the Complaint's sparse, two paragraph allegations concerning SIM cards and SIM boxes provide nothing but legal conclusions couched as facts. *Id.*, ¶¶ 49-50. These meager allegations do not adequately allege how, or why, Ticketmaster's use of SIM cards constitutes a BOTS Act violation. Without more, the allegations fail as a matter of law. *Iqbal*, 556 U.S. at 678.

## II.    KIG Does Not "Circumvent"

### a.    Circumvention Cannot Occur When Conduct is Understood and Permitted

Even if the BOTS Act could apply to non-bots users (it cannot), there can be no liability as a matter of law unless the defendant (a) "***circumvent*[s]** a security measure, access control system, or other technological control or measure" that (b) is "used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules." 15 U.S.C. § 45c(a)(1)(A) (emphasis added). The BOTS Act does not define the term "circumvent." Because the term is not defined, courts are instructed to (a) look to legislative history, *see supra*, Section I(a), and, if possible, (b) construe the term in accordance with "an established common-law meaning" and "its ordinary meaning at the time of the statute's enactment." *United States v. Sutton*, 126 F.4th 869, 876 (4th Cir. 2025). *See also Crespo v. Holder*, 631 F.3d 130, 133 (4th Cir. 2011) ("In interpreting the plain language of a statute, we give the terms their ordinary, contemporary, common meaning, absent an indication Congress intended [it] to bear some different import.").

Black's Law Dictionary defines "circumvent" as "[t]o ***avoid*** (a restrictive problem, rule, etc.), ***esp[ecially] by clever and sometimes dishonest means***." *Circumvent*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added). Likewise, Merriam-Webster defines "circumvent" as "to manage to get around ***especially by ingenuity or strategy***." *Circumvent*, MERRIAM-WEBSTER ONLINE DICTIONARY (emphasis added). Quite obviously, one neither "avoids," "get[s] around," "deceives," nor "tricks" when the other party is aware of and permits the action.

The same is true with respect to the common law meaning of the term "circumvent."[10] A party cannot "circumvent" a ticket issuer's "security measure, access control system, or other technological

---

[10] Black's Law Dictionary's other definitions are similarly consistent, defining "circumvent" as: (1) "[t]o ***avoid*** (an obstacle, etc.) by changing route;" (2) "[t]o gain advantage over or get the better of ***by craft, deceit, or fraud***; to ***outwit through artifice***;" and (3) "[t]o entrap or surround ***by stratagem or trickery***." *Circumvent*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added).

control or measure" if it acts with the issuer's knowledge and consent. 15 U.S.C. § 45c(a)(1)(A). By definition, one neither "avoids" nor "bypasses" nor "evades" a security measure when acting with the system operator's authorization or permission. Nor can there be any "deceit" when the ticket issuer knows precisely what is taking place. Accordingly, where the Complaint acknowledges that a ticket issuer understood and permitted the conduct at issue, there can be no circumvention.

Some corollaries: the Digital Millenium Copyright Act ("DMCA"), 17 U.S.C. § 1201, defines the nearly identical phrase "circumvent a technological measure" to mean "to avoid, bypass, remove, deactivate, or impair a technological measure, *without the authority of the copyright owner.*" 17 U.S.C. § 1201(a)(3)(A) (emphasis added). *See, e.g., Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1187, 1202 (Fed. Cir. 2004) (finding that because plaintiff, an electronic door opener manufacturer, "never restricted its customers' use of competing transmitters . . . [it] could not possibly meet its burden of proving that [defendant] trafficked in a device designed to circumvent a technological measure.").

Like the DMCA, other statutes regulating technological access similarly define "circumvent" as avoiding or bypassing "without authorization" or permission. *See, e.g.*, 22 U.S.C. § 6217(i) (international broadcasting statute defining "internet censorship circumvention tool" as "a software application . . . an individual can use to *evade* foreign government restrictions on internet access."). The use of similar language in similar statutes indicates that the term "circumvent" in the BOTS Act should be defined similarly.[11] Without circumvention, the Complaint fails as a matter of law.

