**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MARYLAND**

**NORTHERN DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, <br><br> Plaintiff, <br><br> v. <br><br> **KEY INVESTMENT GROUP LLC**, **et al.**, <br><br> Defendants. | **Case No. 1:25-cv-02716-GLR** |

**MEMORANDUM OF LAW**

**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## Table of Contents

I.      Introduction.................................................................................................1

II.     Background.................................................................................................2

III.    Legal Standard...........................................................................................5

IV.     Argument...................................................................................................6

      a.   The Commission Has Pled the Elements for Liability Under the Act..............6

      b.   Defendants' Arguments in their Motion to Dismiss Are Unavailing................8

         i.   The Commission has Pled that Defendants Circumvented Security Measures that Ticketmaster Used to Enforce Posted Ticket Purchasing Limits and Posted Purchasing Order Rules .........................................9

            1.   Circumvent Means "to Bypass" ...............................................11

            2.   Circumvention Is Not Contingent on Trickery ........................13

            3.   Defendants Circumvented *Posted* Ticket Purchasing Limits and *Posted* Ticket Purchasing Order Rules ....................................14

            4.   Other Statutes Do Not Support Defendants' Interpretation of the Act ...................................................................................15

         ii.   Liability Under the Act Is Not Contingent on the Use of Bots............17

      c.   The Complaint Adequately Pleads Defendants' Knowledge for Civil Penalties ....................................................................................................20

      d.   The Act is Not Unconstitutionally Vague.......................................................24

      e.   A Plain Reading of the Act Shows that it Does Not Violate the Major Questions Doctrine..........................................................................................25

V.      Conclusion ...............................................................................................26

# Table of Authorities

Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................8

*Azar v. Allina Health Servs.*, 587 U.S. 566 (2019) .........................................18

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...............................6, 21

*Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519 (1947) ............17, 18

*Bostock v. Clayton Cnty.,* 590 U.S. 644 (2020) ...............................................17

*Cornell v. Coyne*, 192 U.S. 418 (1904) ............................................................17

*FTC v. Amazon.com, Inc.*, 735 F. Supp.3d 1297 (W.D. Wash. 2024) .................21, 23, 24

*FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d. Cir. 2015) .................................24

*Goldstein v. S.E.C.*, 451 F.3d 873 (D.C. Cir. 2006) .........................................11

*Hosh v. Lucero*, 680 F.3d 375 (4th Cir. 2012) .................................................23

*Key Inv. Grp. v. Ferguson*, No. 1:25-cv-02354-GLR (D. Md.) .......................................10

*King v. Rubenstein*, 825 F.3d 206 (4th Cir. 2016) .........................................6, 22

*Marx v. Gen. Revenue Corp.*, 568 U.S. 371 (2013) ............................................6

*Mattes v. United States*, 721 F.2d 1125 (7th Cir. 1983) ...................................12

*Mayer Brown LLP v. I.R.S.*, 562 F.3d 1190 (D.C. Cir. 2009) ............................12

*Navy Fed. Credit Union v. LTD Fin. Servs, LP*, 972 F.3d 344 (4th Cir. 2020) .................6

*North Carolina Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291 (4th Cir. 2023) .................................................................26

*Parker v. Levy*, 417 U.S. 733 (1974) ..............................................................25

*Pharm. Coalition for Patient Access v. United States*, 126 F.4th 947 (4th Cir. 2025) ......12

*Pugin v. Garland*, 19 F.4th 437 (4th Cir. 2021) ...............................................23

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) ...............................................11

*Russello v. United States*, 464 U.S. 16 (1983) .................................................16

*Sayyed v. Wolpoff & Abramson*, 485 F.3d 226 (4th Cir. 2007) ...........................................16

*Slattery Skanska Inc. v. Am. Home Assur. Co.*, 885 N.Y.S.2d 264 (N.Y. App. Div. 2009) ...........................................................................................................13

*Strathearn S.S. Co. v. Dillon*, 252 U.S. 348 (U.S. 1920) ....................................17

*United States v. ACB Sales & Serv., Inc.*, 590 F. Supp. 561 (D. Ariz. 1984) ...................22

*United States v. Cartisim Corp.*, No. 2:21-cv-00212 (E.D.N.Y. Jan. 14, 2021) .....5, 23, 26

*United States v. Concert Specials, Inc.*, No. 2:21-cv-00214 (E.D.N.Y. Jan. 14, 2021) ........ ...........................................................................................................5, 23, 26

*United States v. Dish Network LLC*, 954 F.3d 970 (7th Cir. 2020) ..................................21

*United States v. Fisher*, 6 U.S. 358 (1805) ....................................................17

*United States v. Just In Time Tickets, Inc.*, No. 2:21-cv-00215 (E.D.N.Y. Jan. 14, 2021)..... ...........................................................................................................5, 23, 26

*United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131 (4th Cir. 1996) .........................21, 24

*United States v. Sutton*, 126 F.4th 869 (4th Cir. 2025) ....................................11

*Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014) ................................25

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) .......... ...........................................................................................................24, 25

*West Virginia. v. EPA*, 597 U.S. 697 (2022) ..............................................25, 26


Statutes

15 U.S.C. § 45.....................................................................................2, 20, 21, 22, 26

Pub. L. 114-274, 15 U.S.C. § 45c .................1, 2, 6, 8, 9, 12, 14, 15, 17, 18, 20, 23, 25, 26

15 U.S.C. § 57a...........................................................................................20

17 U.S.C. § 1201 ...................................................................................12, 15

18 U.S.C. § 1029........................................................................................10

Pub. L. 117-263, 22 U.S.C. § 6217 ..........................................................15, 16

## I.    Introduction

The Better Online Ticket Sales Act makes it unlawful for any person to "circumvent a security measure … that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules." 15 U.S.C. § 45c(a)(1)(A) ("the Act"). The Commission's straightforward complaint alleges that Defendants did just that. Defendants used IP proxy services, thousands of virtual credit cards and Ticketmaster accounts (almost always registered to fake identities), and SIM boxes (to manage the flood of account verification codes to those fake identities) to circumvent security measures on Ticketmaster's website and exceed posted ticket limits in violation of Ticketmaster's Purchase Policy.[1]

But Defendants would have the Court believe the Act prohibits a much narrower set of conduct: circumvention by bot without the knowledge or consent of the ticket issuer. But this is not what Congress enacted. Lacking support in the plain text of the Act, Defendants cast around to the Act's acronym, news articles, and cherry-picked lines from a muddy legislative history. But none of these sources can support inserting additional pleading requirements into an unambiguous statute.

