IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>*Plaintiff*<br><br>v.<br><br>KEY INVESTMENT GROUP, LLC, et al.,<br><br>*Defendants*. | No. 1:25-cv-02716-GLR |

**BRIEF OF AMICI CURIAE SENATOR MARSHA BLACKBURN AND SENATOR BEN RAY LUJÁN IN SUPPORT OF THE FEDERAL TRADE COMMISSION'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

Page

INTERESTS OF AMICI CURIAE ........................................................................................... 1

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................. 2

I. THE STATUTE'S PLAIN TEXT IS NOT LIMITED TO BOTS. ....................................... 3

II. THE STATUTE'S PLAIN TEXT DOES NOT DEPEND ON HOW VIGOROUSLY A TICKET ISSUER ENFORCES ITS POLICIES, NOR DOES IT CREATE A LOOPHOLE FOR COLLUSIVE CONDUCT. ................................................ 6

III. EVEN IF LEGISLATIVE HISTORY WERE RELEVANT, AMICI DRAFTED THE BOTS ACT BROADLY TO COMBAT UNFAIR TICKET SCALPING. ................ 8

IV. DEFENDANTS' CONSTRICTIVE READING WOULD ALLOW TICKET SCALPERS TO END-RUN THE LAW AND HARM ORDINARY CONSUMERS. .................................................................................................................. 12

CONCLUSION ........................................................................................................................ 15

## **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.*,
    331 U.S. 519 (1947)...................................................................................................5

*Conroy v. Aniskoff*,
    507 U.S. 511 (1993) .................................................................................................8

*FDIC v. Meyer*,
    510 U.S. 471 (1994)...................................................................................................9

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004)...................................................................................................5

*Matal v. Tam*,
    582 U.S. 218 (2017)...................................................................................................4

*Milner v. Dep't of Navy*,
    562 U.S. 562 (2011)...................................................................................................9

*Miranda v. Garland*,
    34 F.4th 338 (4th Cir. 2022) ......................................................................................6

*Oncale v. Sundowner Offshore Servs., Inc.*,
    523 U.S. 75 (1998).....................................................................................................9

*Owens v. Balt. City State's Att'ys Off.*,
    767 F.3d 379 (4th Cir. 2014) .....................................................................................5

*Pa. Dep't of Corr. v. Yeskey*,
    524 U.S. 206 (1998)...................................................................................................9

*Republic Franklin Ins. Co. v. Albemarle Cnty. Sch. Bd.*,
    670 F.3d 563 (4th Cir. 2012) .....................................................................................4

*United States v. Cleveland Indians Baseball Co.*,
    532 U.S. 200 (2001)...................................................................................................7

*United States v. Mills*,
    485 F.3d 219 (4th Cir. 2007) .....................................................................................9

*United States v. Minker*,
    350 U.S. 179 (1956)...................................................................................................5

*United States v. Mo. Pac. R.R. Co.*,
  278 U.S. 269 (1929)...................................................................................................9

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)...................................................................................................5

**Statutes**

15 U.S.C. § 45c(a)(1)(A) ...................................................................................................3, 7, 8

15 U.S.C. § 45c(a)(1)(B)........................................................................................................3, 7

15 U.S.C. § 45c(a)(2) .................................................................................................................4

17 U.S.C. § 1201(a)(3)(A) .........................................................................................................7

Pub. L. No. 114-274, 130 Stat. 1401(2016).....................................................................4, 6, 7, 13

**Other Authorities**

Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF
  LEGAL TEXTS (2012)................................................................................................5, 7

Arsenic Prevention and Protection from Lead Exposure in Juice Act of 2012, H.R.
  3984, 112th Cong. (2012) ..........................................................................................5

*Circumvent*, BLACK'S LAW DICTIONARY (12th ed. 2024) .............................................................3

*Circumvent*, MERRIAM-WEBSTER DICTIONARY (11th ed. rev. 2025) .........................................3, 7

Clare Y. Cho, Cong. Rsch. Serv., R48179, TICKETS FOR LIVE
  ENTERTAINMENT EVENTS (2025)...........................................................................12,13

Congressman Frank Pallone, Jr., *Pallone, DeLauro Proposal for Arsenic Levels in
  Apple Juice Adopted by FDA* (July 12, 2013)..........................................................4, 5

Congressman Paul Tonko, *Tonko, Blackburn Lead Bipartisan Effort to Level
  Online Ticket Sales Playing Field for Fans of Live Entertainment* (Apr. 28,
  2016) ..........................................................................................................................11

Dave Brooks, *Is It a Bot, or Not? Ticketing's Next Big Legal Fight Could Reshape
  the Resale Industry*, BILLBOARD (Aug. 29, 2025) .....................................................13

Digital Citizens Alliance, *When It Comes to Digital Markets, Trust Can't Be
  Secondary* (May 2025)..............................................................................................14