---

[11] *See also Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1192 (D.C. Cir. 2009) ("Webster's [Dictionary] defines the word [circumvent] as 'to avoid by or as if by passing around'"); *BlueEarth Biofuels, LLC v. Hawaiian Elec. Co.*, 2011 WL 2116989, at *26 (D. Haw. May 25, 2011) (agreeing "that 'circumvent' means 'to evade or find a way around'"); *Slattery Skanska Inc. v. Am. Home Assurance Co.*, 67 A.D.3d 1, 15 (N.Y. App. Div. 2009) (holding that, "[i]n context, there can be no question that the plain meaning of circumvent intended by the policy is to bypass or avoid").

### i. Ticketmaster Knew of and Permitted KIG's Conduct

The Complaint affirmatively concedes that Ticketmaster understood, permitted, and even encouraged the specific practices the FTC now alleges violate the BOTS Act. This fundamental deficiency precludes any BOTS Act liability as a matter of law.

The Complaint's overarching allegation is that KIG used multiple accounts to "circumvent" Ticketmaster's "security measures, access control systems, or other technological controls or measures that were designed to prevent ticket purchasers from exceeding posted event ticket limits." Compl., ¶ 48. These conclusory allegations *are explicitly refuted* by the sole Attachment to the FTC's Complaint and the Complaint's Figure 1.

That Attachment consists of a 2024 email chain between a Ticketmaster representative and a representative of KIG. In the email, the Ticketmaster representative confirms that KIG can use multiple accounts, and that any ticket limit is "applied per account." Compl., Attachment A, p. 1. The representative explains, "[a]s long as the purchases were made using different accounts and cards, it's within [Ticketmaster's] guidelines." *Id*.

Paragraph 41 of the Complaint selectively references its own Attachment, misconstruing its meaning. Specifically, the Complaint references KIG's question, as to whether using multiple accounts, but not Ticketmaster's response—*that it does not*. *See* Attachment A. The Court should disregard the FTC's deceptive reconstruction. "In the event of a conflict between the bare allegations in the complaint and any exhibit attached, the exhibit prevails." *Wells v. Fuentes*, 126 F.4th at 896.

Contra the FTC's selective referencing, the Attachment itself clarifies that Ticketmaster both understood and permitted the exact conduct the Complaint alleges violates the BOTS Act. To be clear, KIG cannot "circumvent" when Ticketmaster explicitly approves of KIG's conduct. And the Attachment confirms that Ticketmaster did approve of KIG's conduct.

The Complaint's allegations of supposed BOTS Act violations—regarding IP addresses, SIM cards, "sham" identities, different addresses, credit cards, and phone numbers—fare no better. *See generally* Compl., ¶¶ 34-50. The gravamen of each allegation is that the alleged conduct allowed employees of KIG to use multiple accounts. But, once again, information the FTC took from Ticketmaster and incorporated into its own Complaint belies these allegations.

The Complaint includes a "2018 PowerPoint prepared by Ticketmaster." *Id.*, ¶ 40, Figure 1. Figure 1 confirms Ticketmaster knew ***precisely*** how many Ticketmaster accounts KIG had, how many tickets it purchased, and how much Ticketmaster stood to lose if it allowed KIG, and other legitimate ticket brokers to use only a single account and "move to 8 ticket limit across the board."



Figure 1: Slide from 2018 PowerPoint prepared by Ticketmaster.

***Figure 1 conclusively demonstrates that Ticketmaster tracked KIG's ticket purchasing across all of its accounts—even those accounts using "fictitious" names, virtual credit cards, or accessed via rotating IP addresses—and actively permitted their use.***

KIG cannot "circumvent" when Ticketmaster approves. And the Complaint's Attachment A—an email exchange from 2024—demonstrates Ticketmaster never changed its behavior in this regard. The FTC's own pleading compels the Complaint's dismissal.

To state a claim under the BOTS Act, any "circumvent[ed]" technology must be "**used** by the ticket issuer to **enforce** posted event ticket purchasing limits or to **maintain** the integrity of posted online ticket purchasing order rules." 15 U.S.C. § 45c(a)(1)(A) (emphasis added). But the Complaint is devoid of any allegations that Ticketmaster "**used**" any such technology to "**enforce**" or "**maintain**" its policies against KIG. To the contrary, the sole external information from Ticketmaster included with the Complaint acknowledges both Ticketmaster's years-long awareness of KIG's business practices and Ticketmaster's deliberate choice to refrain from acting against brokers like KIG in the face of this awareness. *See*, *e.g.*, Compl., ¶¶ 24, 26-27, 40, Figure 1, 41, Attachment A. "[B]y attaching exhibits inconsistent with its claims," the FTC has "ple[]d itself out of court." *Beyond Sys., Inc. v. Keynetics, Inc.*, 422 F. Supp. 2d. 523, 530 (D. Md. 2006).