Defendants' attempts to contort the Act to exclude their conduct are also done in service of avoiding civil penalties. But given Defendants' knowledge of the Act, monitoring of its

---

[1] In their Memorandum, Defendants incorrectly claim that "[t]he Complaint does not allege that the Purchase Policy prohibits an entity from using multiple accounts to purchase tickets not exceeding the maximum number for each account." ECF 33-1 at 20. Complaint ¶ 26 clearly contains this allegation. Complaint ¶ 26 ("[Section 7 of the Purchase Policy] specifically **required that 'each account' used to purchase tickets 'be linked to a unique individual**[] and must contain valid and verifiable information' and **prohibited the use of multiple accounts 'to circumvent or exceed published ticket limits.'**" (emphasis added)).

enforcement in the Commission's three 2021 complaints, and warnings from their own vendors, such attempts must fail. The Commission has properly pled objective circumstances that fairly imply knowledge sufficient for civil penalties. *See* 15 U.S.C. § 45(m)(1)(A). Because Defendants' arguments contravene the plain meaning of the Act, their motion should be denied.

## II.    Background

The Corporate Defendants are ticket brokers. Complaint ¶¶ 6-10, 14, 19. Under the control of the Individual Defendants, they purchase event tickets from ticket issuers, like Ticketmaster, and resell them on secondary market websites, including Ticketmaster's resale platform, for higher prices. *Id.* ¶¶ 6-14, 19-22, and 24. From November 1, 2022, to December 30, 2023, Defendants purchased at least 379,776 event tickets from Ticketmaster at a cost of nearly $57,000,000. *Id.* ¶¶ 2 and 23. Defendants resold many of those tickets on secondary marketplaces, often charging consumers a significant markup. *Id.* ¶ 2. Defendants have made thousands of Ticketmaster ticket purchases since December 31, 2023. *Id.* ¶ 23.

> The Better Online Ticket Sales Act makes it unlawful for any person to:
>
> (A) circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules ….

*Id.* ¶ 16 (quoting 15 U.S.C. § 45c(a)(1)(A)). Congress enacted the Act "… to ensure equitable consumer access to tickets for any given event, and for other purposes." *Id.* ¶ 5 (citing Pub. L. 114-274, pmbl.).

Ticketmaster has implemented security measures, access control systems, or other technological controls or measures on its websites to enforce posted event ticket purchasing

limits and to maintain the integrity of posted online ticket purchasing order rules. *Id.* ¶ 24. These measures have been in place between no later than January 10, 2017, and the present. *Id.*

Until at least July 2025, Ticketmaster posted a "Purchase Policy" on its website that applied to purchases made on its website on or after January 1, 2021. *Id.* ¶ 25. The Purchase Policy was designed, in part, "to discourage unfair ticket buying practices," and required "each account" used to purchase tickets to "be linked to a unique individual[] and [to] contain valid and verifiable information." *Id.* at ¶ 26. Ticketmaster's Purchase Policy prohibited the use of multiple accounts "to circumvent or exceed published ticket limits." *Id.* Ticketmaster warned ticket purchasers that orders placed through accounts with false or misleading information, including information related to "name, address, email address, phone number, IP address, or other account or billing information" were subject to cancellation. *Id.*

Beyond prohibiting the use of multiple accounts, including those built on sham identities, Ticketmaster's security measures are designed to prevent other practices, including blocking ticket purchasers from making multiple purchases for the same event from the same IP address. *Id.* ¶¶ 34 and 38. Ticketmaster also uses account verification codes in some instances to verify fan accounts. *Id.* ¶ 49. Ticketmaster views account verifications as "an extra layer of protection" against not only bots, but also "**other abuse**." *Id.* (emphasis added).

Defendants design and run their ticket purchasing operations to circumvent Ticketmaster's security measures. *Id.* ¶¶ 28-50. Defendants regularly conceal the IP addresses that they use when buying tickets from Ticketmaster. *Id.* ¶ 35. They do this, at least in part, by using rotating IP proxy services, which periodically change a computer's IP address. *Id.* ¶¶ 34-37.

Defendants regularly create, obtain, and use Ticketmaster accounts based on sham identities. *Id.* ¶¶ 38-48. From November 15, 2020, through January 16, 2024, Defendants created, purchased, or otherwise obtained from third parties more than 13,000 Ticketmaster accounts. *Id.* ¶ 42. Defendants use accounts based on sham identities to circumvent Ticketmaster security measures designed to monitor names, billing addresses, account identifying information, and credit card numbers, among other identifiers. *Id.* ¶ 38.

Defendants control and use thousands of credit card numbers and link them to their many Ticketmaster accounts. *Id.* ¶¶ 28, 38-48. Many of these credit card numbers are linked to credit accounts in the name of Key Investment Group. *Id.* ¶ 28. Some are linked to accounts in the names of Key Investment Group employees. *Id.* Others are linked to accounts in the names of friends and family of Key Investment Group employees. *Id.* And still others are linked to accounts in the names of friends and family of Key Investment Group officers. *Id.* By using thousands of credit card numbers, Defendants circumvent Ticketmaster security measures that would otherwise prevent them from purchasing tickets in excess of posted ticket limits. *Id.* ¶¶ 28 and 46-48.

Defendants regularly use hundreds of SIM cards and SIM boxes[2] to receive and automate the retrieval of account verification codes that Ticketmaster sends to phone numbers associated with Defendants' thousands of ticket-purchasing accounts. *Id.* ¶¶ 49-50. Defendants do this to circumvent the account verification processes that Ticketmaster uses to enforce its ticket purchasing rules. *Id.* ¶ 50.

---

[2] SIM banks or boxes are "devices that house dozens of SIM cards at a time." Complaint ¶ 50. SIM boxes are increasingly used to obtain unauthorized access to telecommunications networks and facilitate fraud. *What is SIM Box Fraud: Understanding Telecoms' Most Challenging Scam*, COMMUNICATIONS FRAUD CONTROL ASS'N (Sept. 25, 2025), https://cfca.org/what-is-sim-box-fraud-understanding-telecoms-most-challenging-scam/.

The Commission has sued Defendants, alleging that their business practices violate the Act through, among other means, the circumvention of security measures when purchasing tickets on Ticketmaster's website. Complaint, ECF 1. Defendants have been aware of the Act since its enactment and have monitored its enforcement. Complaint ¶ 51(a-b). Defendants knew in January 2021 that the Commission had referred three complaints to the Department of Justice for filing, alleging, in each case, that defendants had violated the Act by using sham accounts (like Defendants), IP proxy services to conceal IP addresses (like Defendants), and certain automated ticket-buying software programs to circumvent Ticketmaster's security measures. Complaint ¶ 51(b); *see also United States v. Cartisim Corp.*, No. 2:21-cv-00212 (E.D.N.Y. Jan. 14, 2021); *United States v. Concert Specials, Inc.*, No. 2:21-cv-00214 (E.D.N.Y. Jan. 14, 2021); and *United States v. Just In Time Tickets, Inc.*, No. 2:21-cv-00215 (E.D.N.Y. Jan. 14, 2021).