*Examining the Better Online Ticket Sales Act of 2016: Hearing Before the
  Subcomm. on Consumer Prot., Prod. Safety, Ins., & Data Sec. of the S. Comm.
  on Com., Sci., & Transp.*, 114th Cong. (2016) ...........................................10, 11, 12

Exec. Order No. 14,254, 90 Fed. Reg. 14,699 (Apr. 3, 2025) ....................................................... 15

Nat'l Indep. Ticket Operators Ass'n, NITO TICKET RESALE STUDY (2024) ................................. 14

N.Y. State Off. of the Att'y Gen., OBSTRUCTED VIEW: WHAT'S BLOCKING NEW
    YORKERS FROM GETTING TICKETS (2016) ............................................................................ 13

Phillip Leslie & Alan Sorensen, *The Welfare Effects of Ticket Resale* (Nat'l
    Bureau of Econ. Rsch., Working Paper No. 15476 (2009) ......................................................... 14

Press Release, White House, *Fact Sheet: President Donald J. Trump Will End
    Price-Gouging by Middlemen in the Entertainment Industry* (Mar. 31, 2025) ................. 14, 15

Senator Amy Klobuchar, *Klobuchar-Backed Bipartisan Legislation to Protect
    Consumers from Ticket Bots Passes Senate* (Dec. 2, 2016) ...................................................... 11

Senator Marsha Blackburn, *The FTC Has Failed To Enforce The BOTS Act* (Dec.
    2, 2022) ...................................................................................................................................... 14

Senator Richard Blumenthal, *Senate Approves Blumenthal Bill to Crack Down on
    Unfair Ticket Bots* (Dec. 1, 2016) ............................................................................................. 11

U.S. Gov't Accountability Off., GAO-18-347, *Event Ticket Sales: Market
    Characteristics and Consumer Protection Issues* (2018) ......................................................... 14

## INTERESTS OF AMICI CURIAE

Amici Curiae are two sitting members of the United States Senate:

Senator Marsha Blackburn (Tennessee)
Senator Ben Ray Luján (New Mexico)

As members of the United States House of Representatives in 2016, both Amici voted to enact the Better Online Ticket Sales Act of 2016, which then-Representative Blackburn had drafted and sponsored.  As legislators, Amici have a special interest in the law's sound interpretation in federal court, and accordingly, they support the Federal Trade Commission (the "Commission") in opposing Defendants' motion to dismiss, which is grounded in an erroneous, unduly narrow interpretation of the law that they helped to enact.

## INTRODUCTION

Amici and their fellow legislators drafted and voted to pass the Better Online Ticket Sales Act of 2016 ("BOTS Act") to help protect ordinary American consumers from rapacious online ticket scalpers.  These bad actors buy up tickets with no intention of using them.  They then re-sell the tickets on secondary markets with eye-popping markups.  Their unearned profits come out of the pockets of ordinary Americans who just want to attend a performance by a favorite artist or cheer on their team at the big game.  Scalpers ply their shady trade using various sophisticated techniques and schemes to bypass the security measures in place to combat their underhanded practices and to maintain access to events for ordinary Americans.  Some scalpers use bots to buy large numbers of tickets before fans have a fighting chance.  Others, like Defendants here, use manpower and trickery to do the same thing.

In March 2025, President Donald Trump directed the FTC to take action and rigorously enforce the law that Amici helped pass.  That law prohibits scalpers from using *any* means to "circumvent" the online controls of ticket issuers that are designed to prevent violations of their

rules—especially limits on the number of tickets a customer may buy for a given event. Defendants have violated this law. Using internet protocol ("IP") proxy services, subscriber identity module ("SIM") card banks, and many thousands of fake Ticketmaster accounts with thousands of different credit cards, Defendants circumvented Ticketmaster's rules limiting the number of tickets that can be purchased for a given event from the same IP address or using the same identifying information. In doing so, Defendants reaped enormous windfall profits—including nearly $7 million between November 2022 and December 2023 alone. The Commission subsequently brought this case.

This Court should deny Defendants' motion to dismiss. The operative text of the BOTS Act does not limit its application to scalpers who use bots. In fact, the law's key provision does not reference bots at all. And contrary to Defendants' representations, Amici—as drafter (Senator Blackburn) and supporter (Senator Luján) of the law—did *not* believe the BOTS Act was confined solely to use of bot technology. If the Court holds for Defendants, the law that Amici worked hard to enact with overwhelming bipartisan support would be easily evaded to the detriment of American eventgoers, who would be forced to keep paying exorbitant markups to scalpers. This Court should not countenance Defendants' circumvention.