### ii. The FTC's Allegations in a Parallel Complaint Against Ticketmaster Confirm the Underlying Complaint is Fatally Flawed

The FTC filed the underlying Complaint on August 18, 2025. Exactly one month later, the FTC (and several State Attorneys General) filed another Complaint against Ticketmaster and its parent Live Nation. *FTC v. Live Nation Ent. Inc.*, 2:25-cv-08884 (C.D. Cal. Sept. 18, 2025).

In the Ticketmaster Complaint, the FTC alleges Ticketmaster has "repeatedly declined to implement methods to prevent brokers from amassing large numbers of tickets and listing them for sale by Ticketmaster." Ticketmaster Complaint, ¶ 102. Indeed, to the contrary, the FTC alleges that Ticketmaster "knowingly allow[s], and in fact even *encourage[s]*, brokers to use multiple Ticketmaster accounts to circumvent Ticketmaster's own security measures and access control systems." *Id.*, ¶ 15 (emphasis in original), and that "[a] senior Ticketmaster executive admitted in an internal email that copied Live Nation leadership, [Ticketmaster and Live Nation] '**turn a blind eye as a matter of policy.**'" *Id.*, ¶ 15 (emphasis added). The FTC in the Ticketmaster Complaint

emphasizes this fact, stating, in no uncertain terms: "**Defendants Allow Brokers to Circumvent Posted Ticket Limits and Purchasing Rules**" *Id.*, p. 32 (emphasis in original).

In these two Complaints—filed just one month apart—the FTC speaks from both sides of its mouth. KIG definitionally cannot circumvent if Ticketmaster "**Allow[s] Brokers**" to do exactly what the Complaint alleges KIG did. (Emphasis in original). The documents taken from Ticketmaster in this action confirm this fact. Compl., ¶ 40, Figure 1; Attachment A.

For BOTS Act liability to attach, KIG must "circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service *that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules.*" 15 U.S.C. § 45c(a)(1)(A) (emphasis added). KIG definitionally cannot violate the BOTS Act if Ticketmaster "allow[s], and in fact even *encourage[s]*" KIG's alleged use of multiple accounts. Ticketmaster Compl., ¶ 15.

**b. Any Purchase Policy is Irrelevant to a BOTS Act Analysis**

The Complaint devotes much paper describing Ticketmaster's Purchase Policy. *See, e.g.*, Compl., ¶¶ 25-27; 41. Ticketmaster's Purchase Policy, which is incorporated into the Complaint by reference,[12] allows Ticketmaster to

> update this Purchase Policy . . . from time to time . . . To the extent that this Purchase Policy has been updated from a prior version of the Purchase Policy to which you previously agreed, the most recent version of the Purchase Policy to which you agreed supersedes and governs.[13]

The Complaint's proposition, that a defendant can violate the BOTS Act based on a Purchase Policy that can be changed by the ticket issuer, without warning, at any given time, is absurd.

---

[12] *See, e.g.*, *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (on a motion to dismiss, a court may "consider documents that are explicitly incorporated into the complaint by reference").

[13] *Standard Purchase Policy*, TICKETMASTER. (August 12, 2025), https://legal.ticketmaster.com/purchase-policy/ ("Ticketmaster's Purchase Policy").

"[C]ourts should avoid interpretations that 'would produce absurd results' contrary to congressional intent." *Akkus v. Rocket Mortg., LLC*, 715 F. Supp. 3d 726, 731 (D. Md. 2024) (Russell, III, C.J.).[14]

In any event, the BOTS Act cannot be implicated by any purported violation of a written purchase policy.[15] A purchase policy is not a "security measure, access control system, or other technological control or measure" that a party can "circumvent." 15 U.S.C. § 45c(a)(1)(A). Words in a policy do not implicate the BOTS Act. Instead, the BOTS Act is triggered (if at all) ***not by what Ticketmaster says, but by what it does***. Here, Ticketmaster made the active choice to allow KIG employees to purchase tickets using multiple accounts. *See supra,* Section II(a)*.* As such, there can be no BOTS Act violation, no matter what any policy purports to say.