Defendants have been alerted to the potential illegality of their business practices by business vendors. Complaint ¶ 51(c-d). For example, a bank working with Defendants commissioned an examination of Key Investment Group's records. *Id.* ¶ 51(d). That examination questioned whether the company's use of thousands of Ticketmaster accounts based on sham identities violated Ticketmaster's ticket purchase policies. *Id.* Despite concerns raised by business vendors, their own awareness of the Act and Commission enforcement actions under it, Defendants continued their practice of using a variety of means to circumvent Ticketmaster's security measures, access control systems, or other technological controls or measures. *Id.* ¶ 51(a-f).

## III.    Legal Standard

A motion under Federal Rule of Civil Procedure 12(b)(6) "tests the sufficiency of a complaint; it does not, however, resolve contests surrounding the facts, the merits of a claim, or

the applicability of defenses." *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (citation modified). A complaint states a claim if it contains a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not necessary to state a claim, but the "[f]actual allegations must be enough to raise a right to relief above the speculative level …." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## IV.    Argument

### a.  The Commission Has Pled the Elements for Liability Under the Act[3]

To state a claim under 15 U.S.C. § 45c(a)(1)(A), the plain language of the Act requires the Commission to plead: (1) that the Defendants "circumvent[ed] a security measure, access control system, or other technological control or measure on an Internet website or online service" that (2) was "used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules[.]" 15 U.S.C. § 45c(a)(1)(A); *see also Navy Fed. Credit Union v. LTD Fin. Servs, LP*, 972 F.3d 344, 356 (4th Cir. 2020) ("'[I]n all statutory construction cases,' we start with the plain text of the provision." (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 376 (2013))). Because the Complaint clearly and specifically pleads facts supporting both elements of Section (a)(1)(A) the Act, Defendants' Motion to Dismiss should be denied.

---

[3] In its Complaint, the Commission seeks relief under Sections (a)(1)(A) and (a)(1)(B) of the Act, 45 U.S.C. § 45c. Defendants have moved to dismiss the Complaint under Rule 12(b)(6) but in doing so have not advanced independent arguments regarding the Commission's pleading of a claim under Section (a)(1)(B) of the Act, 15 U.S.C. § 45c(a)(1)(B). Rather, Defendants focus on the Commission's claims under Section (a)(1)(A), 15 U.S.C. § 45c(a)(1)(A). Consequently, the Commission's opposition to Defendants' Motion to Dismiss addresses only the elements of its claim under Section (a)(1)(A).

In support of the first element of the Act, requiring circumvention of security measures and the like, the Complaint pleads:

> Defendants have used thousands of fictitious Ticketmaster accounts, thousands of virtual and traditional credit card numbers, proxy or spoofed IP addresses, and SIM banks to bypass or otherwise avoid security measures, access control systems, or other technological controls or measures on Ticketmaster's websites that would have otherwise blocked or prevented them from violating Ticketmaster's posted ticket purchase limits.

Complaint ¶ 2; *see also* Complaint ¶¶ 28, 35-37, 39-40, 42-48, and 50.

In support of the second element, the Complaint pleads that "Ticketmaster is a ticket issuer that has implemented security measures, access control systems, or other technological controls or measures on its websites to enforce posted event ticket purchase limits and to maintain the integrity of posted online ticket purchasing order rules." Complaint ¶ 24. Specifically, the Complaint pleads that Ticketmaster's security measures: (1) are "designed to prevent or block ticket purchasers from making multiple purchases for the same event from the same IP address, Complaint ¶ 34; (2) are "designed to prevent individuals from purchasing more tickets than otherwise allowed under its posted event ticket limits" by monitoring "(a) the individual's name, (b) billing address, (c) Ticketmaster accounts, and (d) the IP address and cookies associated with the purchase," Complaint ¶ 38; and (3) "sometimes required fans to enter codes sent via text message to the phone numbers associated with their Ticketmaster accounts" to add "'an extra layer of protection against bots and other abuse,'" Complaint ¶ 49. These security measures enforced Ticketmaster's publicly posted "Purchase Policy," which was in place from at

least January 2021 to July 2025, and prohibited the use of multiple accounts and false or misleading account information to exceed ticket limits. Complaint ¶¶ 25-27.[4]

Because these allegations, taken as true, state a more-than plausible claim that Defendants are liable for violating 15 U.S.C. § 45c(a)(1)(A), their Motion to Dismiss should be denied. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

### b.  Defendants' Arguments in their Motion to Dismiss Are Unavailing

In their Memorandum, Defendants advance several failing arguments. As further explained below, each is precluded by the plain text of the Act and the Commission's properly pled Complaint. The Act prohibits circumvention of security measures used to enforce posted ticket limits and posted order rules. Nothing in this prohibition provides or implies an exception for conduct known to the ticket issuer. The prohibition is also not limited to circumvention by bots. As pled in the Complaint, Defendants closely monitored the Act, Commission enforcement actions, and received warnings from their vendors about compliance with the Act, all more than fairly implying the knowledge necessary to support civil penalties. Finally, Defendants' pro forma as-applied vagueness and major questions challenges to the Act are baseless. Accordingly, Defendants' Motion to Dismiss should be denied.

---

[4] Defendants' Memorandum wrongly asserts that "Any Purchase Policy is Irrelevant to a BOTS Act Analysis." ECF 33-1 at 18. However, the Act applies when a ticket issuer has implemented security measures "to enforce *posted event ticket purchasing limits* or to maintain the integrity of *posted online ticket purchasing order rules*." 15 U.S.C. § 45c(a)(1)(A) (emphasis added). Because the Act explicitly references ticket issuers' posted limits and rules, the posted ticket limit and rules in Ticketmaster's Purchase Policy are highly relevant.

### i.   The Commission has Pled that Defendants Circumvented Security Measures that Ticketmaster Used to Enforce Posted Ticket Purchasing Limits and Posted Online Purchasing Order Rules

Defendants contend that, because Ticketmaster was aware of Defendants' use of multiple accounts, Defendants could not have "circumvent[ed]" Ticketmaster's security measures, access control systems, or other technological controls or measures used to enforce posted event ticket purchasing limits and posted online ticket purchasing order rules. ECF 33-1 at 13. The Act's plain text forecloses Defendants' interpretation.

The Act makes it unlawful for:

> any person … to circumvent *a security measure, access control system, or other technological control or measure* on an Internet website or online service that is *used by the ticket issuer to enforce posted* event ticket purchasing limits or to maintain the integrity of *posted* online ticket purchasing order rules.