## ARGUMENT

The BOTS Act is clear that online ticket scalping in violation of ticket issuers' posted rules is illegal.[1] It is illegal whether scalpers use bots or not. And it is illegal whether ticket issuers actively enforce their policies or not. Amici drafted the BOTS Act broadly to prevent scalpers like Defendants from evading purchase limits to buy up tickets before event-going consumers have a

---

[1] Amici take no issue with referring to the BOTS Act by its short title. *See* Defs. Mem. 6 (complaining that exclusively using the spelled-out title is "intentional misdirection"); *id.* at 1 n.1 (similar). As explained herein, the title does not limit the operative text. *See infra*, pp. 4–6. Defendants' complaints are themselves misdirection.

fair chance. This Court should not condone Defendants' attempt to circumvent the law by doing manually what they concede they cannot do with the aid of bots. The motion to dismiss should be denied.

## I.     THE STATUTE'S PLAIN TEXT IS NOT LIMITED TO BOTS.

Defendants' primary argument is that the BOTS Act applies only to scalpers who use bots. *See* ECF No. 33-1 ("Defs. Mem."), at 2 n.2, 3–6, 8–9, 13. But the text of the statute plainly applies regardless of scalpers' methods. It applies equally to tech-savvy scalpers who use sophisticated bots and to low-tech scalpers who break the rules the old-fashioned way.

The BOTS Act declares:

> [I]t shall be unlawful for any person to circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules.

15 U.S.C. § 45c(a)(1)(A). The statute continues that it is also unlawful "to sell or offer to sell any event ticket . . . obtained" in this way. *Id.* § 45c(a)(1)(B).

By its plain terms, the BOTS Act prohibits "circumvent[ion]" of ticket issuers' means of enforcing "posted event ticket purchasing limits" and "purchasing order rules." *Id.* § 45c(a)(1)(A). As Defendants apparently agree, the operative verb "circumvent" has a plain—and broad— meaning: "To avoid (a restrictive problem, rule, etc.), esp. by clever and *sometimes* dishonest means." *Circumvent*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added); *see also Circumvent*, MERRIAM-WEBSTER DICTIONARY (11th ed. rev. 2025) ("to manage to get around especially by ingenuity or stratagem"); Defs. Mem. 13 (quoting these dictionary definitions).[2]

---

[2] These dictionary definitions can be reduced to a single word: Bypass. To circumvent something is to bypass it. The terms are synonymous. Although "circumvent" may refer to dishonest conduct, it is not limited to such. Even if dishonesty were required for conduct to constitute circumvention, the allegations here—including the use of fictitious accounts and concealed IP addresses—obviously qualify. *See, e.g.*, Compl. ¶¶ 28, 35, 39–40, 42–44.

Defendants' alleged conduct falls squarely within this plain meaning. The Commission alleges that Defendants used various clever tactics to "avoid" Ticketmaster's ticket-purchase controls, including "thousands of fictitious Ticketmaster accounts, thousands of virtual and traditional credit card numbers, proxy or spoofed IP addresses, and SIM banks." ECF No. 1 ("Compl."), at ¶ 2; *see id.* ¶¶ 28–29, 34–50. Nothing about the word "circumvent" limits the means by which Defendants "avoid" or "manage to get around" Ticketmaster's controls exclusively to the use of bots.

If Amici and their fellow legislators had intended to limit the BOTS Act's application to bot users, they could—and would—have said so. But they did not. *Cf. Matal v. Tam*, 582 U.S. 218, 232 (2017) ("If Congress had wanted to confine the reach of the disparagement clause in the way that Tam suggests, it would have been easy to do so."). Indeed, the BOTS Act's very next subsection carves out an exception for "investigat[ion]," "enforcement," and "research" activities that involve the "use [of] any computer software or system." 15 U.S.C. § 45c(a)(2); *cf. Matal*, 582 U.S. at 232 (inclusion of a limitation in a "neighboring provision" evinces congressional intent *not* to limit other provisions without the express textual limitation). This Court should not read into the text an implicit limitation that Congress conspicuously chose not to include.

Without a foothold in the statutory text, Defendants cling to the statute's short title, "the BOTS Act." *See* Defs. Mem. 1 n.1 ("This Act may be cited as the 'Better Online Ticket Sales Act of 2016' ***or the 'BOTS Act of 2016***.'" (quoting Pub. L. No. 114-274, § 1, 130 Stat. 1401, 1401–04 (2016) (emphasis in original))); *ibid.* ("The acronym . . . indicates that the BOTS Act is about bots."); *id.* at 2 n.2 ("[T]he BOTS Act unambiguously applies only to bots users."); *id.* at 23 & n.19 (similar). "But titles are not generally meant to take the place of the substantive provisions of the text." *Republic Franklin Ins. Co. v. Albemarle Cnty. Sch. Bd.*, 670 F.3d 563, 569 (4th Cir.