The second half of the statutory provision at issue clarifies this point. To violate the BOTS Act, an entity must "circumvent a security measure, access control system, or other technological control or measure . . . ***that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules***." 15 U.S.C. § 45c(a)(1)(A) (emphasis added). A purchase policy is not a shield. It has no power to "enforce" or "maintain the integrity" of anything.

Even assuming *arguendo* Ticketmaster's Purchase Policy had some bearing on a BOTS Act violation (it does not), the Complaint misrepresents the effect of the Purchase Policy on ticket limits. The FTC seems to believe Ticketmaster's Purchase Policy works on an institutional level, deriving a "total purchase number" by aggregating the number of tickets purchased by each KIG employee. *See, e.g.*, Compl., ¶¶ 30-33. But, Ticketmaster's Purchase Policy sets a maximum number of tickets that

---

[14] *See also RLM Commc'ns, Inc. v. Tuschen*, 831 F.3d 190, 200 (4th Cir. 2016) (declining to interpret statute in a manner where "an absurd result would follow").

[15] To be clear, KIG vigorously contests that it breached any portion of Ticketmaster's Purchase Policy.

can be purchased by a single account. The Complaint does not allege that the Purchase Policy prohibits an entity from using multiple accounts to purchase tickets not exceeding the maximum number for each account. The Complaint also does not allege that KIG employees purchased more than the maximum number of tickets allowed from each KIG-controlled account. In fact, the Complaint's only attachment affirmatively shows that KIG complies with the Purchase Policy. *See* Attachment A.

This is perhaps most neatly demonstrated by the Complaint's most prominent example. The Complaint's populist centerpiece is the allegation that KIG "used 49 different accounts to purchase 273 tickets to Taylor Swift's March 25, 2023, concert, at Allegiant Stadium, dramatically exceeding The Eras Tour's 2023 six-ticket limit." Compl., ¶ 32. However, dividing the number of purchased tickets by the number of accounts used by KIG employees shows a purchase average of 5.6 tickets per account—well within The Eras Tour's six-ticket limit. *Id.* So long as KIG's use of multiple accounts was approved by Ticketmaster—and the Complaint confirms both that it was and that Ticketmaster was aware that each account was linked directly to KIG—these purchases cannot possibly implicate the BOTS Act. The Complaint does not even implicate Ticketmaster's Purchase Policy—which, in any event, has no bearing on a BOTS Act violation.

## III.    KIG Did Not Have Actual Knowledge or Knowledge Fairly Implied That its Actions Violated the Bots Act

As discussed *supra*, the FTC has not plausibly asserted a BOTS Act violation. But, even assuming *arguendo* KIG did violate the BOTS Act (to be sure, it did not), civil penalties cannot be assessed as a matter of law. The FTC Act only allows for civil penalties if an entity violated the BOTS Act "with actual knowledge or knowledge fairly implied ***on the basis of objective circumstances*** . . . ." 15 U.S.C. § 45(m)(1)(A) (emphasis added). At the time the BOTS Act was enacted, people of ordinary intelligence—*i.e.*, the BOTS Act's drafters, its supporters in and outside of Congress, the

FTC, the populace at large—believed the BOTS Act was meant to stop the behavior of people who use bots to "circumvent a security measure, access control system, or other technological control or measure[.]" 15 U.S.C. § 45c(a)(1)(A). Because KIG does not use bots, it would have been literally impossible for KIG to have had knowledge "on the basis of objective circumstances" that it violated the BOTS Act.

The FTC has not provided KIG a reasonable opportunity to understand the FTC's recent about-face. Instead, the FTC has thrust its new interpretation of the BOTS Act on KIG with no prior warning. Under these circumstances, KIG could not possibly have had knowledge "on the basis of objective circumstances" that it violated the BOTS Act. 15 U.S.C. § 45(m)(1)(A). The Complaint's five sparse allegations to the contrary—truncated in Paragraph 51—only underscore this point.