15 U.S.C. § 45c(a)(1)(A) (emphasis added). Regardless of whether it was aware that Defendants were using thousands of accounts to acquire and re-sell large quantities of tickets in violation of posted limits and rules, Ticketmaster *did* employ "security measures, access control systems, or other technological controls or measures on [its] website or online service … to enforce posted event ticketing purchasing limits and to maintain the integrity of posted online ticket purchasing order rules." *See, e.g.*, Complaint ¶ 34 ("Since at least January 10, 2017, Ticketmaster has maintained security measures, access control systems, or other technological controls or measures on its websites designed to prevent or block ticket purchasers from making multiple purchases for the same event from the same IP address."); Complaint ¶ 38 (alleging that Ticketmaster's security measures monitor certain information, like the buyer's name, billing address, account, IP address, cookies, and credit card, "to prevent individuals from purchasing more tickets than otherwise allowed under its posted event ticket limits[.]"); and Complaint ¶ 48 (describing Ticketmaster's implementation of account verifications as a security measure to

"protect[] against bots and other abuse.").[5]

Because Ticketmaster employed these security measures, Defendants used sophisticated and, in some instances, laborious means to circumvent these security measures and purchase tickets. Defendants used IP proxy services to mask their true IP addresses, SIM boxes to facilitate the receipt and automate the retrieval of Ticketmaster's account verification codes, and thousands of sham Ticketmaster accounts that they linked to thousands of credit card numbers which, in some instances, were not held by Defendants' operating entities. Complaint ¶¶ 28-29 and 34-50. If Defendants had purchased tickets from Ticketmaster like an ordinary consumer, they would not have been able to purchase tickets at the volume and speed they did because Ticketmaster's security measures would have stopped them. Complaint ¶¶ 23-29 and 34-50. For example, Taylor Swift's The Eras Tour had a six-ticket limit per show in March 2023. Complaint ¶ 32. For Swift's March 25, 2023, concert at Allegiant Stadium in Paradise, Nevada, Defendants got around the six-ticket limit by, among other means, using 49 different Ticketmaster accounts

---

[5] Defendants do not appear to dispute the existence of Ticketmaster's security measures. Rather, they openly admit to taking actions that frustrate them. For example, in their Complaint against the Commission in *Key Inv. Grp. v. Ferguson*, No. 1:25-cv-02354-GLR (D. Md.) (ECF 1, hereinafter "KIG Complaint"), seeking declaratory judgment to forestall this enforcement action, Defendants admit to using "Insomniac Browser," which "allows each opened tab its own IP address," KIG Complaint ¶¶ 78-79, frustrating Ticketmaster's IP address security measure that would otherwise block multiple purchases made from a single IP address. *See* Complaint ¶ 34. Defendants also admit to using multiple accounts, registered under "pseudonyms," KIG Complaint ¶¶ 81, 83, which frustrates Ticketmaster's security measure that monitors buyer and account information and blocks purchases by the same account holder. *See* Complaint ¶ 38. Finally, although the KIG Complaint strains to avoid a direct admission to the use of SIM boxes, it explains how a ticket broker might use a SIM box to thwart account verifications. KIG Complaint ¶ 99 (describing how SIM boxes can be used to automatically populate Ticketmaster's account verification codes for multiple accounts into a Google Spreadsheet). SIM boxes are of dubious legality due to their ability to obtain unauthorized access to telecommunications networks. *See supra* n. 2; *see also* 18 U.S.C. § 1029 (prohibiting knowingly using or even possessing hardware or software known to have been configured to modify telecommunication identifying information to obtain telecommunications service without authorization).

to purchase 273 tickets, far exceeding the ordinary consumer's access to no more than six tickets. *Id.* By circumventing Ticketmaster's security measures to exceed posted ticket limits, Defendants violated the Act.

In response to this fundamental point, Defendants argue that, supposedly, no circumvention occurred because Ticketmaster was aware of and tacitly approved their conduct. ECF 33-1 at 15. This argument fails for four reasons: (1) to "circumvent" a security measure means to "bypass" it; no trickery or deception is a precondition of circumvention; (2) even if trickery of some sort were required, the Complaint pleads as much and amply; (3) the Act is concerned with the circumvention of *posted* purchasing limits and *posted* purchasing order rules, underscoring that Ticketmaster's knowledge (or even tacit approval) of Defendants' conduct is irrelevant; and (4) Congress has enacted other statutes that expressly define "circumvent" to exclude authorized conduct, and Congress, pointedly, did not include a similar definition in the Act.

### 1.  Circumvent Means "to Bypass"

First, Defendants contend that the word "circumvent" in Section (a)(1)(A) of the Act is ambiguous because it is not defined and must be read as *circumvent without the ticket issuer's knowledge or authorization*. ECF 33-1 at 14. The lack of a statutory definition for "circumvent" does not make the term ambiguous. *Goldstein v. S.E.C.*, 451 F.3d 873, 878 (D.C. Cir. 2006). In addressing ambiguity, courts consider whether "the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). To do so, courts review the language as used within the statute. *Id.* at 341. If the language is unambiguous, the examination stops. *Id.* at 340. If not, courts look to the common meaning of the language. *United States v. Sutton*, 126 F.4th 869, 876 (4th Cir.

2025). Above all, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

Here "circumvent" is unambiguous within the context of the Act. The Act makes it illegal "to circumvent," *i.e.*, to get around, avoid, or bypass, "a security measure, access control system, or other technological control or measure." 15 U.S.C. § 45c(a)(1)(A). Nothing in the Act's text requires that the bypass occur by surreptitious or unauthorized means. *Id.* When Congress wants to condition liability for circumventing acts on surreptitious or unauthorized conduct, it does so in plain, unambiguous text. *See* 17 U.S.C. § 1201(a)(3)(A) (defining the term "to circumvent a technological measure" to mean "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, *without the authority of the copyright owner*.") (emphasis added); *see also, e.g.*, *Chamberlain Grp., Inc. v. Skylink Tech., Inc.*, 381 F.3d 1178, 1193 (Fed. Cir. 2004) (holding that the plain language of 17 U.S.C. § 1201(a)(3)(A) "requires a plaintiff alleging circumvention (or trafficking) to prove that the defendant's access was unauthorized. . . .").

Courts have long recognized that acts that "circumvent" are not restricted to those that are surreptitious or unauthorized. S*ee, e.g.*, *Pharm. Coalition for Patient Access v. United States*, 126 F.4th 947, 958 (4th Cir. 2025) (using "circumvent" in the sense of to get around, avoid, or bypass when holding that "courts should not use extratextual considerations to circumvent the meaning of an unambiguous statute."); *Mayer Brown LLP v. I.R.S.*, 562 F.3d 1190, 1192 (D.C. Cir. 2009) (holding that "circumvent" is defined as "[t]o avoid by or as if by passing around." (citing Webster's II New Collegiate Dictionary 209 (3d. ed., 2005))); *Mattes v. United States*, 721 F.2d 1125, 1129 n.6 (7th Cir. 1983) (recognizing that "circumvent" may connote both

12

"avoiding or frustrating" or "a scheme or strategy of avoidance" backed by intent); *Slattery Skanska Inc. v. Am. Home Assur. Co.*, 885 N.Y.S.2d 264, 274 (N.Y. App. Div. 2009) (finding "circumvent" not defined in an insurance policy and holding that lack of definition does not make the term ambiguous and further holding that, in context, "circumvent" meant "to bypass or avoid.").