2012). Indeed, it is a cardinal rule of statutory interpretation that "a title . . . should *never* be allowed to override the plain words of a text." Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 222 (2012) (emphasis added); *see Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.*, 331 U.S. 519, 528–29 (1947) ("[T]itles are not meant to take the place of the detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis. . . . [T]hey cannot undo or limit that which the text makes plain." (citations omitted)); *see also, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 483 (2001) (clarity of statutory text "eliminates the interpretive role of the title"); *United States v. Minker*, 350 U.S. 179, 185 (1956) (refusing to allow a statutory title to limit the otherwise "unqualified use" of a statutory word because, "read as ordinary English," it did not admit of a "narrowing reading"); *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 394 (4th Cir. 2014) ("[A]s the Supreme Court has long held, a statute's title provides little assistance to courts interpreting statutory provisions.").

If a *full* title cannot limit the meaning of the text, surely a *short* title—indeed, an acronym—cannot limit the text either. Besides, it makes no sense to ignore deliberate, negotiated statutory language in favor of a punchy short title. As legislators, Amici often pitch bills using memorable acronyms that are merely suggestive of their subject matter. They may help inform the public of the bill's primary objective, but titles have no bearing on the legislation's full scope. *Cf. Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004) (explaining that a statute's caption may refer to the "most common example" of something covered by the law's operative text, but it cannot limit that text when the text "plainly reaches beyond" it).[3]

---

[3] Consider, for example, the proposed Arsenic Prevention and Protection from Lead Exposure in Juice Act of 2012, H.R. 3984, 112th Cong. (2012). Like the BOTS Act, which applies to more than scalping through use of bots, the APPLE Juice Act of 2012 regulates more than just apple juice. Indeed, just as the BOTS Act never says "bots" in its operative text, the APPLE Juice Act never used the word "apple"—it said "fruit juice" instead—and for good reason. The bill was aimed not only at apple juice with reportedly high arsenic levels, it targeted *grape* juice, too. *See* Press Release, Office of Congressman Frank Pallone, Jr., *Pallone, DeLauro Proposal for Arsenic Levels in Apple Juice Adopted by FDA* (July 12, 2013), tinyurl.com/APPLEJuiceAct (explaining that the legislators "introduced their

Further, if the Court were to consider the short title in interpreting the BOTS Act, it should also consider the *full* title, "An Act To prohibit the *circumvention* of control measures used by Internet ticket sellers *to ensure equitable consumer access* to tickets for any given event," along with the relevant section header, "Unfair and deceptive acts and practices *relating to circumvention* of ticket access control measures." Pub. L. No. 114-274, pmbl., 130 Stat. at 1401 (emphases added); *cf. Miranda v. Garland*, 34 F.4th 338, 355 (4th Cir. 2022) ("[I]f we are to consider the heading of [the relevant subsection], we must also consider the heading of the title under which that section falls."). Both clearly indicate a broad scope not limited to bots.

## II.    THE STATUTE'S PLAIN TEXT DOES NOT DEPEND ON HOW VIGOROUSLY A TICKET ISSUER ENFORCES ITS POLICIES, NOR DOES IT CREATE A LOOPHOLE FOR COLLUSIVE CONDUCT.

As a fallback argument, Defendants claim that only acts actively prosecuted by ticket issuers can constitute "circumvent[ion]" under the BOTS Act. *See* Defs. Mem. 16 ("KIG cannot 'circumvent' when Ticketmaster approves."); *id.* at 13–15 (same); *id.* at 1 (similar). This is just another attempt to read an implicit limitation into the text where no such limitation exists.

Yet again, the ordinary meaning of the statutory term "circumvent" forecloses Defendants' argument. Circumvention does not turn on a "system operator's authorization or permission." *See id.* at 14. If, for example, Ticketmaster failed to enforce its rules against bot usage, that would not change whether a scalper is using bots to "circumvent" Ticketmaster's controls.[4] By using bots

---

legislation, the APPLE Juice Act, on the heels of a January 2012 Consumer Reports revelation that alarmingly high levels of inorganic arsenic exist in apple *and grape juice*" (emphasis added)).

[4] Defendants point to a Ticketmaster PowerPoint slide to claim that the ticket issuer "actively permitted" brokers like Defendants to purchase tickets through "accounts using 'fictitious' names, virtual credit cards, or accessed via rotating IP addresses." Defs. Mem. 16 fig. 1. But that same slide clearly refers to this conduct as "violating fictitious account rules." *Ibid.* This does *not* show that the company "actively" granted permission, let alone that it had dismantled the security measures (*e.g.*, controls preventing multiple purchases from the same IP address, *see* Compl. ¶ 34) that Defendants undoubtedly circumvented (*e.g.*, by using an IP proxy service, *see id.* ¶ 35) regardless of permission. By the same token, a single e-mail from a single "Ticketmaster Fan Support" representative, *see* Defs. Mem. 15 (citing ECF No. 1-1, Ex. A), plainly does not represent the company's considered views, nor does it negate the conclusion that Defendants circumvented Ticketmaster's controls.