### a. KIG's Awareness of the BOTS Act Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users

The Complaint's first contention is that "Defendants have been aware of the Better Online Ticket Sales Act since its enactment in December 2016, less than two months after the formation of Key Investment Group, and have since monitored its enforcement." Compl., ¶ 51(a). Exactly.

As discussed *supra*, pp. 3-6, when the BOTS Act was adopted in 2016, ***everyone***—Congress, the FTC, the public at large—understood the BOTS Act to be about regulating the behavior of bots.[16] Nobody at the time understood that the BOTS Act was meant to regulate non-bot behavior.

As a legitimate secondary-ticket broker, KIG closely followed (1) the legislative history surrounding passage of the BOTS Act, (2) contemporary news regarding the BOTS Act's reach, and (3) contemporaneous FTC guidance and Press Releases regarding the BOTS Act's reach. All of these

---

[16] *See, e.g.*, Ben Sisario, *Congress Moves to Stop Ticket Scalping, Banning Bots Used Online*, N.Y. TIMES (Dec. 8, 2016), https://www.nytimes.com/2016/12/08/business/media/ticket-scalping-bots-act.html; Dan Rys, *President Obama Signs Anti-Scalping Bill Into Law*, BILLBOARD (Dec. 15, 2016), https://www.billboard.com/music/music-news/president-obama-signs-bots-act-law-7625257/; *Obama Signs Bots Act Into Law*, IQ LIVE MUSIC INTELLIGENCE (Dec. 16, 2016), https://www.iqmagazine.com/2016/12/obama-signs-bots-act-law/ (All at RJN, Exhibit 5).

sources confirmed that the BOTS Act applied only to bots. KIG modeled its business accordingly, ensuring it did not use bots.

The FTC's recent *post-hoc* attempt to expand the BOTS Act's scope did not provide KIG with a retroactive understanding that KIG's legitimate business practices—designed intentionally not to use bots—violated the BOTS Act.

> **b.    KIG's Awareness of Three 2021 Consent Decrees Against Recidivist Bot Users Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users**

The Complaint next alleges KIG knew the BOTS Act applied to it because the FTC settled and issued consent decrees with respect to three recidivist bots users in 2021. Compl., ¶ 51(b).[17] *See Concert Specials*, No. 2:21-cv-00214; *Just In Time*, No. 2:21-cv-00215; *Cartisim*, No. 2:21-cv-00212. *See also supra*, pp. 5-6.

As an initial matter, consent decrees are not precedential, and thus cannot provide the knowledge required for civil penalties. *See*, *e.g.*, *Gascho v. Glob. Fitness Holdings, LLC*, 863 F. Supp. 2d 677, 694 (S.D. Ohio 2012) ("consent judgments are of little, if any, precedential value . . . although a consent judgment may contain analysis, courts do not view this analysis as precedential because the judgment does not reflect an adjudication by the court as to the underlying issues.") (cleaned up). *See also EEOC v. United Air Lines, Inc.*, 1995 WL 103658, at *4 (N.D. Ill. Mar. 3, 1995) ("courts fully understand that [consent] decrees do not purport to be definitive statements of the parties' legal rights and will accord them little or no weight in the determination of the rights of persons not party to them.") (citation omitted). As such, KIG could *ipso facto* not have acquired actual knowledge or knowledge fairly implied from the non-litigated settlements.

---

[17] The Complaint refers to the consent decree as "enforcement actions," likely to obscure the fact that the settlements were not litigated, and have no precedential value.

In any event, the central allegation of each consent decree was that the defendants used bots to scoop up thousands of tickets. *See, e.g., Cartisim*, ECF 1, ¶ 23 ("By using the Tixdrop and Tixman ticket bots, Defendants were able to purchase multiple tickets across multiple Ticketmaster accounts within seconds . . . ."); *Just In Time*, ECF 1, ¶ 24 ("By using the Tixman and Automatick ticket bots, Defendants were able to purchase multiple tickets across multiple Ticketmaster accounts within seconds . . . ."); *Concert Specials*, ECF 1, ¶ 24 ("By using the Tixdrop and Automatick ticket bots, Defendants were able to purchase multiple tickets across multiple Ticketmaster accounts within seconds . . . .").[18]