### 2.  Circumvention Is Not Contingent on Trickery

Second, despite a lack of ambiguity in the plain meaning of "circumvent" in the Act (to get around, avoid, or bypass), Defendants introduce a gerrymandered definition that requires trickery. "Circumvent," Defendants note, is also defined as "to manage to get around especially by ingenuity or stratagem." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/circumvent. Accessed 10 Dec. 2025. Black's Law Dictionary, as Defendants also note, defines "circumvent" to mean "[t]o avoid (a restrictive problem, rule, etc.), esp. by clever and sometimes dishonest means." Black's Law Dictionary (12th ed. 2024). Neither the Webster's Dictionary definition nor that of Black's Law restricts circumvention to only instances where the circumventing party uses deception. But even if the Court were to require some element of trickery or dishonesty for "circumvention," those elements permeate Defendants' business model, which rested on using various deceptive means to get around or bypass Ticketmaster's security measures, access control systems, and other technological controls or measures.

As the Commission pleads, Defendants used IP proxy services to *conceal* their true IP addresses while buying tickets from Ticketmaster. Complaint ¶¶ 34-37. They created or obtained 13,000 Ticketmaster accounts and used thousands of them to purchase tickets in their efforts to *evade*, or get around, Ticketmaster's security measures. Complaint ¶¶ 42-43. They used

thousands of *fictitious* names and created other identifiers, often *fake*, in connection with these accounts. Complaint ¶¶ 42-45. They used thousands of credit card numbers too. Complaint ¶ 46. They did all of this and more, as the Complaint pleads, to circumvent Ticketmaster's security measures and other controls. Complaint ¶¶ 24-50; *see also supra* n. 5.

### 3. Defendants Circumvented *Posted* Ticket Purchasing Limits and *Posted* Ticket Purchasing Order Rules

Third, liability under the Act turns, expressly, on whether the ticket purchaser circumvented a security measure used by the ticket issuer "to enforce *posted* event ticket purchasing limits or to maintain the integrity of *posted* online ticket purchasing order rules," not on whether the ticket issuer was aware of the ticket purchaser's conduct.[6] *See* 15 U.S.C. § 45c(a)(1)(A) (emphasis added). There is no *Ticketmaster-knew-but-didn't-care exception* in the Act.[7] By focusing on circumvention of security measures used to enforce *posted* ticket purchasing limits and *posted* ticket purchasing rules, Congress set a base line for lawful conduct. Abide by the publicly *posted* ticket purchasing limits and the publicly *posted* purchasing order

---

[6] The structure of the Act also undermines the claim that Ticketmaster can grant selective amnesty to violative brokers. The Act clearly contemplates liability for ticket brokers who circumvent a ticket issuer's security measures, 15 U.S.C. § 45c(a)(1)(A), *and* "any person"—including ticket issuers and resale platforms like Ticketmaster—who "knew or should have known that the event ticket was acquired [by such circumvention]" or "participated directly in or had the ability to control [such circumvention]" and then offer to sell or resell tickets acquired via such circumvention, 15 U.S.C. § 45c(a)(1)(B). By legislating liability for both the circumvention of security measures and the knowing sale of, or offer to sell, tickets acquired in violation of Section (a)(1)(A) of the Act, Congress foreclosed Defendants' purported legal defense that Ticketmaster could immunize their misconduct.

[7] Given Ticketmaster's financial incentives to turn a blind eye to brokers who violate its rules, an interpretation allowing Ticketmaster to privately immunize violations of its posted rules would effectively gut the Act, thwarting Congress's expressed intent to rein in such abuse. *See* Complaint ¶ 40 Figure 1 (showing "brokers violating fictitious account rules on large scale" and noting that there would be a "[s]erious negative economic impact if [Ticketmaster] … move[d] to [an] 8 ticket limit across the board").

rules and resulting ticket purchases are likely to be lawful under the Act. Circumvent the security measures used to enforce those publicly *posted* limits and rules and resulting ticket purchases are likely to violate the Act. Congress did not give ticket issuers, like Ticketmaster, any authority to excuse noncompliance with publicly posted event ticket purchasing limits or publicly posted online ticket purchasing order rules. 15 U.S.C. § 45c(a)(1)(A).

### 4. Other Statutes Do Not Support Defendants' Interpretation of the Act

Finally, ignoring the plain meaning of "circumvent" within the Act (to get around, avoid, or bypass) and the dictionary definitions they cite, Defendants further ask the Court to read definitions from two other federal statutes into the Act. ECF 33-1 at 14. The first definition, from the Digital Millenium Copyright Act ("DMCA"), defines the phrase "circumvent a technological measure" as "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A). The second definition, contained within the National Defense Authorization Act for Fiscal Year 2023, § 9707(i), ("NDAA 23"), Pub. L. 117-263, codified at 22 U.S.C. § 6217(i), defines the phrase "internet censorship circumvention tool" to mean "a software application or other tool that an individual can use to evade foreign government restrictions on internet access." Neither supports Defendants' argument.

These statutes explicitly define "circumvent," and do so in ways that show Congress's intent to include an "authorization" exception to address unique statutory objectives. For example, in the DMCA Congress explicitly defined "circumvent a technological control measure" to exclude situations where a party has given access to copyrighted material. 17 U.S.C. § 1201(a)(3)(A). Thus, there is no circumvention under the DMCA if access is authorized. *Id.* Similarly, in the NDAA 23, Congress defined "internet censorship circumvention tool" as a tool

for use where foreign governments have restricted internet access. Pub. L. 117-263, § 9707(i). If there is open internet access, there is no need to circumvent and thus no reason for a circumvention tool. *Id.* In other words, in both the DMCA and the NDAA 23, Congress explicitly defined "circumvent" to apply only in those instances where there was no authorization, either to copyrighted material (as in the DMCA) or to the internet (as in the NDAA 23), understanding that the word circumvent alone does not imply a lack of authorization. Conversely, in the Act, Congress used the plain meaning of "circumvent" (to avoid, get around, or bypass) and did not create a safe harbor for situations where the ticket issuer authorized or ignored the ticket buyer's unlawful conduct. Congress was concerned with providing equitable access to event tickets by preventing circumvention of security measures used to enforce posted ticket purchasing limits and posted online ticket purchasing order rules, regardless of any party's claim of authorization to circumvent.

Indeed, the statutes on which Defendants rely concern entirely unrelated subjects. The DMCA, enacted 18 years before the Act, was designed to address copyright protections. The NDAA 23, Pub. L. 117-263, § 9707(i), enacted more than six years after the Act, sought to promote global internet freedom through State Department and USAID programs. Neither statute nor its respective definition of "circumvent" bears any relationship to the Act's purpose "… to ensure equitable consumer access to [event] tickets." Pub. L. 114-274, pmbl; *see also Russello v. United States*, 464 U.S. 16, 25 (1983) ("Language in one statute usually sheds little light upon the meaning of different language in another statute, even when the two are enacted at or about the same time."); *Sayyed v. Wolpoff & Abramson*, 485 F.3d 226, 233 (4th Cir. 2007) ("Where the intent of Congress is so clearly expressed in the text of one statute …, it may not be turned aside by comparison to an entirely different statute ….").