(or other means), a user "manages to get around" ticket-issuer controls, permission or acquiescence notwithstanding. *Circumvent*, MERRIAM-WEBSTER DICTIONARY (11th ed. rev. 2025). That is still unlawful circumvention, plain and simple.[5]

An analogy to trespass is instructive. If a property owner turns a blind eye to trespass, that does not mean the trespasser has not climbed over the fence. He *has* climbed over the fence—but with tacit permission. In trespass, of course, permission is a defense. But the BOTS Act includes no such exception. That is because violating the BOTS Act harms *event-going consumers*—not ticket issuers like Ticketmaster. Any lack of enforcement or blind-eye treatment by Ticketmaster cannot absolve scalpers of BOTS Act liability. Holding otherwise would create an atextual exemption for collusive conduct between scalpers and ticket issuers that would harm the very people that the BOTS Act was plainly intended to protect—ordinary Americans who want to see their favorite performers or sports teams at reasonable prices. *See* Pub. L. No. 114-274, pmbl., 130 Stat. at 1401 (indicating Act's focus on "ensur[ing] equitable *consumer* access to tickets" (emphasis added)); *see also* 15 U.S.C. § 45c(a)(1)(B) (law applies to resale platforms too).

In search of a textual basis for their position, Defendants assert the statutory phrase "is used" really means "is *actually* used." *See* Defs. Mem. 1 ("To conclude KIG violated the BOTS

---

[5] In addition to dictionary definitions of the term, Defendants appeal to a *statutory* definition of the phrase "circumvent a technological measure" from the Digital Millenium Copyright Act ("DMCA")—a completely unrelated statute codified in a different title of the U.S. Code—which specifically requires lack of permission. *See* Defs. Mem. 14; *compare* 17 U.S.C. § 1201(a)(3)(A) (the DMCA definition in Title 17), *with* 15 U.S.C. § 45c(a)(1)(A) (BOTS Act use of the term 'circumvent' in Title 15). But a statutory definition lifted from an unrelated title of the U.S. Code says precious little about the meaning of the term in another title. *See United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 213 (2001) ("The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them . . . has all the tenacity of original sin and must constantly be guarded against." (citation omitted)); *ibid.* (refusing to afford the same meaning to an identical phrase used in both Title 42 and Title 26); Scalia & Garner, *supra*, at 172 ("[T]he presumption of consistent usage can hardly be said to apply across the whole *corpus juris*. Frequently when a court is called on to construe a statutory word or phrase, counsel for one side will argue that it must bear the well-established or unavoidable meaning that the same word or phrase has in a different statute altogether. Without more, this argument does not have much force[.]"). If anything, the DMCA definition demonstrates that Congress conspicuously chose *not* to condition the BOTS Act on lack of permission.

Act, the Court must find . . . that Ticketmaster *actually* enforced [its] ticket limits or maintained the integrity of [its] rules." (cleaned up) (emphasis added)). But that is not how an ordinary English speaker would understand the phrase in context. Rather, the phrase "is used" indicates purpose. For example, one might say, "This fire extinguisher *is used* to put out kitchen fires," even though the extinguisher has sat unused beneath the kitchen sink for years on end. In the same way, the BOTS Act prohibits circumventing a "control or measure . . . that *is used* by the ticket issuer to enforce" and "maintain the integrity of" its posted rules—that is, a "control or measure" that exists for that *purpose*. 15 U.S.C. § 45c(a)(1)(A) (emphasis added). Because the Complaint adequately alleges that Ticketmaster has controls and measures "designed" to serve these purposes, Compl. ¶¶ 34, 38; *see id.* ¶ 49, and that Defendants circumvented these controls and measures, *see id.* ¶¶ 35–37, 39–40, 42–48, 50, the Commission has stated viable BOTS Act violations.[6]

### III.  EVEN IF LEGISLATIVE HISTORY WERE RELEVANT, AMICI DRAFTED THE BOTS ACT BROADLY TO COMBAT UNFAIR TICKET SCALPING.

There is no textual basis for Defendants' artificially narrow reading of the statute. So, Defendants all-too-readily venture beyond the text into the fraught domain of legislative history.[7] This is a mistake twice over.

*First*, legislative history comes into play only to assist in resolving textual ambiguities. *See Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011) ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it."); *see also United States v. Mo. Pac. R.R.*

---

[6] Defendants' contrary reading would yield absurd results. Scalpers would escape liability whenever a ticket issuer becomes so overwhelmed by the sheer number of circumventions that it cannot police them all. Moreover, ticket issuers and scalpers could collude to evade the statute by agreeing not to enforce security measures, access control systems, or other technological controls or measures. Nothing in the statute turns on enforcement sufficiency, let alone authorizes or requires a court to invent an *ad hoc* balancing test to determine how much enforcement is enough. Rather, a court need only consider whether a ticket issuer put security measures in place and whether a scalper circumvented those measures. 15 U.S.C. § 45c(a)(1)(A). Nothing more.