KIG's takeaway from these consent decrees was the same as what the consent decrees themselves emphasized. Namely, to violate the BOTS Act, an entity must use bots.[19]

### c.   KIG's Receipt of a Notification Regarding the Three 2021 BOTS Act Consent Decrees Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users

The Complaint next alleges KIG knew the BOTS Act applied to it because "in March 2021, [Emburse,] one of Key Investment Group's credit card issuers notified the company that it would deactivate its accounts upon reasonable suspicion or detection of Better Online Ticket Sales Act violations." Compl., ¶ 51(c). This allegation is curious.

Far from asserting that it believed KIG violated the BOTS Act, Emburse provided a form notice to KIG (and likely to every other ticket broker it worked with) "that the DOJ and FTC announced three settlements . . . resolving alleged violations of the Better Online Ticket Sales (BOTS) Act."[20]

---

[18] *See also* Concurring Statement of Acting-FTC Chair Rebecca Slaughter, *supra*, pp. 5-6.

[19] While the consent decrees did contain additional allegations not directly related to bots, the centrality of bots use in the consent decrees indicated that, without the use of bots, there could be no BOTS Act violation.

[20] The relevant email, incorporated into the FTC's Complaint by reference, makes this clear. *See* RJN, Exhibit 6.

A form notice informing KIG of the three consent decrees the FTC settled with three recidivist bots users does nothing to indicate that Emburse believed **KIG's** behavior violated the BOTS Act. Indeed, **the FTC does not allege that Emburse actually did deactivate KIG's accounts in 2021** (it did not). Any implication to the contrary is nothing more than another attempt at obfuscation.

### d. KIG's Request for Legal Advice Regarding a Routine Bank Audit Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users

The Complaint next alleges KIG "sought legal advice after one of [its] banks commissioned an examination of the company's books and records that ultimately questioned whether the company's use of thousands of Ticketmaster accounts based on sham identities violated Ticketmaster's published ticket purchase policies." Compl., ¶ 51(d). This allegation is disingenuous.

"[R]etention of counsel does not show a party knew its conduct was prohibited[.]" *United States v. Stratics Networks, Inc.*, 721 F. Supp. 3d 1080, 1101 (S.D. Cal. 2024) (citation omitted). If anything, retention of counsel shows that KIG took the matter of the audit seriously, and wished to ensure full compliance.

In any event, as shown *supra*, Section II(a)(ii), any purported "violat[ion of] Ticketmaster's published ticket purchase policies," Compl., ¶ 51(d), does not show knowledge of a BOTS Act violation.

And, a bank "questioning" whether KIG's behavior "violated Ticketmaster's published Ticketmaster purchase policies," *id.*, is not the same thing as the bank alleging that KIG violated the same. In fact, **the FTC does not allege that the bank at issue ended business with KIG or determined that KIG engaged in any BOTS Act violation following the audit** (it did not). Any implication to the contrary is nothing more than an attempt at obfuscation.

**e.   A Washington State Consent Decree Prohibiting the Use of Bots Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users**

The FTC's final push to convince the Court KIG had requisite knowledge that it committed a BOTS Act violation without the use of bots is curious. To prove knowledge, the FTC references a prior consent decree between Taylor Kurth (a Defendant in this case) and ***Washington State, over a Washington State statute, the "Washington[] Ticket Sellers Act, RCW 19.345.020.***" Compl., ¶ 51(e) (emphasis added). The FTC claims the settlement—in which Mr. Kurth agreed not to use bots— provides knowledge that the ***federal*** BOTS Act applies to non-bot users.

This argument is bizarre. The Washington State Complaint alleged Mr. Kurth violated the Washington State statute by using bots to purchase tickets. *See Washington v. Kurth*, No. 18-2-02894-9 (King Cnty. Feb. 2, 2018). At the time, Mr. Kurth ***did*** use bots. He agreed in the state consent decree not to use bots on a go-forward basis. *Id.*

At the time, Mr. Kurth was not associated with KIG in any way. In ***this*** Complaint, the FTC does ***not*** allege that Mr. Kurth or any of the other Defendants used bots. To be sure, the Defendants do not use bots. How Mr. Kurth's prior Washington State consent decree about bots provides constructive knowledge that KIG violated the BOTS Act while not using bots is anybody's guess.