16

**ii. Liability Under the Act is Not Contingent on the Use of Bots**

Defendants further contend—contrary to the Act's plain text—that to adequately state a claim under 15 U.S.C. § 45c(a)(1)(A), the Commission must allege that Defendants used "bots" to circumvent security measures. ECF 33-1 at 8-9. Defendants read this pleading requirement into the Act based on the acronym for the Act's full name: Better Online Ticket Sales Act, *i.e.* BOTS Act. *See* ECF 33-1 at 1 n.1 (citing Pub. L. No. 114-274). Acronym aside, the words "bot" or "bots" do not appear in the Act. 15 U.S.C. § 45c. The Court should decline Defendants' invitation to read an unwritten substantive pleading requirement into the Act's text, based simply on an acronym for the Act's title. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 654-55 (2020) ("If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives.").

For more than two centuries, the Supreme Court has abided by "the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text." *Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947) (citing *United States v. Fisher*, 6 U.S. 358, 386 (1805); *Cornell v. Coyne*, 192 U.S. 418, 430 (1904); and *Strathearn S.S. Co. v. Dillon*, 252 U.S. 348, 354, (1920)). Rather, statute titles and headings "are but tools available for the resolution of a doubt," and are "of use only when they shed light on some ambiguous word or phrase." *Bhd. of R.R. Trainmen*, 331 U.S. at 529. Here, the issue is not even the statute's title or headings, but something even more tenuously connected to the text of the statute—an *acronym* for the statute's title.

In the face of this governing precedent, Defendants contend that the acronym for the Act's title (BOTS) makes bot use an essential element of the Act's prohibitions. But the Act

broadly prohibits the "circumvent[ion of] a security measure, access control system, or other technological control or measure." 15 U.S.C. § 45c(a)(1)(A).[8] It does not prohibit only particular methods of circumvention. *Id.* Thus, there is no "ambiguous word or phrase" upon which the Act's title, let alone acronym, could "shed light." *See Bhd. of R.R. Trainmen*, 331 U.S. at 529. If Congress had intended to limit the Act to circumvention by bot, it would have said so and offered a definition of the word (something Defendants have not done).

Similarly, the Court should decline Defendants' invitation to consider their self-serving view of the Act's legislative history.[9] The Supreme Court has been clear: "[L]egislative history is not the law," and "murky legislative history … can't overcome a statute's clear text and structure." *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 and 581 (2019). Nevertheless, the legislative history supports the broad prohibition against circumvention found in the Act's text. The same Senate hearing transcript selectively cited by Defendants for the faulty proposition that the Act narrowly applies to circumvention accomplished by bots, and nothing else, includes a passage by the Act's Senate Sponsor, Senator Moran, suggesting a far broader intent. In his statement, Senator Moran clearly articulated concern about both bots *and* "human operators" who "enter distinct names, credit cards, addresses and circumvent other security measures." *See* 2016 WL 4773371 (Sept. 13, 2016).

---

[8] If more were needed, the Court could look to the broadly worded heading to 15 U.S.C. § 45c: "Unfair and deceptive acts and practices relating to circumvention of ticket access control measures."

[9] So too, for Defendants' selective reading of FTC blog posts. The post referenced by Defendants included the full text of the Act's prohibition, notably lacking the word "bot," and concluded, "[t]hat's a brief recap that could fit on the back of a ticket. If you have clients interested in this issue, you'll want to read the BOTS Act in its entirety." Lesley Fair, *BOTS Act: That's the ticket!* FED. TRADE COMM'N (Apr. 7, 2017), https://www.ftc.gov/business-guidance/blog/2017/04/bots-act-thats-ticket. Defendants also grasp for references to bots in other sources but fail to identify any that claim the Act *exclusively* prohibits circumvention by bot.

Senator Moran's reference to "human operators" and the use of "distinct names, credit cards, and addresses" demonstrates congressional awareness and disapproval of the methods Defendants use to circumvent security measures, regardless of whether any of them are considered "bots." *See, e.g.*, Complaint ¶ 28 (alleging that Defendants used "thousands of fictitious names, addresses, and phone numbers" and "thousands of credit card numbers" to circumvent Ticketmaster's security measures). [10]

Finally, Defendants claim the Act's prohibition would sweep in seemingly innocent conduct, subjecting unsuspecting consumers to liability. ECF 33-1 at 17. But Defendants' alarmist hypotheticals, constructed with sparse facts, would likely not result in Act violations. Due to Ticketmaster's security measures that enforce ticket limits, neither the executive nor the teenager using multiple accounts to exceed ticket limits would be likely to succeed in securing excess tickets. Unless the executive or the teenager used false information in their accounts, proxy IP addresses to disguise the linked purchases, or otherwise circumvented the security measures—just as Defendants do—Ticketmaster's security measures would likely block the excess purchases. If the teenager or executive *did* take these steps or others to evade Ticketmaster's security measures and purchase tickets in excess of posted ticket limits, such conduct would violate the Act.

---

[10] Fortunately, the absence of the term "bot" from the text of the Act saves the Court from needing to determine what constitutes a bot. But even if the Court does determine that the Act's acronym implies a requirement for the Commission to plead Defendants' use of bots, the Court will find such allegations in the Complaint. In ¶ 50, for example, the Commission alleges that "Defendants have used *SIM banks or boxes to facilitate the receipt and automate the retrieval of account verification codes* sent by Ticketmaster to many of the phone numbers associated with Defendants' many ticket-purchasing accounts, frustrating the purpose of Ticketmaster's account verifications." (emphasis added). Defendants do not explain why devices like SIM boxes (and the software necessary to operate them)—used to automate the retrieval of Ticketmaster's account verification codes—are not "bots."

### c.  The Complaint Adequately Pleads Defendants' Knowledge for Civil Penalties

Civil penalties are appropriate for violations of the Act when a defendant's actions violate the Act "with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such [actions are] unfair or deceptive and [are] prohibited." 15 U.S.C. § 45(m)(1)(A).[11] The Complaint amply pleads facts required to sustain the Commission's claim for civil penalties, alleging that Defendants: (1) have been aware of the Act and monitored its enforcement since its enactment, Complaint ¶ 51(a); (2) reviewed Commission enforcement actions filed in January 2021, giving them notice of the Commission's application of the Act, Complaint ¶ 51(b); (3) were warned by one of their credit card issuers in March 2021, in the wake of the Commission's enforcement actions in January 2021, that suspicion or detection of violations of the Act would lead to deactivation of their accounts, Complaint ¶ 51(c);[12] and (4)

---

[11] The Court may impose civil penalties for Defendants' violations of the Act. 15 U.S.C § 45c(b)(1). A violation of the Act "is a violation of a rule defining an unfair or deceptive act or practice under Section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. § 57a(a)(1)(B))." *Id.* Thus, under Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Better Online Ticket Sales Act is an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). Violations of Section 5(a) of the FTC Act, as the Complaint pleads, may be remedied through the imposition of civil penalties under Section 5(m)(1)(A) of the FTC Act. 15 U.S.C. § 45(m)(1)(A).