[7] *See Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) ("[T]he use of legislative history [is] the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends.").

*Co.*, 278 U.S. 269, 278 (1929) ("[W]here the language of an enactment is clear . . . the words employed are to be taken as the final expression of the meaning intended" and "in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed."). As explained above, *supra* sections I–II, the BOTS Act is unambiguous. It applies broadly to *any* means used to "circumvent" ticket issuer rules—not just the bots that many legislators, Amici included, were particularly concerned about in 2016. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) ("[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." (cleaned up)); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) ("[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").

Attempting to escape the plain text, Defendants briskly posit that the BOTS Act text is ambiguous merely because the term "circumvent" is not defined by the statute. *See* Defs. Mem. 13 ("The BOTS Act does not define the term 'circumvent.' Because the term is not defined, courts are instructed to . . . look to legislative history . . . ."); *see also id.* at 8–9 (similar). That violates Statutory Interpretation 101: "In the absence of [a statutory] definition, we construe a statutory term in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994) (relying on a definition from BLACK'S LAW DICTIONARY to discern ordinary meaning); *see also United States v. Mills*, 485 F.3d 219, 222 (4th Cir. 2007) ("It is a cornerstone of statutory interpretation that an undefined term is construed in accordance with its ordinary or natural meaning." (cleaned up)). And again, as explained above, *supra* sections I–II, the ordinary meaning

-9-

of the statutory term "circumvent" easily resolves this case without any need to resort to legislative history.

*Second*, even assuming legislative history is relevant to resolving some latent ambiguity, Defendants' presentation of that history is incorrect. They claim that "the BOTS Act's drafters . . . believed the BOTS Act was [only] meant to stop the behavior of people who use bots." Defs. Mem. 20–21; *see id.* at 21 ("Nobody at the time understood that the BOTS Act was meant to regulate non-bot behavior."); *id.* at 9 ("The BOTS Act's legislative history is clear and consistent. In 2016, Congress repeatedly and unambiguously stated that the BOTS Act ***is about bots***." (emphasis in original)). That is wrong. Amici include the BOTS Act's drafters, and that is not what they believed. Defendants misrepresent their views.

When Amicus Senator Blackburn introduced the BOTS Act and Congress unanimously passed it into law, legislators drew attention to the problem of online ticket scalpers. The problem troubling Amici and their fellow lawmakers was not just scalpers using bots to gain an unfair advantage—though, to be sure, that was a significant concern. The root problem was that ticket scalpers did not play by the rules; they cheated and enriched themselves at the expense of the ordinary American consumer. By evading ticket-issuer rules like ticket-purchase limits—whatever their means of doing so—to snatch up and accumulate hoards of tickets, online scalpers forced many Americans into secondary markets where scalpers then resold their tickets at exorbitant markups. In short, unscrupulous scalpers gained at American eventgoers' expense.[8]

---

[8] Advocates for the BOTS Act at the Senate subcommittee hearing that considered the bill raised these same concerns. *See, e.g.*, *Examining the Better Online Ticket Sales Act of 2016: Hearing Before the Subcomm. on Consumer Prot., Prod. Safety, Ins., & Data Sec. of the S. Comm. on Com., Sci., & Transp.*, 114th Cong. at 7 (2016) (statement of Bob Bowlsby, Commissioner, Big 12 Conference) ("Whether it's an individual lurking outside the perimeter of an arena or a sophisticated computer operator unleashing a torrent of bots, the bottom line is this: the hard-earned money of our fans spent on tickets to our sporting events should benefit our schools and our student athletes, not third parties who seek to make a quick buck off our most passionate supporters."); *id.* at 12 (prepared statement of Jeffrey Seller, Producer, "Hamilton") ("[W]e are here together to ask for your help in passing the BOTS Act to punish abusers of a system designed for consumers and fans, not just for those looking to 'game the system' and make a quick buck.").

When the BOTS Act passed, Amicus Senator Blackburn, the bill's House co-sponsor, explained this problem and how the BOTS Act addressed it:

> Scalpers . . . purchase tickets in mass quantities and sell them at a drastically inflated rate, which unfairly prices most fans of live entertainment out of the market. The entertainers go to great lengths to build relationships with their fans and ensure that they will have access to shows, but scalpers are decimating this experience. The BOTS Act will allow FTC enforcement . . . against proven online scalpers. It is time to end these anti-consumer tactics and level the online ticket playing field for fans of live entertainment.