**f.   The Rule of Lenity Mandates Any Ambiguity as to Civil Penalties be Construed in Favor of KIG**

As shown above, the Complaint fails to plausibly allege that KIG had "actual knowledge or knowledge fairly implied on the basis of objective circumstances" that it violated the BOTS Act without using bots. 15 U.S.C. § 45(m)(1)(A). As such, civil penalties cannot be imposed.

To be clear, this situation is not ambiguous. No amount of misconstrual and deception on the part of the FTC can change history. But, even assuming *arguendo* that the question of knowledge is a close call (it is not), the rule of lenity requires that civil penalties not be assessed.

"Under the rule of lenity, th[e Supreme] Court has long held, statutes imposing penalties are to be 'construed strictly' against the government and in favor of individuals." *Bittner v. United States*, 598 U.S. 85, 101 (2023) (citation omitted). Indeed, "where text, structure, and history fail to establish that the Government's position is unambiguously correct—we apply the rule of lenity and resolve the ambiguity in [defendant's] favor." *United States v. Granderson*, 511 U.S. 39, 54 (1994). The *Bittner* Court emphasized that "the rule of lenity applies to civil penalties." *Bittner*, 598 U.S. at 102 (citation omitted).

Here, the FTC's straw-grasping for evidence that KIG had the requisite knowledge for civil penalties signifies that it is—at best—a very close call. In close calls, the rule of lenity dictates the tie goes to the defense. Thus, even in the unlikely event that the Court finds the question of whether KIG had the requisite knowledge to be ambiguous, civil penalties cannot be assessed.

## IV.    The BOTS Act is Unconstitutionally Vague as to KIG and Other Non-Bot Users

As explained above, the BOTS Act does not implicate KIG. Thus, the Court need not reach the constitutional issue haunting the FTC's new interpretation of the BOTS Act. But there is a major constitutional flaw with the FTC's newly expansive reading. To wit, the BOTS Act is unconstitutionally vague as to KIG and other legitimate secondary-ticket brokers that do not use bots. As such, the Act violates the Fifth and Fourteenth Amendments solely as to individuals and entities, like KIG, that do not use bots.

To be clear, KIG does not contend that the BOTS Act is void for vagueness *as to bots users*. The BOTS Act clearly implicates bad actors who use bots to circumvent security measures in order to purchase hundreds or thousands of tickets in one go. But the law is, at best, ambiguous as to individuals and entities who do not use bots. Given that purported ambiguity, the Court should find the law void for vagueness as applied to non-bot users.

"There are 'at least two connected but discrete' due process concerns that underlie the void for vagueness doctrine." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 276 (D. Md. 2025) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). A "conviction or punishment fails to comply with due process if [1] the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or [2] is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Fox Television Stations*, 567 U.S. at 253 (2012) (quotation omitted).

*First*, no "person of ordinary intelligence" would be able to ascertain that the statute would apply to non-bots users. *Id.* at 253. Indeed, until the FTC's current attempt to expand the statute's breadth, the legislature that enacted the BOTS Act, the public-at-large, a prior FTC Commissioner who worked on drafting the Act, and even the FTC itself believed the BOTS Act to implicate only those bad actors who used bots. *See supra*, pp. 3-6.

"[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). ***KIG was given no reasonable opportunity to do so here***.

The FTC may argue in response that it provided KIG with a "reasonable opportunity" to understand the FTC's new interpretation of the BOTS Act during the Civil Investigative Demand process. But an investigation that—if the FTC had its way—would have resulted in tens of millions of dollars in civil penalties and the effective shut-down of KIG's business is not a "reasonable opportunity" by any stretch of the imagination.

*Second*, the FTC's reimagining of the BOTS Act to implicate KIG smacks of discriminatory intent. The secondary-ticket market provides a valuable service, but it is not a fount of popularity. By

its Complaint here and in the parallel Ticketmaster Complaint, the FTC has made it clear that it has no love for the ticketing industry. But the FTC cannot discriminately expand a statute beyond its limited scope due to animus or an attempt at populist regard.