[12] The Commission does not oppose Defendants' Request for Judicial Notice of this notification. ECF 33-3, Exhibit 6. Defendants' Exhibit 6 shows that its payment processor provided a direct link to the full text of the Act itself and the Department of Justice's press release regarding the 2021 enforcement actions. *Id.* A plain reading of the Act informs the reasonable reader that bot use is not required under 15 U.S.C. § 45c(a)(1)(A), and DOJ's press release provides specific non-bot examples of violations. *Justice Department and FTC Announce First Enforcement Actions for Violations of the Better Online Ticket Sales Act*, DEP'T OF JUSTICE (Jan. 22, 2021), available at https://www.justice.gov/archives/opa/pr/justice-department-and-ftc-announce-first-enforcement-actions-violations-better-online-ticket ("The defendants are alleged to have circumvented Ticketmaster's restrictions on users holding multiple accounts by creating accounts in the names of family members, friends, and fictitious individuals, and using hundreds of credit cards."). The Commission does not oppose Defendants' request for judicial notice of the documents attached as Exhibits 1-5 to their Request for Judicial Notice. ECF 33-3.

sought legal advice regarding compliance with the Act after one of Defendant Key Investment Group's banks commissioned an examination that questioned whether Defendants' use of thousands of Ticketmaster accounts based on sham identities violated Ticketmaster's published ticket purchase policies, Complaint ¶ 51(d). Additionally, the Complaint pleads that Defendant Kurth entered a consent decree with Washington state regarding his use of software to circumvent Ticketmaster's security and other control measures. Complaint ¶ 51(e). Each of the other Defendants knew of Kurth's history of circumventing Ticketmaster's security and other control measures and yet used business practices designed to circumvent those very security and other control measures. *Id.*

These facts, individually and collectively, show that Defendants were objectively aware of the Act, had ample notice regarding its enforcement, and knew about concerns surrounding their compliance with it. That is more than enough to "fairly imply" that Defendants knew they were acting unlawfully. *See* 15 U.S.C. § 45(m)(1)(a); *see also Bell Atlantic*, 550 U.S. at 555 (holding that to state a claim under Rule 8 "[f]actual allegations must be enough to raise a right to relief above the speculative level ….").

Indeed, a defendant is subject to civil penalties for a violation of the Act "where a reasonable person under the circumstances would have known of the existence of the provision and that the action charged violated that provision." *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 139 (4th Cir. 1996); *see also United States v. Dish Network LLC*, 954 F.3d 970, 978 (7th Cir. 2020) (holding that civil penalties may be imposed when the defendant "either knew that the act was unlawful or if it should have known the act was unlawful ('knowledge fairly implied')"); *FTC v. Amazon.com, Inc.*, 735 F. Supp.3d 1297, 1332-33 (W.D. Wash. 2024) (holding that on a motion to dismiss concerning civil penalties under 15 U.S.C. § 45(m)(1)(A),

the FTC need not prove actual knowledge; it "'need only plausibly state Defendants had knowledge or were on notice that the [applicable law] applied to survive a motion to dismiss.'" (alteration in original) (quoting *United States v. Stratics Networks Inc.*, 721 F. Supp.3d 1080, 1101 (S.D. Cal. 2024)); *United States v. ACB Sales & Serv., Inc.*, 590 F. Supp. 561, 575 n.11 (D. Ariz. 1984) ("I read section 5(m)(1)(A) [of the FTC Act] to require only that the defendant or its agent have some knowledge, actual or constructive, … such that it can be concluded that the defendant or its agent knew or should have known that his conduct was unlawful."). This standard is easily satisfied here.

Defendants argue, incorrectly, that they cannot be subject to civil penalties for violations of the Act because they did not use bots in their operations and therefore, they contend, "it would have been literally impossible for [Key Investment Group] to have had knowledge 'on the basis of objective circumstances' that it violated the BOTS Act." ECF 33-1 at 21. This argument, which Defendants offer in five variations on pages 21-25 of their Memorandum (ECF 33-1), contests the merits of the Commission's claims but does not show that the Commission's pleading fails to meet the short and plain statement for relief standard of Rule 8. *See King*, 825 F.3d at 214 (holding that Rule 12(b)(6) motions do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.").[13]

For example, Defendants argue that their awareness of the Act does not equate to knowledge that the Act applies to circumvention techniques other than bot use. ECF 33-1 at 21-22. Defendants take this position even though the word "bot" does not appear anywhere in the

---

[13] Because the Act plainly covers more than just circumvention by bots, Defendants' claim that they could not have known the Act covers more than just bots is not credible. *See supra* Part IV(b)(ii).

text of the Act. 15 U.S.C. § 45c. If Defendants' awareness of the Act (lacking the word "bot")
were not enough, Defendants also knew about and reviewed the three complaints the Department
of Justice filed in 2021 under the Act, on referral from the Commission.[14] Complaint ¶ 51(b) and
ECF 33-1 at 22-23. Defendants claim those complaints were focused on bots use, ECF 33-1 at
22-23, but that is false. The complaints combined included 45 paragraphs pleading facts
regarding violations of the Act through means other than bot use.[15] Finally, Defendants' bank
questioned whether Defendants' use of so many sham accounts violated Ticketmaster's ticket
purchase rules, putting them on further notice that their conduct was potentially unlawful under
the Act. ECF 33-1 at 24.

These arguments, and others in Defendants' Memorandum, fall flat.[16] The Commission
has pled facts in paragraph 51 of the Complaint, including all reasonable inferences drawn

---

[14] *Cartisim*, No. 2:21-cv-00212 (E.D.N.Y. Jan. 14, 2021); *Concert Specials*, No. 2:21-cv-00214
(E.D.N.Y. Jan. 14, 2021); and *Just In Time Tickets*, No. 2:21-cv-00215 (E.D.N.Y. Jan. 14, 2021).

[15] In their Memorandum, Defendants cite to one paragraph in each of the three enforcement
complaints filed in January 2021. *See* ECF 33-1 at 23. They do not cite to any of the 45
paragraphs in those complaints pleading facts regarding violations of the Act through means
other than bot use. Those allegations can be found at *Cartisim*, No. 2:21-cv-00212 (E.D.N.Y. Jan.
14, 2021) at ECF 1, ¶¶ 2, 16-17, 26-29, and 31-38; *Concert Specials*, No. 2:21-cv-00214
(E.D.N.Y. Jan. 14, 2021) at ECF 1, ¶¶ 2, 16-17, 27-30, and 32-39; and *Just In Time Tickets*, No.
2:21-cv-00215 (E.D.N.Y. Jan. 14, 2021) at ECF 1, ¶¶ 2, 16-17, 27-30, and 32-39.