Press Release, Office of Congressman Paul Tonko, *Tonko, Blackburn Lead Bipartisan Effort to Level Online Ticket Sales Playing Field for Fans of Live Entertainment* (Apr. 28, 2016), tinyurl.com/Tonko-Bbn. To be sure, Senator Blackburn also noted that bots were in Congress's crosshairs because scalpers were often "taking advantage of [them] to circumvent restrictions put in place by online ticketing agents." *Ibid.* But as this statement itself implies, using bots is just *one* way—albeit a common way—of circumventing ticket-issuer restrictions. *See ibid.*; *see also* Press Release, Office of Senator Richard Blumenthal, *Senate Approves Blumenthal Bill to Crack Down on Unfair Ticket Bots* (Dec. 1, 2016), tinyurl.com/Blum-PR (noting that "*[o]ne* of the chief reasons" for ticket scarcity in primary markets is "the use of 'ticket bots'" (emphasis added)); Press Release, Office of Senator Amy Klobuchar, *Klobuchar-Backed Bipartisan Legislation to Protect Consumers from Ticket Bots Passes Senate* (Dec. 2, 2016), tinyurl.com/Klob-PR ("The Better Online Ticket Sales (BOTS) Act of 2016 would prohibit the use of ticket bots *and other online measures* in order to deliberately circumvent security protocols that limit or restrict online ticket purchases." (emphasis added)). The problem that Amici and their congressional colleagues clearly targeted was the use of unfair practices to snatch up tickets and then price-gouge event-going Americans as the date of the ticketed event approached. *See Examining the Better Online Ticket Sales Act of 2016: Hearing Before the Subcomm. on Consumer Prot., Prod. Safety, Ins., & Data*

*Sec. of the S. Comm. on Com., Sci., & Transp.*, 114th Cong. at 21 (2016) (Sen. MORAN: "The goal here is to create the circumstance in which you can't acquire a huge magnitude of the tickets that are available and, therefore, control or corner the market with your resale of those tickets.").

### IV. DEFENDANTS' CONSTRICTIVE READING WOULD ALLOW TICKET SCALPERS TO END-RUN THE LAW AND HARM ORDINARY CONSUMERS.

Defendants concede, as they must, that the BOTS Act forbids the use of bots to violate enforced ticket-issuer policies, amass tickets, and resell them. *See* Defs. Mem. 1, 3–4, 8–9. But they invite the Court to adopt an untenable reading of the BOTS Act that would open the door to easy end-runs around that conceded prohibition. The Court should refuse that invitation.

On Defendants' view, online ticket scalpers can comply with the law by either (1) persuading ticket issuers to relax enforcement of their policies, *see id.* at 13, 17–19, or (2) use manual labor instead of bots to do the very same thing, *see id.* at 7, 9–12. Neither tactic should be condoned.[9]

The first should be rejected because, as explained above, *supra* section II, scalping prohibitions do not turn on how vigorously a ticket issuer enforces its policies. In addition, Defendants' interpretation would condone collusive conduct. Ticket issuers, preferring to continue collecting secondary-market transaction fees from brokers who use bots or legions of fictitious accounts, could keep nice-sounding policies on paper but turn a blind eye to their violations in practice. *See, e.g.*, Clare Y. Cho, Cong. Rsch. Serv., R48179, TICKETS FOR LIVE ENTERTAINMENT EVENTS 3 (2025) ("Ticketers in the primary and secondary markets obtain revenue from fees that are paid by consumers."); *cf.* Compl. ¶ 40 fig. 1 (Ticketmaster slide noting "[s]erious economic impact if we we [sic] move to 8 ticket limit across the board" and listing "brokers violating

---

[9] On Defendants' view, scalpers' compliance with the BOTS Act could also be moral luck: If, of its own accord, a ticket issuer turns a blind eye to violations of its policies or lacks the resources to enforce its policies, scalpers abusing the ticket issuer's platform could, by happenstance, be in compliance with the law as Defendants strain to read it.

-12-

fictitious account rules on large scale" along with the "Potential GVT [*i.e.*, Gross Transaction Value] Loss" (likely lost revenue) and "Potential AOI [*i.e.*, Adjusted Operating Income] Loss" (likely lost profits) if Ticketmaster enforced stricter ticket limits). Immunizing scalpers merely because of collusive ticket-issuer conduct would render the BOTS Act a paper tiger.