There are broader implications here. The FTC may be trying to expand the Act to restrict the behavior of ticket resellers because it does not like their behavior, but the overbroad reach of a newly expanded BOTS Act implicates a far larger population.

The FTC's new interpretation of the BOTS Act could easily catch any individual or entity (secondary-ticket broker or not) in its grasp. ***Pursuant to the FTC's new understanding, any person or entity person who uses two or more Ticketmaster accounts to purchase tickets to a concert or a show commits a per se BOTS Act violation, and can be liable for tens or hundreds of thousands of dollars in civil penalties***.

If the FTC had its way, a statute meant to limit bad actors who use malicious bots could be used against virtually anyone. ***The potential implications of this extraordinary regulatory overreach—and the potential misuse of same by a government agency—are vast.***

For all the reasons explained above, the FTC's Complaint fails. The BOTS Act does not implicate KIG's legitimate business practice. But, if the Court chooses to reach the constitutional issue, it should conclude that the BOTS Act is unconstitutionally void for vagueness as applied to KIG and other non-bot users, and therefore violates the due process clauses of the Fifth and Fourteenth Amendments.

## V.    The FTC's Reimagined Reading of the BOTS Act Violates the Major Questions Doctrine

It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. ***Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to confer the power the agency has asserted.***

*W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022) (emphasis added) (citations omitted).

The Fourth Circuit recently explained that, to implicate the Major Questions Doctrine, "the question must have significant political and economic consequences." *N. Carolina Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 296 (4th Cir. 2023). Both "significant political and economic consequences" are present here. The President himself has taken an interest in strict enforcement of the BOTS Act (albeit, only as to bots), *supra*, p. 6. By contrast, the FTC's expansive reading of the BOTS Act runs directly counter to that of the President. While the FTC is an independent Agency, and is allowed to diverge from the President's views, the divergent opinions of the Executive and the FTC as to the BOTS Act's scope implicate broad political concerns.

And, the economic implications of the FTC's rereading of the BOTS Act are vast. If countenanced, a newly expanded BOTS Act would upend a multi-billion dollar industry, and impose potential liability of tens or hundreds of thousands of dollars on any American who purchases tickets using more than one account.

In *Fisheries*, the Fourth Circuit noted that courts in this Circuit "are more hesitant to recognize new-found powers in old statutes against a backdrop of an agency failing to invoke them previously." *Fisheries*, 76 F.4th at 297. The BOTS Act was adopted in 2016. Over the last decade, it has ***never*** been invoked against an entity or individual who does not use bots. The FTC's wish to do so now resolutely fails.

"[E]nabling legislation is generally not an open book to which the agency may add pages and change the plot line. We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *W. Virginia*, 597 U.S. at 723 (cleaned up). But making major policy decisions is exactly what the FTC is attempting to do here. A statute written with the explicit

Congressional intent of "prohibit[ing] the use of bots," 2016 WL 7115899, at *4, is being coopted by an administrative agency intent on "chang[ing] the plot line." *W. Virginia*, 597 U.S. at 723.

Put simply, the FTC is attempting to arrogate for itself expansive powers Congress did not provide. What was meant to be a statute that "would have a positive impact on the secondary ticket sellers," 2016 WL 7115899, at *4, would become, if the FTC has its way, the death-knell for a $17 billion industry. The FTC should not be allowed to effectively kill the secondary-ticket market without express Congressional authority, something it has not been provided.

## CONCLUSION

The FTC's Complaint fails to allege a cognizable BOTS Act violation. No amendment can cure this fatal defect. As such, KIG respectfully requests that the Court dismiss the Complaint with prejudice.


Dated: November 24, 2025                                  Respectfully submitted,


                                                                   By: */s/ Bezalel A. Stern*
                                                                   Bezalel A. Stern (D. Md. Bar. No. 20667)
                                                                   Joshua N. Drian (*pro hac vice*)
                                                                   MANATT, PHELPS & PHILLIPS, LLP
                                                                   1050 Connecticut Ave. NW, Suite 600
                                                                   Washington, D.C. 20036
                                                                   Tel.: (202) 585-6500
                                                                   bstern@manatt.com
                                                                   jdrian@manatt.com

                                                                   *Counsel for Defendants*