[16] Defendants also suggest the rule of lenity should shield them from civil penalties, citing
*Bittner v. United States*, 598 U.S. 85 (2023). But the plurality in *Bittner* does not hold that "the
rule of lenity applies to civil penalties." ECF 33-1 at 26. Only two justices in *Bittner* would have
applied the rule of lenity, in part, because "the question before us has criminal as well as civil
ramifications." *Bittner*, 598 U.S. at 103; *see also Amazon.com*, 735 F.Supp.3d at 1332
(discussing the plurality decision in *Bittner* and declining to apply the rule of lenity to FTC rule
violations). "Lenity only applies to criminal statutes or the functional equivalent," *Pugin v.
Garland*, 19 F.4th 437, 444 (4th Cir. 2021), and even then, can only be invoked to remedy
"*grievous* ambiguity or uncertainty in the statute," *Hosh v. Lucero*, 680 F.3d 375, 383 (4th Cir.
2012) (emphasis in original). Because this case involves an unambiguous civil statute, the rule of
lenity is inapplicable.

therefrom, showing that a reasonable ticket broker under the circumstances of this case would have known of the existence of the Act and that the use of thousands of sham Ticketmaster accounts, among other practices, violated the Act. Under these circumstances, the Commission has properly pled a claim for civil penalties. *See Nat'l Fin. Servs.,* 98 F.3d at 139; *Amazon.com,* 735 F. Supp.3d at 1332-33.

### d.  The Act is Not Unconstitutionally Vague

Defendants next contend that the Act is unconstitutionally vague as applied to "non-bot users." Courts have found statutes impermissibly vague when they fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited …." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)). Statutes that regulate economic activities are "subject to a less strict vagueness test … because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Id.* Additionally, the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 498-99. For civil statutes regulating economic activities, courts have held that vagueness standards "are especially lax," and that "a party lacks fair notice when the relevant standard is 'so vague as to be no rule or standard at all.'" *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 250 (3d. Cir. 2015) (internal citation omitted). The Act easily clears this low bar with room to spare.

The Act unequivocally applies to "*any* person"—bot user or not—who "circumvent[s] a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket

purchasing limits," so the Court should reject this argument. *See* 15 U.S.C. § 45c(a)(1)(A)

(emphasis added). The Act is clear: circumventing a "security measure, access control system, or

other technological control or measure … that is used by the ticket issuer to enforce posted event

ticket purchasing limits" constitutes a violation of the Act, regardless of the manner and means

used to circumvent the security measure. Accordingly, the statute clearly provides a "reasonable

opportunity to know what is prohibited." *See Village of Hoffman Estates*, 455 U.S. at 498

(quotation omitted). [17]

### e. A Plain Reading of the Act Shows that it Does Not Violate the Major Questions Doctrine

In their final attempt to stymie the plain text of the Act, Defendants invoke the major

questions doctrine. The major questions doctrine applies only to "extraordinary cases" in which

"both separation of powers principles and a practical understanding of legislative intent make

[the Court] 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking

there." *West Virginia. v. EPA*, 597 U.S. 697, 723 (2022) (quoting *Utility Air Regulatory Grp. v.

EPA*, 573 U.S. 302, 324 (2014)). Unlike *West Virginia v. EPA*, this case involves neither

ambiguous statutory text nor "extravagant statutory power over the national economy." 597 U.S.

at 724. Because neither the "history and the breadth of authority"[18] nor the "economic and

---

[17] Defendants' vagueness challenge is also foreclosed by the rule that "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756 (1974); *see, e.g.*, *supra* n. 10 (discussing how Defendants use of SIM boxes and their operating software constitute bot use, however defined).

[18] This is the Commission's first litigated case under the Act, and despite Defendants' characterizations, the facts alleged in the Complaint do not significantly depart from those alleged in the Commission's three 2021 consent judgment cases. The defendants in the 2021 cases used, among other things, multiple accounts, fictitious identifying information, and IP proxy services to circumvent security measures that Ticketmaster used to enforce ticket limits—

political significance".[19] of the Act "provide[s] a reason to hesitate before concluding that Congress meant to confer such authority[,]" the Court should decline Defendants' invitation to second-guess the Act's plain language. *See id.* at 721; *accord North Carolina Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 296-97 (4th Cir. 2023).

## V.    Conclusion

Because the Commission has adequately pled the elements to state a claim under 15 U.S.C. § 45(c)(a)(1)(A) and knowledge for civil penalties under 15 U.S.C. § 45(m)(1)(A), and Defendants' other defenses fail, the Court should deny Defendants' Motion to Dismiss.

Dated: December 24, 2025                      Respectfully submitted,


                                              */s/ Simon Barth*

                                              _____
                                              Simon Barth (MA Bar No. 706122)
                                              P. Connell McNulty (PA Bar No. 87966)
                                              600 Pennsylvania Avenue, NW
                                              Washington, DC 20580
                                              Ph: 202-326-3317 (Barth); 2061 (McNulty)
                                              Email: sbarth@ftc.gov; pmcnulty@ftc.gov

                                              Attorneys for Plaintiff
                                              FEDERAL TRADE COMMISSION

---

the same conduct the Commission now challenges here (in addition to Defendants' use of SIM boxes to overcome account verifications at scale). *See Cartisim*, No. 2:21-cv-00212 (E.D.N.Y. Jan. 14, 2021); *Concert Specials*, No. 2:21-cv-00214 (E.D.N.Y. Jan. 14, 2021); and *Just In Time Tickets*, No. 2:21-cv-00215 (E.D.N.Y. Jan. 14, 2021).

[19] The Act affects only the market for tickets to certain events (i.e., the market for events upon which a ticket issuer imposed a ticket limit). Although the ticket market for such events is undoubtedly important to many consumers, its importance to the national economy does not compare to the "American energy market" at issue in *West Virginia v. EPA*, 597 U.S. at 724. There is no record to support Defendants' hyperbolic claim that a plain reading of the Act would be "the death-knell for a $17 billion industry." ECF 33-1 at 30.

**CERTIFICATE OF SERVICE**

I hereby certify that on December 24, 2025, I caused the foregoing Memorandum of Law in Opposition to Defendants' Motion to Dismiss to be served on the following via the Court's ECF system:

Bezalel A. Stern, Esq.
Joshua N. Drian, Esq.
MANATT, PHELPS & PHILLIPS, LLP
1050 Connecticut Ave. NW, Suite 600
Washington, D.C. 20036
Tel.: (202) 585-6500
bstern@manatt.com
jdrian@manatt.com

Counsel for Defendants

*/s/ Simon Barth*
Simon Barth