As for scalpers' second tactic, engaging in substantially the same fraudulent conduct using human effort instead of automated bots is an unabashed end-run around the statute's clear objective of "ensur[ing] equitable consumer access to tickets for any given event." Pub. L. No. 114-274, pmbl., 130 Stat. at 1401. Indeed, one Defendant in this case previously used bots for ticket scalping, but after facing state prosecution, he simply joined Defendant KIG in an obvious attempt to circumvent the BOTS Act while continuing to engage in large-scale online ticket scalping. *See* Defs. Mem. 25. It is not difficult to imagine devious brokers devising new ways to circumvent ticket-issuer controls or measures—for example, by offshoring ticket purchasing to countries with inexpensive labor.[10]

Adopting Defendants' incorrect construction of the BOTS Act would impose serious and substantial real-world costs on Americans who enjoy attending live performances and sporting events. Almost 40% of Americans report buying event tickets on the secondary market. *See* Digital Citizens Alliance, *When It Comes to Digital Markets, Trust Can't Be Secondary* (May 2025), tinyurl.com/DigCitAllce. "Seventy-five percent of Americans who purchased reseller tickets said online secondary markets lead to speculators hoarding products." *Ibid.* Their

---

[10] *Cf.* N.Y. State Off. of the Att'y Gen., OBSTRUCTED VIEW: WHAT'S BLOCKING NEW YORKERS FROM GETTING TICKETS 17 (2016), tinyurl.com/NYAGRpt (explaining a hybrid bot–human scalper scheme involving bots that transmit "CAPTCHAs they encounter on Ticketmaster . . . to armies of 'typers,' human workers in foreign countries where labor is less expensive," who then enable the bots to "bypass ticket vendors' defenses"); *id.* at 21 (noting that some scalpers "use multiple computers or mobile devices" or "employ dozens of people" instead of bots); Dave Brooks, *Is It a Bot, or Not? Ticketing's Next Big Legal Fight Could Reshape the Resale Industry*, BILLBOARD (Aug. 29, 2025), perma.cc/9XMY-8RRZ (quoting cyber expert Jérôme Segura: "Whether you use bots or an army of humans, you're still doing something that's harmful. What really matters is the intent: is it to purchase a number of tickets like a regular fan, or is it to hoard inventory and scalp it for profit?").

intuitions are amply justified: It is well-documented that unregulated ticket-resale markets incentivize "costly rent-seeking behavior," which "reduce[s] overall social welfare." Phillip Leslie & Alan Sorensen, *The Welfare Effects of Ticket Resale*, at 1 (Nat'l Bureau of Econ. Rsch., Working Paper No. 15476, 2009).

When ticket scalpers buy up tickets in primary markets—whether with bots or armies of humans using fictitious accounts, IP proxy services, and SIM banks—they force ordinary consumers into secondary markets, where "[t]icket resale prices can be significantly higher than primary market prices." U.S. Gov't Accountability Off., GAO-18-347, *Event Ticket Sales: Market Characteristics and Consumer Protection Issues*, at 12 (2018), tinyurl.com/GAO-tix. One study, for instance, found that ticket buyers on average paid 203% of face value for their tickets in the secondary market. *See* Nat'l Indep. Ticket Operators Ass'n, NITO TICKET RESALE STUDY 1–2 (2024), perma.cc/UE6A-WBF6. These markups represent massive wealth transfers from American consumers to unscrupulous online ticket speculators and their platform enablers—precisely what the BOTS Act sought to stop.

For too long, the Commission failed to enforce the BOTS Act with vigor. *See* Press Release, Office of Senator Marsha Blackburn, *The FTC Has Failed To Enforce The BOTS Act* (Dec. 2, 2022), tinyurl.com/FTC-BOTS. In March 2025, President Trump directed the Commission to "[r]igorously enforce" the BOTS Act "to protect fans from exploitative ticket scalping." Press Release, White House, *Fact Sheet: President Donald J. Trump Will End Price-Gouging by Middlemen in the Entertainment Industry* (Mar. 31, 2025), tinyurl.com/WHFctsht; *see* Exec. Order No. 14,254 § 2(b), (d), 90 Fed. Reg. 14,699, 14,699 (Apr. 3, 2025). This Court should not hinder that overdue enforcement by allowing Defendants so easily to circumvent the law.

## CONCLUSION

Because the Commission's Complaint adequately alleges BOTS Act violations, Amici respectfully submit that the Court should deny Defendants' motion to dismiss.

Dated: December 31, 2025

Respectfully submitted,

*/s/ James R. Wedeking*

| | |
|---|---|
| Michael A. Fragoso* | James R. Wedeking (Md. No. 18469) |
| T. Zachary Horton* | **BOYDEN GRAY PLLC** |
| Peter Lee Hamilton* | 800 Connecticut Ave, NW |
| **TORRIDON LAW PLLC** | Washington, DC 20006 |
| 801 17th Street NW, Suite 1100 | Telephone: 202.955.0620 |
| Washington, DC 20006 | jwedeking@boydengray.com |
| Telephone: 202.249.6900 | |
| mfragoso@torridonlaw.com | |
| tzhorton@torridonlaw.com | |
| phamilton@torridonlaw.com | |

*Pro hac vice pending*

**Attorneys for Amici Curiae**

-15-