**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KEY INVESTMENT GROUP LLC,<br><br>Movant,<br><br>v.<br><br>SENATOR BEN RAY LUJÁN and SENATOR MARSHA BLACKBURN<br><br>Respondents. | Misc. Case No. ________<br>Case: 1:26–mc–00115<br>Assigned To : Cooper, Christopher R.<br>Assign. Date : 8/11/2026<br>Description: Misc. |

**MOVANT KEY INVESTMENT GROUP'S MOTION TO COMPEL**
**COMPLIANCE WITH THIRD-PARTY SUBPOENAS**

Pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, Movant Key Investment Group LLC ("KIG") respectfully requests an order compelling nonparty Senators Ben Ray Luján and Marsha Blackburn (collectively, the "Senators") to comply with subpoenas served on them on July 1, 2026, in connection with *Federal Trade Commission v. Key Investment Group, et al.*, Case No. 1:25-cv-02716-GLR, a pending action in the U.S. District Court for the District of Maryland (the "Underlying Litigation"). These subpoenas seek the production of documents.

Movants move this Court to compel the Senators to comply with their respective subpoenas as modified by KIG on July 23, 2026. The Senators have not produced any documents in response to the properly served subpoenas and the objections they asserted are meritless.[1]

The issues raised by the Senators' failure to comply with the subpoenas, particularly as Amici in the Underlying Litigation, are heavily intertwined with the underlying dispute. The grounds for this Motion are set forth in the accompanying Memorandum of Points and Authority,

[1] Because the Senators have only provided general objections to the Modified Requests, as opposed to specific objections to each request, KIG is unable to comply with the requirements under Local Civil Rule 26.2(d).

RECEIVED
AUG 11 2026
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

Declaration of Bezalel A. Stern, and KIG's Certificate Pursuant to Local Civil Rule 26.1, which are being filed contemporaneously herewith.

Dated: August 11, 2026

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP

*/s/ Bezalel A. Stern*

Bezalel A. Stern (D.C. Bar No. 1025745)
Joshua N. Drian (D.C. Bar No. 7669248)
1700 M Street NW, 4th Floor
Washington, D.C. 20036
(202) 585-6500
bstern@manatt.com
jdrian@manatt.com

*Counsel for Movant*

**STATEMENT REGARDING RESULTS OF LCvR 7(M) CONFERENCE**

Movant Key Investment Group LLC ("KIG") respectfully submits this Statement Regarding the Results of the LCvR 7(m) Conference. Counsel for KIG conferred with Counsel for Senators Ben Ray Luján and Marsha Blackburn (collectively, the "Senators") in a good-faith effort to determine whether the Senators opposed the relief sought and, if so, to narrow the areas of disagreement. Despite good-faith efforts to narrow the areas of disagreement, the parties are at an impasse and the Senators oppose KIG's motion to compel compliance with the subpoenas.

Dated: August 11, 2026

Respectfully submitted,

**MANATT, PHELPS & PHILLIPS, LLP**

*/s/ Bezalel A. Stern*
Bezalel A. Stern (D.C. Bar No. 1025745)
Joshua N. Drian (D.C. Bar No. 7669248)
1700 M Street NW, 4th Floor
Washington, D.C. 20036
(202) 585-6500
bstern@manatt.com
jdrian@manatt.com

*Counsel for Movant*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of August, 2026, I caused to be served a true and correct copy of KIG's Motion to Compel, the accompanying Memorandum of Points and Authority, Declaration of Bezalel A. Stern and exhibits appended therein, Proposed Order, and KIG's Certificate Pursuant to Local Civil Rule 26.1 to be filed with the Clerk of Court, and served via email on the following:

Molly Rucki
P. Connell McNulty
Simon Barth
Lauren Rivard
Federal Trade Commission
600 Pennsylvania Ave., NW
Mailstop CC-6316
Washington, DC 20580
202-326-3774
Email: mrucki@ftc.gov
Email: pmcnulty@ftc.gov
Email: sbarth@ftc.gov

*Counsel for Plaintiff Federal Trade Commission*

Todd B. Tatelman
Deputy General Counsel
5140 O'Neill House Office Building
Washington, DC 20515
Email: Todd.Tatelman@mail.house.gov

Thomas E. Caballero
Vivian M. Rivera
Office of Senate Legal Counsel
642 Hart Senate Office Building
Washington, DC 20510
Email: Thomas_Caballero@legal.senate.gov
Email: Vivian_Rivera@legal.senate.gov

*Counsel for Senators Ben Ray Luján and Marsha Blackburn*

and via U.S. First Class Mail upon the following on August 11, 2026

Senator Marsha Blackburn

Office of Senator Marsha Blackburn
357 Dirksen Senate Office Building
Washington DC 20510

– and –

Senator Ben Ray Luján
Office of Senator Ben Ray Luján
489 Russell Senate Office Building
Washington, DC 20501

Dated: August 11, 2026

Respectfully submitted,

**MANATT, PHELPS & PHILLIPS, LLP**

*/s/ Bezalel A. Stern*
Bezalel A. Stern (D.C. Bar No. 1025745)
Joshua N. Drian (D.C. Bar No. 7669248)
1700 M Street NW, 4th Floor
Washington, D.C. 20036
(202) 585-6500
bstern@manatt.com
jdrian@manatt.com

*Counsel for Movant*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KEY INVESTMENT GROUP LLC,<br><br>Movant,<br><br>v.<br><br>SENATOR BEN RAY LUJÁN and SENATOR MARSHA BLACKBURN<br><br>Respondents. | Misc. Case No. _________ |

**MEMORANDUM OF POINTS AND AUTHORITY**
**IN SUPPORT OF KEY INVESTMENT GROUP LLC'S**
**MOTION TO COMPEL COMPLIANCE WITH THIRD-PARTY SUBPOENAS**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........ 1

FACTUAL BACKGROUND ........ 2

A. The BOTS Act and the FTC's Prior Enforcement Under the Act. ........ 2

B. The Underlying Litigation and Related Ticketmaster Lawsuit. ........ 5

C. The Senators Publicly Criticize Ticketmaster. ........ 6

D. KIG and Ticketmaster Move to Dismiss and the Senators file *Amicus* Briefs in Support of the FTC ........ 7

E. The District Court Relied Upon Arguments Advanced by the Senators in Denying KIG's Motion to Dismiss in the Underlying Litigation. ........ 10

F. KIG's Efforts to Obtain the Requested Discovery from Senators Luján and Blackburn. . 11

LEGAL STANDARD ........ 13

ARGUMENT ........ 14

I. The Modified Requests Seek Information Highly Relevant to Claims and Defenses in the Underlying Litigation ........ 14

II. The Modified Requests Do Not Implicate Any Form of Privilege ........ 177

III. The Senators' Remaining Boilerplate Objections are Without Merit ........ 20

A. The Modified Requests Do Not Subject the Senators to Undue Burden ........ 20

B. The Documents Requested Do Not Implicate the Attorney-Client Privilege or Work-Product Doctrines ........ 22

CONCLUSION ........ 23

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Alexander v. F.B.I.*,
186 F.R.D. 21 (D.D.C. 1998) .......... 14

*Athridge v. Aetna Cas. And Sur. Co.*,
184 F.R.D. 181 (D.D.C. 1998) .......... 21

*Blumenthal v. Drudge*,
186 F.R.D. 236 (D.D.C. 1999) .......... 23

**BuzzFeed, Inc. v. U.S. Dep't of Just.*,
318 F. Supp. 3d 347 (D.D.C. 2018) .......... 16, 21

*Educ. Fin. Council v. Oberg*,
2010 WL 3719921 (D.D.C. Mar. 8, 2010) .......... 16

*Federal Trade Commission v. Key Investment Group LLC, et al.*,
Case No. 1:25-cv-02716 .......... 1

*Flanagan v. Wyndham Int'l Inc.*,
231 F.R.D. 98 (D.D.C. 2005) .......... 17

*Franklin v. Mass.*,
505 U.S. 788 (1992) .......... 17

*Glassroth v. Moore*,
229 F. Supp. 2d 1290 (M.D. Ala. 2002), *aff'd*, 335 F.3d 1282 (11th Cir. 2003) .......... 19

**Gravel v. United States*,
408 U.S. 606 (1972) .......... 17, 18, 20

*Heat & Control, Inc. v. Hester Indus., Inc.*,
785 F.2d 1017 (Fed. Cir. 1986) .......... 22

*Hutchinson v. Proxmire*,
443 U.S. 111 (1979) .......... 19

*In re Denture Cream Prods. Liab. Litig.*,
292 F.R.D. 120 (D.D.C. 2013) .......... 14

*In re Micron Tech., Inc. v. Sec. Litig.*,
264 F.R.D. 7 (D.D.C. 2010) .......... 14

**Jewish War Veterans of the U.S. of Am., Inc. v. Gates*,
506 F. Supp. 2d 30 (D.D.C. 2007) .......... 17, 19

*McCarthy v. Pelosi*,
5 F.4th 34 (D.C. Cir. 2021) .......... 17, 18

*McSurely v. McClellan*,
553 F.2d 1277 (D.C. Cir. 1976) .......... 20

*N.Y. State Ass'n of Realtors, Inc. v. Shaffer*,
135 F.R.D. 78 (S.D.N.Y. 1991) .......... 19

*Northrop Corp. v. McDonnell Douglas Corp.*,
751 F.2d 395 (D.C. Cir. 1984) ........ 17

*Tequilla Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.*,
242 F.R.D. 1 (D.D.C. 2007) ........ 21

*United States v. AT&T, Inc.*,
2011 WL 5347178 (D.D.C. Nov. 6, 2011) ........ 21, 22

*Watts v. S.E.C.*,
482 F.3d 501 (D.C. Cir. 2007) ........ 13, 14, 20

**STATUTES**

*15 U.S.C. § 45c ........ passim

**OTHER AUTHORITIES**

2016, S. 3183 114th ........ 3

Pub. L. No. 114-274, 130 Stat. 1401 (2016) ........ 4

S. Rep. No. 114-391 ........ 3

Senate Hearing on the BOTS Act in September 2016, Senator Moran ........ 3

U.S. Const. art. I, § 6, cl. 1 ........ 17

**RULES**

Federal Rule of Civil Procedure 26 ........ 1, 14

Federal Rule of Civil Procedure 45 ........ 1, 13, 14

Movant Key Investment Group, LLC ("KIG") respectfully submits this Memorandum of Law in support of its Motion to Compel Respondents Senators Ben Ray Luján and Marsha Blackburn (collectively, the "Senators") to comply with those portions of the subpoenas issued to them pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure.[1]

## PRELIMINARY STATEMENT

This case arises against the backdrop of a fundamental shift in how the Better Online Tickets Sales ("BOTS") Act, 15 U.S.C. § 45c, is being interpreted and enforced. For nearly a decade following its enactment, enforcement of the BOTS Act focused on what Congress and regulators repeatedly identified as the statute's intended target: the use of bots and other automated technologies to circumvent ticket purchasing limit controls. Yet in the underlying action, *Federal Trade Commission v. Key Investment Group LLC, et al.*, Case No. 1:25-cv-02716, pending in the District of Maryland (the "Underlying Litigation"), the FTC advances a novel theory that is not predicated on bot usage at all, but instead seeks to impose liability based on allegedly exceeding posted ticket-purchasing rules even where no bots were used. That expansionist interpretation marks a significant departure from prior enforcement of the statute and lies at the core of KIG's defenses.

No one is better positioned to shed light on that shift than Senators Blackburn and Luján—the BOTS Act's sponsor and supporter, respectively. The Senators are not detached observers. They publicly criticized Ticketmaster after the FTC announced its new enforcement actions, then voluntarily inserted themselves into both this case and the parallel Ticketmaster litigation as *amici* based on their claimed "unique" perspectives as the BOTS Act's drafter and supporter. The

[1] The supporting exhibits referenced herein are annexed to the Declaration of Bezalel A. Stern, sworn to on August 11, 2026 (the "Stern Decl."). Because the Senators have only provided general objections to the Modified Requests, as opposed to specific objections to each request, KIG is unable to comply with the requirements under Local Civil Rule 26.2(d).

Senators have urged courts to adopt the very expansive interpretation of the statute now being advanced by the FTC, which the court in the Underlying Litigation expressly relied upon in denying KIG's Motion to Dismiss. Having publicly advocated for a broadened construction of the BOTS Act in the Underlying Litigation, the Senators plainly possess information concerning the evolution of that interpretation and their newfound efforts to promote it.

KIG's subpoenas as modified seek narrowly tailored, non-privileged discovery directly related to those issues. Namely, (1) documents reflecting the Senators' understanding of the BOTS Act, (2) any changes in that understanding since enactment, and (3) communications with third parties concerning the Act's interpretation and enforcement. Rather than produce a single document, however, the Senators have responded with a blanket refusal and an extraordinarily broad assertion of protection under the Speech or Debate Clause. The Clause affords no such blanket immunity. It protects legitimate legislative activity, not public advocacy, *amicus* participation, communications with members of executive agencies or other non-governmental third parties, or efforts to influence ongoing litigation from the sidelines—especially where, as the FTC acknowledges, those efforts were "substantial" in "contribut[ing]" to the "fantastic KIG result" and denial of KIG's Motion. (*See* Stern Decl. Ex. 17.) Because the Senators have injected themselves into this case and now seek to use an overbroad privilege assertion to prevent scrutiny of their own representations, it is respectfully submitted that this Court should compel compliance with KIG's narrowly tailored discovery requests.

## FACTUAL BACKGROUND

### A. <u>The BOTS Act and the FTC's Prior Enforcement Under the Act.</u>

In 2016, Senator Blackburn, then a member of the United States House of Representatives, drafted and sponsored an earlier version of the BOTS Act through the House of Representatives and into the Senate. *See* H.R. 5104, 114th Cong. (2016). Although that version was not ultimately

adopted, Senator Blackburn was a vociferous voice in favor of the ultimate legislation. *See* Better Online Ticket Sales Act of 2016, S. 3183 114th Cong. (2016) ("S. 3183"). Senator Luján—also then a Representative—voted in support of the Law.

The BOTS Act was drafted in direct response to and intended to curb the use of computer scripts or computer code (*i.e.*, bots) designed to circumvent security measures, access control systems, and other technological controls in order to bypass the "virtual waiting room" lines of primary ticket sellers such as Ticketmaster, skip straight to the purchasing page, and purchase hundreds or thousands of tickets before the regular public had a fighting chance to purchase them. *See*, *e.g.*, S. Rep. No. 114-391, 2016 WL 7115899 (Dec. 5, 2016). When deployed, bots can overwhelm websites to unfairly jump to the heads of queues, lock tickets in carts *en masse*, and complete purchases in a matter of seconds. *Id.* The BOTS Act is intended to prevent this.

The legislative history of the BOTS Act clarifies that the Act was about stopping bad actors from using ***bots*** to subvert the ticketing process. In a Senate Hearing on the BOTS Act in September 2016, Senator Moran explained:

> When you're trying to pick up tickets for the next big event, you're no longer only competing against other eager fans when tickets are released, ***you're now focused—forced to compete against an army of sophisticated ticket bots that overwhelm the ticketing website with brute force, scoop up as many tickets as possible and then resell them on a secondary market at a significant mark-up.***

S. Hrg. 114-614, 2016 WL 4773371 (Sept. 13, 2016) (emphasis added). On November 30, 2016, a unanimous Senate passed the BOTS Act. Shortly thereafter, a Senate Report explained the BOTS Act's purpose before sending it back to the House. 2016 WL 7115899, at *4 (Dec. 5, 2016). The Report emphasized, "***this legislation [the BOTS Act] aims to prohibit the use of bots***[.]" *Id.* (emphasis added). Far from stifling the secondary ticket market, the Senate Report explained the BOTS Act "would have a positive impact on the secondary ticket sellers . . . ." *Id.*

President Obama signed the BOTS Act into law on December 14, 2016. *See* Pub. L. No. 114-274, 130 Stat. 1401 (2016). Portions of the law are codified at 15 U.S.C. § 45c. As enacted, the BOTS Act prohibits

> ***circumvent[ing]* a *security measure*, *access control system, or other technological control or measure*** on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules.

15 U.S.C. § 45c(a)(1) (emphasis added). The BOTS Act does not define any of the italicized terms, all of which are key to understanding the statute's reach.

The FTC was charged with enforcing the BOTS Act. *See* 15 U.S.C. § 45c(b). Consistent with its legislative history, following adoption the FTC made clear that the BOTS Act was intended to address the use of bots. In an April 2017 blog post, the FTC explained:

> It used to be a rite of passage: spending the night in a line outside the box office to score tickets to the Stones, Springsteen, or [insert your favorite group here]. The convenience of internet ticket sales ended the sleeping-on-the-sidewalk ritual. But online ticket sales raised another concern: ***Were prospective buyers losing out to <u>computer programs</u> that scooped up the best seats only to resell them at inflated prices***? Congress responded to that issue by passing the Better Online Ticket Sales Act of 2016.
>
> It's no coincidence that it's called the BOTS Act because ***the law outlaws the use of computer software like bots that game the ticket system***.

(Stern Decl., Ex. 1 (emphasis added).) Prior to the Underlying Litigation, the FTC had only entered into three settlements under the BOTS Act, all three of which involved recidivist bot users. (Stern Decl., ¶ 5, Stern Decl., Exs. 2-4.) In a concurring statement issued by the FTC, then-Chairwoman Rebecca K. Slaughter lauded her staff for these settlements and reveled in the new authority conferred upon the Commission by virtue of the BOTS Act "to bring to heel the ***high-tech scoundrels*** who bedevil fans seeking tickets to live events." (Stern Decl., Ex. 5 (emphasis added).) Doubling down on the BOTS Act's intended targets (*i.e.*, bot users), Chairwoman Slaughter added: "[t]he Act's bipartisan sponsors sought to crack down on the abuses that unscrupulous actors inflict

Case 1:25-cv-02716-GLR Document 96 Filed 09/25/26 Page 14 of 464

on consumers whose typing fingers were no match for ***algorithms in attempting to secure tickets online***." (*Id.* (emphasis added).)

**B. The Underlying Litigation and Related Ticketmaster Lawsuit.**

On August 18, 2025, the FTC filed a Complaint against KIG. (Stern Decl., Ex. 6 (the "Complaint").) The Underlying Litigation marks a stark deviation from the FTC's enforcement of the statute and positions regarding the same over the past decade since the statute's enactment—all of which focus on unlawful bot usage. (*See id.*) Indeed, ***nowhere*** in the Complaint does the FTC actually allege KIG uses bots—that's because it doesn't. Instead, the FTC advances a novel theory of liability that is not predicated on the use of bots at all, but on allegations that KIG used various means to purportedly "circumvent" security measures implemented by the Ticket issuer (Ticketmaster) to exceed posted ticket limits. (*See id.* ¶¶ 24, 34-50.) Put differently, based on the FTC's new reading of the BOTS Act, KIG can be liable for violating the statute if it "circumvented" security measures put into place by Ticketmaster to enforce its ticket limit purchasing rules.

As apparent support, the FTC includes an email exchange between Ticketmaster and KIG representatives, which demonstrates nothing but KIG's reliance upon Ticketmaster's interpretation and enforcement of its own purchasing rules. (*See id.*, Ex. A.) In the initial email dated February 2, 2024, a KIG representative informed Ticketmaster that he was a ticket broker that purchased 61 tickets to an event, which he understood "exceeded the ticket limit stated on the event page which allows a maximum of 6 tickets to be purchased" and, therefore, requested the orders be cancelled. (*Id.*) In response, the Ticketmaster representative advised KIG that the purchases did not exceed Ticketmaster's posted ticket purchase limits, which is determined on a "per account" basis. (*Id.*) The Ticketmaster representative further advised KIG that "[a]s long as the purchases were made using different accounts and cards, ***it's within the guidelines***." (*Id.* (emphasis added).)

The Underlying Litigation directly conflicts with allegations made in its separate lawsuit filed against Ticketmaster the following month in the Central District of California. (*See* Stern Decl., Ex. 7 (the "Ticketmaster Complaint").) In *that* case, the FTC accuses Ticketmaster of failing to enforce purported ticket purchase limits. (*See id.*, ¶¶ 74-76; 103-07.) Specifically, the FTC alleges that Ticketmaster "aided" ticket brokers (like KIG) to circumvent Ticketmaster's own security measures, so that (according to the FTC) Ticketmaster could maximize ticket sales. (*Id.*) In doing so, the FTC claims that Ticketmaster has separately violated the BOTS Act because it knowingly sells and otherwise permits tickets to be sold to brokers who have allegedly circumvented Ticketmaster's security measures. (*Id.*, ¶¶ 103-10; 119-25.)

**C. <u>The Senators Publicly Criticize Ticketmaster.</u>**

Coming off the heels of the FTC's lawsuits against KIG and Ticketmaster, on September 30, 2025, the Senators publicly issued a letter to Ticketmaster demanding answers relating to the purported scheme described in the FTC's complaint. (Stern Decl., Ex. 8.) Specifically, the Senators accused Ticketmaster of "turn[ing] a blind eye to bad actors violating the [BOTS] Act" and demanded Ticketmaster address a series of questions concerning Ticketmaster's commitment to prevent violations of the BOTS Act. (*Id.* at 1-3.)

On October 17, 2025, Ticketmaster issued a response—criticizing the Senators' and FTC's allegations of "colluding with scalpers" as "categorically false" and that "neither Live Nation nor Ticketmaster *ever* 'purposefully relax enforcement of ticket limits for certain buyers or brokers for financial gain.'" (Stern Decl., Ex. 9.) Critically, Ticketmaster addressed the "misimpression" of collusion created by the FTC, which, according to Ticketmaster, failed to recognize longstanding ticket purchasing practices:

> The reality is that brokers have had multiple accounts for a very long time—long before Ticketmaster entered the secondary ticketing business in 2014, and well

> before StubHub created the first successful secondary ticket marketplace in the early 2000s. This practice harkens back to the days of physical tickets, when ticket brokers would often have a number of employees or others paid to stand in line and purchase concert tickets—a practice that was generally accepted in the industry. Similarly, it was generally accepted that a broker with multiple employees could have each person hold an account and separately purchase tickets. All this can be done legitimately under the rules of the primary ticketing companies without having to resort to any unlawful behavior.

(*Id.* at 2-3.) Put differently, the use of multiple accounts is "not inherently illegal." (*Id.*) Ticketmaster also rebuffed the Senators' suggestion that it has ever turned a "blind eye," particularly when it invests more in bot detection and prevention than any other ticket issuer. (*Id.* at 4.) And, finally, like KIG here, Ticketmaster criticized the FTC for its "novel and expansionist view of the BOTS Act," which "makes it illegal to circumvent *ticket limits*—full stop—not just technological controls protecting ticket limits." (*Id.* at 7.)

### D. KIG and Ticketmaster Move to Dismiss and the Senators file *Amicus* Briefs in Support of the FTC

On November 24, 2025, KIG moved to dismiss the FTC complaint. (Stern Decl., Ex. 10.) Relevant for purposes of this Motion, KIG argued that (i) it did not circumvent because, among other things, Ticketmaster was aware of and permitted KIG's ticket purchase practices, (*id.* at 13-18); (ii) it did not have actual knowledge or knowledge fairly implied that its actions violated the BOTS Act, (*id.* at 21-25); and (iii) the BOTS Act is unconstitutional. *Id.* at 26.

On December 31, 2025, the Senators moved for leave in the Underlying Litigation to file a brief as *amici curiae* in support of the FTC's opposition to KIG's Motion to Dismiss—which addressed point-for-point arguments advanced by KIG. (Stern Decl., Ex. 11.) In support of their Motion, Senator Blackburn highlighted her role as "lead Republican sponsor and a primary architect of the [BOTS Act]"[2] and Senator Luján noted his support of the BOTS Act, while serving

---

[2] This statement is not technically true, as H.R. 5104, the bill Senator Blackburn sponsored, died in the Senate. Nonetheless, the Senator did support S. 3183 as it made its way from the Senate to the House of Representatives.

in the House of Representatives and his "strong interest in the proper interpretation and application of the law." (*Id.* at 1.) According to the Senators, their ***unique background and perspectives*** would provide the court with "useful legislative context" needed to address a novel question presented before it:

> An amicus brief from Senator Blackburn and Senator Luján is desirable because it provides the Court with ***useful legislative context to aid in rendering the correct interpretation of the BOTS Act and its broad scope***. Because this litigation centers on a novel question regarding what constitutes "circumvent[ion]" under the Act, ***Senator Blackburn's perspective as a leading drafter, and Senator Luján's perspective as a supporter of the bill, <u>offer unique insights</u>*** that could assist the Court in resolving the Defendants' pending motion to dismiss.
>
> ***Amici can clarify the legislative intent animating the statute's use of the word "circumvent" and the intended conduct that the legislation targeted***. This context may assist the Court as it evaluates the breadth of Congress's mandate to the FTC for enforcement in this area. This context is particularly important given Defendants' erroneous speculation about what the drafters "believed" when crafting the BOTS Act. This proposed amicus brief affords the law's leading drafter and sponsor, Senator Blackburn, with the opportunity to disabuse the Court of Defendants' misrepresentations. Furthermore, Amici provide perspectives on how bulk-buying and scalping operations siphon wealth from creators and consumers and impede access to live events, thereby harming the economies and constituents of their respective states.

(*Id.* at 2 (emphasis added).)

In their *amicus brief*, the Senators argued that the BOTS Act is not limited to the use of bots. (Stern Decl., Ex. 12 at 2 ("contrary to Defendants' representations Amici—as drafter (Senator Blackburn) and supporter (Senator Luján) of the law—did *not* believe the BOTS Act was confined solely to use of bot technology"); at 4 ("If Amici and their fellow legislators had intended to limit the BOTS Act's application to bot users, they could—and would—have said so").) They further argued that whether ticket issuers actually enforce their posted rules (or otherwise permit or acquiesce to noncompliance with same) is irrelevant for purposes of determining liability under the Act because the statute does not recognize "permission" as a defense:

> Yet again, the ordinary meaning of the statutory term "circumvent" forecloses Defendants' argument. Circumvention does not turn on a "system operator's authorization or permission." If, for example, Ticketmaster failed to enforce its rules against bot usage, that would not change whether a scalper is using bots to "circumvent" Ticketmaster's controls. By using bots (or other means), a user "manages to get around" ticket-issuer controls, permission or acquiescence notwithstanding. That is still unlawful circumvention, plain and simple.
>
> An analogy to trespass is instructive. If a property owner turns a blind eye to trespass, that does not mean the trespasser has not climbed over the fence. He *has* climbed over the fence—but with tacit permission. In trespass, of course, permission is a defense. But the BOTS Act includes no such exception. That is because violating the BOTS Act harms *event-going consumers*—not ticket issuers like Ticketmaster. Any lack of enforcement or blind-eye treatment by Ticketmaster cannot absolve scalpers of BOTS Act liability. Holding otherwise would create an atextual exemption for collusive conduct between scalpers and ticket issuers that would harm the very people that the BOTS Act was plainly intended to protect—ordinary Americans who want to see their favorite performers or sports teams at reasonable prices.

(*Id.* at 6-7 (citations omitted).) And, finally, the Senators argued that the BOTS Act was intended to have broad reach and punish those who violate a ticket issuer's posted rules—regardless of whether bots were used or not:

> When Amicus Senator Blackburn introduced the BOTS Act and Congress unanimously passed it into law, legislators drew attention to the problem of online ticket scalpers. The problem troubling Amici and their fellow lawmakers was not just scalpers using bots to gain an unfair advantage—though, to be sure, that was a significant concern. The root problem was that ticket scalpers did not play by the rules; they cheated and enriched themselves at the expense of the ordinary American consumer. By evading ticket-issuer rules like ticket-purchase limits—whatever their means of doing so—to snatch up and accumulate hoards [*sic*] of tickets, online scalpers forced many Americans into secondary markets where scalpers then resold their tickets at exorbitant markups.

(*Id.* at 10.)

In the parallel Ticketmaster proceeding, on January 6, 2026, Ticketmaster moved to dismiss the FTC complaint, arguing, among other things, that the FTC complaint fails to identify any technological controls that were actually circumvented and, instead, simply identifies instances where tickets were purchased in violation of ticket limits (which is not a technological control).

(Stern Decl., Ex. 13, at 21-24.) Three weeks later, on January 30, 2026, Senators Blackburn and Luján moved for leave to file an *amicus* brief in support of the FTC's opposition to Ticketmaster's Motion to Dismiss. (Stern Decl., Ex. 14.) As in the Underlying Litigation, the Senators highlighted their "unique legislative perspective on the interpretation and enforcement of the BOTS Act" that "uniquely position[]" the Senators to expound upon. (*Id.* at 4.) In response to Ticketmaster's arguments, the Senators, again, argued that the BOTS Act is intended to have broad application and enforcement and used the same exact trespassing analogy to illustrate that a ticket issuer's permission or consent does not absolve a party of liability under the statute. (Stern Decl., Ex. 15, at 2-3, 7 n.2, 10-11.)

**E. <u>The District Court Relied Upon Arguments Advanced by the Senators in Denying KIG's Motion to Dismiss in the Underlying Litigation.</u>**

On April 28, 2026, the Court issued its Decision and Order granting the Senators' Motion for Leave to file an *Amicus* Brief (which the court considered "in its analysis of the Motion to Dismiss") and denying KIG's Motion to Dismiss. (Stern Decl., Ex. 16.) On the issue of whether the BOTS Act "exclusively applies to 'bots,'" the Court extensively cited and relied upon the Senators' brief as support for its determination that "[t]he legislative history of the BOTS Act does not support a narrow reading as Defendants suggest." (*Id.* at 10.) For example, the Court stated:

> As Amici Senators explain, "the operative text of the BOTS Act does not limit its application to scalpers who use bots. In fact, the law's key provision does not reference bots at all." Further, and most critically, "contrary to Defendants' representations, Amici—as drafter (Senator Blackburn) and supporter (Senator Luján) of the law—did not believe the BOTS Act was confined solely to use of bot technology." Rather, "the problem troubling Amici and their fellow lawmakers was not just scalpers using bots to gain an unfair advantage—though, to be sure, that was a significant concern."

(*Id.* (citations omitted).) Similarly, in rejecting KIG's argument challenging the BOTS Act under the major questions doctrine, the court again relied upon the Senators' *Amicus* Brief as support for

its reasoning that the Act "does not seek to regulate large swaths of the economy nor is it particularly politically significant or controversial." (*Id.* at 14.)

That very same day, the FTC's chief litigation counsel wrote to the Senators' counsel to share with them the court's denial of KIG's Motion and to express his "gratitude" for the Senators' support. (*See* Stern Decl., Ex. 17.) In the underlying email, the FTC expressly recognizes the impact that the Senators' *amicus* brief had on the court's ruling:

> I just wanted to express my gratitude for ***the substantial contribution that you and your clients made to the fantastic KIG result***. We really appreciate it. And we hope for good news in Ticketmaster soon.

(*Id.* (emphasis added).)

**F. <u>KIG's Efforts to Obtain the Requested Discovery from Senators Luján and Blackburn.</u>**

On June 30, 2026, KIG issued subpoenas to the Senators, which were accepted by the Deputy General Counsel for the U.S. House of Representatives on July 1, 2026. (Stern Decl., Exs. 19, 20.) The subpoenas sought information likely to be directly relevant to the Underlying Litigation. Among other things, the subpoenas sought documents and communications concerning: (i) KIG and the named defendants in the underlying action; (ii) the Senators' amicus briefs filed in the Underlying and Ticketmaster Litigations; (iii) their understanding of the BOTS and MAIN Event Ticketing Acts; and (iv) Ticketmaster. (*Id.*)

On July 15, 2026, the Senators responded to their subpoenas, declining to produce any records or information whatsoever. (Stern Decl., Ex. 21.) Critically, the Senators neither confirmed nor denied the existence of responsive information but, instead, claimed that the information sought (i) is "absolutely protected" under the Speech or Debate Clause, (ii) presents an undue burden "because they request materials that are not relevant to the claims in this action, seek an overly broad scope of documents, and seek documents from a nonparty that should be sought from

a party to the action"; (iii) is protected by the attorney-client and work product privileges; (iv) requires prior Senate approval; and (v) is "insulate[d]" by "the doctrine of sovereign immunity." (*Id.*)

On July 22, 2026, counsel for KIG met and conferred with counsel for the Senators. During the conferral, counsel for KIG made clear at the outset that they were not interested in any privileged documents and, instead, sought documents reflecting the Senators' understanding of the BOTS Act, post-enactment, and efforts to inform the public and agencies regarding the same. (Stern Decl., ¶ 25.) These documents, counsel for KIG explained, were highly relevant in light of the fact that the Senators emphasized their "unique perspectives" as sponsors and supporters of the BOTS Act in the Underlying Litigation, which the Court accepted and relied upon in denying KIG's Motion to Dismiss. (*Id.*, Stern Decl., Ex. 11.)

Any change in view by the Senators as to how broadly the statute was to be enforced, then, would go directly to KIG's defenses. (*Id.*) This much, the Senators' counsel did not dispute. (Stern Decl., ¶ 25.) As far as their assertion of burden, the Senators' counsel admitted that while they were familiar with the "types of communications" involving the Senators that could be responsive to KIG's requests, they had not actually began of substantive review or even collection of same. (Stern Decl., ¶ 26.) That said, for purposes of attempting to reach an agreement, KIG offered to significantly narrow the scope of what the subpoenas sought.

The following day, in an effort to address points previously raised by the Senators, KIG narrowed its prior sixteen requests to just six (the "Modified Requests"), proposed as follows:

> **Modified Request No. 1**: All non-privileged Documents and Communications demonstrating Your understanding as to what constitutes "circumvent[ion]" under the BOTS Act.
>
> **Modified Request No. 2**: All non-privileged Documents and Communications concerning Your contention that "the BOTS Act was [not]

> confined solely to use of bot technology," as set forth on pages 2 through 6 of the Amicus Brief You filed in the Action.
>
> **Modified Request No. 3**: All non-privileged Documents and Communications showing any change in Your understanding or interpretation of the BOTS Act since its enactment.
>
> **Modified Request No. 4**: All non-privileged Documents and Communications between You and any third-party concerning the interpretation and enforcement of the BOTS Act.
>
> **Modified Request No. 5**: All non-privileged Documents and Communications between You and any third-party, including but not limited to the FTC, concerning Defendants.
>
> **Modified Request No. 6**: All non-privileged Documents and Communications between You and any third-party, including but not limited to the FTC, concerning the Amicus Brief You filed in the Action.

(Stern Decl., Ex. 22.) Almost a week later, on July 29, the Senators' counsel responded by rejecting KIG's Proposed Requests outright. Citing no factual or legal support, the Senator's counsel baldly claimed that "the overwhelming majority of documents sought by the subpoenas are absolutely protected from compelled disclosure under the Speech or Debate Clause, as they constitute communications integral to the Senators' legislative activities regarding the BOTS Act and the pending MAIN Event Ticketing Act." (*Id.*) Given the Senators' refusal to meaningfully engage further with KIG, the parties have reached an impasse.

Accordingly, KIG now brings the present Motion, moving to compel the Senators to produce documents and communications responsive to the Modified Requests.

## LEGAL STANDARD

"Disputes over third-party subpoenas to agencies in civil litigation . . . must commence in the district court under Rule 45," which "authorizes court-issued subpoenas to obtain discovery from third parties." *Watts v. S.E.C.*, 482 F.3d 501, 503, 507 (D.C. Cir. 2007). Rule 45 requires that district courts enforce subpoenas over agencies' objections so long as the subpoenas do not call

for privileged matter or cause undue burden. *Id.* at 508; *see also Alexander v. F.B.I.*, 186 F.R.D. 21, 43 (D.D.C. 1998). When deciding a motion to compel under Rule 45, courts must first consider whether the discovery sought is relevant to a party's claim or defense in the Underlying Litigation, as defined in Rule 26(b)(1). *See id.*; *see also In re Denture Cream Prods. Liab. Litig.*, 292 F.R.D. 120, 123 (D.D.C. 2013). Next, the court must assess any objections to the subpoena under the standards supplied by Rule 45, which "requires that district courts quash subpoenas that call for privileged matter or would cause an undue burden." *Watts*, 482 F.3d at 508. "The burden lies on the party resisting discovery to show that the documents requested are either unduly burdensome or privileged." *In re Micron Tech., Inc. v. Sec. Litig.*, 264 F.R.D. 7, 9 (D.D.C. 2010).

## ARGUMENT

### I. The Modified Requests Seek Information Highly Relevant to Claims and Defenses in the Underlying Litigation

The Modified Requests principally seek documents and communication reflecting the Senators' understanding of how the BOTS Act is to be interpreted and enforced (including any changes therein). They are clearly relevant to the Underlying Litigation and KIG's defenses therein.[3] It is well-settled that "[f]or purposes of discovery, relevance is liberally construed" and, in the context of a Rule 45 subpoena, "request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party." *In re Denture Cream Prods. Liability Litigation*, 292 F.R.D. at 123. As discussed below, the information sought by KIG is plainly relevant.

[3] In response to the initially-served subpoenas, the Senators asserted a blanket relevance objection. (Stern Decl., Ex. 21.) However, upon receiving the Modified Requests, their primary objection is moored to the Speech or Debate Clause. (Stern Decl. Ex. 22.) That said, for completion's sake, KIG begins by first addressing the plain relevance of its requests before addressing the Senators' primary privilege objection.

***First***, the Senators—as vociferous supporters of the BOTS Act—possess "unique" perspective and insights relating to the enactment of the bill. Indeed, in their own court submissions in the Underlying Litigation, they emphasized this very point as a primary reason for the court to consider granting their Motion to file an *Amicus* Brief—that their unique experiences could provide the court with "useful legislative context" necessary for evaluating arguments advanced by KIG as part of its Motion to Dismiss—including that the BOTS Act was intended to be applied broadly. (Stern Decl., Ex. 11.) The court, in turn, relied upon arguments advanced by the Senators in their *Amicus* Brief in denying KIG's Motion. (Stern Decl., Ex. 16.) The court's reliance upon material representations made by the Senators in their *Amicus* Brief confirms the relevance of the information sought by KIG.

***Second***, since the BOTS Act's enactment, the Senators' view (or change in view) on how the Act should be interpreted and enforced (including discussions with other agencies or non-governmental third-parties) is unquestionably relevant to claims and defenses in the Underlying Litigation. That is especially true here given that, prior to the Underlying Litigation, the ***only*** circumstances in which the FTC enforced the BOTS Act have been against recidivist bot users. (Stern Decl., Exs. 2-4.) Indeed, it is readily apparent that there has been a paradigm shift in how the FTC has chosen to interpret and enforce the BOTS Act, given the novel theories advanced against both KIG and Ticketmaster. (*See, e.g.* Stern Decl., Ex. 9 ("The FTC case is based on a fundamentally novel and expansionist view of the BOTS Act that makes it illegal to circumvent ticket limits—full stop—not just technological controls protecting ticket limits.").) Given the Senators' deep involvement in not only the statute's passage, but in defending its novel enforcement against KIG and Ticketmaster (as evidenced by their *amicus* briefs in both lawsuits), they clearly possess knowledge and information concerning the Act.

***Finally***, the information requested by KIG is plainly relevant to its ability to establish that the BOTS Act was never intended to be enforced in the manner in which the FTC now does against KIG. *BuzzFeed, Inc. v. U.S. Dep't of Just.*, 318 F. Supp. 3d 347, 356-58 (D.D.C. 2018) (granting motion to compel compliance with third-party subpoenas to DOJ, FBI, and other government entities where requested information was "directly relevant" to defendant's asserted fair-report-privilege affirmative defense); *Educ. Fin. Council v. Oberg*, 2010 WL 3719921, at *3-5 (D.D.C. Mar. 8, 2010) (compelling production from a non-party trade association where communications with the Department of Education were relevant to defendants' affirmative defense that the government knew of and approved their practices). This, in turn, goes directly to key defenses that KIG has asserted in Underlying Litigation, chief among them being KIG's lack of knowledge (Fourth Affirmative Defense) and KIG's constitutional defenses, including that the BOTS Act is unconstitutionally vague (Twelfth Affirmative Defense), the FTC failed to provide fair notice (Thirteenth Affirmative Defense), and the FTC's selective enforcement of the BOTS Act violates the Equal Protection Clause (Fifteenth Affirmative Defense). (Stern Decl., Ex. 18.) The same information could also defeat the FTC's efforts to seek civil penalties against KIG, since it would further demonstrate KIG's lack of actual knowledge or knowledge fairly implied that its actions violated the BOTS Act. 15 U.S.C. § 45(m)(1)(A) (allowing for civil penalties if an entity violated the BOTS Act "with actual knowledge or knowledge fairly implied on the basis of objective circumstances").

At bottom, it cannot be disputed that the requests proposed by KIG seek highly relevant information to potentially establish key affirmative defenses and to rebut the element of knowledge for purposes of issuing civil penalties.

## II. <u>The Modified Requests Do Not Implicate Any Form of Privilege</u>

The Modified Requests do not seek any information that could implicate any of the privilege asserted by the Senators. In their initial response, the Senators raised several doctrinal defenses that purportedly excuse their compliance with the Modified Requests. None have merit.[4]

It is well-settled that excusing the compliance of a subpoena "is an extraordinary measure, and is usually inappropriate absent extraordinary circumstances." *Flanagan v. Wyndham Int'l Inc.*, 231 F.R.D. 98, 102 (D.D.C. 2005). Members of Congress are not immune from the issuance of subpoenas and cannot make blanket refusals to produce non-privileged discoverable information—which is precisely what the Senators attempt to do here, by asserting privilege under the Speech or Debate Clause. *See Franklin v. Mass.*, 505 U.S. 788, 826 (1992); *Gravel v. United States*, 408 U.S. 606, 614-15 (1972).

The Speech or Debate Clause states that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. The "central object of the . . . Clause is to protect the 'independence and integrity of the legislature.' " *McCarthy v. Pelosi*, 5 F.4th 34, 38 (D.C. Cir. 2021) (citation omitted). The Supreme Court has cautioned, however, that the Speech or Debate Clause's protection only extends to "legislative acts" that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings." *Gravel v. United States*, 408

[4] The Senators originally argued (i) the documents sought by KIG are privileged under the Speech or Debate Clause; (ii) they are entitled to sovereign immunity; and (iii) the Standing Rules of the Senate excuse their compliance. For over sixty years, however, the D.C. Circuit "has assumed the nonapplicability of sovereign immunity to such a subpoena" and, instead, has evaluated the challenges to discovery based on special privileges. *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 398 n.2 (D.C. Cir. 1984); *see McCarthy v. Pelosi*, 5 F.4th 34, 38-41 (D.C. Cir. 2021) (evaluating challenged legislative acts exclusively under the Speech or Debate Clause); *see also Jewish War Veterans of the U.S. of Am., Inc. v. Gates*, 506 F. Supp. 2d 30, 52-63 (D.D.C. 2007) (granting, in part, motion to compel compliance with subpoenas served upon members of congress). Given the overlapping principles and frameworks at play, *see Jewish War Veterans*, 506 F.Supp.2d at 50-52 (discussing safeguards afforded under House Rules, the Federal Rules of Civil Procedure, and the Speech and Debate Clause), KIG addresses these issues in the context and framework of the Speech and Debate Clause, which is the primary objection relied upon by the Senators.

U.S. 606, 625 (1972). The D.C. Circuit has clarified that "legislative acts" include "(i) matters pertaining 'to the consideration and passage or rejection of proposed legislation,' and (ii) 'other matters which the Constitution places within the jurisdiction of either House." *McCarthy*, 5 F.4th at 40 (quoting *Gravel*, 408 U.S. at 625).

Here, to justify the complete refusal to comply with either subpoena, the Senators assert that "the overwhelming majority of documents sought by the subpoenas are absolutely protected from compelled disclosure under the Speech or Debate Clause." (Stern Decl., Ex. 22.) But this is facially untrue.

The Senators' invocation of the Clause is fundamentally misplaced given that the Modified Requests do not seek documents or information reflecting their performance of legislative acts. On the contrary, the Modified Requests seek documents and communications that reflect the Senators' efforts to inform the judiciary, the public, and other agencies regarding their post-enactment understanding of the BOTS Act, including the scope of the statute's reach for enforcement purposes, which are outside the legislative forum and not protected by the Speech or Debate Clause.

For example, Modified Request Nos. 1 and 2 request documents and communications concerning the Senators' respective understandings as to what constitutes "circumvent[ion]" under the BOTS Act and the basis for their contention that "the BOTS Act was [not] confined solely to use of bot technology," which were key arguments advanced in their own *amicus* brief. (*Id*., Stern Decl., ¶ 28.) Similarly, Modified Request No. 3 seeks documents and communications concerning any change in the "understanding or interpretation of the BOTS Act since its enactment." These requests drive at the heart of understanding the ***legislative purpose*** behind the BOTS Act, which

the Senators put squarely at issue by virtue of their *amicus* brief, and ***not*** the Senators' motives for sponsoring or supporting the bill itself.

The distinction between legislative "purpose" and legislative "motives" carries legal significance—the former ("purpose") does not invade the province of "legislative acts." *N.Y. State Ass'n of Realtors, Inc. v. Shaffer*, 135 F.R.D. 78, 80 (S.D.N.Y. 1991); *Glassroth v. Moore*, 229 F. Supp. 2d 1290, 1315-16 (M.D. Ala. 2002) ("there is a difference between [legislative] motive and purpose"), *aff'd*, 335 F.3d 1282 (11th Cir. 2003); *see also Jewish War Veterans of the U.S. of Am., Inc. v. Gates*, 506 F. Supp. 2d 30, 60 (D.D.C. 2007) (accord and collecting cases). Recognizing this distinction, the Southern District of New York held that while the latter reflects "a political decision to support or oppose proposed legislation," which should be immune from discovery, the former does not and "need not be protected." *Id.* That is especially true here given (as in *Shaffer*) KIG seeks similar "[d]ocuments relating to the underlying rationale or purpose for the legislation and rulemaking . . . which are created or approved by those already publicly supporting it" and therefore "need not be protected and would better serve the public interest by disclosure." *Id.*

The remaining three Modified Requests seek documents and communications between the Senators, on the one hand, and ***third parties*** (whether the press, the executive branch, or other agencies) on the other—are similarly not exempt from discovery. The Supreme Court has consistently held that communications and engagements with the press do not qualify as "legislative acts" protected by the Speech or Debate Clause because they are inherently *political* (not legislative) in nature. *See Brewster*, 408 U.S. at 512 (recognizing that "Members of Congress engage in many activities other than the purely legislative activities protected by the Speech or Debate Clause," including "preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress."); *Hutchinson v. Proxmire*, 443 U.S. 111, 132-33 (1979)

("the duty of Members to tell the public about their activities . . . is not a part of the legislative function or the deliberations that make up the legislative process."). The same reasoning applies to communications with agencies outside of Congress, which are similarly "not immune from inquiry" based on the dissemination of information "to individuals or agencies outside of Congress." *McSurely v. McClellan*, 553 F.2d 1277, 1297 (D.C. Cir. 1976).

In short, none of the categories of documents requested in the Modified Requests reflect "legislative acts" protected by the Speech or Debate Clause. To accept the Senators' contrary, overbroad, interpretation and application here would run squarely afoul of the precedent above and the Supreme Court's express warning that "legislative acts" covered by the Clause "are not all-encompassing." *See Gravel*, 408 U.S. at 625.

## III. The Senators' Remaining Boilerplate Objections are Without Merit

In addition to their blanket Speech or Debate Arguments, the Senators offer a laundry list of other objections, each more dubious than the next.

### A. The Modified Requests Do Not Subject the Senators to Undue Burden

The Senators would be hard-pressed to claim undue burden if ordered to comply with the subpoena and produce documents responsive to the Modified Requests. To balance "the government's serious and legitimate concern that its employee resources not be commandeered into service by private litigants to the detriment of the smooth functioning of government operations," courts weigh several factors in evaluating a claim of burden, including: "whether the discovery is unreasonably cumulative or duplicative, whether the discovery sought is obtainable from some other source that is more convenient, less burdensome, or less expensive; and whether the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation and the importance of the proposed discovery in resolving the issues."

*Watts*, 482 F.3d at 509 (internal citations omitted). Given that the Senators are the party resisting discovery, they "carr[y] [the] 'heavy' burden of persuasion," which they fall far short of satisfying. *United States v. AT&T, Inc.*, 2011 WL 5347178, at *5 (D.D.C. Nov. 6, 2011).

***First***, the Senators cannot credibly argue that the Modified Requests seek duplicative or cumulative materials; on the contrary, KIG seeks information that by its very nature is uniquely within the Senators' possession—i.e., information reflecting their interpretation and enforcement of the BOTS Act (including any material changes therein).

***Second***, with the exception of communications with the FTC—which KIG has separately propounded discovery upon, and which the FTC has in large part refused to provide—the requested documents and information cannot be obtained from alternative sources. Indeed, with the exception of the FTC, KIG is not aware of any other parties or sources that are in possession of similar information. But the Senators are. That should not come as a surprise to the Senators given that they readily admit to possessing "unique" perspectives and experiences as sponsors and supporters of the law that enable them to "offer unique insights" as to how the statute is to be interpreted and enforced. (Stern Decl., Ex. 11; *see also Buzzfeed*, 318 F. Supp. 3d at 360 (rejecting undue burden argument where documents sought could not be obtained from some other source).

***Third***, the Senators cannot be credibly heard to complain of burden ***when they have not even made a meaningful effort to demonstrate the nature and scope of their purported burden***. *Tequilla Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.*, 242 F.R.D. 1, 10 (D.D.C. 2007) (overruling burden objections where party resisting discovery failed to make any showing demonstrating overbreadth); *Athridge v. Aetna Cas. And Sur. Co.*, 184 F.R.D. 181, 190-91 (D.D.C. 1998) (holding that party resisting discovery waived objection based on burden based on failure to offer any evidence as to the nature of the burden). That aside, any claim of burden imposed by the subpoenas

(as initially served) has been obviated by the Modified Requests, which eliminates entire categories of documents and merely seek information that reflect the Senators' respective understanding of the BOTS Act and any potential change in view of the same. *See AT&T*, 2011 WL 5347178, at *7 (granting motion to compel where movant narrowed production requests to seek only those non-duplicative documents central to the case and to eliminate other requests from the scope of its subpoena).

***Fourth***, the importance of the issues at stake further counsel in favor of compelling compliance. The Underlying Litigation presents a novel theory and approach to enforcing the BOTS Act—one that does not actually implicate the use of bots or other technological tools to circumvent a ticket provider's security measures. This marks a complete deviation from the plain language of the statute and how it has been previously enforced. If, as KIG anticipates, there was a deliberate change in view as to how the statute should be interpreted and enforced—one that has never been disclosed publicly—it has serious implications on not just the Underlying Litigation, but also other related enforcement actions (including the related Ticketmaster litigation) that involve this novel interpretation.

***Finally***, and fundamentally, the Senators have no right to completely defy their discovery obligations. *See Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1025 (Fed. Cir. 1986) ("When a court is confronted with a motion to quash, its duty is not to deny discovery altogether, but to reduce the demand to a reasonable level, considering the parties' concerns.").

### B. The Documents Requested Do Not Implicate the Attorney-Client Privilege or Work-Product Doctrines

The Court should reject any attempt by the Senators to withhold documents on the basis of privilege or work product. None one of the Modified Requests seek information that could even remotely be argued as invading either privilege. On the contrary, the first three Modified Requests

are limited to seeking ***non-privileged*** documents and communications concerning the Senators' understandings as to what constitutes "circumvention" (Modified Request No. 1), the Senators' contention that the BOTS Act was intended to be construed and enforced broadly (Modified Request No. 2), and any change in the Senators' understanding or interpretation of the BOTS Act (Modified Request No. 3). Similarly, the remaining three Modified Requests seek documents and communications between the Senators (on the one hand) and ***any third-party*** (on the other). The Senators cannot maintain any legitimate privilege assertion over communications or documents shared with third parties. *Blumenthal v. Drudge*, 186 F.R.D. 236, 243 (D.D.C. 1999) (holding that communications shared with third parties were not protected by attorney-client privilege and had to be produced because disclosure destroyed confidentiality).

## CONCLUSION

For the foregoing reasons, KIG respectfully requests that this Court compel the Senators to comply with the subpoenas and provide substantive documents and communications in response to the Modified Requests.

Dated: August 11, 2026
Washington, D.C.

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP

*/s/ Bezalel A. Stern*

Bezalel A. Stern (D.C. Bar No. 1025745)
Joshua N. Drian (D.C. Bar No. 7669248)
1700 M Street NW, 4th Floor
Washington, D.C. 20036
(202) 585-6500
bstern@manatt.com
jdrian@manatt.com

*Counsel for Movant*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KEY INVESTMENT GROUP LLC,<br><br>Movant,<br><br>v.<br><br>SENATOR BEN RAY LUJÁN and SENATOR MARSHA BLACKBURN<br><br>Respondents. | Misc. Case No. _________ |

**DECLARATION OF BEZALEL A. STERN IN SUPPORT OF**
**KEY INVESTMENT GROUP LLC'S**
**MOTION TO COMPEL COMPLIANCE WITH THIRD-PARTY SUBPOENAS**

Bezalel A. Stern, under the penalty of perjury, pursuant to 28 U.S.C. § 1746, hereby declares that the following is true and correct:

1. I am a partner of the law firm of Manatt, Phelps & Phillips, LLP ("Manatt"), counsel for Key Investment Group LLC ("KIG") in the above-captioned miscellaneous action and in *Federal Trade Commission v. Key Investment Group LLC, et al.*, Case No. 1:25-cv-02716, pending in the United States District Court for the District of Maryland (the "Underlying Litigation"). I have personal knowledge of the facts set forth herein, which are known to me to be true and correct, and if called as a witness, I could and would competently testify thereto.

2. I submit this declaration in support of KIG's Motion to Compel Compliance with Third-Party Subpoenas.

3. The Underlying Litigation involves a single claim brought under the Better Online Tickets Sales ("BOTS") Act, 15 U.S.C. § 45c.

4. Attached as Exhibit 1 is a true and correct copy of a blog post posted on April 7, 2017 by the FTC, entitled "BOTS Act: That's the ticket!," which is available at https://www.ftc.gov/business-guidance/blog/2017/04/bots-act-thats-ticket.

5. Prior to the initiation of the Underlying Litigation, the FTC had only entered into three settlements under the BOTS Act, all three of which involved recidivist bot users. *See United States v. Cartisim Corp. and Simon Ebrani*, No. 2:21-cv-00212 (E.D.N.Y.), *United States v. Concert Specials, Inc. and Steven Ebrani,* No. 2:21-cv-00214 (E.D.N.Y.), and *United States v. Just In Time Tickets, Inc. and Evan Kohanian*, No. 2:21-cv-00215 (E.D.N.Y.).

6. Attached as Exhibit 2 is a true and correct copy of the January 14, 2021 Complaint filed by the FTC in *United States v. Cartisim Corp. and Simon Ebrani*, No. 2:21-cv-00212 (E.D.N.Y.).

7. Attached as Exhibit 3 is a true and correct copy of the January 14, 2021 Complaint filed by the FTC in *United States v. Concert Specials, Inc. and Steven Ebrani,* No. 2:21-cv-00214 (E.D.N.Y.).

8. Attached as Exhibit 4 is a true and correct copy of the January 14, 2021 Complaint filed by the FTC in *United States v. Just In Time Tickets, Inc. and Evan Kohanian*, No. 2:21-cv-00215 (E.D.N.Y. Jan. 2021).

9. Attached as Exhibit 5 is a true and correct copy of the Concurring Statement of then-Acting Chairwoman Rebecca Kelly Slaughter with the FTC regarding the BOTS Act, dated January 22, 2021.

10. On August 18, 2025, the FTC filed a complaint against KIG and others in the District of Maryland. Attached as Exhibit 6 is a true and correct copy of the August 18, 2025 Complaint filed by the FTC against KIG in the Underlying Litigation.

11. On September 18, 2025, the FTC separately filed a complaint against Ticketmaster LLC ("Ticketmaster") and others in the Central District of California for alleged violations of the BOTS Act, among other things. Attached as Exhibit 7 is a true and correct copy of the September 18, 2025 Complaint filed by the FTC against Ticketmaster.

12. In a letter addressed to Ticketmaster, dated September 30, 2025, United States Senators Marsha Blackburn and Ben Ray Luján (collectively, the "Senators") demanded that Ticketmaster address questions relating to the FTC's recently-filed lawsuit. Attached as Exhibit 8 is a true and correct copy of the letter addressed to Ticketmaster, dated September 30, 2025.

13. On October 17, 2025, Ticketmaster responded to the Senators' September 30, 2025 letter. Attached as Exhibit 9 is a true and correct copy of the letter addressed to Senators Blackburn and Luján, dated October 17, 2025.

14. On November 24, 2025, KIG moved to dismiss the FTC's Complaint in the Underlying Litigation. Attached as Exhibit 10 is a true and correct copy of KIG's Memorandum of Law in Support of Motion to Dismiss, filed on November 24, 2025 in the Underlying Litigation.

15. Attached as Exhibit 11 is a true and correct copy of Senators Blackburn and Luján's Motion for Leave to file an *Amicus* Brief in support of the FTC's opposition to KIG's Motion to Dismiss, filed on December 31, 2025 in the Underlying Litigation.

16. Attached as Exhibit 12 is a true and correct copy of Senators Blackburn and Luján's *Amicus* Brief in support of the FTC's opposition to KIG's Motion to Dismiss, filed on December 31, 2025 in the Underlying Litigation.

17. On January 6, 2026, Ticketmaster moved to dismiss the FTC's Complaint in the Central District of California. Attached as Exhibit 13 is a true and correct copy of Ticketmaster's

Memorandum of Law in Support of Motion to Dismiss, filed on January 6, 2026 in the Central District of California.

18. Attached as Exhibit 14 is a true and correct copy of Senators Blackburn and Luján's Motion for Leave to file an *Amicus* Brief in support of the FTC's opposition to Ticketmaster' Motion to Dismiss, filed on January 30, 2026 in the Central District of California.

19. Attached as Exhibit 15 is a true and correct copy of Senators Blackburn and Luján's *Amicus* Brief in support of the FTC's opposition to Ticketmaster's Motion to Dismiss, filed on January 30, 2026 in the Central District of California.

20. On April 28, 2026, the District of Maryland issued a decision and order granting Senators Blackburn and Luján's Motion for Leave to file an *Amicus* Brief on behalf of the FTC and, in that same order, denying KIG's Motion to Dismiss. Attached as Exhibit 16 is a true and correct copy of the April 28, 2026 Decision and Order granting the Senators' Motion for Leave to File an Amicus Curiae Brief and denying KIG's Motion to Dismiss in the Underlying Litigation.

21. Attached as Exhibit 17 is a true and correct copy of an email communication from the FTC's Chief Litigation Counsel to counsel for Senators Blackburn and Luján, reporting the Court's decision denying KIG's Motion to Dismiss, dated April 29, 2026 and produced by the FTC in the Underlying Action at Bates Number FTC-PROD-00002414.

22. On May 13, 2026, KIG filed its Answer to the FTC Complaint. Attached as Exhibit 18 is a true and correct copy of KIG's Answer to the FTC Complaint filed on May 13, 2026 in the Underlying Litigation.

23. On June 30, 2026, KIG issued subpoenas to Senators Blackburn and Luján, service of which was accepted by the Deputy General Counsel for the U.S. House of Representatives on

July 1, 2026. Attached as Exhibits 19 and 20 are true and correct copies of the subpoenas issued to Senators Blackburn and Luján, respectively.

24. On July 15, 2026, Senators Blackburn and Luján, through their counsel from the U.S. Senate Office of Senate Legal Counsel, responded to the subpoenas, refusing to produce any of the requested documents. Attached as Exhibit 21 is a true and correct copy of Senators Blackburn and Luján's letter objecting to the subpoenas served in the Underlying Action, dated July 15, 2026.

25. On July 22, 2026, counsel for KIG met and conferred with counsel for Senators Blackburn and Luján. During the conferral, counsel for KIG made clear that they were not interested in any privileged documents and, instead, sought documents reflecting the Senators' understanding of the BOTS Act, post-enactment, and efforts to inform the public and agencies regarding the same. Counsel for KIG further explained that any change in view by the Senators as to how broadly the statute was to be enforced, then, would go directly to KIG's defenses. The Senators' counsel did not dispute these assertions.

26. During the July 22, 2026 conferral, counsel for Senators Blackburn and Luján indicated that although they were familiar with the "types of communications" involving the Senators that could be responsive to KIG's requests, they had not actually started a substantive review or even collection of same.

27. At the conclusion of the conferral, counsel for KIG offered to significantly narrow the scope of information sought from the subpoenas.

28. The following day, on July 23, 2026, KIG narrowed its prior sixteen requests to the following:

> **Modified Request No. 1**: All non-privileged Documents and Communications demonstrating Your understanding as to what constitutes "circumvent[ion]" under the BOTS Act.
>
> **Modified Request No. 2**: All non-privileged Documents and Communications concerning Your contention that "the BOTS Act was [not] confined solely to use of bot technology," as set forth on pages 2 through 6 of the Amicus Brief You filed in the Action.
>
> **Modified Request No. 3**: All non-privileged Documents and Communications showing any change in Your understanding or interpretation of the BOTS Act since its enactment.
>
> **Modified Request No. 4**: All non-privileged Documents and Communications between You and any third-party concerning the interpretation and enforcement of the BOTS Act.
>
> **Modified Request No. 5**: All non-privileged Documents and Communications between You and any third-party, including but not limited to the FTC, concerning Defendants.
>
> **Modified Request No. 6**: All non-privileged Documents and Communications between You and any third-party, including but not limited to the FTC, concerning the Amicus Brief You filed in the Action.

29. Attached as Exhibit 22 is a true and correct copy of an email correspondence from KIG's counsel narrowing prior subpoena requests to six modified requests, dated July 23, 2026.

30. On July 29, 2026, counsel for Senators Blackburn and Luján responded by rejecting KIG's proposed modified requests, claiming that "the overwhelming majority of documents sought by the subpoenas are absolutely protected from compelled disclosure under the Speech or Debate Clause, as they constitute communications integral to the Senators' legislative activities regarding the BOTS Act and the pending MAIN Event Ticketing Act." (*See* Ex. 22 at 2-3.)

31. Given Senators Blackburn and Luján's refusal to comply with any of the requests as modified, the parties have reached an impasse. (*See* Ex. 22 at 1-2.)

I declare under penalty of perjury that the foregoing is true and correct.

Executed: August 11, 2026
Washington, D.C.

/s/ *Bezalel A. Stern*
Bezalel A. Stern

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KEY INVESTMENT GROUP LLC,<br><br>Movant,<br><br>v.<br><br>SENATOR BEN RAY LUJÁN and SENATOR MARSHA BLACKBURN<br><br>Respondents. | Misc. Case No. _________ |

**PROPOSED ORDER**

Upon Consideration of Movant Key Investment Group LLC's ("KIG" or "Movant") Motion to Compel Compliance with Third-Party Subpoenas, KIG's Memorandum of Points and Authority in Support, the Declaration of Bezalel A. Stern and exhibits appended therein, and any opposition thereto, it is hereby

**ORDERED** that Movant's Motion is **GRANTED**; and it is

**FURTHER ORDERED** that Senators Ben Ray Luján and Marsha Blackburn are compelled to comply with their respective subpoenas by producing responsive documents as modified by KIG on July 23, 2026, no later than ________.

**SO ORDERED** this ______ day of __________, 2026

______________________________
United States District Judge

AO 458 (Rev. 06/09) Appearance of Counsel

# UNITED STATES DISTRICT COURT

for the

District of Columbia

Key Investment Group LLC
*Plaintiff*
v.
Senators Ben Ray Lujan and Marsha Blackburn
*Defendant*

Case No. 1:26-mc-00115-CRC

## APPEARANCE OF COUNSEL

To: The clerk of court and all parties of record

I am admitted or otherwise authorized to practice in this court, and I appear in this case as counsel for:

Key Investment Group LLC .

Date: 08/19/2026

/s/ Joshua N. Drian
*Attorney's signature*

Joshua N. Drian (D.C. Bar No. 1009917)
*Printed name and bar number*

1700 M Street NW, 4th Floor
Washington, D.C. 20036
*Address*

jdrian@manatt.com
*E-mail address*

(202) 585-6500
*Telephone number*

(202) 585-6600
*FAX number*

AO 458 (Rev. 06/09) Appearance of Counsel

# UNITED STATES DISTRICT COURT

for the

District of Columbia

Key Investment Group LLC
*Plaintiff*
v.
Senators Ben Ray Lujan and Marsha Blackburn
*Defendant*

Case No. 1:26-mc-00115-CRC

## APPEARANCE OF COUNSEL

To: The clerk of court and all parties of record

I am admitted or otherwise authorized to practice in this court, and I appear in this case as counsel for:

Senators Ben Ray Lujan and Marsha Blackburn .

Date: 08/21/2026

/s/ Morgan J. Frankel
*Attorney's signature*

Morgan J. Frankel, Bar #342022
*Printed name and bar number*

Office of Senate Legal Counsel
642 Hart Senate Office Building
Washington, D.C. 20510-7250
*Address*

morgan_frankel@legal.senate.gov
*E-mail address*

(202) 224-4435
*Telephone number*

(202) 224-3391
*FAX number*

AO 458 (Rev. 06/09) Appearance of Counsel

# UNITED STATES DISTRICT COURT

for the

District of Columbia

Key Investment Group LLC
*Plaintiff*
v.
Senators Ben Ray Lujan and Marsha Blackburn
*Defendant*

Case No. 1:26-mc-00115-CRC

**APPEARANCE OF COUNSEL**

To: The clerk of court and all parties of record

I am admitted or otherwise authorized to practice in this court, and I appear in this case as counsel for:

Senators Ben Ray Lujan and Marsha Blackburn .

Date: 08/21/2026

/s/ Patricia Mack Bryan
*Attorney's signature*

Patricia Mack Bryan, Bar #335463
*Printed name and bar number*

Office of Senate Legal Counsel
642 Hart Senate Office Building
Washington, D.C. 20510-7250
*Address*

pat_bryan@legal.senate.gov
*E-mail address*

(202) 224-4435
*Telephone number*

(202) 224-3391
*FAX number*

AO 458 (Rev. 06/09) Appearance of Counsel

# UNITED STATES DISTRICT COURT

for the

District of Columbia

Key Investment Group LLC
*Plaintiff*
v.
Senators Ben Ray Lujan and Marsha Blackburn
*Defendant*

Case No. 1:26-mc-00115-CRC

**APPEARANCE OF COUNSEL**

To: The clerk of court and all parties of record

I am admitted or otherwise authorized to practice in this court, and I appear in this case as counsel for:

Senators Ben Ray Lujan and Marsha Blackburn .

Date: 08/21/2026

/s/ Thomas E. Caballero
*Attorney's signature*

Thomas E. Caballero
*Printed name and bar number*

Office of Senate Legal Counsel
642 Hart Senate Office Building
Washington, D.C. 20510-7250
*Address*

thomas_caballero@legal.senate.gov
*E-mail address*

(202) 224-4435
*Telephone number*

(202) 224-3391
*FAX number*

AO 458 (Rev. 06/09) Appearance of Counsel

# UNITED STATES DISTRICT COURT
for the
District of Columbia

Key Investment Group LLC
*Plaintiff*
v.
Senators Ben Ray Lujan and Marsha Blackburn
*Defendant*

Case No. 1:26-mc-00115-CRC

**APPEARANCE OF COUNSEL**

To: The clerk of court and all parties of record

I am admitted or otherwise authorized to practice in this court, and I appear in this case as counsel for:

Senators Ben Ray Lujan and Marsha Blackburn .

Date: 08/21/2026

/s/ Vivian M. Rivera
*Attorney's signature*

Vivian M. Rivera
*Printed name and bar number*

Office of Senate Legal Counsel
642 Hart Senate Office Building
Washington, D.C. 20510-7250
*Address*

vivian_rivera@legal.senate.gov
*E-mail address*

(202) 224-4435
*Telephone number*

(202) 224-3391
*FAX number*

# EXHIBIT 1

RECEIVED
AUG 18 2026
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

FEDERAL TRADE COMMISSION
PROTECTING AMERICA'S CONSUMERS

Business Blog

# BOTS Act: That's the ticket!

By: Lesley Fair | April 7, 2017

It used to be a rite of passage: spending the night in a line outside the box office to score tickets to the Stones, Springsteen, or [insert your favorite group here]. The convenience of internet ticket sales ended the sleeping-on-the-sidewalk ritual. But online ticket sales raised another concern: Were prospective buyers losing out to computer programs that scooped up the best seats only to resell them at inflated prices? Congress responded to that issue by passing the Better Online Ticket Sales Act of 2016.

It's no coincidence that it's called the BOTS Act because the law outlaws the use of computer software like bots that game the ticket system. Specifically, the BOTS Act makes it illegal to "circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules."

The BOTS Act addresses more than just buying tickets illegally. Congress also made it illegal to sell tickets obtained in violation of the statute if the seller participated in the illegal purchase or knew or should have known that the tickets were acquired in violation of the law.

The law applies to public concerts, theater performances, sporting events, and similar events at venues with seating capacity of over 200. The State AGs and the FTC have enforcement authority.

That's a brief recap that could fit on the back of a ticket. If you have clients interested in this issue, you'll want to read the BOTS Act in its entirety. And remember that many states also have laws relating to ticket sales.

**Tags:** Consumer Protection | Bureau of Consumer Protection | Advertising and Marketing | Online Advertising and Marketing | Advertising and Marketing Basics

Comments closed.

**Nancy** April 07, 2017

Does the BOTS Act also apply to online ticket sales for travel as I have experienced a similar escalation of ticket cost each time I revisited bus, train and airline ticket searches ?

**lfair** April 13, 2017

According to the wording of the law, Nancy, the BOTS Act applies only to a "concert, theatrical, performance, sporting event, show, or similarly scheduled activity" that's open to the public in a venue with seating for more than 200 people.

**Jenny Childs** May 12, 2017

How do you report a violation of the BOTS act? I have had two instances recently where I waited in an online queue for a ticket for a concert to go on sale. The moment the sales opened I was able to request a ticket only to find it had sold out in seconds... however, within minutes, hundreds of available seats were available on vivdseats or stubhub for more than twice the price. It is obvious these sites used a program to buy up all the seats... this needs to stop!

**lfair** May 26, 2017

You can file a complaint with the FTC Complaint Assistant. There isn't a particular category for BOTS Act complaints, so feel free just to describe what happened and mentions the BOTS Act. The state Attorneys General also have enforcement authority under the new BOTS Act, so you could file a complaint with your state AG, too. Thanks!

**Dan Liston** June 06, 2017

What action is the FTC currently taking to promulgate rules and guidance regarding the BOTS Act?

**lfair** June 07, 2017

The BOTS Act didn't direct the FTC to issue rules, but we're working on educational materials for consumers and hope to have them available soon. If you spot a possible BOTS Act violation, please file a complaint with the FTC or your State Attorney General. Thank you.

---

**Christine Llobregat** October 20, 2017

I and many other Phil Lesh fans where shut out of buying tickets today only ONE MINUTE after tickets went on sale. The tickets are for Feb 2 and 3 at Portland Oregon's Crystal Ballroom, and the ticket seller was ETIX.COM. After a little research, I found that ticketbots.net sells software specifically designed to bypass CAPTCHA. I have an image saved of an online chat w/ their customer service where they admit that this is the purpose of their software. How can I send you this image? Can you do anything from a legal perspective? Can you help me get tickets for these shows, please? FYI, within minutes, tickets were on stubhub.com for hundreds more.

---

**Ann Venema** October 20, 2017

ETIX is selling tickets for a show for $75. It sold out in under 1 minute and now VIVID SEATS and STUB HUB are re-selling the same tickets for upwards of $300. This is WRONG.

---

**Truthfinder** March 27, 2020

What is FTC doing about StubHub still selling tickets for shows which are cancelled due to the Corona virus crisis. They are not letting the people know that the events are cancelled.

---

**FTC Staff** March 31, 2020

You can tell the FTC about a problem you have with a business at www.FTC.gov/Complaint. 

## More from the Business Blog

Business Blog

## Veterans: Here's help to protect your small business

BCP Staff | July 20, 2026

Business Blog

## Back up those earnings claims — and other lessons from the FTC's Labor Task Force work

BCP Staff | June 16, 2026

Business Blog

## Take It Down Act enforcement starts now: What to know about the FTC and TIDA

Christopher G. Mufarrige | May 19, 2026

Business Blog

## Protect your business from scams and online threats this National Small Business Week

BCP Staff | May 4, 2026

## Get Business Blog updates

Enter email address

Subscribe

# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

v.

CARTISIM CORPORATION, formerly known as Ebrani Corporation and Ebrani Enterprises, a corporation, and

SIMON EBRANI, individually and as an officer of Cartisim Corporation,

Defendants.

Civil Action No.
21-CV-212

**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF**

Plaintiff, the United States of America, by its undersigned attorneys, acting upon notification and authorization to the Attorney General by the Federal Trade Commission ("FTC") pursuant to Section 16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 56(a)(1), for its Complaint alleges:

1. Plaintiff brings this action under Sections 5(m)(1)(A), 13(b), 16(a), and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(m)(1)(A), 53(b), 56(a), and 57b and Section 2 of the Better Online Ticket Sales Act ("the BOTS Act"), 15 U.S.C. § 45c, to obtain monetary civil penalties, permanent injunctive relief, and other relief for Defendants' acts or practices in violation of Section 2(a) of the BOTS Act, 15 U.S.C. § 45c(a) and Section 5 of the FTC Act, 15 U.S.C. § 45(a).

## SUMMARY OF THE CASE

2. Between January 1, 2017 and the present date, Defendants have used ticket bots and other technology to gain access to tens of thousands of tickets for performances and events, including concerts and sporting events. Defendants' purchases exceeded posted ticket limits to

many popular events, like Elton John concerts. Defendants also have used hundreds of fictitious Ticketmaster accounts, multiple credit cards (including some in the names of fictitious individuals), and proxy or spoofed IP addresses to bypass, trick, or otherwise avoid security measures, access control systems, or other technological controls or measures on Ticketmaster's websites, that would have otherwise blocked or prevented them from obtaining so many tickets. Defendants then have resold or have attempted to resell the tickets on secondary ticketing websites. Defendants have made more than $3.8 million in revenue selling the tickets they obtained from Ticketmaster on secondary markets—often at a significant price markup. Their actions prejudiced consumers, who otherwise may have been able to purchase those tickets directly from Ticketmaster at a lower price. By their actions, Defendants have violated the BOTS Act and the FTC Act.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345.

4. Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), (b)(3), (c)(1), (c)(2), (c)(3) and (d), and 1395(a), and 15 U.S.C. § 53(b).

## DEFENDANTS

5. Defendant Cartisim Corporation, formerly known as Ebrani Corporation and Ebrani Enterprises, ("Cartisim") is a New York corporation with its principal place of business at 747 Middle Neck Road, Great Neck, NY 11024. Cartisim transacts or has transacted business in this District and throughout the United States.

6. Defendant Simon Ebrani ("Simon Ebrani") is the owner and president of Cartisim. At all times material to this Complaint, acting alone or in concert with others, he has formulated,

directed, controlled, or had the authority to control or participated in the acts and practices of Cartisim, including the acts and practices set forth in this Complaint. Simon Ebrani resides in New York, and, in connection with the matters alleged herein, transacts or has transacted business in this district.

7. On July 26, 2016, Defendants signed an Assurance of Discontinuance with the New York Attorney General relating to, among other things, their use of ticket bots. The New York Attorney General alleged, among other things, that Defendants violated New York state law by using automated ticket purchasing software, or any machine, device, or computer program that navigates or runs automated tasks on retail ticket purchasing websites in order to bypass security measures to purchase tickets. Under the Assurance of Discontinuance, Defendants agreed "not to utilize automated ticket purchasing software, including Bots, in order to bypass security measures to purchase tickets to events in New York, or to maintain an interest in or maintain control over the operation of automated ticket purchasing software to bypass security measures to purchase tickets."

## COMMERCE

8. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## THE BOTS ACT

9. Under the BOTS Act, it is unlawful for any person to "circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket limits or to maintain the integrity of posted online ticket purchasing order rules." 15 U.S.C. § 45c(a)(1).

10. The BOTS Act defines an "event" to mean "any concert, theatrical performance, sporting event, show, or similarly scheduled activity, taking place in a venue with a seating or attendance capacity exceeding 200 persons that—(A) is open to the general public; and (B) is promoted, advertised, or marketed in interstate commerce or for which event tickets are generally sold or distributed in interstate commerce."

11. A violation of the BOTS Act is "a violation of a rule defining an unfair or a deceptive act or practice under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B))." 15 U.S.C. § 45c(b)(1). Thus, pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the BOTS Act is an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**DEFENDANTS CIRCUMVENTED SECURITY MEASURES, ACCESS CONTROL SYSTEMS, OR TECHNOLOGICAL CONTROLS OR MEASURES ON TICKETMASTER'S WEBSITES**

12. Cartisim is a ticket reseller. Its primary business involves purchasing tickets on from primary ticket sellers, and then reselling the tickets to consumers on secondary ticketing websites.

13. Simon Ebrani, as the President of Cartisim, was involved in selecting the tickets for purchase and arranging for their resale.

14. Between January 1, 2017 and the present date, Defendants have made more than 9,088 Ticketmaster ticket purchases. They obtained more than 24,478 tickets from these purchases.

15. Ticketmaster is a ticket issuer that has implemented security measures, access control systems, or other technological controls or measures on its websites to enforce posted event ticket purchase limits and to maintain the integrity of posted online ticket purchasing order rules.

16. In many instances, Defendants circumvented security measures, access control systems, and other technological controls or measures on Ticketmaster's websites by, among other things, using ticket bots and other computer software and technologies, CAPTCHA bypass or solving services, fictitious names and addresses, multiple credit card accounts (including some in the names of fictitious individuals), and IP proxies.

17. By their actions, Defendants have been able to purchase tickets far more rapidly and in a greater volume than a consumer who was not using ticket bots or otherwise circumventing security measures, access control systems, or other technological controls or measures on Ticketmaster's websites.

18. Defendants later resold many of the tickets on secondary ticketing websites, for a profit.

**DEFENDANTS' USE OF TICKET BOTS TO CIRCUMVENT SYSTEMS OR CONTROLS ON TICKETMASTER'S WEBSITES**

19. Between January 1, 2017 and at least February 2019, in numerous instances, Defendants used an automated computer program called Tixman to purchase tickets on Ticketmaster's websites. Defendants entered information into the Tixman ticket bot about the tickets that they were interested in purchasing and the price they would pay for those tickets. The Tixman ticket bot then would search Ticketmaster's websites to see if the tickets were available to purchase. The Tixman ticket bot would automatically reserve any tickets that fit Defendants' search criteria. This reservation set aside the tickets for Defendants and blocked others from purchasing them, at least until the reservation clock expired. Defendant Simon Ebrani would then review the reserved tickets and select which tickets to purchase.

20. The Tixman ticket bot saved Defendants' credit card information and Ticketmaster account information, and automatically entered that information into Ticketmaster's websites.

Also, the Tixman ticket bot would bypass any CAPTCHAs it encountered on Ticketmaster's websites while searching for or reserving tickets on Defendants' behalf. CAPTCHA is an acronym for "Completely Automated Public Turing test to tell Computers and Humans Apart." At times, Ticketmaster used CAPTCHAs on its websites to try to ensure that visitors to its website were humans, and not automated computer programs or ticket bots.

21. Between April 2018 and at least May 2019, in many instances, Defendants also used an automated computer program called Tixdrop to purchase tickets on Ticketmaster's websites. Defendants entered information into the Tixdrop ticket bot about the tickets that they were interested in purchasing. The Tixdrop ticket bot then would repeatedly search Ticketmaster's websites to see if the tickets were available to purchase. The Tixdrop ticket bot would automatically reserve any tickets that fit Defendants' search criteria. This reservation set aside the tickets for Defendants and blocked others from purchasing them, at least until the reservation clock expired. Defendant Simon Ebrani would then review the reserved tickets and select which tickets to purchase.

22. The Tixdrop ticket bot also saved Defendants' credit card information and Ticketmaster account information, and automatically entered that information into Ticketmaster's websites. In addition, the Tixdrop ticket bot would automatically complete all CAPTCHAs that appeared on Ticketmaster's websites while it was searching for or reserving tickets at the direction of Defendants.

23. By using the Tixdrop and Tixman ticket bots, Defendants were able to purchase multiple tickets across multiple Ticketmaster accounts within seconds—something that a consumer abiding by Ticketmaster's security, access control, and other technological measures would be unable to do.

24. Defendants' use of the Tixman and Tixdrop ticket bots, along with other technologies, allowed them to circumvent security measures, access control systems, or other technological controls or measures on Ticketmaster's websites that were used by Ticketmaster to enforce posted event ticket purchase limits, or to maintain the integrity of posted online ticket purchasing order rules.

**DEFENDANTS HID THEIR IP ADDRESSES TO CIRCUMVENT SYSTEMS OR CONTROLS ON TICKETMASTER'S WEBSITES**

25. Between January 1, 2017 and the present date, Ticketmaster has had security measures, access control systems, or other technological controls or measures on its websites that were designed to prevent or block ticket purchasers from making multiple purchases on the same day from the same IP address. An IP address is a unique string of numbers separated by periods that Ticketmaster uses to identify a computer or affiliated computers making purchases. Ticketmaster uses this technological system to enforce posted event ticket purchase limits and to maintain the integrity of its posted online ticket purchasing order rules.

26. In many instances, between January 1, 2017 and the present date, Defendants have taken steps to conceal their IP address when making ticket purchases. For example, at times, Defendants used rotating proxy services and IP address blocks. These services allowed Defendants to hide their actual IP address from Ticketmaster and instead use a proxy IP address or the IP address of a computer or network that belongs to someone else.

27. Between January 1, 2017 and the present date, Defendants have used over 8,000 different IP addresses while making purchases on Ticketmaster's websites.

28. Defendants hid their true IP addresses from Ticketmaster because they believed it would allow them to circumvent technological controls on Ticketmaster's websites.

29. By hiding their true IP addresses from Ticketmaster, Defendants have circumvented security measures, access control systems, or other technological controls or measures on Ticketmaster's websites that were used by Ticketmaster to enforce posted event ticket purchase limits, or to maintain the integrity of posted online ticket purchasing order rules.

**DEFENDANTS' USE OF FICTITIOUS NAMES, MULITIPLE TICKETMASTER ACCOUNTS, PROXY IP ADDRESES, AND MULTIIPLE CREDIT CARDS TO CIRCUMVENT SYSTEMS OR CONTROLS**

30. Between January 1, 2017 and the present date, Ticketmaster also has had security measures, access control systems, or other technological controls or measures in place on its websites that were designed to prevent individuals from purchasing more tickets than is otherwise allowed under its posted event ticket limits. Among other things, these technological measures monitor the following information to verify whether the purchase fell within posted purchase limits: (a) the individual's name, (b) billing address, (c) Ticketmaster accounts, and (d) the IP address and cookies associated with the computer that made the purchase. From January 1, 2017 until or around October 2018, Ticketmaster also monitored the credit card number used by the purchaser.

31. In many instances, between January 1, 2017 and the present date, Defendants have bypassed these security measures, access control systems, or other technological controls and measures by using sham identities and addresses, multiple credit cards, multiple Ticketmaster accounts, and IP proxy services.

32. Defendants have used more than 120 Ticketmaster accounts to purchase tickets during the relevant period. Each Ticketmaster account had a unique email address.

33. Defendants typically did not open Ticketmaster accounts in their own names, but in the names of family and friends. Defendants have used more than 115 different names to open the accounts.

34. In many instances, Defendants also did not use their address as the primary address, shipping address, or billing address for their Ticketmaster accounts. Instead, they used over 110 addresses that were either fake or unrelated to their business.

35. Defendants have used more than 150 different credit cards to make purchases through their Ticketmaster accounts. In numerous instances, Defendants' Ticketmaster accounts included credit cards in the names of fictitious individuals or the names of friends and family. Defendants opened at least 26 corporate credit cards in the names of fictitious individuals or friends and family members. Defendants have used many of these credit cards to purchase tickets.

36. As discussed above, Defendants also hid from Ticketmaster the true IP addresses of the computers used by Defendants to make purchases.

37. Defendants knew that if they purchased tickets using their true names, addresses, and IP addresses, then Ticketmaster could prevent them from making all of the purchases they wished to make, or their purchases could be cancelled.

38. Defendants' use of multiple names, addresses, IP addresses, credit cards, and Ticketmaster accounts circumvented Ticketmaster's security measures, access control systems, or other technological controls or measures that were designed to prevent ticket purchasers from exceeding posted event ticket purchase limits.

## PLAINTIFF HAS REASON TO BELIEVE THAT DEFENDANTS ARE VIOLATING AND WILL CONTINUE TO VIOLATE THE BOTS ACT AND THE FTC ACT

39. Based on the facts and violations of law alleged in this Complaint, Plaintiff has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission, because among other things, (a) Defendants have been aware of the BOTS Act since early 2017, but continued to violate the Act; (b) Defendants continue to circumvent security measures, access control systems, or other technological controls or measures on Ticketmaster's

websites; and (c) Defendants are recidivists who continued to engage in unlawful conduct after prior enforcement action.

**COUNT I - VIOLATIONS OF THE BOTS ACT AND THE FTC ACT**

40. As alleged in paragraphs 1 through 39, in numerous instances, Defendants have circumvented a security measure, access control system, or other technological control or measure on Ticketmaster's websites that is used by Ticketmaster to enforce posted event ticket limits or to maintain the integrity of posted online ticket purchasing order rules.

41. Therefore, Defendants' acts or practices as set forth in paragraphs 1 through 39 violate the BOTS Act and the FTC Act.

**CONSUMER INJURY**

42. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the BOTS Act and the FTC Act. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**THIS COURT'S POWER TO GRANT RELIEF**

43. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

44. Section 19 of the FTC Act, 15 U.S.C. § 57b, and the BOTS Act authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting

from Defendants' violations of the BOTS Act, including the rescission or reformation of contracts, and the refund of money.

45. Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, and as implemented by 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil penalties. From August 1, 2016 to January 21, 2018, the Court was authorized to award a penalty of up to $40,000 for each violation of the BOTS Act. *See* 16 C.F.R. § 1.98(d) (2016). From January 22, 2018 to February 13, 2019, the maximum penalty amount was $41,484 per violation, and effective February 14, 2019, the maximum penalty amount was adjusted to $42,530 per violation, pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015. *See* 16 C.F.R. § 1.98(d) (2018); 84 Fed. Reg. 3980 (Feb. 13, 2019). Defendants' violations of the BOTS Act were committed with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

46. This Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including disgorgement, to prevent and remedy any violation of the BOTS Act and the FTC Act.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, pursuant to Sections 5(a), 5(m)(1)(A), and 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), and 53(b), Section 2(a) of the BOTS Act, 15 U.S.C. § 45c(a)(1), and the Court's own equitable powers, requests that this Court:

A. Enter judgment against Defendants and in favor of Plaintiff for each violation alleged in this Complaint;

B. Enter a permanent injunction to prevent future violations of the BOTS Act by Defendants;

C. Award Plaintiff monetary civil penalties from each Defendant for every violation of the BOTS Act;

D. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

E. Award Plaintiff the costs of bringing this action, as well as such other and additional relief, including disgorgement, as the Court may determine to be just and proper.

Date: January 14, 2021

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

JENNIFER B. DICKEY
Acting Assistant Attorney General
Civil Division

DANIEL J. FEITH
Deputy Assistant Attorney General

GUSTAV W. EYLER
Director, Consumer Protection Branch

*/s/ Benjamin A. Cornfeld*
BENJAMIN A. CORNFELD
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20004
Tel: 202-598-7276
Fax: 202-514-8742
Benjamin.A.Cornfeld2@usdoj.gov

SETH D. DUCHARME
Acting United States Attorney
Eastern District of New York

*/s/ Bonni J. Perlin*
BONNI J. PERLIN
KEVIN YIM
Assistant U.S. Attorneys
Tel: (718) 254-6254
Tel: (718) 254-6186
bonni.perlin@usdoj.gov
kevin.yim@usdoj.gov

# EXHIBIT 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

v.

CONCERT SPECIALS, INC., a corporation, and

STEVEN EBRANI, individually and as an officer of Concert Specials, Inc.,

Defendants.

Civil Action No.
21-CV-214

**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF**

Plaintiff, the United States of America, by its undersigned attorneys, acting upon notification and authorization to the Attorney General by the Federal Trade Commission ("FTC") pursuant to Section 16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 56(a)(1), for its Complaint alleges:

1. Plaintiff brings this action under Sections 5(m)(1)(A), 13(b), 16(a), and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(m)(1)(A), 53(b), 56(a), and 57b and Section 2 of the Better Online Ticket Sales Act ("the BOTS Act"), 15 U.S.C. § 45c, to obtain monetary civil penalties, permanent injunctive relief, and other relief for Defendants' acts or practices in violation of Section 2(a) of the BOTS Act, 15 U.S.C. § 45c(a) and Section 5 of the FTC Act, 15 U.S.C. § 45(a).

**SUMMARY OF THE CASE**

2. Between January 1, 2017 and the present date, Defendants have used ticket bots and other technology to gain access to tens of thousands of tickets for performances and events, including concerts and sporting events. Defendants' purchases exceeded posted ticket limits to many popular events, like Elton John concerts. Defendants also have used hundreds of fictitious

Ticketmaster accounts, multiple credit cards (including some in the names of fictitious individuals), and proxy or spoofed IP addresses to bypass, trick, or otherwise avoid security measures, access control systems, or other technological controls or measures on Ticketmaster's websites, that would have otherwise blocked or prevented them from obtaining so many tickets. Defendants then have resold or have attempted to resell the tickets on secondary ticketing websites. Defendants have made more than $13.7 million in revenue selling the tickets they obtained from Ticketmaster on secondary markets—often at a significant price markup. Their actions prejudiced consumers, who otherwise may have been able to purchase those tickets directly from Ticketmaster at a lower price. By their actions, Defendants have violated the BOTS Act and the FTC Act.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345.

4. Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), (b)(3), (c)(1), (c)(2), (c)(3) and (d), and 1395(a), and 15 U.S.C. § 53(b).

## DEFENDANTS

5. Defendant Concert Specials, Inc. ("Concert Specials") is a New York corporation with its principal place of business at 747 Middle Neck Road, Great Neck, NY 11024. Concert Specials transacts or has transacted business in this District and throughout the United States.

6. Defendant Steven Ebrani ("Steven Ebrani") is the owner and president of Concert Specials. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, or had the authority to control or participated in the acts and practices of Concert Specials, including the acts and practices set forth in this Complaint. Steven

Ebrani resides in New York, and, in connection with the matters alleged herein, transacts or has transacted business in this district.

7. On July 26, 2016, Defendants signed an Assurance of Discontinuance with the New York Attorney General relating to, among other things, their use of ticket bots. The New York Attorney General alleged, among other things, that Defendants violated New York state law by using automated ticket purchasing software, or any machine, device, or computer program that navigates or runs automated tasks on retail ticket purchasing websites in order to bypass security measures to purchase tickets. Under the Assurance of Discontinuance, Defendants agreed "not to utilize automated ticket purchasing software, including Bots, in order to bypass security measures to purchase tickets to events in New York, or to maintain an interest in or maintain control over the operation of automated ticket purchasing software to bypass security measures to purchase tickets."

## COMMERCE

8. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## THE BOTS ACT

9. Under the BOTS Act, it is unlawful for any person to "circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket limits or to maintain the integrity of posted online ticket purchasing order rules." 15 U.S.C. § 45c(a)(1).

10. The BOTS Act defines an "event" to mean "any concert, theatrical performance, sporting event, show, or similarly scheduled activity, taking place in a venue with a seating or

attendance capacity exceeding 200 persons that— (A) is open to the general public; and (B) is promoted, advertised, or marketed in interstate commerce or for which event tickets are generally sold or distributed in interstate commerce."

11. A violation of the BOTS Act is "a violation of a rule defining an unfair or a deceptive act or practice under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B))." 15 U.S.C. § 45c(b)(1). Thus, pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the BOTS Act is an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## DEFENDANTS CIRCUMVENTED SECURITY MEASURES, ACCESS CONTROL SYSTEMS, OR TECHNOLOGICAL CONTROLS OR MEASURES ON TICKETMASTER'S WEBSITES

12. Concert Specials is a ticket reseller. Its primary business involves purchasing tickets from primary ticket issuers, and then reselling the tickets to consumers on secondary ticketing websites.

13. Steven Ebrani, as the President of Concert Specials, was involved in selecting the tickets for purchase and arranging for their resale.

14. Between January 1, 2017 and the current date, Defendants have made more than 34,513 Ticketmaster ticket purchases. They obtained more than 82,925 tickets from these purchases.

15. Ticketmaster is a ticket issuer that has implemented security measures, access control systems, or other technological controls or measures on its websites to enforce posted event ticket purchase limits and to maintain the integrity of posted online ticket purchasing order rules.

16. In many instances, Defendants circumvented security measures, access control systems, and other technological controls or measures on Ticketmaster's websites by, among other things, using ticket bots and other computer software and technologies, CAPTCHA bypass or

solving services, fictitious names and addresses, multiple credit card accounts (including some in the names of fictitious individuals), and IP proxies.

17. By their actions, Defendants have been able to purchase tickets far more rapidly and in a greater volume than a consumer who was not using ticket bots or otherwise circumventing security measures, access control systems, or other technological controls or measures on Ticketmaster's websites.

18. Defendants later resold many of the tickets on secondary ticketing websites, for a profit.

**DEFENDANTS' USE OF TICKET BOTS TO CIRCUMVENT SYSTEMS OR CONTROLS ON TICKETMASTER'S WEBSITES**

19. Between January 1, 2017 and at least March 2017, in numerous instances, Defendants used an automated computer program called Automatick to purchase tickets on Ticketmaster's websites. The Automatick ticket bot is also known as Smartick.

20. Defendants entered information into the Automatick ticket bot about the tickets that they were interested in purchasing and the price they would pay for those tickets. The Automatick ticket bot then would search Ticketmaster's websites to see if the tickets were available to purchase. The Automatick ticket bot would automatically reserve any tickets that fit Defendants' search criteria. This reservation set aside the tickets for Defendants and blocked others from purchasing them, at least until the reservation clock expired. Defendant Steven Ebrani would then review the reserved tickets and select which tickets to purchase.

21. The Automatick ticket bot saved Defendants' credit card information and Ticketmaster account information, and automatically entered that information into Ticketmaster's websites. The Automatick ticket bot also would bypass any CAPTCHAs it encountered on Ticketmaster's websites while searching for or reserving tickets on Defendants' behalf.

CAPTCHA is an acronym for "Completely Automated Public Turing test to tell Computers and Humans Apart." At times, Ticketmaster used CAPTCHAs on its websites to try to ensure that visitors to its website were humans, and not automated computer programs or ticket bots.

22. Between approximately May 2017 and at least May 2019, in many instances, Defendants used an automated computer program called Tixdrop to purchase tickets on Ticketmaster's websites. Defendants entered information into the Tixdrop ticket bot about the tickets that they were interested in purchasing. The Tixdrop ticket bot then would repeatedly search Ticketmaster's websites to see if the tickets were available to purchase. The Tixdrop ticket bot would automatically reserve any tickets that fit Defendants' search criteria. This reservation set aside the tickets for Defendants and blocked others from purchasing them, at least until the reservation clock expired. Defendant Steven Ebrani would then review the reserved tickets and select which tickets to purchase.

23. The Tixdrop ticket bot also saved Defendants' credit card information and Ticketmaster account information, and automatically entered that information into Ticketmaster's websites. In addition, the Tixdrop ticket bot would automatically complete all CAPTCHAs that appeared on Ticketmaster's websites while it was searching for or reserving tickets at the direction of Defendants.

24. By using the Tixdrop and Automatick ticket bots, Defendants were able to purchase multiple tickets across multiple Ticketmaster accounts within seconds—something that a consumer abiding by Ticketmaster's security, access control, and other technological measures would be unable to do.

25. Defendants' use of the Tixdrop and Automatick ticket bots, along with other technologies, allowed them to circumvent security measures, access control systems, or other

technological controls or measures on Ticketmaster's websites that were used by Ticketmaster to enforce posted event ticket purchase limits, or to maintain the integrity of posted online ticket purchasing order rules.

**DEFENDANTS HID THEIR IP ADDRESSES TO CIRCUMVENT SYSTEMS OR CONTROLS ON TICKETMASTER'S WEBSITES**

26. Between January 1, 2017 and the present date, Ticketmaster has had security measures, access control systems, or other technological controls or measures on its websites that were designed to prevent or block ticket purchasers from making multiple purchases on the same day from the same IP address. An IP address is a unique string of numbers separated by periods that Ticketmaster uses to identify a computer or affiliated computers making purchases. Ticketmaster uses this technological system to enforce posted event ticket purchase limits and to maintain the integrity of its posted online ticket purchasing order rules.

27. In many instances, between January 1, 2017 and the present date, Defendants have taken steps to conceal their IP address when making ticket purchases. For example, at times, Defendants used rotating proxy services and IP address blocks. These services allowed Defendants to hide their actual IP address from Ticketmaster and instead use a proxy IP address or the IP address of a computer or network that belongs to someone else.

28. Between January 1, 2017 and the present date, Defendants have used over 19,000 different IP addresses while making purchases on Ticketmaster's websites.

29. Defendants hid their true IP addresses from Ticketmaster because they believed it would allow them to circumvent technological controls on Ticketmaster's websites.

30. By hiding their true IP addresses from Ticketmaster, Defendants have circumvented security measures, access control systems, or other technological controls or

measures on Ticketmaster's websites that were used by Ticketmaster to enforce posted event ticket purchase limits, or to maintain the integrity of posted online ticket purchasing order rules.

**DEFENDANTS' USE OF FICTITIOUS NAMES, MULITIPLE TICKETMASTER ACCOUNTS, PROXY IP ADDRESES, AND MULTIIPLE CREDIT CARDS TO CIRCUMVENT SYSTEMS OR CONTROLS**

31. Between January 1, 2017 and the present date, Ticketmaster also has had security measures, access control systems, or other technological controls or measures in place on its websites that were designed to prevent individuals from purchasing more tickets than is otherwise allowed under its posted event ticket limits. Among other things, these technological measures monitor the following information to verify whether the purchase fell within posted purchase limits: (a) the individual's name, (b) billing address, (c) Ticketmaster accounts, and (d) the IP address and cookies associated with the computer that made the purchase. From January 1, 2017 until or around October 2018, Ticketmaster also monitored the credit card number used by the purchaser.

32. In many instances, between January 1, 2017 and the present date, Defendants have bypassed these security measures, access control systems, or other technological controls or measures by using sham identities and addresses, multiple credit cards, multiple Ticketmaster accounts, and IP proxy services.

33. Defendants have used more than 700 Ticketmaster accounts to purchase tickets during the relevant period. Each Ticketmaster account had a unique email address.

34. Defendants typically did not open Ticketmaster accounts in their own names. Instead, Defendants have used more than 650 different names to open the accounts. The names were either fictitious or the names of Defendant Ebrani's friends and family members.

35. In many instances, Defendants also did not use their address as the primary address, shipping address, or billing address for their Ticketmaster accounts. Instead, they used over 550 addresses that were either fake or unrelated to their business.

36. Defendants have used more than 450 different credit cards to make purchases through their Ticketmaster accounts. In numerous instances, Defendants' Ticketmaster accounts included credit cards in the names of fictitious individuals or the names of friends and family. Defendants opened at least 150 corporate credit cards in the names of friends, family members, and fictitious individuals. Defendants have used many of these credit cards to purchase tickets.

37. As discussed above, Defendants also hid from Ticketmaster the true IP addresses of the computers used by Defendants to make purchases.

38. Defendants knew that if they purchased tickets using their true names, addresses, and IP addresses, then Ticketmaster could prevent them from making all of the purchases they wished to make, or their purchases could be cancelled.

39. Defendants' use of multiple names, addresses, IP addresses, credit cards, and Ticketmaster accounts circumvented Ticketmaster's a security measures, access control systems, or other technological controls or measures that were designed to prevent ticket purchasers from exceeding posted event ticket purchase limits.

**PLAINTIFF HAS REASON TO BELIEVE THAT DEFENDANTS ARE VIOLATING AND WILL CONTINUE TO VIOLATE THE BOTS ACT AND THE FTC ACT**

40. Based on the facts and violations of law alleged in this Complaint, Plaintiff has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission, because among other things, (a) Defendants have been aware of the BOTS Act since early 2017, but continued to violate the Act; (b) Defendants continue to circumvent security measures, access control systems, or other technological controls or measures on Ticketmaster's

websites; and (c) Defendants are recidivists who continued to engage in unlawful conduct after prior enforcement action.

**COUNT I - VIOLATIONS OF THE BOTS ACT AND THE FTC ACT**

41. As alleged in paragraphs 1 through 40, in numerous instances, Defendants have circumvented a security measure, access control system, or other technological control or measure on Ticketmaster's websites that is used by Ticketmaster to enforce posted event ticket limits or to maintain the integrity of posted online ticket purchasing order rules.

42. Therefore, Defendants' acts or practices as set forth in paragraphs 1 through 40 violate the BOTS Act and the FTC Act.

**CONSUMER INJURY**

43. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the BOTS Act and the FTC Act. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**THIS COURT'S POWER TO GRANT RELIEF**

44. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

45. Section 19 of the FTC Act, 15 U.S.C. § 57b, and the BOTS Act authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting

from Defendants' violations of the BOTS Act, including the rescission or reformation of contracts, and the refund of money.

46. Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, and as implemented by 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil penalties. From August 1, 2016 to January 21, 2018, the Court was authorized to award a penalty of up to $40,000 for each violation of the BOTS Act. *See* 16 C.F.R. § 1.98(d) (2016). From January 22, 2018 to February 13, 2019, the maximum penalty amount was $41,484 per violation, and effective February 14, 2019, the maximum penalty amount was adjusted to $42,530 per violation, pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015. *See* 16 C.F.R. § 1.98(d) (2018); 84 Fed. Reg. 3980 (Feb. 13, 2019). Defendants' violations of the BOTS Act were committed with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

47. This Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including disgorgement, to prevent and remedy any violation of the BOTS Act and the FTC Act.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, pursuant to Sections 5(a), 5(m)(1)(A), and 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), and 53(b), Section 2(a) of the BOTS Act, 15 U.S.C. § 45c(a)(1), and the Court's own equitable powers, requests that this Court:

A. Enter judgment against Defendants and in favor of Plaintiff for each violation alleged in this Complaint;

B. Enter a permanent injunction to prevent future violations of the BOTS Act by Defendants;

C. Award Plaintiff monetary civil penalties from each Defendant for every violation of the BOTS Act;

D. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

E. Award Plaintiff the costs of bringing this action, as well as such other and additional relief, including disgorgement, as the Court may determine to be just and proper.

Date: January 14, 2021

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

JENNIFER B. DICKEY
Acting Assistant Attorney General
Civil Division

DANIEL J. FEITH
Deputy Assistant Attorney General

GUSTAV W. EYLER
Director, Consumer Protection Branch

*/s/ Benjamin A. Cornfeld*
BENJAMIN A. CORNFELD
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20004
Tel: 202-598-7276
Fax: 202-514-8742
Benjamin.A.Cornfeld2@usdoj.gov

SETH D. DUCHARME
Acting United States Attorney
Eastern District of New York

*/s/ Bonni J. Perlin*
BONNI J. PERLIN
KEVIN YIM
Assistant U.S. Attorneys
Tel: (718) 254-6254
Tel: (718) 254-6186
bonni.perlin@usdoj.gov
kevin.yim@usdoj.gov

# EXHIBIT 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

v.

JUST IN TIME TICKETS, INC., a corporation, and

EVAN KOHANIAN, individually and as an officer of Just in Time Tickets, Inc.,

Defendants.

Civil Action No.
21-CV-215

**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF**

Plaintiff, the United States of America, by its undersigned attorneys, acting upon notification and authorization to the Attorney General by the Federal Trade Commission ("FTC") pursuant to Section 16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 56(a)(1), for its Complaint alleges:

1. Plaintiff brings this action under Sections 5(m)(1)(A), 13(b), 16(a), and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(m)(1)(A), 53(b), 56(a), and 57b and Section 2 of the Better Online Ticket Sales Act ("the BOTS Act"), 15 U.S.C. § 45c, to obtain monetary civil penalties, permanent injunctive relief, and other relief for Defendants' acts or practices in violation of Section 2(a) of the BOTS Act, 15 U.S.C. § 45c(a) and Section 5 of the FTC Act, 15 U.S.C. § 45(a).

**<u>SUMMARY OF THE CASE</u>**

2. Between January 1, 2017 and the present date, Defendants have used ticket bots and other technology to gain access to tens of thousands of tickets for performances and events, including concerts and sporting events. Defendants' purchases exceeded posted ticket limits to many popular events, like Elton John concerts. Defendants also have used hundreds of fictitious

Ticketmaster accounts, multiple credit cards (including some in the names of fictitious individuals), and proxy or spoofed IP addresses to bypass, trick, or otherwise avoid security measures, access control systems, or other technological controls or measures on Ticketmaster's websites, that would have otherwise blocked or prevented them from obtaining so many tickets. Defendants then have resold or have attempted to resell the tickets on secondary ticketing websites. Defendants have made more than $8.6 million in revenue selling the tickets they obtained from Ticketmaster on secondary markets—often at a significant price markup. Their actions prejudiced consumers, who otherwise may have been able to purchase those tickets directly from Ticketmaster at a lower price. By their actions, Defendants have violated the BOTS Act and the FTC Act.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345.

4. Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), (b)(3), (c)(1), (c)(2), (c)(3) and (d), and 1395(a), and 15 U.S.C. § 53(b).

**DEFENDANTS**

5. Defendant Just in Time Tickets, Inc. ("Just in Time Tickets") is a New York corporation with its principal place of business at 747 Middle Neck Road, Great Neck, NY 11024. Just in Time Tickets transacts or has transacted business in this District and throughout the United States.

6. Defendant Evan Kohanian ("Kohanian") is the owner and president of Just in Time Tickets. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, or had the authority to control or participated in the acts and

practices of Just in Time Tickets, including the acts and practices set forth in this Complaint. Kohanian resides in New York, and, in connection with the matters alleged herein, transacts or has transacted business in this district.

7. On February 25, 2016, Defendants signed an Assurance of Discontinuance with the New York Attorney General relating to, among other things, their use of ticket bots. The New York Attorney General alleged, among other things, that Defendants violated New York state law by using automated ticket purchasing software, or any machine, device, or computer program that navigates or runs automated tasks on retail ticket purchasing websites in order to bypass security measures to purchase tickets. Under the Assurance of Discontinuance, Defendants agreed "not to utilize automated ticket purchasing software, including Bots, in order to bypass security measures to purchase tickets, or to maintain an interest in or maintain control over the operation of automated ticket purchasing software to bypass security measures to purchase tickets."

## COMMERCE

8. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## THE BOTS ACT

9. Under the BOTS Act, it is unlawful for any person to "circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket limits or to maintain the integrity of posted online ticket purchasing order rules." 15 U.S.C. § 45c(a)(1).

10. The BOTS Act defines an "event" to mean "any concert, theatrical performance, sporting event, show, or similarly scheduled activity, taking place in a venue with a seating or

attendance capacity exceeding 200 persons that—(A) is open to the general public; and (B) is promoted, advertised, or marketed in interstate commerce or for which event tickets are generally sold or distributed in interstate commerce."

11. A violation of the BOTS Act is "a violation of a rule defining an unfair or a deceptive act or practice under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B))." 15 U.S.C. § 45c(b)(1). Thus, pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the BOTS Act is an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## DEFENDANTS CIRCUMVENTED SECURITY MEASURES, ACCESS CONTROL SYSTEMS, OR TECHNOLOGICAL CONTROLS OR MEASURES ON TICKETMASTER'S WEBSITES

12. Defendant Just in Time Tickets is a ticket reseller. Its primary business involves purchasing tickets from ticket issuers, and then reselling the tickets to consumers on secondary ticketing websites.

13. Defendant Kohanian, as the President of Just in Time Tickets, was involved in selecting the tickets for purchase and arranging for their resale.

14. Between January 1, 2017 and the present date, Defendants have made more than 14,186 Ticketmaster ticket purchases. They obtained more than 48,451 event tickets from these purchases.

15. Ticketmaster is a ticket issuer that has implemented security measures, access control systems, or other technological controls or measures on its websites to enforce posted event ticket purchase limits and to maintain the integrity of posted online ticket purchasing order rules.

16. In many instances, Defendants circumvented security measures, access control systems, and other technological controls or measures on Ticketmaster's websites by, among other things, using ticket bots and other computer software and technologies, CAPTCHA bypass or

solving services, fictitious names and addresses, multiple credit card accounts (including some in the names of fictitious individuals), and IP proxies.

17. By their actions, Defendants have been able to purchase tickets far more rapidly and in a greater volume than a consumer who was not using ticket bots or otherwise circumventing security measures, access control systems, or other technological controls or measures on Ticketmaster's websites.

18. Defendants later resold many of the tickets on secondary ticketing websites, for a profit.

**DEFENDANTS' USE OF TICKET BOTS TO CIRCUMVENT SYSTEMS OR CONTROLS ON TICKETMASTER'S WEBSITES**

19. Between January 2017 to September 2018, in numerous instances, Defendants used an automated computer program called Automatick to purchase tickets on Ticketmaster's websites. The Automatick ticket bot is also known as Smartick.

20. Defendants entered information into the Automatick ticket bot about the tickets that they were interested in purchasing and the price they would pay for those tickets. The Automatick ticket bot then would search Ticketmaster's websites to see if the tickets were available to purchase. The Automatick ticket bot would automatically reserve any tickets that fit Defendants' search criteria. This reservation set aside the tickets for Defendants and blocked others from purchasing them, at least until the reservation clock expired. Defendant Kohanian would then review the reserved tickets and select which tickets to purchase.

21. The Automatick ticket bot saved Defendants' credit card information and Ticketmaster account information, and automatically entered that information into Ticketmaster's websites. In addition, the Automatick ticket bot would bypass any CAPTCHAs it encountered on Ticketmaster's websites while searching for or reserving tickets on Defendants' behalf.

CAPTCHA is an acronym for "Completely Automated Public Turing test to tell Computers and Humans Apart." At times, Ticketmaster used CAPTCHAs on its websites to try to ensure that visitors to its website were humans, and not automated computer programs or ticket bots.

22. Between September 2018 and until at least February 2019, in numerous instances, Defendants also used an automated computer program called Tixman to purchase tickets on Ticketmaster's websites. Like the Automatick ticket bot, Defendants used the Tixman ticket bot to search Ticketmaster's websites for tickets they were interested in acquiring. The Tixman ticket bot would repeatedly search Ticketmaster's websites to see if the tickets were available to purchase. The Tixman ticket bot would automatically reserve any tickets that fit Defendants' search criteria. Once reserved, only Defendants would have the option to buy them, until the reservation clock expired. Defendant Kohanian would then review the reserved tickets and select which tickets to purchase.

23. The Tixman ticket bot also saved Defendants' credit card information and Ticketmaster account information, and automatically entered that information into Ticketmaster's websites. In addition, the Tixman ticket bot would automatically complete all CAPTCHAs that appeared on Ticketmaster's websites while it was searching for or reserving tickets at the direction of Defendants.

24. By using the Tixman and Automatick ticket bots, Defendants were able to purchase multiple tickets across multiple Ticketmaster accounts within seconds—something that a consumer abiding by Ticketmaster's security, access control, and other technological measures would be unable to do.

25. Defendants' use of the Tixman and Automatick ticket bots, along with other technologies, allowed them to circumvent security measures, access control systems, or other

technological controls or measures on Ticketmaster's websites that were used by Ticketmaster to enforce posted event ticket purchase limits, or to maintain the integrity of posted online ticket purchasing order rules.

**DEFENDANTS HID THEIR IP ADDRESSES TO CIRCUMVENT SYSTEMS OR CONTROLS ON TICKETMASTER'S WEBSITES**

26. Between January 1, 2017 and the present date, Ticketmaster has had security measures, access control systems, or other technological controls or measures on its websites that were designed to prevent or block ticket purchasers from making multiple purchases on the same day from the same IP address. An IP address is a unique string of numbers separated by periods that Ticketmaster uses to identify a computer or affiliated computers making purchases. Ticketmaster uses this technological system to enforce posted event ticket purchase limits and to maintain the integrity of its posted online ticket purchasing order rules.

27. In many instances, between January 1, 2017 and the present date, Defendants have taken steps to conceal their IP address when making ticket purchases. For example, at times, Defendants used rotating proxy services and IP address blocks. These services allowed Defendants to hide their actual IP address from Ticketmaster and instead use a proxy IP address or the IP address of a computer or network that belongs to someone else.

28. Between January 1, 2017 and the present date, Defendants have used over 12,500 different IP addresses while making purchases on Ticketmaster's websites.

29. Defendants hid their true IP addresses from Ticketmaster because they believed it would allow them to circumvent technological controls on Ticketmaster's websites.

30. By hiding their true IP addresses from Ticketmaster, Defendants have circumvented security measures, access control systems, or other technological controls or

measures on Ticketmaster's websites that were used by Ticketmaster to enforce posted event ticket purchase limits, or to maintain the integrity of posted online ticket purchasing order rules.

**DEFENDANTS' USE OF FICTITIOUS NAMES, MULITIPLE TICKETMASTER ACCOUNTS, PROXY IP ADDRESES, AND MULTIIPLE CREDIT CARDS TO CIRCUMVENT SYSTEMS OR CONTROLS**

31. Between January 1, 2017 and the present date, Ticketmaster also has had security measures, access control systems, or other technological controls or measures in place on its websites that were designed to prevent individuals from purchasing more tickets than is otherwise allowed under its posted event ticket limits. Among other things, these technological measures monitor the following information to verify whether the purchase fell within posted purchase limits: (a) the individual's name, (b) billing address, (c) Ticketmaster accounts, and (d) the IP address and cookies associated with the computer that made the purchase. From January 1, 2017 until or around October 2018, Ticketmaster also monitored the credit card number used by the purchaser.

32. In many instances, between January 1, 2017 and the present date, Defendants have bypassed these security measures, access control systems, or other technological controls or measures by using sham identities and addresses, multiple credit cards, multiple Ticketmaster accounts, and IP proxy services.

33. Defendants have used more than 436 Ticketmaster accounts to purchase tickets during the relevant period. Each Ticketmaster account had a unique email address.

34. Defendants typically did not open Ticketmaster accounts in their own names. Instead, Defendants used more than 320 different names to open the accounts. The names were either fictitious or the names of Defendant Kohanian's friends and family members.

35. In many instances, Defendants also did not use their address as the primary address, shipping address, or billing address for their Ticketmaster accounts. Instead, they used over 280 addresses that were either fake or unrelated to their business.

36. Defendants have used more than 450 different credit cards to make purchases through their Ticketmaster accounts. In numerous instances, Defendants' Ticketmaster accounts included credit cards in the names of fictitious individuals or the names of friends and family. Defendants opened at least 160 corporate credit cards in the names of friends, family members, and fictitious individuals. Defendants have used many of these credit cards to purchase tickets.

37. As discussed above, Defendants also hid from Ticketmaster the true IP addresses of the computers used by Defendants to make purchases.

38. Defendants knew that if they purchased tickets using their true names, addresses, and IP addresses, then Ticketmaster could prevent them from making all of the purchases they wished to make, or their purchases could be cancelled.

39. Defendants' use of multiple names, addresses, IP addresses, credit cards, and Ticketmaster accounts circumvented Ticketmaster's security measures, access control systems, or other technological controls or measures that were designed to prevent ticket purchasers from exceeding posted event ticket purchase limits.

## PLAINTIFF HAS REASON TO BELIEVE THAT DEFENDANTS ARE VIOLATING AND WILL CONTINUE TO VIOLATE THE BOTS ACT AND THE FTC ACT

40. Based on the facts and violations of law alleged in this Complaint, Plaintiff has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission, because among other things, (a) Defendants have been aware of the BOTS Act since early 2017, but continued to violate the Act; (b) Defendants continue to circumvent security measures, access control systems, or other technological controls or measures on Ticketmaster's

websites; and (c) Defendants are recidivists who continued to engage in unlawful conduct after prior enforcement action.

**COUNT I - VIOLATIONS OF THE BOTS ACT AND THE FTC ACT**

41. As alleged in paragraphs 1 through 40, in numerous instances, Defendants have circumvented a security measure, access control system, or other technological control or measure on Ticketmaster's websites that is used by Ticketmaster to enforce posted event ticket limits or to maintain the integrity of posted online ticket purchasing order rules.

42. Therefore, Defendants' acts or practices as set forth in paragraphs 1 through 40 violate the BOTS Act and the FTC Act.

**CONSUMER INJURY**

43. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the BOTS Act and the FTC Act. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**THIS COURT'S POWER TO GRANT RELIEF**

44. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

45. Section 19 of the FTC Act, 15 U.S.C. § 57b, and the BOTS Act authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting

from Defendants' violations of the BOTS Act, including the rescission or reformation of contracts, and the refund of money.

46. Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, and as implemented by 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil penalties. From August 1, 2016 to January 21, 2018, the Court was authorized to award a penalty of up to $40,000 for each violation of the BOTS Act. *See* 16 C.F.R. § 1.98(d) (2016). From January 22, 2018 to February 13, 2019, the maximum penalty amount was $41,484 per violation, and effective February 14, 2019, the maximum penalty amount was adjusted to $42,530 per violation, pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015. *See* 16 C.F.R. § 1.98(d) (2018); 84 Fed. Reg. 3980 (Feb. 13, 2019). Defendants' violations of the BOTS Act were committed with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

47. This Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including disgorgement, to prevent and remedy any violation of the BOTS Act and the FTC Act.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, pursuant to Sections 5(a), 5(m)(1)(A), and 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), and 53(b), Section 2(a) of the BOTS Act, 15 U.S.C. § 45c(a)(1), and the Court's own equitable powers, requests that this Court:

A. Enter judgment against Defendants and in favor of Plaintiff for each violation alleged in this Complaint;

B. Enter a permanent injunction to prevent future violations of the BOTS Act by Defendants;

C. Award Plaintiff monetary civil penalties from each Defendant for every violation of the BOTS Act;

D. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

E. Award Plaintiff the costs of bringing this action, as well as such other and additional relief, including disgorgement, as the Court may determine to be just and proper.

Date: January 14, 2021

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

JENNIFER B. DICKEY
Acting Assistant Attorney General
Civil Division

DANIEL J. FEITH
Deputy Assistant Attorney General

GUSTAV W. EYLER
Director, Consumer Protection Branch

*/s/ Benjamin A. Cornfeld*
BENJAMIN A. CORNFELD
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20004
Tel: 202-598-7276
Fax: 202-514-8742
Benjamin.A.Cornfeld2@usdoj.gov

SETH D. DUCHARME
Acting United States Attorney
Eastern District of New York

*/s/ Bonni J. Perlin*
BONNI J. PERLIN
KEVIN YIM
Assistant U.S. Attorneys
Tel: (718) 254-6254
Tel: (718) 254-6186
bonni.perlin@usdoj.gov
kevin.yim@usdoj.gov

# EXHIBIT 5

**UNITED STATES OF AMERICA**
**Federal Trade Commission**
WASHINGTON, D.C. 20580

Office of Acting Chairwoman
Rebecca Kelly Slaughter

# CONCURRING STATEMENT OF ACTING CHAIRWOMAN REBECCA KELLY SLAUGHTER

*In the Matters of Just In Time Tickets; Cartisim Corp.; and Concert Specials*
*Commission File Nos. 1823115; 1923195; and 1923196*
January 22, 2021

As the COVID-19 pandemic continues to imperil so many lives and livelihoods, millions of Americans yearn for the chance to see live music, sports, and theater again once it is safe to do so. Reminiscing about our favorite live experiences, we might be forgiven for forgetting the hassles we endured to secure the tickets in the first place. But the many problems that plague the live-event ticketing market are certain to return as soon as the events do. Happily, new tools that Congress gave the Federal Trade Commission and the strong first step the Commission is taking with three significant settlements give fans real hope that better days are ahead.

In response to myriad consumer complaints, Congress adopted the Better Online Ticket Sales Act, or BOTS Act,[1] in 2016 with the hope that the Federal Trade Commission would use its new authority to bring to heel the high-tech scoundrels who bedevil fans seeking tickets to live events. The Act's bipartisan sponsors sought to crack down on the abuses that unscrupulous actors inflict on consumers whose typing fingers were no match for algorithms in attempting to secure tickets online. To ensure robust enforcement, the legislation endowed the Commission with the ability to seek monetary penalties sufficient to deter those who would consider getting in on the lucrative scheme. I have a longstanding interest in the tickets market,[2] and I am thrilled that the Commission's staff thoroughly investigated and uncovered the violations of the BOTS Act alleged in these complaints against ticket resellers Just in Time Tickets, Inc., Cartisim Corp., and Concert Specials, Inc. and their principals, Evan Kohanian, Simon Ebrani, and Steven

---

[1] Pub. L. No. 114-274, § 2, Dec. 14, 2016, 130 Stat. 1401 (codified at 15 U.S.C. § 45c).

[2] I should disclose that I have a professional connection to this law. Before I joined the Commission, I spent a decade as counsel to Senator Charles Schumer, and, in that capacity, I worked on multiple versions of the BOTS Act. As a Commissioner, I provided opening remarks at an excellent workshop and resulting report our staff put together on problems in the tickets market. *See* Fed. Trade Comm'n, Opening Remarks of Comm'r Rebecca Kelly Slaughter, "That's the Ticket" Workshop (June 11, 2019), https://www.ftc.gov/system/files/documents/public_statements/1527238/slaughter_-_prepared_remarks_ftc_tickets_workshop_6-11-19.pdf; *see also* Fed. Trade Comm'n, Staff Perspective: "That's the Ticket" Workshop (May 7, 2020), https://www.ftc.gov/system/files/documents/reports/thats-ticket-workshop-staff-perspective/staffperspective_tickets_final-508.pdf.

Ebrani, respectively. I strongly support the complaints against them—the first that we have brought using our new authority—and I hope that they are the first of many.

The settlements our staff negotiated with these alleged BOTS Act violators make clear that serious consequences will befall those who cheat fans out of a fair shot to secure tickets to live events. The civil penalty amounts in these settlements are much higher than the revenues that the defendants raked in through the conduct charged in the complaints.[3] When live events return, so too no doubt will the bad actors who use advanced technology to game the system for profit—but now they will have to consider the risk that, if they get caught, they will not only have to disgorge the profits they made from cheating but also pay a penalty that may be many multiples thereof. I extend my hearty congratulations to the staff of the Division of Marketing Practices for securing these settlements that send a strong message of general deterrence. These first three BOTS Act enforcement actions are only a first step in fixing the broken market for tickets to live events, but they chart a course for continued improvement through enforcement, rulemaking,[4] and legislating. And they reassure the bipartisan coalition in Congress that worked hard to pass the BOTS Act that when the Federal Trade Commission is given new powers we will responsibly put them to good use for the benefit of American consumers.

---

[3] *See* Just in Time Tickets Compl. ¶ 2; Caritism Corp. Compl. ¶ 2; Concert Specials, Inc. Compl. ¶ 2. The defendants will ultimately pay less than the civil penalty judgments, which are partially suspended, based on the defendants' inability to pay, as documented by sworn financial statements.

[4] In my opening remarks at the Commission's workshop on online ticket sales, I exhorted the tickets industry to end the deceptive "drip pricing" practice in which consumers are unable to see the true price of tickets—including mandatory fees—until late in the shopping process, and I called for rulemaking under section 18 of the Federal Trade Commission Act to get the job done if industry will not. *See* Opening Remarks of Comm'r Slaughter, at 4 ("I believe that the government must explore a . . . regulatory solution.").

# EXHIBIT 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

**FEDERAL TRADE COMMISSION**,
600 Pennsylvania Avenue, NW
Washington, DC 20580

Plaintiff,

v.

**KEY INVESTMENT GROUP LLC**, a Delaware limited liability company, also d/b/a Epic Seats; TotalTickets.com LLC; and Totally Tix LLC, 1777 Reisterstown Road, Suite 363, Pikesville, Baltimore Co., Maryland 21208;

**TOTALTICKETS.COM LLC**, a Florida limited liability company, 2755 East Oakland Park Boulevard, Suite 230, Fort Lauderdale, Florida 33306;

**TOTALLY TIX LLC**, a Delaware limited liability company, 1777 Reisterstown Road, Pikesville, Baltimore Co., Maryland 21208;

**FRONT ROSE TIX LLC**, a Maryland limited liability company, 1777 Reisterstown Road, Pikesville, Baltimore Co., Maryland 21208;

**WLK INVESTMENTS LLC**, a Delaware limited liability company, 33 Nashoba Road, Acton, Massachusetts 01720;

**YAIR D. ROZMARYN**, individually and as an officer and manager of Key Investment Group LLC, as a member and manager of Front Rose Tix, LLC, and as a manager of TotalTickets.com LLC and Totally Tix LLC, 7906 Humboldt Road, Pikesville, Baltimore Co., Maryland 21208;

**ELAN N. ROZMARYN**, individually and as an officer and manager of Key Investment Group LLC, as a member and manager of Front Rose Tix, LLC, and as a manager of TotalTickets.com LLC and Totally Tix LLC, 7912 Long Meadow Road, Pikesville, Baltimore Co., Maryland 21208; and

Case No. 1:25-cv-02716

**COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF**

**TAYLOR KURTH**, individually and as an officer and de facto manager of Key Investment Group LLC, and as a de facto manager of WLK Investments LLC, TotalTickets.com LLC, and Totally Tix LLC, 33 Nashoba Road, Acton, Massachusetts 01720,

Defendants.

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1. The FTC brings this action for Defendants' violations of Section 2(a) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(a), and Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a). For these violations, Plaintiff seeks relief, including a permanent injunction and civil penalties, pursuant to Section 2(b) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(b), and Sections 5(m)(1)(A) and 13(b) of the FTC Act, 15 U.S.C. §§ 45(m)(1)(A) and 53(b).

## SUMMARY OF THE CASE

2. Beginning on or around October 2016 to the present, Defendants have used illegal means to purchase hundreds of thousands of tickets from Ticketmaster for performances and events, including concerts, plays, and sporting events. Defendants' purchases have regularly exceeded posted ticket purchasing limits to many popular events, such as Taylor Swift's Eras Tour. Defendants have used thousands of fictitious Ticketmaster accounts, thousands of virtual and traditional credit card numbers, proxy or spoofed IP addresses, and SIM banks to bypass or otherwise avoid security measures, access control systems, or other technological controls or measures on Ticketmaster's websites that would have otherwise blocked or prevented them from violating Ticketmaster's posted ticket purchase limits. Defendants then have resold or offered to resell the illegally purchased tickets on secondary ticketing websites, including Ticketmaster's resale platform. Between November 1, 2022, and December 30, 2023, Defendants purchased at

least 379,776 tickets from Ticketmaster at a cost of nearly $57,000,000. Defendants resold a portion of those tickets on secondary marketplaces for approximately $64,000,000, often charging a significant markup to consumers. Defendants' actions have injured consumers, who otherwise may have been able to purchase those tickets in the first instance from Ticketmaster at a lower price. By circumventing Ticketmaster's security measures, access control systems, or other technological controls or measures to buy tickets, and then selling or offering to sell the tickets, Defendants have violated and continue to violate the Better Online Ticket Sales Act and the FTC Act.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

4. Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2), (b)(3), (c)(1), and (c)(2), and 1395(a), and 15 U.S.C. § 53(b).

## PLAINTIFF

5. The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Better Online Ticket Sales Act, 15 U.S.C. § 45c, which Congress enacted in 2016 "[t]o prohibit the circumvention of control measures used by Internet ticket sellers to ensure equitable consumer access to tickets for any given event, and for other purposes." Pub. L. 114-274, pmbl.

## DEFENDANTS

6. Defendant Key Investment Group LLC is a Delaware limited liability company, with its principal place of business at 1777 Reisterstown Road, Suite 363, Pikesville, Baltimore

Co., Maryland 21208. Key Investment Group also does business as Epic Seats, TotalTickets.com LLC, and Totally Tix LLC. Key Investment Group is the sole member and owner of both TotalTickets.com and Totally Tix. Key Investment Group transacts or has transacted business in this district and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Key Investment Group has purchased and then subsequently advertised, marketed, distributed, or sold event tickets to consumers throughout the United States.

7. Defendant TotalTickets.com LLC is a Florida limited liability company with its principal place of business at 2755 East Oakland Park Boulevard, Suite 230, Fort Lauderdale, Florida 33306. TotalTickets.com is a wholly owned subsidiary of Key Investment Group. It transacts or has transacted business in this district and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, TotalTickets.com has purchased and then subsequently advertised, marketed, distributed, or sold event tickets to consumers throughout the United States.

8. Defendant Totally Tix LLC is a Delaware limited liability company with its principal place of business at 1777 Reisterstown Road, Pikesville, Baltimore Co., Maryland 21208. Totally Tix is a wholly owned subsidiary of Key Investment Group. It transacts or has transacted business in this district and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, Totally Tix has purchased and then subsequently advertised, marketed, distributed, or sold event tickets to consumers throughout the United States.

9. Defendant Front Rose Tix LLC is a Maryland limited liability company with its principal place of business at 1777 Reisterstown Road, Pikesville, Baltimore Co., Maryland 21208. Front Rose Tix is the majority owner and a member and manager of Key Investment

Group. Front Rose Tix transacts or has transacted business in this district and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Front Rose Tix has purchased and then subsequently advertised, marketed, distributed, or sold event tickets to consumers throughout the United States.

10. Defendant WLK Investments LLC is a Delaware limited liability company with its principal place of business at 33 Nashoba Road, Acton, Massachusetts 01720. WLK Investments is an owner, member, and manager of Key Investment Group. It transacts or has transacted business in this district and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, WLK Investments has purchased and then subsequently advertised, marketed, distributed, or sold event tickets to consumers throughout the United States.

11. Defendant Yair D. Rozmaryn is the chief executive officer and a manager of Key Investment Group. He is a member and manager of Front Rose Tix and a manager of TotalTickets.com and Totally Tix. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, or had the authority to control, or participated in the acts and practices of Defendants, including the acts and practices described in this Complaint. Yair D. Rozmaryn is responsible for the overall direction and operation of Key Investment Group, including compliance with the Better Online Ticket Sales Act. He resides in Baltimore County, Maryland, in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

12. Defendant Elan N. Rozmaryn is the chief financial officer and a manager of Key Investment Group. He is a member and manager of Front Rose Tix and a manager of TotalTickets.com and Totally Tix. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, or had the authority to control, or

participated in the acts and practices of Defendants, including the acts and practices described in this Complaint. Elan N. Rozmaryn is responsible for managing the finances of Key Investment Group, including the use of credit to buy tickets on Ticketmaster's websites. He resides in Baltimore County, Maryland, in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

13. Defendant Taylor Kurth is the chief strategic officer and a de facto manager of Key Investment Group. He is a de facto manager of WLK Investments and a de facto manager of TotalTickets.com and Totally Tix. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, or had the authority to control, or participated in the acts and practices of Defendants, including the acts and practices described in this Complaint. Taylor Kurth develops strategic plans for Key Investment Group's ticket-brokering investments and business relationships. He resides in Middlesex County, Massachusetts and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

**COMMON ENTERPRISE**

14. At all times relevant to this Complaint, Defendants Key Investment Group, TotalTickets.com, Totally Tix, Front Rose Tix, and WLK Investments (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive or unfair and unlawful acts and practices alleged below. Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common or interrelated ownership, officers, managers, business functions, marketing, employees, office locations, and revenue. In creating and operating their business operations, Corporate Defendants have pursued and benefitted from a shared scheme marked by interdependent economic interests. Because these Corporate Defendants have operated as a

common enterprise, each of them is liable for the acts and practices alleged below.

**COMMERCE**

15. At all times relevant to this Complaint, Corporate Defendants, singularly or in any combination, and at the direction of individual defendants Yair D. Rozmaryn, Elan N. Rozmaryn, and Taylor Kurth, have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**THE BETTER ONLINE TICKET SALES ACT**

16. Under the Better Online Ticket Sales Act, it is unlawful for any person to:

(A) "circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules," 15 U.S.C. § 45c(a)(1)(A); or

(B) "sell or offer to sell any event ticket in interstate commerce obtained in violation of [the Better Online Ticket Sales Act] if the person offering to sell or selling the ticket either (i) participated directly in or had the ability to control the conduct in violation of [the Better Online Ticket Sales Act]; or (ii) knew or should have known that the event ticket was acquired in violation of [the Better Online Ticket Sales Act]. 15 U.S.C. § 45c(a)(1)(B).

17. The Better Online Ticket Sales Act defines an "event" to mean "any concert, theatrical performance, sporting event, show, or similarly scheduled activity, taking place in a venue with a seating or attendance capacity exceeding 200 persons that—(A) is open to the general public; and (B) is promoted, advertised, or marketed in interstate commerce or for which event tickets are generally sold or distributed in interstate commerce." 15 U.S.C. § 45c note, Pub. L. 114-274, § 3.

Case 1:25-cv-02716-RJC Document 1 Filed 08/18/25 Page 8 of 14

18. A violation of the Better Online Ticket Sales Act is "a violation of a rule defining an unfair or a deceptive act or practice under Section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B))." 15 U.S.C. § 45c(b)(1). Thus, pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Better Online Ticket Sales Act is an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**DEFENDANTS CIRCUMVENT CONTROL MEASURES ON TICKETMASTER'S WEBSITES TO OBTAIN TICKETS AND THEN SELL OR OFFER TO SELL THOSE TICKETS TO CONSUMERS**

19. Corporate Defendants are ticket brokers. Their primary business involves purchasing tickets from ticket issuers and then reselling the tickets to consumers on secondary ticketing websites at a higher price.

20. Defendant Yair D. Rozmaryn is responsible for overseeing Key Investment Group and managing its overall operations.

21. Defendant Elan N. Rozmaryn manages Key Investment Group's accounting department.

22. Defendant Taylor Kurth provides guidance on the dynamics of the ticket brokering business to other officers, managers, and employees of Key Investment Group.

23. Beginning on November 1, 2022, and continuing through December 30, 2023, Defendants made more than 107,265 Ticketmaster ticket purchases. They obtained at least 379,776 event tickets from these purchases. Defendants have made many thousands of Ticketmaster ticket purchases since December 31, 2023, continuing through the present.

24. Ticketmaster is a ticket issuer that has implemented security measures, access control systems, or other technological controls or measures on its websites to enforce posted event ticket purchase limits and to maintain the integrity of posted online ticket purchasing order

rules. These measures have been in place between no later than January 10, 2017, and the present.

25. Until at least July 2025, Ticketmaster also maintained a "Purchase Policy" that was posted on its website and set forth rules that "applie[d] to any purchases on our Site made on or after January 1, 2021."

26. Section 7 of the Purchase Policy, titled "Number of Tickets or 'Ticket Limits,'" stated that ticket limits were imposed "to discourage unfair ticket buying practices." This provision specifically required that "each account" used to purchase tickets "be linked to a unique individual[] and must contain valid and verifiable information" and prohibited the use of multiple accounts "to circumvent or exceed published ticket limits." Section 7 further stated that tickets cancelled because the purchaser violated posted ticket limits "may be refunded at face value (excluding fees)," and "[t]his includes orders associated with the same name, e-mail address, billing address, credit card number, or other information."

27. Section 13 of Ticketmaster's Purchase Policy stated that ticket orders placed via accounts with false or misleading information, including information related to "name, address, email address, phone number, IP address, or other account or billing information" were subject to cancellation.

28. When purchasing tickets from Ticketmaster, Defendants have regularly circumvented security measures, access control systems, and other technological controls or measures on Ticketmaster's websites by, among other things, using: computer software and technologies designed to do so; thousands of fictitious names, addresses, and phone numbers; thousands of credit card numbers (including some linked to accounts in the names of Key Investment Group employees, or friends and family of Key Investment Group officers or employees); IP proxy services to utilize multiple IP addresses; hundreds of SIM cards; and SIM

banks, also known as SIM boxes.

29. By their actions, Defendants have been able to purchase tickets more rapidly and in a greater volume than a consumer who has not been circumventing security measures, access control systems, or other technological controls or measures on Ticketmaster's websites.

30. Defendants have later resold or offered to resell many of the tickets they have purchased from Ticketmaster's websites on secondary ticketing websites, for a profit. From June 10, 2022, through December 21, 2023, Defendants purchased from Ticketmaster at least 321,286 non-sports event tickets to 3,261 live performances, excluding tickets for parking passes. Defendants purchased 15 or more tickets to each of these 3,261 events at a total cost of $46,756,601. Defendants subsequently resold these tickets for $52,418,398.49, netting $5,661,797.49 in revenue.

31. From March 24, 2023, through August 20, 2023, Defendants purchased ten or more tickets to each of 38 Taylor Swift concerts for a total of 2,280 tickets. Defendants paid $744,970.29 for these tickets and resold them for $1,961,980.65, netting $1,217,010.36 in revenue.

32. To give an example from just one Taylor Swift concert, Defendants used 49 different accounts to purchase 273 tickets to Taylor Swift's March 25, 2023, concert at Allegiant Stadium, dramatically exceeding The Eras Tour's 2023 six-ticket limit. Defendants then marked up and resold these tickets, netting $119,227.21 in revenue.

33. For a Bruce Springsteen show at MetLife Stadium on September 1, 2023, Defendants used 277 different accounts to purchase 1,530 tickets, dramatically exceeding Springsteen and the E Street Band's four-ticket limit. Defendants marked up and resold these tickets, netting $20,900.84 in revenue.

## DEFENDANTS CONCEAL THEIR IP ADDRESSES

34. Since at least January 10, 2017, Ticketmaster has maintained security measures, access control systems, or other technological controls or measures on its websites designed to prevent or block ticket purchasers from making multiple purchases for the same event from the same IP address. An IP address is a unique string of numbers separated by periods that Ticketmaster uses to identify a computer or affiliated computers making purchases. Ticketmaster uses this technological system to enforce posted event ticket purchase limits and to maintain the integrity of its posted online ticket purchasing order rules.

35. In many instances, between December 1, 2018, and the present date, Defendants have taken steps to conceal their IP addresses when making ticket purchases. For example, at times, Defendants have used rotating IP proxy services. These services have allowed Defendants to hide their actual IP addresses from Ticketmaster.

36. Defendants have hidden their true IP addresses from Ticketmaster because doing so would allow them to circumvent technological controls on Ticketmaster's websites.

37. By hiding their true IP addresses from Ticketmaster, Defendants have circumvented security measures, access control systems, or other technological controls or measures that Ticketmaster used on its websites to enforce posted event ticket purchase limits, or to maintain the integrity of posted online ticket purchasing order rules.

## DEFENDANTS CREATE SHAM TICKETMASTER ACCOUNTS AND USE THOUSANDS OF CREDIT CARD NUMBERS

38. Between December 1, 2018, and the present date, Ticketmaster has maintained security measures, access control systems, or other technological controls or measures on its websites designed to prevent individuals from purchasing more tickets than otherwise allowed under its posted event ticket limits. Among other things, these technological measures monitor

the following information to verify whether a purchase falls within posted purchase limits: (a) the individual's name, (b) billing address, (c) Ticketmaster accounts, and (d) the IP address and cookies associated with the purchase. From January 1, 2021, through the filing of this Complaint, Ticketmaster also monitored the credit card number used by the purchaser.

39. In many instances, between December 1, 2018, and the present date, Defendants have bypassed these security measures, access control systems, or other technological controls or measures by using Ticketmaster accounts based on sham identities, thousands of virtual and traditional credit card numbers, and IP proxy services.

40. Defendants have used thousands of Ticketmaster accounts to purchase tickets, since Key Investment Group's formation in late 2016. As shown by Figure 1 below, by September 2018, Ticketmaster had determined that Key Investment Group controlled more than 3,100 active and fictitious Ticketmaster accounts. These accounts have typically been controlled by Defendants and not linked to a unique individual, as required by Ticketmaster's policies.


4

EVALUATING POTENTIAL ACTIONS

FILTER CONCERT INVENTORY FROM BROKERS VIOLATING FICTITIOUS ACCOUNT RULES ON LARGE SCALE

Serious negative economic impact if we we move to 8 ticket limit across the board

| Broker | # of TM.com Accounts | Total # of concert tickets in possession | % of Resale Concert Inventory | % of Primary Concert Inventory | Total # of events with tickets | Sell-Through | R12 GTV | Potential GTV Loss | Potential AOI Loss |
|---|---|---|---|---|---|---|---|---|---|
| Reps & Company | 1,074 | 102,968 | 4% | 0.6% | 1,202 | 29% | $9.6M | $3.9M | $482K |
| KP3 Endeavors | 597 | 56,388 | 2% | 0.3% | 1,123 | 26% | $14.1M | $1.5M | $192K |
| Lavaseats Corp | 83 | 43,935 | 2% | 0.3% | 1,133 | 16% | $3.5M | $866K | $108K |
| Key Investment Group | 3,188 | 33,088 | 1% | 0.2% | 483 | 12% | $2.6M | $671K | $84K |
| Smash Entertainment | 1,403 | 10,028 | >0% | 0.1% | 294 | 40% | $1.0M | $750K | $94K |
| **Total** | **6,345** | **246,407** | **10%** | **1.4%** | **2,594** | **24%** | **$30.7M** | **$7.7M** | **$959K** |

*Broker Inventory as of 9.25.18 for productions 10.1.18 forward

37

*Privileged and Confidential*

ticketmaster

Ticketmaster confidential and proprietary. Do not distribute. For internal use only.

Figure 1: Slide from 2018 PowerPoint prepared by Ticketmaster.

41. In February 2024, after Defendants learned that the FTC was investigating their business practices, Defendants notified Ticketmaster that they had used 19 Ticketmaster accounts, each with a unique email address created or obtained by Key Investment Group, to purchase 61 tickets to a single Bad Bunny concert, in violation of Section 7 of Ticketmaster's Purchase Policy. *See* Attachment A to Complaint, email exchange between Luis Koch, a fake identity used by Key Investment Group, and Ticketmaster, dated February 2, 2024.

42. Defendants have not typically opened Ticketmaster accounts in their own names. From November 15, 2020, through January 16, 2024, Defendants created, purchased, or otherwise obtained from third parties more than 13,000 Ticketmaster accounts. In numerous instances, they created fictitious names for the accounts or knowingly purchased accounts others had created with fictitious names. Defendants' practice of using fictitious names on Ticketmaster accounts continues through the present.

43. In addition to opening their own fictitious Ticketmaster accounts and using the accounts of friends and family members, Defendants have "crowdsourced," i.e., purchased, hundreds of Ticketmaster accounts from individuals unrelated to Key Investment Group. Defendants advertised their crowdsourcing opportunity on physical flyers, including in Baltimore, Maryland, which claimed participants could "Make Money Doing Verified Fan Sign Ups" in just "3 Easy Steps!" First, participants were instructed to make a new Gmail account "with a generic name." Then, participants were instructed to make a new Ticketmaster account using the new generic Gmail account and share the username and password with Defendants. Finally, the flyer told participants they could "Sit back and get paid," earning $5 for the account creation and between $5 and $20 each time they receive a Verified Fan presale code.

44. Defendants do not typically use their business addresses as the primary addresses, shipping addresses, or billing addresses for their Ticketmaster accounts. Instead, they use addresses that are either fake or unrelated to their business.

45. In numerous instances, Defendants use fake phone numbers for their Ticketmaster accounts, using actual numbers connected to their business only when necessary to receive Verified Fan codes or other potentially valuable communications from Ticketmaster.

46. From November 15, 2020, through January 16, 2024, Defendants used thousands of credit card numbers, including virtual credit card numbers, to make purchases through their Ticketmaster accounts.

47. At all times relevant to this Complaint, Defendants have known that if they purchased tickets using their true names, addresses, and IP addresses, then Ticketmaster's security measures could prevent them from making all the purchases they wished to make.

48. Defendants have used thousands of Ticketmaster accounts based on fictitious names and made-up contact information and thousands of credit card numbers to circumvent Ticketmaster's security measures, access control systems, or other technological controls or measures that were designed to prevent ticket purchasers from exceeding posted event ticket purchase limits.

**DEFENDANTS USE HUNDREDS OF SIM CARDS AND SIM BANKS**

49. Since at least 2017, Ticketmaster has implemented security measures and access control systems to maintain the integrity of posted online ticket purchasing order rules. These security measures and access control systems have included account verifications. On its website, Ticketmaster explains that account verifications are "an extra layer of protection against bots and other abuse." To verify fan accounts before allowing ticket purchases, Ticketmaster has sometimes required fans to enter codes sent via text message to the phone numbers associated with their Ticketmaster accounts.

50. At times relevant to this Complaint, Defendants have used hundreds of SIM cards and SIM banks or boxes, which are devices that house dozens of SIM cards at a time, to

Case 1:25-cv-02716-CRC Document 9-1 Filed 09/15/25 Page 108 of 464

circumvent Ticketmaster's account verification processes. Defendants have used SIM banks or boxes to facilitate the receipt and automate retrieval of account verification codes sent by Ticketmaster to many of the phone numbers associated with Defendants' many ticket-purchasing accounts, frustrating the purpose of Ticketmaster's account verifications.

**THE FTC HAS REASON TO BELIEVE THAT DEFENDANTS ARE VIOLATING AND WILL CONTINUE TO VIOLATE THE BETTER ONLINE TICKET SALES ACT AND THE FTC ACT**

51. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission, because, among other things:

(a) Defendants have been aware of the Better Online Ticket Sales Act since its enactment in December 2016, less than two months after the formation of Key Investment Group, and have since monitored its enforcement, but they have continued to violate the Act;

(b) Defendants reviewed enforcement actions regarding the Better Online Ticket Sales Act in January 2021, providing them with notice of real-world application of the Act, but they did not change their business practices;

(c) in March 2021, one of Key Investment Group's credit card issuers notified the company that it would deactivate its accounts upon reasonable suspicion or detection of Better Online Ticket Sales Act violations, but Defendants did not change their business practices;

(d) in March 2022, Defendants sought legal advice after one of Key Investment Group's banks commissioned an examination of the company's books and records that ultimately questioned whether the company's use of thousands of Ticketmaster accounts based on sham identities violated Ticketmaster's published ticket purchase policies, but Defendants did not change their business practices;

(e) in February 2018, Defendant Taylor Kurth entered a consent decree with the State of

Washington regarding his use of software to circumvent, thwart, or interfere with or evade a security measure, access control system, or other control or measure on Ticketmaster's websites in violation of Washington's Ticket Sellers Act, RCW 19.345.020, and yet Kurth and his co-Defendants, who know of the consent agreement, have continued to use business practices designed to circumvent Ticketmaster's posted ticket purchase policies in the operation of the Corporate Defendants; and

(f) despite knowing of the Better Online Ticket Sales Act and its enforcement, Defendants continue to operate their ticket brokering business as they have since late 2016, using sham Ticketmaster accounts and other means to obtain tickets by circumventing security measures, access control systems, or other technological controls or measures on Ticketmaster's websites and then selling or offering to sell those tickets in interstate commerce.

**COUNT I – VIOLATIONS OF THE BETTER ONLINE TICKET SALES ACT AND THE FTC ACT**

52. As alleged in paragraphs 1 through 51, in numerous instances, Defendants have obtained event tickets by circumventing a security measure, access control system, or other technological control or measure that Ticketmaster has used on its websites to enforce posted event ticket limits or to maintain the integrity of posted online ticket purchasing order rules. Defendants have subsequently sold or offered to sell in interstate commerce the tickets they have obtained in this manner.

53. Therefore, Defendants' acts or practices as set forth in paragraphs 1 through 51 violate the Better Online Ticket Sales Act and the FTC Act.

**CONSUMER INJURY**

54. Consumers are suffering, have suffered, and will continue to suffer substantial

injury as a result of Defendants' violations of the Better Online Ticket Sales Act and the FTC Act. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**CIVIL PENALTIES**

55. Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), authorizes this Court to award civil penalties for each violation of the Better Online Ticket Sales Act, 15 U.S.C. § 45c.

56. Defendants violated the Better Online Ticket Sales Act, 15 U.S.C. § 45c, with actual knowledge or knowledge fairly implied on the basis of objective circumstances, as required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

**PRAYER FOR RELIEF**

Wherefore, the FTC, requests that this Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act and the Better Online Ticket Sales Act in accordance with Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and Section 2(b) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(b);

B. Impose civil penalties for each violation of the Better Online Ticket Sales Act in accordance with Section 2(b) of that Act, 15 U.S.C. § 45c(b), and Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A); and

C. Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated: August 18, 2025

Simon Barth (MA Bar No. 706122) *(Special Appearance Request pending)*
P. Connell McNulty (PA Bar No. 87966) *(Special Appearance Request pending)*
Molly Rucki (D. Md. Bar No. 22369)
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
Ph: 202-326-3317 (Barth); 2061 (McNulty); 3774 (Rucki)
Email: sbarth@ftc.gov; pmcnulty@ftc.gov mrucki@ftc.gov
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

# Attachment A

**From:** Key Investment Group <admin@keyinvestmentgroupllc.com>
**Date:** February 2, 2024 at 1:48:28 PM EST
**To:** Ryan Rosendorff <ryan@keyinvestmentgroupllc.com>
**Subject: Fwd: Exceeded Ticket Limit**

---------- Forwarded message ---------
From: **Ticketmaster Fan Support** <support@ticketmaster-us.zendesk.com>
Date: Fri, Feb 2, 2024 at 12:37 PM
Subject: Re: Exceeded Ticket Limit
To: Luis Koch89886 <luis.koch89886@gmail.com>

##-- Please type your reply above this line -##-

***ticketmaster***

Your request (38448953) has been updated. To add additional comments, reply to this email.

**John Mark A** (Ticketmaster US)

Feb 2, 2024, 18:37 GMT

Hello Luis,

Thank you for reaching out regarding the ticket limit. I understand your concern, but please note that the ticket limit is applied per account to ensure fair access to tickets for fans. As long as the purchases were made using different accounts and cards, it's within the guidelines.

Regarding your event, it's still scheduled to happen and the Event Organizer isn't authorizing refunds at this time. However, you have the option to either transfer or sell your tickets. If you'd prefer to do that, please select either "Transfer Tickets" or "Sell Tickets" and follow the steps provided. Please note that add-on items or ticket insurance cannot be transferred.

I hope this information helps. If you have any other questions or concerns, feel free to ask.

Sincerely,
John Mark A
Ticketmaster Fan Support

**Luis Koch89886**

Feb 2, 2024, 18:08 GMT

Hello,

I am a Ticket Broker and I purchased 61 tickets for the Bad Bunny show at Kaseya Center scheduled for 5/26/2024. This exceeded the ticket limit stated on the event page which allows a maximum of 6 tickets to be purchased. I would like to own up to this so you can cancel my orders at this time. I purchased them across several accounts and have listed all of the accounts and order numbers below.

68-10752/FLO luis.koch89886@gmail.com

67-58845/FLO harry.watson53@stockymail.com

68-10486/FLO cora.osborne38@craggymail.com

67-58903/FLO ebony.rangel65@bollardmail.com

67-59237/FLO bachyvonnehsyik@gmail.com

68-11148/FLO elisha.doyle79@deferredmail.com

67-59444/FLO pearl.rangel62@sandalmail.com

67-59821/FLO paul.jackson95@correoemail.com

68-10301/FLO esha.aguirre84@obviouslymail.com

62-46129/FLO ellis.barron86@stampermail.com

68-11773/FLO zuzanna.york51@horseshoemail.com

63-50303/FLO angela.kelly77@horseshoemail.com

68-11773/FLO zuzanna.york51@horseshoemail.com

68-10860/FLO felix.potter13@stockymail.com

68-10448/FLO kara.lambert38@stockymail.com

67-58716/FLO nikita.eaton59@sandalmail.com

67-59694/FLO davion.wells86@stampermail.com

67-58839/FLO jorge.durham54@stampermail.com

63-18987/FLO ellis.barron86@stampermail.com

68-10354/FLO jamie.clarke25@crispermail.com

63-47320/FLO riley.miller90@cumbermail.com

# EXHIBIT 7

ELIZABETH C. SCOTT (*pro hac vice* forthcoming)
escott@ftc.gov
TAYLOR H. ARANA (*pro hac vice* forthcoming)
tarana@ftc.gov
CLAIRE E.W. STEWART (*pro hac vice* forthcoming)
cstewart@ftc.gov
FEDERAL TRADE COMMISSION
230 South Dearborn Street, Suite 3030
Chicago, IL 60604
Telephone: (312) 960-5609 (Scott)
Telephone: (312) 960-5639 (Arana)
Telephone: (312) 960-5615 (Stewart)

Local Counsel:
AARON M. SCHUE (CA BAR NO. 338760)
aschue@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Telephone: (310) 824-4300

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

[Additional Attorneys for Plaintiffs Listed on Signature Page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION; ATTORNEY GENERAL OF COLORADO; OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS; THE PEOPLE OF THE STATE OF ILLINOIS; STATE OF NEBRASKA; STATE OF TENNESSEE; STATE OF UTAH; UTAH DIVISION OF CONSUMER | Case No. ______________<br><br>Complaint for Permanent Injunction, Monetary Relief, Civil Penalties, And Other Relief |

Case 2:25-cv-08884-MEMF-MAA Document 17-6 Filed 10/29/25 Page 3 of 85 Page ID


PROTECTION; COMMONWEALTH OF VIRGINIA

Plaintiffs,

v.

LIVE NATION ENTERTAINMENT, INC.
and
TICKETMASTER, L.L.C.,

Defendants.

Plaintiffs, the Federal Trade Commission ("FTC"); Attorney General of Colorado; Office of the Attorney General, State of Florida, Department of Legal Affairs; the People of the State of Illinois; the State of Nebraska; the State of Tennessee by and through its Attorney General and Reporter; the Attorney General of the State of Utah, and the Utah Division of Consumer Protection; and the Commonwealth of Virginia, by, through, and at the relation of its Attorney General (collectively, "Plaintiffs"), for their Complaint allege:

1. Plaintiff the FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the Better Online Ticket Sales Act, 15 U.S.C. § 45c. For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, civil penalties, and other relief, pursuant to Sections 5(m)(1)(A), 13(b), and 19 of the FTC Act, 15 U.S.C. §§ 45(m)(1)(A), 53(b), and 57b, and the Better Online Ticket Sales Act, 15 U.S.C. § 45c.

2. Plaintiff, the Attorney General of Colorado, acting in his official law enforcement capacity, brings this action for Defendants' violations of the Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101 *et seq* and the Better Online Ticket Sales Act, 15 U.S.C. § 45c. For these violations, Colorado seeks relief, including a permanent injunction, monetary relief, civil penalties, and other relief pursuant to the Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-110 and 112 and the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c).

3. Plaintiff State of Florida brings this action for Defendants' violations of the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes, and the Better Online Ticket Sales Act, 15 U.S.C. § 45c. For these violations, Florida seeks relief, including injunctive relief, equitable monetary relief, consumer restitution, the refund of monies paid, disgorgement of ill-gotten monies, civil penalties, attorney's fees, and other relief pursuant to Sections 501.207(1)(b), 501.207(3), 501.2075, and 501.2077, Florida Statutes, and the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c).

4. Plaintiff State of Illinois brings this action for Defendants' violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505 ("Consumer Fraud Act"), the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510, and the Better Online Ticket Sales Act, 15 U.S.C. § 45c. For these violations, Illinois seeks relief, including a permanent injunction, restitution, civil

penalties, and other relief pursuant to Section 7 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/7, and the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c).

5. Plaintiff Nebraska brings this action for Defendants' violations of the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. §§ 87-301 *et. seq* and the Better Online Ticket Sales Act, 15 U.S.C. § 45c. For these violations, Nebraska seeks relief, including a permanent injunction, restitution for Nebraska consumers, civil penalties, attorneys' fees, and costs and other relief pursuant to Neb. Rev. Stat. § 87-303.05 and 15 U.S.C. § 45c(c).

6. Plaintiff State of Tennessee brings this action for Defendants' violations of the Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101. *et seq*. and the Better Online Ticket Sales Act, 15 U.S.C. § 45c. For these violations, Tennessee seeks relief, including a permanent injunction, restitution, civil penalties, attorneys' fees and costs, and other relief pursuant to Tenn. Code Ann. § 47-18-108 and 15 U.S.C. § 45c(c).

7. Plaintiff State of Utah brings this action for Defendants' violations of the Better Online Ticket Sales Act, 15 U.S.C. § 45c. For these violations, Utah seeks a permanent injunction, compelled compliance with the law, and damages, restitution, or other compensation on behalf of Utah residents pursuant to the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c).

8. Plaintiff Utah Division of Consumer Protection brings this action for violations of the Utah Consumer Sales Practices Act, Utah Code § 13-11-1 *et seq*., under Utah Code §§ 13-2-5(3) and 13-11-17(1). For these violations, the Utah Division of Consumer Protection seeks permanent injunctive relief, disgorgement of ill-gotten monies, restitution of actual damages on behalf of impacted consumers, civil penalties, fines, and other equitable relief.

9. Plaintiff Commonwealth of Virginia brings this action for Defendants' violations of the Better Online Ticket Sales Act, 15 U.S.C. § 45c. For these violations, Virginia seeks relief, including a permanent injunction, damages, restitution, and other relief pursuant to the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c).

## SUMMARY OF THE CASE

10. Ticketmaster, L.L.C. ("Ticketmaster"), a wholly owned subsidiary of Live Nation Entertainment, Inc. ("Live Nation"), is the nation's largest ticketing company. It sells and offers to sell tickets for concerts, sports, and other live entertainment events on its website and a mobile application ("app"), making them available to consumers across the country on both the primary ("box office") and secondary ("resale") ticket markets. Ticketmaster dwarfs its competitors. The company controls roughly 80% or more of major concert venues' primary ticketing for concerts and a growing share of ticket resales in the secondary market. From

2019 to 2024 alone, consumers spent more than $82.6 billion purchasing tickets from Ticketmaster.

11. The ticket prices and per-event ticket purchase limits on Defendants' website are primarily determined by the artists. In public, Defendants profess to prioritize "[g]etting tickets into the hands of fans, at prices set by the artist." Defendants also claim that ticket scalpers and "big resale sites" are to blame for resale tickets that Defendants sell for substantially more than the face value of the ticket. In private, however, Defendants have tacitly worked with those very same scalpers, allowing them to unlawfully purchase millions of dollars in tickets in the primary market, so that Defendants can extract more profit for themselves when reselling those tickets on the secondary market. Defendants' illegal conduct frustrates artists' desire to maintain affordable ticket prices that fit the needs of ordinary American families, costing ordinary fans millions of dollars every year. In public, Defendants maintain that their business model is at odds with brokers that routinely exceed ticket limits. In private, Defendants acknowledge that their business model and bottom line benefit from brokers preventing ordinary Americans from purchasing tickets to the shows they want to see at the prices artists set. For years, with the approval and participation of senior executives, Defendants have engaged in three illegal practices that injure artists, cause consumers to pay significantly more for event tickets, and benefit Defendants' bottom line.

12. **First**, Defendants have displayed deceptively low ticket prices to consumers and charged much more. When consumers have searched for event tickets on Ticketmaster, Defendants have displayed a list price in the search results that does not reflect the actual cost to consumers at checkout. That list price is displayed for nearly the entire purchase process, but at checkout, Defendants have charged consumers a substantially higher price with no explanation for the increase. The higher price is because, on every ticket sale, Defendants have added substantial mandatory fees not included in the list price, which can raise the cost to the consumer by 30% or more.

13. In Ticketmaster's own words, Defendants have taken a "bait and switch approach" to advertising ticket prices, employed specifically to create a "lift" in ticket sales. Defendants have reaped massive profits by misrepresenting the total price of tickets to consumers, who pay billions of dollars each year in mandatory fees not reflected in the list price. While listing tickets for sale at artificially low prices, Defendants have claimed publicly that they support "all-in pricing"—where, as they put it, "the first price the consumer sees is the price the consumer pays."[1] Yet, over the last decade, the first price the consumer has seen on Ticketmaster's

---

[1] *See* Live Nation Entertainment and Ticketmaster North America's Public Comment on FTC Notice of Proposed Rule Making on Unfair or Deceptive Fees, 16 C.F.R. Part 464 (2024), https://www.regulations.gov/comment/FTC-2023-0064-3306 (last visited April 10, 2025).

platform has almost never been the price the consumer pays. As Ticketmaster's President told other Ticketmaster and Live Nation executives in 2022: "Until we have ALL IN pricing—this customer experience sucks, even if you change the name of the fees—the sticker shock at the end is the problem."

14. **Second**, Defendants deceptively represent that they impose strict ticket limits for individual events. Artists request and rely on these ticket limits to give ordinary fans the opportunity to purchase tickets to their events at affordable prices. But despite publicly blaming "scalpers and bots" for "prevent[ing] fans from getting tickets at the prices artists set," Defendants routinely allow ticket brokers to exceed ticket limits. Defendants have known for years that ticket brokers often buy as many as thousands of tickets for a single event, denying ordinary fans the opportunity to purchase them "at the prices artists set." Defendants' knowing participation in ticket brokers' unlawful conduct serves only to line Defendants' own pockets at the expense of fans and artists.

15. **Third**, Defendants have earned hundreds of millions of dollars in revenue by systematically violating the Better Online Ticket Sales Act, which prohibits selling or offering to sell tickets previously purchased in circumvention of measures used to enforce posted ticket-purchase limits or purchasing rules. Rather than enforce their ticket limits and purchasing rules against brokers, Defendants knowingly allow, and in fact even *encourage*, brokers to use multiple Ticketmaster

accounts to circumvent Ticketmaster's own security measures and access control systems. Defendants' tacit agreement to allow brokers to circumvent their ticket limits so that those same brokers can then list the unlawfully purchased tickets on Defendants' resale marketplace drives up the price of tickets and leaves ordinary fans unable to access the finite pool of tickets available at their face value. As a senior Ticketmaster executive admitted in an internal email that copied Live Nation leadership, the companies "turn a blind eye as a matter of policy" to brokers' violations of posted ticket limits.

16. Defendants blame a technological "arms race" and ticket scalping for shutting fans out of artist-priced primary market tickets, but in reality, Defendants' own conduct gives purchasing consumers no choice but to resort to purchasing tickets at a steep markup in the resale market, where Defendants can collect another round of fees on the same tickets. Indeed, Defendants earn significant revenue from ticket resales. When reselling tickets brokers purchased from Ticketmaster, Defendants can "triple dip" on fees, collecting fees from: (1) brokers when they purchase the tickets on the primary market, (2) brokers, again, when Ticketmaster sells their tickets on Ticketmaster's secondary market, and, finally, (3) consumers who purchase tickets from Ticketmaster on its secondary market. Ticketmaster offers and sells millions of tickets in this way on its website and app, charging $3.7 billion in fees on resale tickets from 2019 through 2024.

17. Defendants' unlawful conduct and tacit coordination with brokers injures fans, who have paid far more than the advertised ticket price for both box office and resale tickets, and who are forced to pay inflated resale prices for high-demand tickets that brokers illegally amassed from Defendants by circumventing measures used to enforce posted ticket-purchase limits and in violation of posted purchasing rules. Defendants' conduct also injures artists, who set ticket limits that they understand Defendants will implement, only to be thwarted by Defendants' choice to allow brokers to evade them.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

19. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), and (d), 1395(a), and 15 U.S.C. §§ 45c(c)(5)(A) and 53(b).

## PLAINTIFFS

20. The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Better Online Ticket Sales Act, 15

U.S.C. § 45c, which makes it unlawful both to (1) circumvent "a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules," and to (2) "sell or offer to sell any ticket in interstate commerce" obtained through circumvention of the above-referenced controls, when the seller "participated directly in or had the ability to control" the circumvention, or "knew or should have known" the tickets were acquired through circumvention.

21. Philip J. Weiser is the Attorney General for the State of Colorado. Attorney General Weiser brings this action in his official, law enforcement capacity. The Attorney General of Colorado is responsible for enforcing the Colorado Consumer Protection Act. Colo. Rev. Stat. § 6-1-103. The Colorado Consumer Protection Act prohibits individuals, in the course of their business, vocation, or occupation, from advertising goods, services, or property with the intent not to sell them as advertised, from making false or misleading statements concerning the price of goods, services or property, and from knowingly or recklessly committing an unfair business practice. Colo. Rev. Stat. §§ 6-1-105(1)(i), (l), (u), (rrr). The Colorado Consumer Protection Act also prohibits any person from using, or causing to be used, a software application that runs automated tasks over the internet that circumvents or disables any electronic queues, waiting periods, or other sales

volume limitation systems associated with an online event ticket sale. Colo. Rev. Stat. § 6-1-720(1)(b); Colo. Rev. Stat. § 6-1-105(1)(x). The Attorney General of Colorado is further empowered to enforce the federal Better Online Ticket Sales Act, 15 U.S.C. § 45c(c).

22. James Uthmeier, the Florida Attorney General, is an enforcing authority of the Florida Deceptive and Unfair Trade Practices Act pursuant to Section 501.203(2), Florida Statutes, is afforded the authority to seek the full range of relief available under Florida Deceptive and Unfair Trade Practices Act, and has determined that this enforcement action serves the public interest. The Florida Attorney General enforces Section 501.204(1), Florida Statutes, which prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce. The Florida Attorney General also has authority to enforce the Better Online Ticket Sales Act pursuant to 15 U.S.C. § 45c(c).

23. The State of Illinois is one of the fifty sovereign states of the United States. Attorney General Kwame Raoul is the duly elected and qualified Attorney General, acting for the Plaintiff State of Illinois, and brings this action in his official capacity for and on behalf of the People of the State of Illinois, pursuant to the Provisions of the Consumer Fraud Act, 815 ILCS 505/7, and his common law authority as Attorney General to represent the People of the State of Illinois. The Illinois Attorney General believes this action to be in the public interest of the

citizens of the State of Illinois and brings this lawsuit pursuant to Section 7(a) of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/7(a). The Illinois Attorney General also has authority to enforce the Better Online Ticket Sales Act pursuant to 15 U.S.C. § 45c(c).

24. Michael T. Hilgers, Attorney General of the State of Nebraska is empowered by the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. §§ 87-303.05, 303.11 and the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c) to bring an action in the name of Nebraska to enforce these laws and protect the public.

25. Jonathan Skrmetti, Attorney General and Reporter of the State of Tennessee, is the chief legal officer of the State of Tennessee and may exercise such authority as the public interest requires and may file suits necessary for the enforcement of the law and public protection. The Attorney General is also empowered by the Tennessee Consumer Protection Act, Tenn. Code Ann. §§47-18-101, et seq. and the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c) to bring an action in the name of Tennessee to enforce these laws and protect the public.

26. The State of Utah is one of the fifty sovereign states of the United States. Attorney General Derek Brown is the duly elected and qualified Attorney, acting for the Plaintiff State of Utah, and he is authorized to bring this action on

behalf of Utah residents to enforce the Better Online Ticket Sales Act, pursuant to 15 U.S.C. § 45c(c) and Utah Code § 67-5-1(1)(b).

27. The Utah Division of Consumer Protection is a state agency within the Utah Department of Commerce that administers and enforces Utah consumer protection laws, including *inter alia* the Utah Consumer Sales Practices Act, Utah Code §§ 13-11-1 through -23, which prohibits deceptive and unconscionable acts and practices in connection with consumer transactions. The Utah Division of Consumer Protection, while represented by the Utah Attorney General, is authorized to initiate and maintain this action by statute and does so under Utah Code § 13-11-17(1), through the undersigned counsel pursuant to Section 67-5-1(1)(b).

28. Jason S. Miyares, the Attorney General of the Commonwealth of Virginia, is the chief legal officer of the Commonwealth of Virginia and may exercise such authority as the public interest requires and may file suits necessary for the enforcement of the law and public protection. The Attorney General is empowered by the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c) to bring an action in the name of Virginia to enforce the law and protect the public.

## DEFENDANTS

29. Defendant Live Nation Entertainment, Inc. is incorporated in Delaware and headquartered in California with its principal place of business at 9348 Civic

Center Drive, Beverly Hills, CA 90210. Live Nation Entertainment, Inc. transacts, or has transacted, business in this District and throughout the United States.

30. Defendant Ticketmaster, L.L.C. is a wholly owned subsidiary of Live Nation Entertainment, Inc. Ticketmaster is incorporated in Virginia and headquartered in California with its principal place of business located at 9348 Civic Center Drive, Beverly Hills, CA 90210. Ticketmaster transacts, or has transacted, business in this District and throughout the United States. Ticketmaster has two directors, both of whom are Live Nation Entertainment, Inc. executives.

## COMMON ENTERPRISE

31. Defendants Live Nation Entertainment, Inc. and Ticketmaster, L.L.C. (collectively, "Defendants") have operated as a common enterprise while engaging in the deceptive and unfair acts and practices alleged below. Defendants have conducted the business practices described below through their interrelated companies that have common officers, headquarters, and business functions. Live Nation's President and CFO is the Live Nation executive responsible for Ticketmaster's operations.

## COMMERCE

32. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44; Section 501.203(8), Florida Statutes; and

Section 1 of the Illinois Consumer Fraud Act, 815 ILCS 505/1(f); and Tenn. Code Ann. § 47-18-103(24).

**DEFENDANTS' BUSINESS ACTIVITIES**

33. Ticketmaster describes itself as a "ticketing company that provides both ticket sales and ticket resale services." In its primary market (box office) ticketing business, which is "the sale of tickets to a buyer in the first instance," Ticketmaster contracts with venues to "enable them to manage and market shows, sell tickets, and validate tickets for entry." In its secondary market (resale) ticketing business, Ticketmaster sells tickets that third parties have previously purchased in the primary market and then listed for resale on Ticketmaster's platform. Ticketmaster is the merchant of record for all primary and resale tickets sold on its platform.

34. Live Nation is the nation's largest live entertainment company, touching nearly every facet of the industry. Live Nation describes itself as "operat[ing] in more than 30 countries, selling tickets to consumers in both the primary and secondary market for live-event tickets." In addition to closely managing Ticketmaster's operations, Live Nation owns or controls hundreds of live entertainment venues nationwide, including live entertainment venues within the State of Florida, State of Illinois, and State of Tennessee, promotes thousands of live entertainment events each year, manages artists, and brokers sponsorships for its concerts and festivals. In 2024, Ticketmaster generated more than half of Live

Nation's adjusted operating income. Ticketmaster has substantially higher profit margins than Live Nation's concert and venue operations and is a key part of Live Nation's profitability.

35. Consumers purchasing tickets from Defendants on either the primary or secondary markets access them via Ticketmaster's website or app.

36. Defendants' ticket prices have several components. The "face value" of a ticket on the primary market is set by the performing artist and does not include fees. Next, Defendants add several mandatory fees to the cost of tickets purchased from the Ticketmaster website and app, both for primary and secondary market sales. These typically include service fees, facility fees, and order processing fees. Consumers cannot purchase tickets from Ticketmaster without paying the mandatory fees. According to internal Ticketmaster documents, the average percentage of fees charged on tickets ranges from 24% to 44% of the total price. From 2019 through 2024, consumers paid over $16.4 billion in mandatory fees on ticket purchases from Ticketmaster. Defendants each retain a significant portion of these fees—Ticketmaster as the ticketing company and Live Nation as a promoter and owner and operator of venues.

37. Defendants earn additional revenue when tickets are sold again on the secondary market. In addition to the mandatory fees charged to buyers as described above, Defendants charge consumers who list tickets for resale on Ticketmaster a

set percentage, which Ticketmaster calls a "seller fee." The fees for brokers to list tickets are set by agreements between Ticketmaster and the brokers, and Ticketmaster often decreases fees for high-volume brokers, incentivizing them to list more tickets for Ticketmaster to resell on its platform. Defendants have collected $986 million in these resale fees from 2019 through 2024.

38. Ticketmaster generates most of its revenue on its primary and secondary market ticket sales from these various mandatory fees charged to consumers and brokers. Altogether these fees earned Defendants over $11 billion from 2019 through 2024 alone.

39. Defendants also have authority to increase the price of tickets on their secondary market, separate and apart from any fees. The consumer or broker listing the ticket for resale selects the initial price. Defendants can then unilaterally increase that price. When Defendants increase the price of a ticket, they keep the markup on each sale. Defendants collected over $187 million in markups they added to resale tickets from 2019 through 2024.

**Defendants Have Advertised Deceptive Ticket Prices**

40. To view ticket prices for an event, consumers often search for the event on Ticketmaster's website or app. From Ticketmaster's website, consumers can select the event from the search results, and the website takes them to a page that shows the available tickets. For years, that experience has been the same or similar

to the example shown in **Figures 1-4**. In **Figure 1**, on the left, the page displays a seating chart for the whole arena, showing all the available sections and rows. On the right, Ticketmaster shows the list price for the available tickets and their corresponding section and row. Consumers can sort the results by "Lowest Price" or "Best Seats."

**Figure 1 – Ticket Search Results [Captured on March 19, 2024]**




41. Ticketmaster's search-results page also lets consumers filter by ticket list price using a price-selection tool that allows consumers to choose a maximum and minimum per-ticket price, as depicted below in **Figure 2**. The consumer is then shown only the ticket options with list prices within that selected price range and can look at the seat options in various sections by clicking on the interactive seat map or by clicking on tickets in the list on the right-hand side of the page.

**Figure 2 – Ticketmaster Price Selection Tool [Captured on July 15, 2024]**




42. After a consumer selects a ticket on the right-hand side of the page, Ticketmaster displays a page with a bright green button labeled "Next" at the bottom of the screen, as shown in **Figure 3**. Above it, Ticketmaster lists the "**SUBTOTAL**" in bold. The subtotal equals the previously displayed ticket list price (*see* **Figure 1**) multiplied by the number of tickets (e.g., for two tickets listed at $245, $490).

**Figure 3 – Ticket Selection Screen [Captured on March 19, 2024]**




43. After a consumer clicks the green "Next" button, Ticketmaster displays another screen (**Figure 4**), which shows a clock at the top of the screen that counts down the limited time the consumer has to complete the purchase or lose the option to purchase the tickets. On the left, Ticketmaster requests consumers' payment information, provides information about how the tickets will be delivered, and offers ancillary services, including parking and hotel reservations. A bright green "Place Order" button is on the right-hand side. After a consumer enters their payment information, clicking "Place Order" completes the purchase.

**Figure 4 – Ticket Delivery and Purchase Price Screen [Captured on March 19, 2024]**




44. Unbeknownst to many consumers searching for tickets, Defendants have charged much more than the list price to purchase a ticket. For example, in **Figure 4** above, although the list price was $245 per ticket (or $490 for two tickets), Ticketmaster ultimately charges $662.21—$172 (23%) more than the list price. Smaller and lighter text next to the total price indicates that this final cost includes

$60.96 in tax. But the page has not displayed the remaining $111.04 in mandatory fees (a $45.20 service fee on each ticket, a $6.00 facility charge on each ticket, and an order processing fee of $8.85).

45. For years, by default, Defendants did not show consumers these mandatory fees in the list price in the original event search results, in the price selection tool, or on any other screen (*see* **Figures 1-3**). Nor did Defendants display the fees at checkout unless the consumer saw and clicked on the unlabeled dropdown caret next to the total charge.

46. The only reference to fees during the purchase process has been on the screen that appeared *after* the consumer searched for and selected the seat based on the advertised list price, as shown above in **Figure 3**. In small print next to the list price, the phrase "+ Fees" appears. Even there, Ticketmaster does not state that it charges fees on every ticket—regardless of whether consumers purchase ancillary services—let alone identify the types or amounts of fees that will be added.

47. The same has been true even when a consumer used the price-selection tool to limit search results to tickets within the consumer's budget. For example, if a consumer searched for tickets costing between $74-$95 (as shown above in **Figure 2**), and selected tickets listed for $94.50 each, the next screen would have shown a subtotal of $189 (double the per-ticket list price). But those same tickets

actually cost a total of $242.55—which is $53 more than the list price, and $26 more per ticket than the consumer's maximum budget.

48. Ticketmaster's purchase process (as depicted in **Figures 1-4**) has been the same for primary and secondary market ticket sales. For tickets purchased and resold on Ticketmaster, the secondary market purchaser does not know who purchased the ticket from the primary market; the only entity named in connection with the resale is Ticketmaster. When Ticketmaster delivers resale tickets to a secondary-market purchaser, it voids the first ticket that it sold on the primary market and reissues a new ticket, with unique identifying information, to the secondary purchaser.

49. Consumers who have purchased tickets on Ticketmaster's Android and iOS apps also have had a similar experience. On both platforms, Ticketmaster has advertised a lower list price but ultimately has charged consumers who complete their purchases significantly more.

**Defendants' Deceptive Ticket Pricing Has Harmed Consumers**

50. Consumers are routinely misled to believe that Defendants' listed prices are what they will pay or close to it, before tax. Indeed, many consumers have complained about Defendants' fees. For example, consumers have reported that they were surprised to learn that Defendants' mandatory fees substantially increased the price of the ticket. Even consumers who might expect that they will pay marginally

more than the list price, plus tax, do not expect that Defendants will charge 24 to 44% more than the advertised price. As Ticketmaster acknowledges in an internal presentation, "[w]hen fans are not complaining about the cost of fees they are complaining about the display of fees (bait and switch approach)."

51. The true cost of tickets is important to consumers, as Defendants appear to recognize. As recently as 2023, Ticketmaster and Live Nation executives have stated, including to the United States Senate Judiciary Committee, that "fans should know the full cost of their tickets from the start. The various fees can be broken out and displayed as well, but the all-in price is the real price of admission, and that ought to be the first thing a fan sees."[2] Yet, for years, Defendants have chosen not to make the "full cost" the "first thing a fan sees," despite knowing from their own research that "most ticket buyers say the final cost of the tickets, including fees, is the most critical information to have UPFRONT in the purchase process." Ticketmaster's President, himself, has acknowledged that the company's tactics result in "sticker shock" when consumers finally see the actual price of their tickets.

52. Defendants are well aware of consumers' preferences to see the total price upfront. Consumers have given them specific, negative feedback on the

[2] Senate Judiciary Hearing Jan. 24, 2023, Opening Statement of Joe Berchtold, President and Chief Financial Officer, Live Nation Entertainment, Inc. https://www.judiciary.senate.gov/imo/media/doc/Testimony%20-%20Berchtold%20-%202023-01-24.pdf (last visited June 6, 2025).

dramatic increase in price on the checkout page. Defendants have regularly commissioned or conducted surveys of consumers who used their platforms. Examples of consumers complaining about fees abound. In 2023, for example, one consumer said, "[f]ees are insane. Discourages me from attending events due to added and hidden costs." Another consumer said, "I don't understand why the FULL cost of the tickets can not [sic] just be displayed when viewing what tickets you want. Then I have to go to the cart just to see the absurd amount of fees you will charge me. Just put it on the main page!" In a different internal survey, another consumer noted "if you have to pay these extra fees, they should just be included in the listed ticket price so you don't have **unexpected charges at the end**. It's frustrating!!!"

53. Even though Defendants have been well aware that consumers were being misled about the total price of tickets, they declined to change their sales tactics, choosing instead to maximize sales. Indeed, a 2015 Ticketmaster study confirmed that Ticketmaster sold tickets to consumers who would not have purchased them if they had known the true price of tickets upfront: "completely hiding the fee until checkout resulted in the highest conversion." As Defendants have known, a sizable difference between Defendants' list prices and what they charge matters to consumers and, if presented as an all-in-one price, would reduce sales. As

one consumer put it in 2023, mandatory fees are "like 40% of your ticket cost […] to me that would be a deterrent."

54. Consumers have relied on Defendants' misleading pricing tactics to their detriment. For example, consumers have wasted substantial time comparing tickets and making purchase decisions based on the lower, advertised price. As an internal 2022 study reported, "[f]ans want to know the total cost of their ticket at the start to know if they can afford the ticket." Sometimes, this purchase process involves navigating several offers for optional add-on costs such as parking, insurance, and various VIP experiences, which consumers choose to accept or reject based on what they expect to pay for the ticket list price. Consumers also navigate this process under pressure from a purchase countdown clock that leaves them little time to review the material on the checkout page before making a purchase. And for highly sought-after events, where available tickets are snatched up at breakneck speed, consumers have risked losing the chance to buy any tickets at all if they chose not to complete the transaction after seeing the actual price.

**Defendants Have Obscured Total Ticket Prices to Boost Revenue**

55. Defendants' deceptive price display was no accident: The design resulted from years of internal testing designed by Defendants' employees that shows that Defendants' revenues increase when their price display is, in Ticketmaster's words, "less transparent." Internal documents show that, at least

since 2014, with input from Live Nation, Ticketmaster consistently chose to continue obscuring the true price of tickets after internal test results showed that accurate, transparent pricing would reduce sales.

56. In one 2015 study, for example, Ticketmaster hypothesized that "the later we make the fee details transparent in the purchase funnel the more we can optimize ticket sales." To test this hypothesis, Ticketmaster hid the fees behind a "Price Details" link. As shown in **Figure 5**, the study expressly referred to this option as "less transparent."

**Figure 5 – Ticketmaster Tests "Less Transparent Fee Display"**




57. When tested in actual transactions, the "less transparent" display resulted in higher sales, so Defendants adopted it and provided information about

mandatory fees only if consumers saw and clicked on the words "Price Details." Over time, Defendants made this even less prominent: For many years, Defendants continued to use a checkout page that replaced the "Price Details" link with an unlabeled dropdown caret. *See* **Figure 4**, *supra*.

58. Defendants' executives and employees have communicated openly for a decade about how Defendants have hidden part of the ticket price in mandatory fees. For example, in an April 2015 email with the subject line "Surprise Fee!" a Ticketmaster employee indicated that some of the company's clients (e.g., artists, or sports teams) "are not in favor of hidden fees and prefer fee transparency." This email discussed yet another test to determine whether Defendants could make more money if they changed their default display from what Defendants deemed a "prominent" fee display, which showed the additional fees and total cost, to a "surprise" fee display, which did not, as shown below in **Figure 6**.

**Figure 6 – "Prominent" vs. "Surprise" Fee Display**



59. Two months later, a multinational entertainment company objected when Defendants used the less transparent "fees behind a link" display when selling tickets for the company's events (shown above in **Figure 5**, for example). The company questioned Ticketmaster about why it was not displaying the fee details more prominently. Internal discussions among Ticketmaster executives about how to respond to the objection centered around increasing conversion rates and revenue. One executive noted: "the less transparent the higher the conversion," concluding that "this means we're headed towards less transparency." Likewise, in September 2015, in response to an internal Ticketmaster study that reported consumers were complaining about "bait and switch" pricing, Ticketmaster decided that "the lift in ticket sales is more important than fan sentiment around fee display." Defendants even gave an employee an "MVP" award for designing the testing that proved the Defendants would make more money if they "optimiz[ed] the fee display" by making it "less transparent."

60. In 2018, Defendants again considered changing their default display to reflect the full, accurate ticket price and ran tests to determine whether this switch would reduce the company's revenue. The test display showed a "fee toggle" at the beginning of the purchase process that Defendants described as giving fans "the choice of opting-in to see the per-ticket price with fees included on the [event detail page] and see the same price throughout the checkout process." Documents

describing the test claimed that the toggle would keep consumers from being "surprised" by "additional ticket fees during checkout." Defendants ended the test early when the ticket-purchase conversion rate dropped for consumers who used the toggle.

61. In 2022, a Live Nation executive said she was "poking around" on Ticketmaster's site and "realize[d] our toggle is buried in filters." Defendants again tested the impact of displaying the fee toggle on the search results page in 2023, listing it above the seat options. This test showed significant increases in consumers' use of the fee toggle: 256.5% increased use on the website interface and 178.2% increased use on the app. Defendants concluded that "[i]ncreasing prominence of fee toggle had adverse impact on purchase behavior," and that consumers who used the fee toggle were less likely to "add-to-cart" or "continue to Checkout." In other words, when consumers had the option, they overwhelmingly chose to see the total cost of their tickets during the selection process and chose to buy fewer tickets. Defendants estimated that increased consumer use of the fee toggle would have resulted in a nearly $50 million loss of annual income. Defendants kept the fee toggle "buried in filters."

62. That same year, a Live Nation marketing executive acknowledged internally that "[a]ll-in pricing benefits the consumer because they see the total all-in price of the ticket right upfront." She further noted that without all-in pricing, the

"[p]rice of a ticket when starting purchase process looks significantly lower than the final purchase price" and that "after all-in pricing," consumers "understand exactly how much [they] are going to spend when selecting tickets."

63. Not until May 2025, deep into the FTC's investigation—and just before the effective date of the FTC's Rule on Unfair or Deceptive Fees,[3] which authorizes the FTC to seek civil penalties and other monetary relief against violators—did Defendants announce their intention to incorporate fees into listed ticket prices.

64. In sum, despite public claims championing price transparency and internal recognition that consumers are misled by "bait and switch" tactics that result in "sticker shock," Defendants for years repeatedly chose to use displays that induced consumers to select tickets based on a lower advertised price than what Ticketmaster ultimately charges.

**Defendants Allow Brokers to Circumvent Posted Ticket Limits and Purchasing Rules**

65. Artists set, and Ticketmaster posts, per-event ticket purchase limits for many of the events on its platform. But since at least 2018, as Defendants well know, brokers have circumvented Ticketmaster's measures to enforce these limits at a staggering level, amassing and listing for resale millions of tickets to high-demand events. Defendants could stop these purchases but choose not to—and, in some

[3] 16 C.F.R. § 464, *et seq*, effective May 12, 2025.

respects, even contribute to brokers' ability to surpass ticket limits.

*Posted Event Ticket Limits*

66. Ticket limits vary from event to event. For primary market sales for many high-demand events, artists determine the number of tickets that a consumer can buy and memorialize those limits in correspondence with Ticketmaster regarding marketing and ticketing guidelines. Artists typically cap purchases at anywhere from four to ten tickets for a single event. Defendants have claimed that they have "an active program to enforce ticket limits."

67. For each event, Defendants have various measures to enforce the ticket limit built into the purchase process. Ticketmaster displays the ticket limit alongside other event information in the ticket browsing flow. As seen in the example below in **Figure 7**, in addition to stating that there is "an 8 ticket limit for this event" and that it is a "strict eight (8) ticket limit," the screen warns that "[m]ultiple purchases are forbidden." Ticketmaster further states that a violation of its ticket limit policy "may result in tickets (over the limit) being voided and refunded."

**Figure 7 – Example of Posted Ticket Purchase Limits**




68. Ticketmaster's posted Terms of Use and Purchase Policy, along with other security measures and controls, also have prohibited users both from purchasing tickets in excess of posted per-event ticket limits, and from using multiple Ticketmaster user accounts to buy tickets in excess of those limits. Ticketmaster also requires users, before purchasing a ticket, to check a box on the final order page next to a statement that the user has agreed to the linked Terms of Use, also located in Ticketmaster's Help Center. The Terms of Use have prohibited users from "order[ing], or attempt[ing] to order, a number of tickets for an event that

exceeds the stated limit for that event" and from "circumventing any security measure, access control system, or other technological control or measure on the Site that is used to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules."

69. The Purchase Policy, incorporated in the Terms of Use and located in Ticketmaster's Help Center, has stated:

> When purchasing tickets on our Site, you are limited to a specified number of tickets for each event (also known as a "ticket limit"). This ticket limit is posted during the purchase process and verified with every transaction. This policy is in effect to discourage unfair ticket buying practices. Each account must be linked to a unique individual, and must contain valid and verifiable information. **Multiple accounts may not be used to circumvent or exceed published ticket limits.** If you exceed the posted ticket limits, we reserve the right to cancel, without notice, any or all orders and tickets, in addition to prohibiting your ticket purchasing abilities…. This includes orders associated with the same name, e-mail address, billing address, credit card number, or other information. (Emphasis added.)

70. Ticketmaster's website and app automatically prevent a single Ticketmaster accountholder from adding to their cart, or purchasing, more tickets than the posted limit in a single transaction. Ticketmaster uses a drop-down menu that allows the purchaser to select only up to the limit.

71. Ticketmaster's array of security measures for enforcing event ticket limits also includes its TicketCounter system (previously called Over the Ticket

Limit or "OTL System"). Among other things, TicketCounter automatically blocks multiple purchase attempts from the same IP address and analyzes patterns to identify multiple accounts acting in concert to evade purchase limits. And, at the direction of artists and event promoters, Defendants will sometimes look at purchases after they were made to detect whether a single person or entity attempted to exceed purchase limits by using multiple Ticketmaster accounts or transactions. Nonetheless, Defendants do not as a matter of course cancel the tickets they identify as having been purchased by circumventing their enforcement measures, nor do they block the accounts that have repeatedly made such purchases.

72. Artists impose ticket limits because they want their fans—not brokers—to buy their event tickets at face value. For high-demand events, those face value prices are often *only* available to consumers on the primary market. By contrast, once tickets have been purchased by brokers and listed for sale on the secondary market, artists have almost no control over how much their fans will pay for the tickets, if they can afford them at all.

73. Tickets for high-demand events and for the most desirable seats are typically much more expensive on the secondary market than on the primary market, sometimes twice the original cost or more. For example, one broker purchased 772 tickets to a 2023 Coldplay concert for about $81,000. The same tickets were resold for over $170,000. The same broker also purchased 612 tickets to a single

2023 Chris Stapleton concert for about $47,000. The same tickets were resold for over $89,000. Consumers have paid hundreds of millions of dollars more for overlimit tickets offered for sale and resold by Defendants than the tickets cost on the primary market.

*Brokers Routinely Circumvent Ticket Limits*

74. To evade Ticketmaster's enforcement measures, brokers routinely create hundreds or thousands of Ticketmaster accounts, often using fictitious names, email addresses, and other required information. Brokers also acquire Ticketmaster accounts from individual consumers by advertising online or even by placing flyers in public spaces offering to purchase Ticketmaster accounts. Brokers then hire employees or engage contractors to use these Ticketmaster accounts to purchase tickets in excess of posted limits over multiple transactions. This is a known tactic: internally, Defendants have discussed "the use of multiple accounts to circumvent TM systems." Indeed, from 2020 to 2024, one broker created, purchased, or otherwise obtained from third parties more than 13,000 Ticketmaster accounts.

75. Though Live Nation publicly concedes that the practices of "buy[ing] and sell[ing] Ticketmaster accounts to brokers for no other reason than to help them obtain more tickets than anyone can consistent with posted ticket limits" are among the methods that, "when used for their intended purposes, violate the [Better Online Ticket Sales] Act," Defendants themselves have, for years, known about and aided

brokers who used multiple Ticketmaster accounts for these precise "intended purposes." For example, before the COVID-19 pandemic impacted live events, Ticketmaster forecast that in 2020, alone, more than five million of the concert tickets that it would offer for resale would be tickets purchased over ticket limits—this was more than 55% of the concert tickets it anticipated would be listed by brokers. In 2024, when Defendants considered enforcing their ban on multiple accounts against brokers, they contemplated "[p]roactively email[ing] brokers ahead of rollout to advise them to check they have access to the email(s) used on account(s)" and "to consider consolidating their tickets into a single account" so that the brokers holding tickets in multiple Ticketmaster accounts—in violation of Ticketmaster's enforcement measures—could still access their unlawfully purchased tickets.

76. To bypass ticket limits by using multiple accounts, many brokers use software that allows one person to log into multiple accounts at once on the same computer without being detected by Defendants' automatic controls. This software generates proxy IP addresses so that it appears that each of the accounts is logged on from a different location, thereby evading Ticketmaster's automatic screening measures. Some brokers use an internet browser or browser extensions that are designed to provide the proxy IP addresses—another method Live Nation has publicly said violates the Better Online Ticket Sales Act. Still others use software to

operate technology called a "SIM box," or "SIM bank," to facilitate the receipt, and automate the retrieval of, account verification codes sent by Defendants to phone numbers associated with the brokers' fictitious ticket-purchasing accounts, evading Defendants' automated account verification measures, which Ticketmaster describes on its website as "an extra layer of protection against bots and other abuse."

*Selling and Offering to Sell Brokers' Unlawfully Obtained Tickets Harms Consumers and Enriches Defendants*

77. Growing revenue from the secondary ticket market is one of Defendants' principal business objectives. If Defendants sell a secondary market ticket that was purchased on their primary market, they collect three sets of fees on the same ticket: (1) the fees on the original purchase; (2) the fees charged to the person or broker listing the ticket for sale, which range from 13-15% of the resale price for consumers and 5-8% for brokers; and (3) the fees charged to the secondary market purchaser, which range from 17-23% of the resale price. Defendants have significantly increased their sale of secondary market concert tickets, from 3.8 million tickets in 2019 to over 20 million in 2024.

78. In the aggregate, brokers list far more tickets for resale on Ticketmaster than consumers do. According to one Ticketmaster document, at one point in 2018, 55% of the tickets offered for resale by Ticketmaster were listed by brokers. Brokers make up an even higher share of Defendants' resale *concert* ticket sales. In the first quarter of 2022, 63% of the money consumers spent on Defendants' resale concert

tickets was on tickets listed by brokers. In the first quarter of 2023, it was 78%. Over those two quarters alone, consumers spent $504 million on resale concert tickets from Ticketmaster that were listed by brokers. By contrast, when a consumer who purchases a ticket on the primary market attends the event using that ticket, Defendants' revenue from that ticket is substantially less because Defendants cannot collect additional resale fees or markup the resale price.

79. Selling and offering to sell tickets that brokers acquired by evading enforcement measures harms consumers, who are boxed out of the primary market and forced to pay substantially higher prices for the same tickets on the secondary market. In a Ticketmaster-commissioned May 2023 survey of consumers who attempted to purchase tickets on Ticketmaster's platform, for example, consumers reported being unable to purchase tickets on the primary market after waiting in the queue and instead being forced "to buy inflated resale tickets." One consumer noted that "all the bots get the tickets and then charge 10x the tickets."

**Defendants Know About and Enable Brokers' Overlimit Purchases**

80. Since at least 2018, Defendants have been aware that brokers use various tactics to evade their enforcement measures and exceed ticket limits. In public, Defendants advocate for greater Better Online Ticket Sales Act enforcement against resale ticketing platforms because, in Defendants' own words, the law acknowledges that secondary ticketing platforms "should [] know[]" when event

tickets are acquired unlawfully and are able to constantly look for "indications" of such unlawful purchases. In reality, Defendants sell or offer to sell millions of tickets that they know were purchased unlawfully and reap massive profits from those sales.

81. Defendants admit that certain tools and practices are used to circumvent their enforcement measures in violation of the Better Online Ticket Sales Act. For example, Defendants have publicly acknowledged that proxy service tools that mask a user's true IP address and location are among a list of technologies that, among others, violate the Better Online Ticket Sales Act "when used for their intended purposes." Defendants also included multi-session browsers "specifically tailored to ticket scalping" in this list, noting one browser contained a review stating that it "mainly caters to ticket brokers" and "comes with several specialized features that help one bypass purchasing limits."

82. In 2018, Defendants identified and analyzed a broker practice that it later termed the "mass buyer model," in which a broker pays hundreds to thousands of people to purchase tickets on the broker's behalf. Defendants also publicly acknowledge that scalpers use "burner accounts" to "scoop [tickets] up in seconds." A Ticketmaster engineer pointed out to a Ticketmaster executive that the company routinely chooses to turn a blind eye to broker circumvention of ticket limits: "we have a guy that hires 1000 college kids to each buy the ticket limit of 8, giving him 8000 tickets to resell. Then we have a guy who creates 1000 'fake' accounts and

uses each [to] buy the ticket limit of 8, giving him 8000 tickets to resell. We say the former is legit and call him a 'broker' while the latter is breaking the rules and is a 'scalper.' But from the fan perspective, we end up with one guy reselling 8000 tickets!"

83. Despite Defendants' recognition of these violations, thousands of Ticketmaster accounts are owned by a small handful of brokers who Defendants know or have reason to know routinely purchase tickets from Ticketmaster's primary market in excess of Ticketmaster's posted ticket limits. In 2018, for example, Defendants identified five brokers that "violat[ed] fictitious account rules on [a] large scale." As seen in the chart below in **Figure 8**, the five brokers listed controlled 6,345 Ticketmaster accounts and possessed 246,407 concert tickets to 2,594 events. A then-Ticketmaster vice president described these five brokers plus one other as "the most questionable in [his] mind" of the brokers who purchased and listed tickets on Ticketmaster's platform. For years, Defendants have continued to offer and sell tickets these very same brokers purchased by circumventing Ticketmaster's enforcement measures.

**Figure 8 – Ticketmaster Presentation Identifying Brokers That Violate Its Rules on a Large Scale**

4

## EVALUATING POTENTIAL ACTIONS

FILTER CONCERT INVENTORY FROM BROKERS VIOLATING FICTITIOUS ACCOUNT RULES ON LARGE SCALE

Serious negative economic impact if we we move to 8 ticket limit across the board

| Broker | # of TM.com Accounts | Total # of concert tickets in possession | % of Resale Concert Inventory | % of Primary Concert Inventory | Total # of events with tickets | Sell-Through | R12 GTV | Potential GTV Loss | Potential AOI Loss |
|---|---|---|---|---|---|---|---|---|---|
| Reps & Company | 1,074 | 102,968 | 4% | 0.6% | 1,202 | 29% | $9.6M | $3.9M | $482K |
| KP3 Endeavors | 597 | 56,388 | 2% | 0.3% | 1,123 | 26% | $14.1M | $1.5M | $192K |
| Lavaseats Corp | 83 | 43,935 | 2% | 0.3% | 1,133 | 16% | $3.5M | $866K | $108K |
| Key Investment Group | 3,188 | 33,088 | 1% | 0.2% | 483 | 12% | $2.6M | $671K | $84K |
| Smash Entertainment | 1,403 | 10,028 | >0% | 0.1% | 294 | 40% | $1.0M | $750K | $94K |
| **Total** | **6,345** | **246,407** | **10%** | **1.4%** | **2,594** | **24%** | **$30.7M** | **$7.7M** | **$959K** |

*Broker Inventory as of 9.25.18 for productions 10.1.18 forward

37

*Privileged and Confidential*

ticketmaster

Ticketmaster confidential and proprietary. Do not distribute. For internal use only.

84. Defendants even provide technological support for brokers who exceed ticket limits to list the tickets for resale by Ticketmaster. For example, Defendants offer ticket brokers a software platform called TradeDesk, which enables brokers to aggregate tickets purchased from multiple Ticketmaster accounts into a single interface for simpler resale management. Defendants make TradeDesk available only to high-volume brokers.

85. TradeDesk's features make overlimit ticket purchases apparent to Defendants even before they sell or offer to sell them because TradeDesk aggregates, at the time of purchase, all the tickets purchased by each broker-controlled Ticketmaster account, and collects data about the number of tickets each account acquired for each event. For example, an October 2019 internal review looking at

"all listed tickets in [TradeDesk] across all associated accounts" and applying an estimated 8-ticket limit across all events identified dozens of brokers who "continued to hold positions greater than ticket limits" in ticket sales.

86. The TradeDesk software aggregates tickets purchased on Ticketmaster's website or mobile app and has a dashboard that tracks sales metrics. Defendants also routinely monitor TradeDesk users' sales and reserve the right to discontinue accounts if they do not meet specified ticket sales thresholds. Moreover, Defendants pay brokers for their resale profits using a single invoice, aggregating the sales made from thousands of fictitious Ticketmaster accounts into a single payment to the broker who controls them. Ticketmaster also often denotes in its system which Ticketmaster accounts are controlled by brokers.

87. A September 2018 Ticketmaster presentation reported that each TradeDesk account was associated with, on average, approximately 200 Ticketmaster accounts. These Ticketmaster accounts were not controlled by 200 unrelated individuals; rather, each TradeDesk account corresponded to a single broker using multiple Ticketmaster accounts to amass quantities that exceeded posted ticket limits. Ticketmaster executives reviewed and edited this presentation and ultimately declined to block these broker-controlled accounts despite their repeated violative purchases.

88. Public reports detail Defendants' use of TradeDesk to help brokers

circumvent enforcement measures and exceed ticket limits. In 2018, for example, undercover journalists from the Toronto Star and the Canadian Broadcasting Corporation reported as much in an article titled, "We went undercover as ticket scalpers – and Ticketmaster offered to help us do business." When describing TradeDesk, one Ticketmaster sales executive told the reporters that he had "brokers that have literally a couple of hundred Ticketmaster accounts" aggregated in singular TradeDesk accounts. The reporters, posing as brokers, asked Ticketmaster whether brokers circumventing Ticketmaster's controls by using multiple accounts might be detected and investigated by Ticketmaster when they list tickets for resale. Ticketmaster's sales executive reassured the undercover reporters that Ticketmaster knew brokers buy tickets from multiple Ticketmaster accounts but would not crack down on accounts that exceed posted limits.

89. Following artist and consumer outrage about the reporting, Live Nation's CEO directed the Defendants' public response, in which Defendants denied that they allowed brokers to circumvent ticket limits and claimed to be reviewing broker accounts to ensure compliance with ticket limits and Ticketmaster's terms of use. To this day, Ticketmaster claims that it "vets its reseller customer base looking for bad actors, violations of posted ticket limits, and other indications on inappropriate reseller behavior." But brokers' circumvention of Ticketmaster's enforcement measures with Defendants' knowledge, participation, or ability to

control continues unabated.

**Defendants Have the Ability to Stop Brokers' Circumvention of Artists' Ticket Limits**

90. Internal documents show that Defendants have technological and other means to prevent brokers from evading ticket limits, but often do not use them because doing so would decrease their revenue. As a Ticketmaster executive vice president explained to Ticketmaster's executive team and Live Nation's President and CFO in the wake of the undercover reporting on TradeDesk, as a "matter of policy" Defendants "turn[] a blind eye" to brokers' circumvention of their enforcement measures and follow a "don't ask don't tell" approach to brokers' blatantly violative conduct, allowing Defendants to then offer and sell those tickets on the secondary market. Yet as recently as July 2025, Defendants told the public the opposite, insisting that Ticketmaster "does not turn a blind eye" to "patterns of behavior that indicate unlawful ticket purchases."

91. In keeping with Defendants' turn-a-blind-eye policy, they have continued to offer and sell tickets from brokers who circumvent enforcement measures. For years, Defendants have tested various enhanced security measures that would identify and block brokers who skirt artists' ticket limits. Despite publicly acknowledging that many primary accounts "are actually controlled by ticket brokers" and that they are "increasingly able to [identify and weed out fake accounts]," Defendants have consistently declined to use these enforcement

measures to prevent brokers from exceeding ticket limits.

92. In 2018, for example, Ticketmaster debated how proactive to be in restricting brokers from using "multiple accounts tied to a single Broker ID" to exceed ticket limits. Around the same time, Defendants considered whether to enforce ticket limits against the biggest violators. As seen below in **Figure 9**, Defendants analyzed the concentration of resale concert tickets among brokers. Eight of the "Large Brokers" they identified each controlled between 83 and 3,188 Ticketmaster accounts and between 24,721 and 102,968 concert tickets.

**Figure 9 – Ticketmaster Document Showing Brokers Controlling Thousands of Fictitious Ticketmaster Accounts and Tens of Thousands of Tickets**

| Largest | Broker | Type | # of Trade Desk Accounts | # of TM.com Accounts | Total # of concert tickets in possession | Total # of events with tickets | Concert GTV YTD by broker |
|---|---|---|---|---|---|---|---|
| 1. | Cloakify | Aggregator | 1 | 325 | 260,755 | 2,349 | $37.8M |
| 2. | *Stagefront* | Aggregator | 1 | 4,150 | 156,386 | 2,092 | $36M |
| 3. | DTI Management | Aggregator | 1 | 3,679 | 134,578 | 1,890 | $36.5M |
| 4. | Reps & Company | Large Broker | 1 | 1,074 | 102,968 | 1,202 | $14.8M |
| 5. | Ticket Galaxy | Large Broker | 1 | 629 | 73,869 | 1,208 | $12.2M |
| 6. | Ticket Boat | Large Broker | 1 | 845 | 73,449 | 2,375 | $10.5M |
| 7. | KP3 Endeavors | Large Broker | 1 | 597 | 56,388 | 1,123 | $11.4M |
| 8. | Lavaseats Corp | Large Broker | 1 | 83 | 43,935 | 1,133 | $4.4M |
| 9. | Perfect Tix | Large Broker | 1 | 231 | 41,383 | 1,115 | $7.5M |
| 10 | Top Star Tickets | Aggregator | 1 | 1,142 | 36,928 | 1,227 | $8.5M |
| 11 | Key Investment Group | Large Broker | 1 | 3,188 | 33,088 | 483 | $4.9M |
| 12 | Viwa | Large Broker | 1 | 728 | 24,721 | 308 | $3.8M |

93. Defendants contemplated capping each of these brokers at eight resale ticket listings per event, but declined to do so because they concluded that such an action would have "[s]erious negative economic impact" to Defendants from the

reduction of Ticketmaster's profits from the secondary market.

94. A year later, in September 2019, Defendants conducted an internal "Abuse Working Session" to discuss brokers' ticket limit violations and whether to take steps to stop them. The stated objective for the session was to reach agreement on the definition of "abuse," including differentiating between "good actors" and "bad actors" and "acceptable vs unacceptable behavior." A PowerPoint created by a Ticketmaster vice president for the session, which was revised and vetted by other Ticketmaster executives, states that "[e]veryone agrees that use of bots and false account information constitutes abuse."

95. Despite that universal agreement, Defendants continued to permit brokers' "abuse," letting brokers create fictitious accounts and purchase above ticket limits. For example, in one October 2019 email exchange about overlimit purchases, a Ticketmaster employee remarked, "[y]ikes we are still not slowing [Broker A] down." Broker A is one of the large volume brokers Defendants had identified in an internal report a year earlier as "violating fictitious account rules on [a] large scale."

96. Defendants then contemplated a new rule to limit purchases from the same IP address to "4x the event ticket limit," which would "limit [a broker's] mass purchases while still allowing for households or multi-use buildings to purchase for more than one account." Ticketmaster did not implement this rule.

97. In early 2020, Defendants considered the "potential financial impact"

of limiting brokers to 4, 8, or 16 tickets per concert. This analysis revealed that if Defendants stopped brokers' circumvention of their controls, the inventory of concert resale tickets from brokers would decrease by 55%, or over five million tickets per year. The accompanying "significant" financial impact to Defendants would reduce annual resale ticket revenue by nearly $220 million and cost them over $26 million in annual operating income. Defendants did not impose these limits.

98. Defendants also tested a "new method for clustering accounts that tie back to the same account holder for the purpose of enforcing ticket limits," acknowledging "brokers have found ways to evade" the company's enforcement measures. To evaluate the results of the test, Defendants said they would look at metrics including the "[d]istribution of [resale] postings among known brokers." Internal Ticketmaster emails about the new clustering system reveal that Defendants decided to overrule the system to maintain a steady flow of tickets to brokers that could then be resold on Defendants' platform.

99. In 2021, Defendants identified a third tool to prevent brokers from bypassing posted ticket limits, but once again, it was "too effective" at reducing broker purchases, and Defendants backed away from it. The tool employed third-party identity verification to help identify fictitious Ticketmaster accounts and prevent them from purchasing tickets. Soon brokers complained in online ticket broker forums (which were monitored by Ticketmaster employees) that their

attempts to purchase tickets were being blocked. Ticketmaster executives then raised alarms internally over brokers' complaints.

100. A Ticketmaster employee explained to executives that the tool had been launched "to stop 'shell accounts' using fake emails from making purchases. A pattern that both fraudsters AND brokers use to violate [ticket] limits." The employee further explained that the Ticketmaster policy "says no multiple accounts, info must be real, and no bots. Brokers have been used to running the show for years here and it's becoming an issue this year with abuse running rampant." Nonetheless, the employee relayed that the account verification system was "turned … down for now since it was too effective." This dampening meant that "the brokers can go wild again and get most of their extra purchases through while we sort out what [Ticketmaster executives] would like to do." In the years since that email was sent, Ticketmaster has continued to let brokers exceed ticket purchase limits.

101. In 2023, an internal Ticketmaster and Live Nation document detailing potential steps to make sure Ticketmaster accounts belonged to actual people also discussed the need to address the use of multiple accounts to circumvent Defendants' enforcement measures. But Defendants continue to let brokers circumvent the measures and violate ticket limits.

102. In sum, for years, Defendants have been fully aware that brokers circumvent the measures they put in place to enforce ticket limits, and they have

repeatedly declined to implement methods to prevent brokers from amassing large numbers of tickets and listing them for sale by Ticketmaster. Defendants know exactly who those brokers are, how they are circumventing the measures, and to what degree. To facilitate brokers' circumvention of ticket limits, Defendants have reduced, discontinued, or declined to implement the use of tools that could effectively enforce ticket limits against brokers, intentionally giving brokers increased access to more tickets so that Ticketmaster can then resell them and collect additional fees from consumers.

**Defendants Knowingly Sell and Offer to Sell Tickets Obtained in Violation of the Better Online Ticket Sales Act**

103. Since at least 2018, Defendants have offered to sell and sold millions of secondary market tickets acquired by brokers who circumvented their enforcement measures. As detailed above, Defendants have well understood that these tickets were purchased in violation of these measures yet offered them for sale and resold them anyway. At one point, Defendants estimated that refraining from selling tickets that were purchased by brokers in excess of ticket limits would result in hundreds of millions of dollars in lost resale ticket sales.

104. Many of the ticket purchasing violations have been by brokers that routinely and flagrantly circumvented Defendants' controls and exceeded ticket limits, and which Defendants identified or could have identified as doing so based on their own data. When brokers use their TradeDesk accounts, Defendants can see

the tickets purchased and sold on Ticketmaster's platform for each of the hundreds or thousands of Ticketmaster accounts linked to the TradeDesk account. In an internal analysis, Defendants acknowledged the consequences of using TradeDesk data to enforce ticket limits, finding that "strict enforcement of [over the limit] policy with TradeDesk data would crush broker inventory and [gross transactional value] levels" and ultimately reduce Defendants' revenue dramatically.

105. Defendants' decision not to enforce the limit against brokers is reflected in brokers' ongoing unlawful conduct. One broker Defendants identified in internal 2018 documents as "violating the fictitious account rule on [a] large scale" and in 2019 as using the "mass buyer model," continued its violative conduct on Ticketmaster's platform into 2023 and 2024, while it continued to maintain a TradeDesk account. It purchased over 9,000 tickets on Ticketmaster to one night of Beyonce's Renaissance tour, and Ticketmaster sold over 2,500 of those tickets on the resale market. It then used 1,075 Ticketmaster accounts to purchase 8,518 tickets on Ticketmaster to a single Travis Scott concert in 2024, and Ticketmaster offered and sold 1,149 of these tickets on the resale market. The ticket purchasing limit at the point of sale for both of these events was 8. Broker B, another broker Defendants identified in the 2018 internal analysis, still has a TradeDesk account and controls 920 Ticketmaster accounts that it uses to make Ticketmaster primary market ticket purchases. A 2022 audit of the ticket inventory held by Broker C—another broker

identified by Ticketmaster in its 2018 analysis—estimated that over 50% of its inventory was tickets purchased above ticket limits using multiple accounts to circumvent Ticketmaster's enforcement measures.

106. Defendants approved each of these brokers for TradeDesk accounts and have monitored their inventory on Ticketmaster to ensure they reach sales goals set by Ticketmaster, so that the brokers can maintain their TradeDesk access and discounted fee structures. Each broker's TradeDesk accounts are linked to hundreds or thousands of Ticketmaster accounts and their associated tickets purchased on Ticketmaster's platform.

107. Defendants' choice to knowingly sell tickets that they allowed or enabled brokers to acquire by circumventing ticket limit enforcement measures harms consumers. As Live Nation's President and Chief Financial Officer Joe Berchtold stated to Congress in 2023 in response to questions about whether efforts to minimize scalping "trumps the welfare of consumers and preferences of the free market":

> We disagree strongly with [that] suggestion …. [T]here is absolutely nothing about scalping that promotes consumer welfare or a free market. Scalpers do not remedy a market imperfection, as they like to argue. They raise prices to consumers, transferring in return tickets that were meant to be less costly.

108. Since, as Defendants acknowledge, ticket prices on the secondary market often far exceed those on the primary market, hundreds of thousands of

consumers have either paid significantly more on the secondary market or have been unable to purchase tickets at all because they could not afford the higher secondary market prices. As Live Nation stated publicly in July 2025:

> [I]t doesn't take a Ph.D. in economics to figure out that neither producers nor consumers are better off when a $300 ticket sells for $3,000 and the artist doesn't get a penny of the scalper's $2,700 profit. That is a world in which scalpers and resale sites are incentivized to get tickets by any means possible, and both artists and consumers are cheated.

109. Despite knowing that both the brokers' conduct and Defendants' own conduct violate the Better Online Ticket Sales Act, Defendants have for years persisted in these practices, tacitly coordinating with the brokers and profiting handsomely, to the detriment of consumers and artists alike. These violations are ongoing.

* * *

110. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things, Defendants engaged in unlawful conduct willfully, knowingly, repeatedly, and unabated for many years despite knowledge of consumer complaints and this investigation, earned significant revenue from this conduct, actively impaired the progress of the FTC's investigation by failing to timely comply with a Civil Investigative Demand, changed the terms

of use, policies and practices related to the subject matter of this complaint after learning of the prospect of this litigation, and remain in the ticketing business and maintain the means, ability, and incentive to resume their unlawful conduct.

## VIOLATIONS OF THE FTC ACT

111. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce" and "unfair methods of competition."

112. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### COUNT I
### Deceptive Claims Regarding Ticket Prices
### (by Plaintiff FTC)

113. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants have represented, directly or indirectly, expressly or by implication, that tickets are available:

a. at or around a specific price; or

b. within a specific price range.

114. In numerous instances, Defendants' representations as set forth above have been false or misleading.

115. Therefore, Defendants' representations constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT II**
**Deceptive Claims Regarding Artists' Ticket Limits**
**(by Plaintiff FTC)**

116. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants misrepresent, directly or indirectly, expressly or by implication, the maximum number of tickets that can be purchased for an event by or on behalf of the same person or entity.

117. In numerous instances, Defendants' representations as set forth above have been false or misleading.

118. Therefore, Defendants' representations constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**THE BETTER ONLINE TICKET SALES ACT**

119. Under Section (a)(1)(A) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(a)(1)(A), it is unlawful for any person to "circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket limits or to maintain the integrity of posted online ticket purchasing order rules." Under section (a)(1)(B) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(a)(1)(B), it is unlawful "to sell or offer to sell any event ticket in interstate commerce obtained in violation of subparagraph (A) if the person selling or offering to sell the ticket either (i) participated directly in or had the ability to control the

conduct in violation of subparagraph (A); or (ii) knew or should have known that the event ticket was acquired in violation of subparagraph (A)."

120. The Better Online Ticket Sales Act defines an "event" to mean "any concert, theatrical performance, sporting event, show, or similarly scheduled activity, taking place in a venue with a seating or attendance capacity exceeding 200 persons that—(A) is open to the general public; and (B) is promoted, advertised, or marketed in interstate commerce or for which event tickets are generally sold or distributed in interstate commerce." The Better Online Ticket Sales Act defines a "ticket issuer" to mean, in part, "any person who makes event tickets available, directly or indirectly, to the general public[.]"

121. A violation of the Better Online Ticket Sales Act is "a violation of a rule defining an unfair or a deceptive act or practice under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B))." 15 U.S.C. § 45c(b)(1). Thus, pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Better Online Ticket Sales Act is an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

122. For each violation of the Better Online Ticket Sales Act, Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes the Court to grant relief as it finds necessary to redress injury to consumers, including monetary relief, rescission or reformation of contracts, the refund of money or return of property, and public

notification respecting the rule violation or the unfair or deceptive act or practice.

123. Under Section (c)(1) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c)(1), the attorney general of a State may bring a civil action in an appropriate district court to enforce the Act, if the attorney general has reason to believe the State's residents have been adversely affected by the engagement of any person subject to subsection (a) in a practice that violates such subsection. Pursuant to Section (c)(1) of the Better Online Ticket Sales Act, the State may seek such relief to: enjoin further violations of the Better Online Ticket Sales Act, compel compliance with the Act, and obtain damages, restitution, or other compensation on behalf of its residents.

**COUNT III**
**Violations of the Better Online Ticket Sales Act**
**(by Plaintiffs FTC and the States of Colorado, Florida, Illinois, Nebraska, Tennessee, and Utah, and the Commonwealth of Virginia)**

124. Ticketmaster is a ticket issuer that has implemented security measures, access control systems, or other technological controls or measures on its website or online service that Defendants have used to enforce posted event ticket limits or to maintain the integrity of posted online ticket purchasing order rules. In numerous instances, various persons have circumvented these measures, and in numerous instances, Defendants sell or offer to sell in interstate commerce event tickets purchased in circumvention of these measures. In numerous such instances,

Defendants (i) participate directly in or have the ability to control the conduct in violation of Section (a)(1)(A) of the Better Online Ticket Sales Act, or (ii) know or should know that these event tickets were purchased in violation of Section (a)(1)(A) of the Better Online Ticket Sales Act.

125. Defendants' practices as set forth above are violations of Section (a)(1)(B) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(a)(1)(B), and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). Colorado, Florida, Illinois, Nebraska, Tennessee, Utah, and Virginia join this count pursuant to Section (c) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c).

## VIOLATIONS OF COLORADO STATE LAW

### COUNT IV
### Violations of Colorado Consumer Protection Act
### (By Plaintiff Attorney General of Colorado)

9. Plaintiff Colorado re-alleges and incorporates each and every allegation set forth in the preceding paragraphs.

10. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants have violated the Colorado Consumer Protection Act by:

a. advertising tickets with the intent not to sell them as advertised. Colo. Rev. Stat. § 6-1-105(1)(i);

b. making false or misleading statements concerning the price of tickets, including by advertising tickets without including the full amount that the consumer must pay in order to purchase the ticket. Colo. Rev. Stat. § 6-1-105(1)(l);

c. failing to disclose material information concerning the total price of tickets, which Defendants knew at the time they advertised tickets for sale, in order to induce consumers to enter into a transaction. Colo. Rev. Stat. § 6-1-105(1)(u); and

d. knowingly or recklessly engaging in an unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent acts by failing to enforce ticket limits and other measures intended to prevent ticket brokers from buying excess tickets and causing consumers to pay higher prices. Colo. Rev. Stat. § 6-1-105(1)(rrr).

109. When Defendants performed the deceptive trade practices described in the preceding paragraph, they did so in the course of their business, vocation, or occupation.

110. Live Nation Entertainment, Inc. and Ticketmaster, L.L.C., violated the Colorado Consumer Protection Act, and they did so pursuing a joint or common interest. Colo. Rev. Stat. § 6-1-102(6).

## VIOLATIONS OF FLORIDA STATE LAW

### THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

112. Section 501.204(1), Florida Statutes, declares that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

113. Section 501.203(8), Florida Statutes, defines "trade or commerce" as the "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise; of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity."

114. The provisions of Florida Deceptive and Unfair Trade Practices Act shall be "construed liberally" to promote and "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202, Fla. Stat.

115. Section 501.203(3), Florida Statutes, establishes that a violation of the Florida Deceptive and Unfair Trade Practices Act may be based upon any of the following: (a) any rules promulgated pursuant to the FTC Act; (b) the standards of unfairness and deception set forth and interpreted by the FTC or the federal courts;

or (c) any law, statute, rule, regulation or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.

116. The Florida Legislature also expressly provided that when interpreting the Florida Deceptive and Unfair Trade Practices Act, "great weight shall be given to the interpretations of the [FTC] and the federal courts . . ." § 501.204(2), Fla. Stat.

117. A person that willfully engages in a deceptive or unfair act or practice is liable for a civil penalty of Ten Thousand Dollars ($10,000.00) for each such violation, pursuant to Section 501.2075, Florida Statutes, and Fifteen Thousand Dollars ($15,000.00) for each violation victimizing a senior citizen or a person who has a disability. Willful violations occur when the person knew or should have known that the conduct in question was deceptive or unfair or prohibited by rule, pursuant to Section 501.2075, Florida Statutes.

118. The enforcing authority is entitled to reasonable attorney's fees and costs in any litigation where civil penalties are assessed. § 501.2075, Fla. Stat.

**COUNT V**
**Florida Deceptive and Unfair Trade Practices Act Violations**
**(By Plaintiff State of Florida)**

119. Plaintiff Florida re-alleges and incorporates each and every allegation set forth in the preceding paragraphs. In the course of Defendants' trade or commerce, Defendants have committed acts and practices that violate the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes.

Furthermore, pursuant to Section 501.203(3), Florida Statutes, violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), also constitute violations of Florida Deceptive and Unfair Trade Practices Act.

120. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants have represented, directly or indirectly, expressly or by implication, that tickets are available: (a) at or around a specific price; or (b) within a specific price range.

121. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants misrepresent, directly or indirectly, expressly or by implication, the maximum number of tickets that can be purchased for an event by or on behalf of the same person or entity.

122. In numerous instances, Defendants' representations as set forth above have been false or misleading. Defendants' false or misleading representations have affected the people of the State of Florida.

123. Therefore, Defendants' representations constitute deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act and of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which therefore also violate the

Florida Deceptive and Unfair Trade Practices Act.

## VIOLATIONS OF ILLINOIS STATE LAW

### The Illinois Consumer Fraud Act

124. Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act provides the following:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August, 5, 1965 [815 ILCS 510/2], in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILCS 505/2.

Section 7 of the Illinois Consumer Fraud Act provides:

> (a) Whenever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by the Act to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the State against such person to restrain by preliminary or permanent injunction the use of such method, act or practice. The Court, in its discretion, may exercise all powers necessary, including but not limited to: injunction, revocation, forfeiture or suspension of any license, charger, franchise, certificate or other evidence of authority of

> any person to do business in this State; appointment of a receiver, dissolution of domestic corporations or association suspension or termination of the right of foreign corporation or associations to do business in this State; and restitution.
>
> (b) In addition to the remedies provided herein, the Attorney General may request and this Court may impose a civil penalty in a sum not to exceed $50,000 against any person found by the Court to have engaged in any method, act or practice declared unlawful under this Act. In the event the court finds the method, act or practice to have been entered into with the intent to defraud, the court has the authority to impose a civil penalty in a sum not to exceed $50,000 per violation.
>
> (c) In addition to any other civil penalty provided in this Section, if a person is found by the court to have engaged in any method, act, or practice declared unlawful under this Act, and the violation was committed against a person 65 years of age or older, the court may impose an additional civil penalty not to exceed $10,000 for each violation.

815 ILCS 505/7.

126. Section 10 of the Illinois Consumer Fraud Act provides, "In any action brought under the provisions of this Act, the Attorney General is entitled to recover costs for the use of this State." 815 ILCS 505/10.

**COUNT VI**
**Violations of the Illinois Consumer Fraud Act**
**(by Plaintiff State of Illinois)**

127. Plaintiff Illinois re-alleges and incorporates each and every allegation set forth in the preceding paragraphs.

128. Defendants, in the course of trade or commerce, have in numerous instances engaged in conduct which constitutes unfair and deceptive acts or

practices declared unlawful under section 2 of the Consumer Fraud Act, 815 ILCS 505/2, by:

A. Misrepresenting, directly or indirectly, expressly or by implication, through advertisements, marketing, or promotion for sale with the intent that consumers rely on the misrepresentation that tickets are available at or around a specific price, or within a specific price range when that is not true;

B. Failing to disclose or adequately disclose to consumers that additional fees apply to live events, thereby suppressing or omitting a material fact with the intent that consumers rely upon that suppression or omission;

C. Failing to disclose or adequately disclose to Illinois consumers the amount of all applicable fees for live events, thereby suppressing or omitting a material fact with the intent that consumers rely upon that suppression or omission;

D. Misrepresenting directly or indirectly, expressly or by implication with the intent consumers rely on the misrepresentation, the true cost of live tickets to Illinois consumers; and

E. Misrepresenting directly or indirectly, expressly or by implication with intent consumers rely on the misrepresentation, the

maximum number of tickets that can be purchased for an event on behalf of the same person or entity.

## VIOLATIONS OF NEBRASKA STATE LAW

129. Plaintiff Nebraska re-alleges and incorporates each and every allegation set forth in the preceding paragraphs.

130. The Nebraska Uniform Deceptive Trade Practices Act specifies multiple acts or practices which, when conducted in the course of business, constitute deceptive trade practices. Neb. Rev. Stat. § 87-302.

131. Under Neb. Rev. Stat. § 303.05:

> (1) Whenever the Attorney General has cause to believe that a person has engaged in or is engaging in any deceptive trade practice or unconscionable act listed in section 87-302 . . . the Attorney General may apply for and obtain, in an action in any district court of this state, a temporary restraining order, or injunction, or both, pursuant to the rules of civil procedure, prohibiting such person from continuing such practices, or engaging therein, or doing any act in furtherance thereof. The court may make such orders or judgments as may be necessary to prevent the use or employment by such person of any such deceptive trade practice, or which may be necessary to restore to any other person any money or real or personal property which may have been acquired by means of any such practice.

132. Under Neb. Rev. Stat. § 303.11:

> (1) Any person who violates section 87-302 . . . or who

Case 1:25-cv-02716-GLR Document 96 Filed 09/25/26 Page 183 of 464

> willfully violates the terms of an injunction or declaratory judgment of a district court or the terms of a written assurance of voluntary compliance entered into pursuant to the Uniform Deceptive Trade Practices Act shall be subject to a civil penalty of not more than two thousand dollars for each violation. The Attorney General, acting in the name of the state, may seek recovery of such civil penalties in a civil action.

**COUNT VII**
**Violations of the Nebraska Uniform Deceptive Trade Practices Act**
**(By Plaintiff State of Nebraska)**

133. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants have represented, directly or indirectly, expressly or by implication, that tickets are available:

a. without additional fees;

b. at or around a specific price; and/or

c. within a specific price range.

134. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants have represented, directly or indirectly, expressly or by implication, the maximum number of tickets that can be purchased for an event by or on behalf of the same person or entity.

135. In numerous instances, Defendants' representations have been false or misleading.

136. Therefore, Defendants' false or misleading representations constitute

deceptive acts or practices in the course of business in violation of the Nebraska Uniform Deceptive Trade Practices Act. *See* Neb. Rev. Stat. § 87-302(2), (3), (5), (6), (10), (11), and (12).

137. Defendants engaged in the above deceptive acts and practices willfully, knowing them to be deceptive.

138. Defendants' false or misleading representations have affected the people of the State of Nebraska.

139. Each deceptive act or practice as alleged herein constitutes a separate violation of the Nebraska Uniform Deceptive Trade Practices Act.

## <u>VIOLATIONS OF TENNESSEE STATE LAW</u>

### COUNT VIII
### Unfair or Deceptive Acts of Practices Under Tennessee Consumer Protection Act (By Plaintiff State of Tennessee)

140. Plaintiff Tennessee re-alleges and incorporates each and every allegation set forth in the preceding paragraphs.

141. The Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101, *et seq.* prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104.

142. The Tennessee Consumer Protection Act "shall be interpreted and construed consistently with the interpretations given by the Federal Trade Commission and the federal courts pursuant to § 5(A)(1) of the Federal Trade

Commission Act, codified in 15 U.S.C. § 45(a)(1).” Tenn. Code Ann. § 47-18-115.

143. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants misrepresent, directly or indirectly, expressly or by implication, the maximum number of tickets that can be purchased for an event by or on behalf of the same person or entity.

144. In numerous instances, Defendants’ representations as set forth above have been false or misleading.

145. Therefore, Defendants’ representations, as described above, also constitute a deceptive act or practice in violation of Tenn. Code Ann. § 47-18-104(a) and (b)(27).

## VIOLATIONS OF UTAH STATE LAW

146. The Utah Consumer Sales Practices Act prohibits suppliers from committing “deceptive” acts or practices in connection with a consumer transaction, whether the act occurs before, during, or after the transaction. Utah Code § 13-11-4(1).

147. The Utah Consumer Sales Practices Act further prohibits suppliers from committing “unconscionable” acts or practices in connection with a consumer transaction, whether the act occurs before, during, or after the transaction. *Id.* § 13-11-5(1).

148. Defendants engage in “consumer transaction[s]” by marketing and/or

selling to "person[s]" products and services that are primarily for personal, family, or household purposes, or for purposes that relate to a business opportunity. *Id.* § 13-11-3(2).

149. Defendants are a "supplier" because they regularly solicit, engage in, or enforce consumer transactions regardless of whether they deal directly with consumers. *Id.* § 13-11-3(5).

150. As set forth below, Defendants have violated the Utah Consumer Sales Practices Act by engaging in the acts and practices alleged herein.

**COUNT IX**
**Violations of the Utah Consumer Sales Practices Act for Deceptive and Unconscionable Conduct Regarding Ticket Prices**
**(by Plaintiff Utah Division of Consumer Protection)**

151. Plaintiff Utah Division of Consumer Protection re-alleges and incorporates each and every allegation set forth in the preceding paragraphs.

152. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants have represented, directly or indirectly, expressly or by implication, that tickets are available:

a. at or around a specific price; or

b. within a specific price range.

153. In numerous instances, Defendants' representations as set forth above have been false or misleading.

154. In numerous instances, Defendants knew or had reason to know that

these representations would induce consumers into contracts with oppressive and unfair terms that the consumers would not have otherwise accepted.

155. Therefore, Defendants' representations and actions constitute deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Utah Code §§ 13-11-4.

156. Further, Defendants' representations and actions constitute unconscionable acts or practices in violation of Section 13-11-5.

**COUNT X**
**Violations of the Utah Consumer Sales Practices Act for Deceptive and Unconscionable Conduct Regarding Artists' Ticket Limits**
**(by Plaintiff Utah Division of Consumer Protection)**

157. Plaintiff Utah Division of Consumer Protection re-alleges and incorporates each and every allegation set forth in the preceding paragraphs.

158. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants misrepresent, directly or indirectly, expressly or by implication, the maximum number of tickets that can be purchased for an event by or on behalf of the same person or entity.

159. In numerous instances, Defendants' representations as set forth above have been false or misleading.

160. In numerous instances, Defendants knew or had reason to know that these representations would induce consumers into contracts with oppressive and unfair terms that the consumers would not have otherwise accepted.

161. Therefore, Defendants' representations and actions constitute deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Utah Code § 13-11-4.

162. Further, Defendant's representations and actions constitute unconscionable acts or practices in violation of Section 13-11-5.

**CIVIL PENALTIES**

163. Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), authorizes this Court to award civil penalties for each violation of the Better Online Ticket Sales Act, 15 U.S.C. § 45c.

164. Defendants violated the Better Online Ticket Sales Act, 15 U.S.C. § 45c, with actual knowledge or knowledge fairly implied on the basis of objective circumstances, as required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

165. The Colorado Consumer Protection Act authorizes this Court to award civil penalties in the amount of up to $20,000 per violation or $50,000 for violations committed against an elderly person. Colo. Rev. Stat. § 6-1-112

166. Section 501.2075, Florida Statutes, authorizes this Court to award civil penalties against a person that willfully engages in a deceptive or unfair act or practice in the amount of $10,000 for each violation and Section 501.2077, Florida Statutes, authorizes this Court to award civil penalties in the amount of $15,000.00

for each violation victimizing a senior citizen or a person who has a disability. Willful violations occur when the person knew or should have known that the conduct in question was deceptive or unfair or prohibited by rule, pursuant to Section 501.2075, Florida Statutes.

167. Subsection 815 ILCS 505/7(b) of the Illinois Consumer Fraud Act authorizes this Court to award civil penalties for each deceptive and unfair practice done in violation of the Consumer Fraud Act and an additional penalty of $50,000 for each violation the Court finds that Defendants committed with the intent to defraud.

168. Subsection 815 ILCS 505/7(c) of the Illinois Consumer Fraud Act authorizes this Court to award an additional civil penalty of $10,000 for each violation of the Illinois Consumer Fraud Act found to have been committed against a senior citizen.

169. Neb. Rev. Stat. § 87-303.11(1) authorizes this Court to award civil penalties for each violation of the Nebraska Uniform Deceptive Trade Practices Act.

170. Tenn. Code Ann. § 47-18-108(b)(3) authorizes this Court to award a civil penalty of not more than $1,000 for each violation of the Tennessee Consumer Protection Act.

171. The Utah Consumer Sales Practices Act authorizes this Court to award a fine to the Utah Division of Consumer Protection for Defendants' violation of the

Utah Consumer Sales Practices Act. Utah Code § 13-11-17(1)(e). There is no cap on the amount of fine this Court can award, but it must instead be assessed after considering the factors set forth under Utah Code § 13-11-17(6).

**CONSUMER INJURY**

172. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the Better Online Ticket Sales Act, the Colorado Consumer Protection Act, the Florida Deceptive and Unfair Trade Practices Act, the Illinois Consumer Fraud Act, the Illinois Uniform Deceptive Trade Practices Act, the Nebraska Uniform Deceptive Trade Practices Act, the Tennessee Consumer Protection Act, and the Utah Consumer Sales Practices Act. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs request that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act, the Better Online Ticket Sales Act, the Colorado Consumer Protection Act, the Florida Deceptive and Unfair Trade Practices Act, the Illinois Consumer Fraud Act, the Illinois Uniform Deceptive Trade Practices Act, the Nebraska Uniform Deceptive Trade Practices Act, the Tennessee Consumer Protection Act, and the Utah Consumer Sales Practices Act;

B. Award monetary and other relief within the Court's power to grant;

C. Impose civil penalties for each violation of the Better Online Ticket Sales Act in accordance with Section 2(b) of that Act, 15 U.S.C. § 45c(b), and Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A);

D. Award Plaintiff States civil penalties, fines, and/or forfeitures for each violation of their respective state laws, attorneys' fees, and expenses as provided under state law;

E. Award Plaintiffs the cost of bringing this action, attorneys' fees, and such other and additional relief as the Court may determine to be just and proper; and

F. Award any additional relief as the Court determines to be just and proper.

Dated: September 17, 2025 Respectfully submitted,

**FOR THE FEDERAL TRADE COMMISSION:**

/s/*Elizabeth C. Scott*
Elizabeth C. Scott (*pro hac vice forthcoming)*
escott@ftc.gov
Taylor H. Arana (*pro hac vice forthcoming)*
tarana@ftc.gov
Claire E. W. Stewart (*pro hac vice forthcoming)*
cstewart@ftc.gov
FEDERAL TRADE COMMISSION
230 South Dearborn Street, Suite 3030
Chicago, IL 60604
Telephone: 312-960-5609 (Scott)
312-960-5639 (Arana)
312-960-5615 (Stewart)
Fax: 312-960-5600

Local Counsel:
Aaron M. Schue (CA Bar No. 338760)
aschue@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Telephone: (310) 824-4300
Fax: (310) 824-4380

*Attorneys for the Federal Trade Commission*

**FOR THE ATTORNEY GENERAL OF COLORADO:**

PHILIP J. WEISER
Attorney General
State of Colorado

/s/*Brady J. Grassmeyer*
Brady J. Grassmeyer (*pro hac vice* forthcoming)
Brady.Grassmeyer@coag.gov
Senior Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6263

*Attorney for the State of Colorado*

**FOR THE OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS:**

JAMES UTHMEIER
Attorney General

/s/ *Donna Cecilia Valin*
Donna Valin, Special Counsel, Assistant Attorney General (*pro hac vice* forthcoming)
Donna.valin@myfloridalegal.com
Consumer Protection Division
135 West Central Blvd.
Orlando, FL 32801
Telephone: (407) 316-4840
Fax: (407) 245-0365

Victoria Ann Butler, Dir. of Consumer Protection Litigation (*pro hac vice* forthcoming)
Victoria.butler@myfloridalegal.com
3507 E. Frontage Road, Suite 325
Tampa, FL 32607
Telephone: (813) 287-7950

Henry Q. Johnson, Senior Assistant Attorney General (*pro hac vice* forthcoming)
Henry.Johnson@myfloridalegal.com
Multistate and Privacy Bureau
110 SE 6th Street
Fort Lauderdale, FL 33301
Telephone: (954) 712-4600

*Attorneys for the State of Florida*

**FOR THE PEOPLE OF THE STATE OF ILLINOIS:**
KWAME RAOUL
Attorney General

/s/ *Alexandra A. Golota*
ALEXANDRA A. GOLOTA (*pro hac vice* forthcoming)
alexandra.golota@ilag.gov
WILTON A. PERSON (*pro hac vice* forthcoming)
Wilton.Person@ilag.gov
Office of the Illinois Attorney General
Consumer Fraud Bureau
115 S. LaSalle Street, 26th Floor
Chicago, Illinois 60603
Telephone: (872) 272-0794 (Golota)
(224) 252-6458 (Person)

*Attorneys for the State of Illinois*

Case 1:25-cv-02716-GLR Document 96 Filed 09/25/26 Page 196 of 464

**FOR THE STATE OF NEBRASKA:**


/s/ *Benjamin J. Swanson*
Benjamin J. Swanson (*pro hac vice* forthcoming)
benjamin.swanson@nebraska.gov
Assistant Attorney General
Consumer Protection Bureau
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68508
Telephone: (402) 471-7759

*Attorney for the State of Nebraska*

**FOR THE STATE OF TENNESSEE:**

JONATHAN SKRMETTI
Attorney General and Reporter

/s/ *Kelley L. Groover*
KELLEY GROOVER, Sr. Assistant Attorney General/Managing Attorney (*pro hac vice* forthcoming)
Kelley.Groover@ag.tn.gov
KRISTINE KNOWLES, Assistant Attorney General (*pro hac vice* forthcoming)
Kristine.Knowles@ag.tn.gov
OFFICE OF THE TENNESSEE ATTORNEY GENERAL
Public Protection Section
Consumer Protection Division
UBS Tower, 20th Floor
315 Deaderick Street
Nashville, Tennessee 37243
Telephone: (615) 741-1671
Fax: (615) 532-2910

*Attorneys for the State of Tennessee*

**FOR THE STATE OF UTAH and the**
**UTAH DIVISION OF CONSUMER PROTECTION:**

DEREK BROWN
Utah Attorney General

Douglas Crapo
Deputy Attorney General

/s/ *Marilee L. Miller*
Marilee L. Miller (Utah bar pending, *pro hac vice* forthcoming)
Director, Public Protection and Fraud Division
marileemiller@agutah.gov
Utah Attorney General's Office
160 East 300 South, Fifth Floor
Salt Lake City, UT 84114
Telephone: (801) 366-0310

/s/ *Stevenson Smith*
Stevenson Smith (*pro hac vice* forthcoming), Assistant Attorney General
scsmith@agutah.gov
Utah Attorney General's Office
160 East 300 South, Fifth Floor
Salt Lake City, UT 84114
Telephone: (801) 366-0310

*Attorneys for the State of Utah*

**FOR THE COMMONWEALTH OF VIRGINIA, *ex rel.* JASON S. MIYARES, ATTORNEY GENERAL:**

JASON S. MIYARES
Attorney General of Virginia

/s/ *Chandler P. Crenshaw*
CHANDLER P. CRENSHAW (*pro hac vice* forthcoming)
Assistant Attorney General and Unit Manager
CCrenshaw@oag.state.va.us
Assistant Attorney General and Unit Manager
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Fax: (804) 786-0122

*Attorney for Plaintiff Commonwealth of Virginia*

# EXHIBIT 8

United States Senate

WASHINGTON, DC 20510

September 30, 2025

**VIA ELECTRONIC TRANSMISSION**

Joe Berchtold
President & Chief Financial Officer
Live Nation Entertainment, Inc.
Beverly Hills, CA 90210

Dear Mr. Berchtold:

We write to express our grave concern over recent allegations regarding the harm that Ticketmaster engaged in a "bait-and-switch" scheme to drive up ticket prices.[1] When you testified before the Senate Judiciary Committee in 2023, you told Congress "We believe that the artist-fan connection is the foundation of the live entertainment industry, the source of nearly all commercial value, and the number one thing that public policy should protect."[2] Yet, according to a lawsuit filed by the Federal Trade Commission and seven states attorneys general, Ticketmaster coordinated with ticket brokers allowing them to obtain millions of dollars of tickets which they then resold on the secondary market.[3]

Ticketmaster has allegedly turned a blind eye to bad actors violating the Better Online Ticket Sales (BOTS) Act for years, costing fans billions of dollars in hard earned money. Instead of working with trusted cybersecurity professionals and Congress to protect consumers and stop ticket scalping, Ticketmaster went so far as to provide technical support to help "brokers" exceed their purchasing limits to buy up tickets.[4] This decision allowed Ticketmaster to collect fees at three different points in the purchasing process. Ticketmaster collects fees when scalpers buy tickets on the primary market, they collect *more* fees when those tickets are then sold on its own secondary market, and they charge *even more* fees when fans eventually purchase the resold tickets.[5]

This conduct was not isolated, nor was meaningful action taken to bring this misconduct to a halt. When employees flagged the abuse occurring on Ticketmaster's platform, their concerns were allegedly ignored. Ticketmaster was not worried about the consumer. In fact, reporting indicates that Ticketmaster was more concerned when brokers complained about high-volume purchases that were blocked. A Ticketmaster executive even wrote that they "turn a blind eye as a matter of policy" to the violation of their own purchasing limits.[6] LiveNation went so far as to "offer technological support to brokers through a software platform called TradeDesk, which enables

---

[1] *FTC v. Live Nation Ent., Inc.*, Compl. for Perm. Inj., Monetary Relief, Civil Penalties, and Other Relief at 6, No. 2:25-cv-08884 (C.D. Cal. Sept. 18, 2025) [hereinafter FTC Compl.].
[2] *That's the Ticket: Promoting Competition and Protecting Consumers in Live Ent. Hearing Before the S. Comm. on the Judiciary*, 118th Cong. 8 (2023) (statement of Joe Berchtold, President & CEO, Live Nation Ent.) [hereinafter Senate Hearing].
[3] FTC Compl. at 54.
[4] *Id*. at 41.
[5] *Id*.
[6] *Id* at 9.

brokers to track and aggregate tickets purchased from multiple Ticketmaster accounts into a single interface for simpler resale management."[7] These actions stem from purely financial motives —if Ticketmaster had enforced its ticket purchasing limits, the company stood to lose up to $220 million in resale revenue per year.[8]

When you appeared before the Senate Judiciary Committee in 2023 following the Taylor Swift Ticketmaster meltdown, you repeatedly assured the committee that Ticketmaster does everything in its power to stop bots and scalpers.[9] When pressed on the issue of cybersecurity protections, you seemed dumbfounded and argued that LiveNation spent over a billion dollars investing in site protections against bots.[10] It is astounding that you would make such a claim while actively colluding with scalpers and bad actors to extort the American public.

America's world-leading live entertainment industry is the center of our culture, and consumers deserve the opportunity to see their favorite band or cheer on their hometown sports team without competing with bots and fraudsters. Instead of casting blame on any entity other than Ticketmaster, we urge you to be forthright with Congress and the American public about the extent of your complicity in allowing bots to buy up and hoard massive amounts of tickets. With that in mind, please respond to the following questions by October 14, 2025:

1. Live Nation's July 2025 comment in response to the DOJ-FTC RFI on Anticompetitive Practices in Live Ticketing claims that "Ticketmaster does not turn a blind eye"[11] to violations of the BOTS Act. However, in an internal email that copied Live Nation leadership, a senior Ticketmaster executive wrote that the companies "turn a blind eye as a matter of policy" to brokers' violations of posted ticket limits.[12] Do you stand by the statement that Live Nation, its Ticketmaster subsidiary, or any other Live Nation-affiliated entity does not "turn a blind eye" to violations of the BOTS Act?

2. Did Live Nation or Ticketmaster ever purposefully relax enforcement of ticket limits for certain buyers or brokers for financial gain?

3. In 2023, you told the Senate Judiciary Committee that the issues in the ticketing industry are "the direct result of the industrial-scale scalping that goes on today"[13] and that "[w]e are doing everything we can to fight the people who attack our sales and steal tickets meant for real fans."[14] By contrast, a recent investigation found that Ticketmaster knew that just five brokers controlled thousands of Ticketmaster accounts, possessing nearly a quarter of a million tickets. Despite being aware of this, Ticketmaster continued to offer and sell tickets to these very same brokers purchased by circumventing Ticketmaster's enforcement

---

[7] *Id* at 43.
[8] *Id* at 49.
[9] *See, e.g.*, Senate Hearing at 9 (statement of Joe Berchtold, President & CEO, Live Nation Ent.).
[10] *Id.* at 48.
[11] Live Nation Ent. Inc., Comment Letter on DOJ-FTC RFI on Anticompetitive Practices in Live Ticketing 12 (July 7, 2025), https://www.regulations.gov/comment/ATR-2025-0002-3566.
[12] FTC Compl. at 9.
[13] Senate Hearing at 9 (statement of Joe Berchtold, President & CEO, Live Nation Ent.).
[14] Senate Hearing at 57 (written statement of Joe Berchtold, President & CEO, Live Nation Ent.).

measures. Do you still stand by your statement that the company is doing "everything we can" to fight "industrial-scale scalping"?

4. You testified in 2023 that Ticketmaster invested millions in anti-BOT technology every year and that the company is "far and away the leader in preventing fraud and getting tickets into the hands of real fans."[15] By contrast, the FTC's investigation found that—far from preventing fraudulent use of multiple accounts by brokers—the company considered encouraging brokers to consolidate their duplicate accounts into a single account so that they could continue accessing their unlawfully purchased tickets.

    a. Why is Ticketmaster investing millions of dollars annually in anti-bot technology while you are actively helping scalpers circumvent it?
    b. Given the FTC's findings, do you stand by your statement that Ticketmaster is "far and away the leader in preventing fraud and getting tickets into the hands of real fans"?

5. The FTC asserts that brokers routinely exceeded posted ticket limits and then resold through Ticketmaster's resale marketplace.
    a. Did Live Nation or Ticketmaster ever audit brokers to ensure compliance with posted limits?
    b. If any brokers were discovered to have exceeded limits, how were they disciplined or excluded?

6. Do you support the MAIN Event Ticketing Act's reporting requirement that obligates ticket sellers to notify the FTC of any known circumvention incidents?

Sincerely,

Marsha Blackburn
United States Senator

Ben Ray Luján
United States Senator

---

[15] *Id*.

# EXHIBIT 9

LIVE NATION

**VIA EMAIL**

October 17, 2025

Senator Marsha Blackburn
357 Dirksen Senate Office Building
United States Senate
Washington, DC 20510

Senator Ben Ray Luján
498 Russell Senate Office Building
United States Senate
Washington, DC 20510

Re: September 30, 2025, Letter Concerning FTC Allegations

Dear Senators Blackburn and Luján:

I write in response to your letter dated September 30, 2025, seeking information regarding certain allegations in the complaint recently filed by the Federal Trade Commission ("FTC") and seven state attorneys general against Ticketmaster L.L.C. ("Ticketmaster") and its parent, Live Nation Entertainment, Inc. ("Live Nation").[1] I want to assure you that Live Nation and Ticketmaster share your commitment to supporting artists and fans and protecting the integrity of the live entertainment industry. Unfortunately, the recently filed lawsuit does not advance that shared objective. The FTC complaint presents a distorted view of the facts and the law, specifically the Better Online Ticket Sales (BOTS) Act. While we would prefer to work with the FTC on addressing the real threats to the live event industry instead of litigating these claims, we look forward to setting the record straight here, and if necessary in court.

Ticketmaster is an industry leader in the fight against bots and ticket scalping.[2] Among its many initiatives, Ticketmaster has:

- Invested more than $1 billion in ticketing technology, including anti-bot technology, fraud detection, and ticket security.

- Invented rotating barcodes and digital ticketing to stop screenshot resale.

---

[1] Complaint, *FTC v. Live Nation Ent., Inc.*, No. 2:25-cv-08884 (C.D. Cal. Sept. 18, 2025) ("Compl.").

[2] *See That's the Ticket: Promoting Competition and Protecting Consumers in Live Entertainment: Hearing Before the S. Comm. on the Judiciary*, 118th Cong. 8-9, 57 (2023) (statement of Joe Berchtold, President & CFO, Live Nation Entertainment) ("Senate Hr'g"); Live Nation Ent. Inc., Comment Letter on DOJ-FTC RFI on Anticompetitive Practices in Live Ticketing 2-3 (July 7, 2025) ("DOJ-FTC Comment").

➢ Pioneered SafeTix and the smart queue digital waiting rooms to get tickets in the hands of real fans rather than bad actors.

➢ Developed powerful new technologies designed to prevent inauthentic account creation and provide for ongoing account validation.

At the same time, Ticketmaster has recognized that private sector action alone cannot outpace rapid advancements in ticket scalping technology. Especially with AI, bad actors are only getting faster, smarter, and harder to stop. We recently called attention to the proliferation of ticket harvesting technologies in our comments in response to President Trump's Executive Order on Combating Unfair Practices in the Live Entertainment Market. And since this is an industry-wide problem, Live Nation and Ticketmaster have repeatedly called on Congress and regulators to act in this space by enhancing legislative and regulatory protections. We have offered to lend our extensive experience in combatting ticket scalpers, as well as evidence from our various abuse-detection measures, to assist in formulating policies and legislation, and building cases against bad actors. The decision by the FTC to forgo that path in favor of litigation is disappointing. Even more disappointing is the complaint's strained attempt to portray Ticketmaster—the company that has indisputably done more than anyone else in the industry to fight the bad actors—as somehow complicit in their schemes.

In your letter, you expressed concerns about Ticketmaster's ticketing practices based on allegations in the complaint. We address each of the major contentions.

***1. "Colluding with Scalpers":*** Your letter paraphrases the FTC as alleging that "Ticketmaster coordinated with ticket brokers allowing them to obtain millions of dollars of tickets which they then resold on the secondary market." Later you state Ticketmaster was "actively colluding with scalpers and bad actors to extort the American public." We fully understand how one could get this impression from the FTC's complaint and press statements, but it is categorically false. No facts alleged in the FTC complaint indicate that Ticketmaster has conspired with ticket brokers to put tickets directly on resale markets. Live Nation and Ticketmaster do not allow that. We have for many years opposed the various "direct-to-secondary" schemes that others have come up with. We believe that other than standard industry and venue holds, all tickets to every concert should be made available to fans through the primary ticketing channel. And we can assure you that today *every* concert ticket that Ticketmaster is asked to distribute is sold through onsales that are open to fans. *None* are secretly sold or transferred to ticket brokers. To answer one of your questions directly, no, neither Live Nation nor Ticketmaster *ever* "purposefully relax enforcement of ticket limits for certain buyers or brokers for financial gain."

The FTC complaint creates this misimpression by conflating "conspiracy" with a longstanding practice of primary ticketing companies allowing ticket brokers to maintain multiple accounts. That ticket brokers have been allowed to maintain multiple accounts is true; calling that conspiracy is specious. The reality is that brokers have had multiple

accounts for a very long time—long before Ticketmaster entered the secondary ticketing business in 2014, and well before StubHub created the first successful secondary ticket marketplace in the early 2000s. This practice harkens back to the days of physical tickets, when ticket brokers would often have a number of employees or others paid to stand in line and purchase concert tickets—a practice that was generally accepted in the industry. Similarly, it was generally accepted that a broker with multiple employees could have each person hold an account and separately purchase tickets. All this can be done legitimately under the rules of the primary ticketing companies without having to resort to any unlawful behavior.

This is all apparently a surprise to the FTC, but as the agency singularly charged with BOTS Act enforcement, it shouldn't be. Ticket resale is dominated by broker inventory. StubHub, SeatGeek and Vivid Seats live and die by ticket brokers, getting 80 to 100 percent of their inventory from brokers. And while there are lots of ways brokers acquire inventory, many plainly illegal, using multiple accounts is one method and not inherently illegal. To be sure, it has gotten out of hand, especially since scalpers developed automated tools for creating Ticketmaster accounts. Given the level of abuse we are now seeing, we are no longer permitting this, as described below. But this is neither conspiracy nor collusion as implied by the FTC lawsuit.

***2. TradeDesk:*** Your letter also appears to accept the FTC's characterization of an inventory management system, TradeDesk, as technological support for unlawful ticket harvesting. This is plainly false. TradeDesk is a suite of ticket management tools that streamline a reseller's business operations, including pricing, inventory distribution, and order fulfillment on various ticket marketplaces, including but not limited to Ticketmaster. It is one of numerous inventory management systems for ticket resellers, some from other ticketing companies like Ticket Utils from StubHub[3] and SkyBox from Vivid Seats,[4] and some from independent technology providers like Automatiq.[5] Brokers use these tools to manage all their tickets across sports, concerts, etc.

TradeDesk has no functionality to buy primary tickets. Contrary to the FTC's allegation, the TradeDesk platform does not in any way enable "bots to buy up and hoard massive amounts of tickets."[6] And while TradeDesk—like every product in this class—has a syncing feature that enables brokers to aggregate tickets from multiple accounts into a single interface, that feature is simply a reflection that ticket brokers have multiple

[3] https://www.ticketutils.com/ We understand StubHub is replacing TicketUtils with a new product called Reach.

[4] https://skybox.vividseats.com/welcome.html

[5] https://automatiq.com/

[6] 9/30/2025 Ltr. at 2.

accounts.[7] If anything, the prevalence of tools like this from multiple vendors should indicate that it is not unlawful, nor a violation of our terms and conditions, to hold multiple accounts.

We have come to the conclusion that the reputational harm to Ticketmaster from having to explain and defend TradeDesk exceeds its value. While we believe this criticism is unfair, we are removing TradeDesk's concerts ticket management functionality from the market.[8] As noted, there are many similar products, so TradeDesk users will likely shift to them. But at least no one will again be able to claim that because Ticketmaster has a resale management product, it has no standing to advocate for resale market reforms.

***3. "Turning a Blind Eye":*** Live Nation and Ticketmaster do not "turn a blind eye to bad actors violating the Better Online Ticket Sales (BOTS) Act."[9] This is a particularly frustrating allegation, since we have invested more than a billion dollars in ticketing technology, including anti-bot and fraud detection measures.[10] These investments are unmatched in the industry, and they have allowed Live Nation and Ticketmaster to block an ever-increasing number of bots—including some 8.7 billion bots in April 2025 alone.[11] We are the only company active in secondary ticketing that supported the BOTS Act and encouraged its enforcement. We encouraged and supported President Trump's Executive Order, have called on the FTC to more aggressively pursue enforcement actions for BOTS Act violations, and also called on Congress to broaden the BOTS Act, provide a private right of action, ban speculative ticket listings, and more. Far from turning a blind eye, Live Nation and Ticketmaster have been facing these issues head on and diligently trying to address them. So, yes, in answer to your question 4.b, we do stand by our previous statement that Ticketmaster is "far and away the leader in preventing fraud and getting tickets into the hands of real fans."

The FTC's blind-eye allegations are premised on the idea that Ticketmaster cozies up to ticket brokers "to collect fees at three different points in the purchasing process."[12] This makes no economic sense. It *would* were Ticketmaster a resale-only marketplace like StubHub and Vivid Seats, or even like SeatGeek, which makes most of its money from

---

[7] Furthermore, in Ticketmaster's case, the syncing feature is used as a consumer-protective strategy to prevent fraudulent listings—a serious problem on other resale platforms. TradeDesk provides an efficient way for Ticketmaster to verify that a ticket is valid and in the seller's possession.

[8] The primary use of TradeDesk has been in sports, where many teams use brokers for distribution and brokers need multiple accounts to do what the teams ask of them. We intend to incorporate some TradeDesk functionality into a new product to support this. It will not support concert ticket resale.

[9] 9/30/2025 Ltr. at 1.

[10] Live Nation and Ticketmaster do not publicly discuss the methods and technologies used to enforce ticket limits and prevent bots, but they have provided detailed information to the FTC.

[11] *See* DOJ-FTC Comment 2, 5.

[12] 9/30/2025 Ltr. at 1.

secondary. But secondary ticketing accounts for approximately 3% of Live Nation's revenue, and revenue from fees on concert ticket resale is less than 2% of Live Nation's revenue. Ticketmaster's market share in concert ticket resale is also less than 20%, meaning that over 80% of the time a concert ticket gets resold, *some other marketplace collects any resale fees*. In this setting, Live Nation's incentives are plainly to favor its relationships with artists and fans and Ticketmaster's primary ticketing business, and not to jeopardize any of that for the benefit of such a small portion of its operations. This is why Ticketmaster is alone among secondary marketplaces in supporting resale reform.

Against all that, the FTC complaint repeatedly highlights a September 2018 internal email among Ticketmaster and Live Nation personnel to assert that the companies "'turn a blind eye as a matter of policy' to brokers' violations of posted ticket limits."[13] That is not what the email says, nor what the author of the email meant—which the FTC failed to understand in part because they did not take any depositions prior to filing its lawsuit. The author's point was that while Ticketmaster has "lots of anti-abuse tools that we use actively," because of the company's "policy of keeping a wall between our primary and resale operations," the Ticketmaster resale operation could not distinguish between properly and improperly sourced tickets. In other words, the "policy" he was complaining about was the "wall," which the company had erected for antitrust compliance reasons, *i.e.*, to guard against claims that it was using its primary ticketing business to advantage its resale business. He was *not* saying that Ticketmaster had a policy to let brokers circumvent ticket limits. The FTC picked nine words out of context and *changed the policy those words addressed* to create that misimpression.[14] It also misleadingly presented that seven-year-old email as reflecting present-day policy.[15]

This discussion occurred in the aftermath of the CBC stories about TradeDesk in October 2018. At that time, Ticketmaster indeed reviewed its policies toward brokers and resale generally. And of course, as the FTC emphasizes, Ticketmaster assessed the economic implications of various alternatives as anyone would. But what the FTC missed is that Ticketmaster mainly focused on what would be *effective* in addressing the root cause of brokers creating and using inauthentic Ticketmaster accounts (irrespective of predicted impact on the business). Measures that would simply cause brokers to avoid Ticketmaster and post on other resale marketplaces instead were fundamentally illusory, and rejected on that basis. On the other hand, Ticketmaster did not decide to do nothing, as the FTC claims. To the contrary, it chose to expand its abuse prevention and account verification measures, which it determined would address root causes. Wave after wave of more sophisticated and

[13] Compl. ¶ 15; *see id.* ¶¶ 82, 90-91.

[14] The "wall" exists to this date, as in the ensuing years unfounded complaints that Ticketmaster leverages its position in primary ticketing for the benefit of its resale business have been constant.

[15] *See* Compl. ¶¶ 90-91.

effective abuse prevention measures followed, counter to the FTC's suggestion that Ticketmaster decided to do nothing at all.

***4. The BOTS Act:*** We want to be very clear that Ticketmaster has never tolerated, let alone facilitated, violations of the BOTS Act. We do not believe the FTC has alleged a credible BOTS Act violation by Ticketmaster, and we are confident it will not prove one.

As strong supporters of the BOTS Act, we have always been thankful to Sen. Blackburn for championing it—and thankful to you both for looking to enhance it through the MAIN Event Ticketing Act. We have also had a clear understanding of its meaning. It was passed as a first but important step in addressing the growing problem of ticket scalpers using automated purchasing scripts called bots and other *technological exploits* to buy substantial volumes of tickets from primary ticketing companies like Ticketmaster. In short, it was passed to help us with our work to fend off automated ticket harvesting by making it illegal to circumvent the technological controls we use to enforce ticket limits.

To that end, the BOTS Act makes it unlawful for any person *"to circumvent a security measure, access control system, or other technological control or measure"* that a primary ticketing company uses "to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules." The act of circumventing a technological control is illegal on its own. But then a companion section makes it illegal "to sell or offer to sell" any ticket acquired through circumvention if the seller participated in the circumvention, controlled the circumvention, or "knew or should have known that the event ticket was acquired" through circumvention. Here is a graphical representation of how the statute works.



LIVE NATION

At its core, the BOTS Act targets three things a scalper might do: it might circumvent our controls itself, it might get someone else to circumvent our controls, and it will sell or at least try to sell the tickets acquired through circumvention.

The FTC case is based on a fundamentally novel and expansionist view of the BOTS Act that makes it illegal to circumvent *ticket limits*—full stop—not just technological controls protecting ticket limits. They have written "technological controls or measures" out of the statute, deeming that unnecessary to finding circumvention. And upon that foundation, they claim that whenever a secondary ticketing marketplace sees that an individual or entity is posting more tickets than the one-account ticket limit, the marketplace knows there has been circumvention and therefore also violates the BOTS Act.

This will all be resolved in the litigation but suffice it to say that we strongly disagree with the FTC's position. Ironically, just days before the FTC staff revealed their new theory, we had urged President Trump to support an expansion of the BOTS Act that was not limited to circumvention of technological controls.[16] For now, however, that is undisputedly a limiting principle. The Act does not give the ticket limit itself the power of federal law. The countless families, friends groups, church groups and others who have used multiple accounts to seek tickets to see a favorite artist are not BOTS Act violators. The scalpers who use technological exploits to buy tickets are.

***5. Addressing the Proliferation of Broker Accounts:*** We of course understand that the emotional force of the FTC's lawsuit comes from the fact that some ticket brokers today simply have too many accounts. It doesn't matter whether that's lawful or unlawful. What started as a reasonable and acceptable level of behavior has been abused, and today it is growing exponentially through digitally exploited means. It's unfair to artists and fans and it is time to do something about it.

This is not an easy issue, because, as we have said before, the practice in the industry for a very long time has been to let professional resellers have multiple accounts and use them to try to buy tickets. We have never thought it was our place to change unilaterally the

---

[16] See DOJ-FTC Comment at 11:

> The key prohibition [of the BOTS Act] is structured so that it is unlawful for any person to "circumvent a security measure, access control system, or other technological control or measure" used "to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules." That is a rather indirect way to describe what bots do. It requires an inquiry into whether there is "circumvent[ion]" of security measures, which is not only unnecessary but invites arguments that defenses ticketing companies put up against improper ticket harvesting do not qualify as security measures to enforce ticket limits or ticket purchasing order rules.
>
> Live Nation has proposed an amendment to the BOTS Act that would make circumvention of security measures subordinate to a broader prohibition that makes it unlawful for ticket brokers "to use or cause to be used any software application that runs automated tasks over the internet to purchase event tickets from an Internet website or online ticket marketplace." Since there is no downside from "over-deterring" bots usage, the prohibition should be broadly worded.

historical practices of the industry.[17] Instead, we have focused on stopping scalpers from creating fake accounts, and we have developed ticket queueing processes that with increasing efficacy favor fans who actually attend events over purchasers that transfer tickets instead of attending. Favoring fans is also the idea behind our preregistration product Artist Sign Up, and our Face Value Exchange that allows artists to choose not to permit any for-profit transfers.

To counter this increasingly unfair behavior, our policy will now be to limit everyone and every entity, ticket brokers included, to only one Ticketmaster account. This is not easy to do—and we know scalpers will do everything in their power to undermine us. But fortunately, we have new AI tools and identity verification technology that we think makes this a reasonable aspiration. It also aligns with the FTC's position that it is illegal for brokers to use more than one account to buy tickets. We are therefore announcing today that we will no longer let any broker maintain, buy tickets with, or post resale tickets with more than one account. Excess accounts will be canceled in due course. Nor will we allow any broker to post more tickets on our resale marketplace than the posted ticket limit. To that end, we will require every account that wishes to post tickets for resale on Ticketmaster have a unique Taxpayer Identification Number (SSN or EID).

Experience teaches us that we can expect all sorts of exploits and subterfuges to get around this policy. We will therefore be increasing our efforts to prevent the creation of new, unauthorized accounts that may be used to replace cancelled accounts. Ticketmaster already blocks over 99% of the up to 25 million account sign-up attempts *every day* because our technologies determine these are not real fans, and we have stopped over 6 billion fake accounts so far this year. We will also be deploying AI tools on existing accounts, identifying those accounts most likely to be unauthorized accounts, requiring validation that the accounts are held by fans, and canceling those that are not validated. Yet it is, and always will be, a numbers game, with bad actors throwing billions of account creation requests at us figuring that if even a small fraction succeed, they can buy and scalp lots of tickets. With our new AI models and identity verification tools, we will make that harder.

***6. Better Anti-Bot Measures:*** We are also improving our technologies against bots. Ticketmaster already blocks over 200 million bots *daily,* a five-fold increase from 2019. We continue to invest to improve our ability to block bots on Ticketmaster, and in addition we will be offering artists additional anti-bot tools for Artist Sign Ups for major onsales and post-onsale ticket sweeps. Together we expect these tools will increase the percentage of tickets going to real fans and enable faster assessment and cancelation of bot-purchased tickets.

Ultimately, Ticketmaster's commitment is to do what it takes to make sure that tickets meant for fans get to fans. That should not be as hard as it is—but it is every bit as

---

[17] Your Question 5 asks whether Ticketmaster audits brokers to ensure compliance with posted limits. At an artist's request, Ticketmaster conducts "OTL Sweeps" that are meant to determine if tickets were acquired with bots or other unauthorized means. Brokers are regularly caught in OTL sweeps, since normally bad brokers rather than fans are acquiring tickets through improper means.

hard as one should expect when ticket scalpers are making billions of dollars every year. Regardless, to protect fans, artists, and event organizers, Ticketmaster will continue to invest in abuse-prevention measures designed to detect and prevent scalpers and other bad actors from interfering with sales or acquiring tickets in violation of Ticketmaster's terms.

* * * * *

Live Nation and Ticketmaster once again reiterate their commitment to supporting artists and fans while protecting the integrity of the live entertainment industry. We respectfully believe this litigation is misguided. Litigating this case will needlessly consume resources that should be directed toward our shared objective of addressing the problem of ticket scalping. Thus, while Live Nation and Ticketmaster will vigorously defend against these allegations, we remain committed to working with Congress and the FTC on real solutions as well.

As to the MAIN Event Ticketing Act, Live Nation and Ticketmaster support it but would go further. We appreciate the addition of a BOTS Act prohibition that covers the use of ticket buying software directly, but as noted earlier we would not tie this to "circumvention of an access control system, security measure, or other technological control or measure." It ought to be illegal to use any software application that runs automated tasks over the internet to purchase event tickets, period. There should not be any qualifiers on how the software automates ticket harvesting for live events.

We support, with some concerns, the proposal to require online ticket issuers to report to the FTC any incidents of circumvention of which the ticket issuer has actual knowledge. We have proactively shared information with the FTC about suspected ticket harvesting efforts on multiple occasions, but we have yet to see the FTC take action on any of our tips. But the larger issue is that attempted circumvention of technological controls is not an occasional, noteworthy event. It happens constantly and at enormous scale, and we are confident the FTC understands that. A reporting requirement is also problematic because it is in the nature of this arms race that the ticket company may know when it has *won* a battle by stopping a circumvention attempt, but probably not when it has *failed*. To illustrate, with the new technologies we have and the initiatives described above, we may cancel up to 10 million fake accounts (out of over 300 million accounts on the Ticketmaster Host system). It is very hard for us to believe that 10 million fake accounts were created without some kind of technological tool that, in our view, should be unlawful. Our data scientists can make educated guesses about how some of those accounts were created (e.g., using technology that creates fake emails). But when do inferences lead to the "actual knowledge" that triggers the reporting requirement? This concerns us.

The obvious targets for BOTS Act enforcement actions are the purveyors of ticket harvesting technology and their customers. The FTC already knows who these people are. Furthermore, if the FTC genuinely believes that secondary marketplaces violate the BOTS Act by allowing brokers to post more tickets than the one-account ticket limit, all secondary

marketplaces are targets for enforcement. In all events, we need more enforcement as opposed to simply more reporting.

We trust this letter answers your questions, and that the policy changes we are making demonstrates our commitment to real change. Please do not hesitate to contact us again should you have further questions.

Very truly yours,

Daniel M. Wall
Executive Vice President
Corporate and Regulatory Affairs
Live Nation Entertainment, Inc.

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br>***Plaintiff,***<br>**v.**<br>**KEY INVESTMENT GROUP LLC, et al.,**<br>***Defendants.*** | **Case No. 1:25-cv-02716-GLR** |

**DEFENDANTS' MOTION TO DISMISS**

Defendants Key Investment Group, LLC, TotalTickets.com LLC, Totally Tix LLC, Front Rose Tix LLC, WLK Investments, LLC, Yair D. Rozmaryn, Elan N. Rozmaryn, and Taylor Kurth (collectively, "KIG") respectfully move to dismiss the Complaint for failure to assert a claim for which relief can be granted. Fed. R. Civ. P. 12(b)(6).

The Complaint fails to allege a cognizable violation of the BOTS Act, 15 U.S.C. § 45c.[1] The BOTS Act is and has always been meant to prevent bad actors from using bots from "circumvent[ing] a security measure, access control system, or other technological control or measure." *Id.* KIG does not use bots. The Complaint does not allege otherwise. In the absence of bot use, the Complaint's sparse allegations of purported BOTS Act violations fail the *Iqbal* smell test.

The Complaint fails to plausibly allege that Ticketmaster, the "ticket issuer" in this case, "enforce[d] posted event ticket purchasing limits or [] maintain[ed] the integrity of posted online

1 The Complaint refuses to call the statute the "BOTS Act," even though the Public Law enacting the statute refers to it as such. Pub. L. No. 114-274, § 1, 130 Stat. 1401, 1401-04 (2016) ("[t]his Act may be cited as the 'Better Online Ticket Sales Act of 2016' ***or the 'BOTS Act of 2016.'***") (emphasis added). As discussed in more detail in the Memorandum in Support of the Motion, Plaintiff's omission is representative of a slew of misleading and deceptive assertions sprinkled throughout and underlying much of its Complaint.

ticket purchasing order rules." *Id.* To the contrary, ***the sole external materials Plaintiff attaches to its Complaint confirm that Ticketmaster was aware of, and approved of, KIG's actions, since at least 2018.*** *See* Compl. ¶ 40, Figure 1; Compl. Attachment A.

The Complaint fails to adequately allege civil penalties. To assess civil penalties, the FTC Act requires "actual knowledge or knowledge fairly implied on the basis of objective circumstances." 15 U.S.C. § 45(m)(1)(A). The Complaint's sparse allegations that KIG had the requisite knowledge to assess civil penalties fall woefully short of this standard.

Plaintiff's interpretation of the BOTS Act also fails on constitutional grounds. The BOTS Act is, at best, void for vagueness as to non-bot users. And, because Congress did not give Plaintiff the power to expand the BOTS Act as it now attempts to do, the relief the Complaint seeks is barred by the Major Questions Doctrine as well.

For any or all of these reasons, and as explained in more detail in the accompanying Memorandum of Law in Support of this Motion, the Court should respectfully dismiss the Complaint, in full and with prejudice.

Dated: November 24, 2025

Respectfully submitted,

*/s/ Bezalel A. Stern*
Bezalel A. Stern (D. Md. Bar No. 20667)
Joshua N. Drian (*pro hac vice*)
MANATT, PHELPS & PHILLIPS, LLP
1050 Connecticut Ave. NW, Suite 600
Washington, D.C. 20036
Tel.: (202) 585-6500
bstern@manatt.com
jdrian@manatt.com

*Counsel for Defendants*

Case 1:25-cv-02716-GLR Document 63-1 Filed 11/24/25 Page 218 of 464

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

**FEDERAL TRADE COMMISSION,**

***Plaintiff,***

**v.**

**KEY INVESTMENT GROUP LLC, et al.,**

***Defendants.***

**Case No. 1:25-cv-02716-GLR**

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1
LEGAL STANDARDS ..... 3
FACTUAL BACKGROUND ..... 3
I. The BOTS Act Was Designed and Enacted to Stop the Use of Bots ..... 3
a. The Legislative History of the Bots Act Clarifies That the Law is About Bots ..... 4
b. The FTC Understood the BOTS Act is About Bots ..... 5
c. President Trump Understands the BOTS Act is About Bots ..... 6
II. Key Investment Group and Ticketmaster's Industry-Standard Business Practices ..... 7
ARGUMENT ..... 8
I. Key Investment Group Does Not Violate the BOTS Act ..... 8
a. The BOTS Act Regulates the Use of Bots ..... 8
b. The Complaint's Allegations—Which Do Not Include Bot-Use—Do Not Constitute BOTS Act Violations ..... 9
i. Key Investment Group's Alleged Use of Multiple IP Addresses and Multiple Accounts Do Not Constitute BOTS Act Violations ..... 10
ii. Key Investment Group's Alleged Use of SIM Cards and SIM Boxes Do Not Constitute BOTS Act Violations ..... 11
II. KIG Does Not "Circumvent" ..... 13
a. Circumvention Cannot Occur When Conduct is Understood and Permitted ..... 13
i. Ticketmaster Knew of and Permitted KIG's Conduct ..... 15
ii. The FTC's Allegations in a Parallel Complaint Against Ticketmaster Confirm the Underlying Complaint is Fatally Flawed ..... 17
b. Any Purchase Policy is Irrelevant to a BOTS Act Analysis ..... 18
III..KIG Did Not Have Actual Knowledge or Knowledge Fairly Implied That its Actions Violated the Bots Act ..... 20
a. KIG's Awareness of the BOTS Act Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users ..... 21
b. KIG's Awareness of Three 2021 Consent Decrees Against Recidivist Bot Users Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users ..... 22
c. KIG's Receipt of a Notification Regarding the Three 2021 BOTS Act Consent Decrees Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users ..... 23
d. KIG's Request for Legal Advice Regarding a Routine Bank Audit Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users ..... 24

e. A Washington State Consent Decree Prohibiting the Use of Bots Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users ................... 25

f. The Rule of Lenity Mandates Any Ambiguity as to Civil Penalties be Construed in Favor of KIG ................................................................................................ 25

IV. The BOTS Act is Unconstitutionally Vague as to KIG and Other Non-Bot Users ............... 26

V. The FTC's Reimagined Reading of the BOTS Act Violates the Major Questions Doctrine 28

CONCLUSION ................................................................................................................ 30

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Akkus v. Rocket Mortg., LLC*,
715 F. Supp. 3d 726 (D. Md. 2024) (Russell, III, C.J.) ....................19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................1, 3, 12

*Beyond Sys., Inc. v. Keynetics, Inc.*,
422 F. Supp. 2d. 523 (D. Md. 2006)....................17

*Bittner v. United States*,
598 U.S. 85 (2023)....................26

*BlueEarth Biofuels, LLC v. Hawaiian Elec. Co.*,
2011 WL 2116989 (D. Haw. May 25, 2011)....................14

*CGM, LLC v. BellSouth Telecom., Inc.*,
664 F.3d 46 (4th Cir. 2011) ....................9

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.*,
381 F.3d 1178 (Fed. Cir. 2004)....................14

*Crespo v. Holder*,
631 F.3d 130 (4th Cir. 2011) ....................13

*EEOC v. United Air Lines, Inc.*,
1995 WL 103658 (N.D. Ill. Mar. 3, 1995)....................22

*F.C.C. v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)....................27

*FTC v. Live Nation Ent. Inc.*,
2:25-cv-08884 (C.D. Cal. Sept. 18, 2025) ....................7

*Gascho v. Glob. Fitness Holdings, LLC*,
863 F. Supp. 2d 677 (S.D. Ohio 2012) ....................22

*Goines v. Valley Cmty. Servs. Bd.*,
822 F.3d 159 (4th Cir. 2016) ....................18

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)....................27

*Hornbeck Offshore Transp., LLC v. U.S. Coast Guard*,
424 F.Supp.2d 37 (D.D.C. 2006)....................6

*In re Human Genome Scis. Inc. Secs. Litig.*,
933 F. Supp. 2d 751 (D. Md. 2013)....................3

*Mayer Brown LLP v. IRS*,
562 F.3d 1190 (D.C. Cir. 2009) ....................14

*N. Carolina Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*,
76 F.4th 291 (4th Cir. 2023) ....29

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
767 F. Supp. 3d 243 (D. Md. 2025) ....27

*RLM Commc'ns, Inc. v. Tuschen*,
831 F.3d 190 (4th Cir. 2016) ....19

*Slattery Skanska Inc. v. Am. Home Assurance Co.*,
67 A.D.3d 1 (N.Y. App. Div. 2009) ....14

*State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*,
381 F. Supp. 3d 536 (D. Md. 2019) ....3

*United States v. Cartisim Corp.*,
No. 2:21-cv-00212 (E.D.N.Y. Jan. 14, 2021) ....5, 22, 23

*United States v. Concert Specials, Inc.*,
No. 2:21-cv-00214 (E.D.N.Y. Jan. 14, 2021) ....5, 22, 23

*United States v. Granderson*,
511 U.S. 39 (1994) ....26

*United States v. Just In Time Tickets, Inc.*,
No. 2:21-cv-00215 (E.D.N.Y. Jan. 14, 2021) ....5, 22, 23

*United States v. Stratics Networks, Inc.*,
721 F. Supp. 3d 1080 (S.D. Cal. 2024) ....24

*United States v. Sutton*,
126 F.4th 869 (4th Cir. 2025) ....13

*W. Virginia v. Env't Prot. Agency*,
597 U.S. 697 (2022) ....29, 30

*Washington v. Kurth*,
No. 18-2-02894-9 (King Cnty. Feb. 2, 2018) ....25

*Wells v. Fuentes*,
126 F.4th 882 (4th Cir. 2025) ....3, 15

*Whitfield v. Cont. Callers, Inc.*,
2021 WL 5999265 (D. Md. Dec. 20, 2021) ....3

## STATUTES

15 U.S.C. § 45 .......... 2, 21, 25

15 U.S.C. § 45c .......... *passim*

17 U.S.C. § 1201 .......... 14

22 U.S.C. § 6217 .......... 14

Pub. L. No. 114-274 .......... 1, 4

## INTRODUCTION

The Federal Trade Commission ("FTC")'s Complaint, ECF 1, attempts to shoehorn the legitimate behavior of Defendants (collectively, "Key Investment Group" or "KIG") into the strict confines of the BOTS Act, 15 U.S.C. § 45c, a statute drafted to prevent users of malicious computer code—colloquially known as bots—from bypassing security measures enforced or maintained by a ticket issuer.[1]

KIG does not use bots. KIG does not circumvent any "security measure, access control system, or other technological control or measure" of Ticketmaster, the "ticket issuer" in this case. 15 U.S.C. § 45c(a)(1)(A). And Ticketmaster does not "enforce" or "maintain" security measures with respect to KIG. *Id.* To the contrary, Ticketmaster knows of, allows, and encourages KIG's use of all KIG-linked accounts.

To conclude KIG violated the BOTS Act, the Court must find ***both*** that: (1) KIG "circumvent[ed] a security measure, access control system, or other technological control or measure" put in place by Ticketmaster "to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules," ***and*** that (2) Ticketmaster actually "enforce[d]" those ticket limits or "maintain[ed] the integrity of those rules." *Id.* The Complaint adequately alleges neither, mandating dismissal at this stage.

The Complaint's allegations of circumvention do not pass the *Iqbal* smell test. The Complaint's three conclusory allegations of BOTS Act violations are grounded in the industry-standard practice of using multiple accounts to purchase tickets. But using multiple accounts does not

---

[1] The FTC's Complaint refuses to call the statute the "BOTS Act," even though the Public Law enacting the statute refers to it as such. Pub. L. No. 114-274, § 1, 130 Stat. 1401, 1401-04 (2016) ("[t]his Act may be cited as the 'Better Online Ticket Sales Act of 2016' ***or the 'BOTS Act of 2016.'***") (emphasis added). The acronym, of course, indicates that the BOTS Act is about bots.

and cannot constitute circumvention, especially where, as here, Ticketmaster knew of and approved of KIG's use of the same. *See*, *e.g.*, Compl. ¶ 40, Figure 1; Attachment A.

The Complaint's contention that KIG had "actual knowledge or knowledge fairly implied" it violated the BOTS Act fares no better. *See* 15 U.S.C. § 45(m)(1)(A) (requiring "actual knowledge or knowledge fairly implied under objective circumstances" to assess civil penalties). The idea that KIG had constructive knowledge that the BOTS Act applied to non-bot users—in the face of contrary legislative history, public understanding, and prior FTC guidance—has no merit.

The FTC's interpretation of the BOTS Act also runs afoul of constitutional precedent. While the Act clearly implicates users of malicious bots, it is, at best, void for vagueness when it comes to other individuals and entities such as KIG, who do not use bots.[2] And, the Major Questions Doctrine prevents the FTC from arrogating power through a novel interpretation of the BOTS Act absent Congress's explicit approval to do so, which Congress has not provided.

In March 2025, President Trump—with Kid Rock by his side—issued an Executive Order charging the FTC with "rigorous[] enforce[ment]" of the BOTS Act. Executive Order No. 14254, 2025 WL 986449.[3] Minutes after the Executive Order's issuance, the FTC sent KIG a Draft Complaint, substantially similar to the Complaint the FTC filed here, threatening to file it unless KIG conceded it violated the BOTS Act (it does not). With its Complaint, the government takes the President's demand too far, expanding the BOTS Act far beyond its written and intended scope.

The FTC's Complaint cannot stand. No amendment can fix the FTC's improper attempt to apply the BOTS Act to KIG, not to mention other legitimate secondary ticket brokers, and every other

---

[2] To be sure, KIG's position is the BOTS Act unambiguously applies only to bots users.

[3] *See also Trump is joined by Kid Rock for the signing of an EO targeting unfair scalping of concert tickets*, WHITE HOUSE (Mar. 31, 2025), https://www.whitehouse.gov/videos/trump-is-joined-by-kid-rock-for-the-signing-of-an-eo-targeting-unfair-scalping-of-concert-tickets/ (Request for Judicial Notice ("RJN"), Exhibit 1).

person or company who purchases tickets from Ticketmaster using more than one account. As such, the Court should dismiss the Complaint, in full and with prejudice.

## LEGAL STANDARDS

A complaint must be dismissed if it "fail[s] to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). A complaint must "state a claim to relief that is plausible on its face . . . [a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).

"[A]n exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). "[I]n the event of a conflict between the bare allegations in the complaint and any exhibit attached, the exhibit prevails" *Wells v. Fuentes*, 126 F.4th 882, 896 (4th Cir. 2025). Additionally, "a court may properly consider documents that are explicitly incorporated into a complaint by reference" "without converting the motion to dismiss to one for summary judgment." *State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*, 381 F. Supp. 3d 536, 552 (D. Md. 2019) (quotation omitted).

"In the context of a motion to dismiss, this Court may take notice of judicial docket entries, pleadings and papers in other cases without converting a motion to dismiss into a motion for summary judgment." *Whitfield v. Cont. Callers, Inc.*, 2021 WL 5999265, at *6 (D. Md. Dec. 20, 2021) (quotation omitted). Courts in this Circuit "routinely take judicial notice of newspaper articles . . . and press releases in order to assess what the market knew at particular points in time, even where the materials were not specifically referenced in the complaint." *In re Human Genome Scis. Inc. Secs. Litig.*, 933 F. Supp. 2d 751, 758 (D. Md. 2013) (quotations omitted).

## FACTUAL BACKGROUND

### I. The BOTS Act Was Designed and Enacted to Stop the Use of Bots

In the late aughts and early 2010s, enterprising coders created computer scripts or computer code (software colloquially known as "bots") designed to circumvent security measures, access

control systems, and other technological controls in order to bypass the "virtual waiting room" lines of primary ticket sellers such as Ticketmaster, skip straight to the purchasing page, and purchase hundreds or thousands of tickets before the regular public had a fighting chance to purchase them. *See generally* S. Rep. 114-391, 2016 WL 711589 (Dec. 5, 2016).

When deployed, bots overwhelm websites to unfairly jump to the heads of queues, lock tickets in carts *en masse* as pending purchases, or bypass CAPTCHAs to purchase hundreds or thousands of tickets in a matter of seconds. *Id.* In 2016, Congress acted to stop the scourge of bots.

**a. The Legislative History of the Bots Act Clarifies That the Law is About Bots**

The legislative history of the BOTS Act clarifies that the Act was about stopping bad actors from using ***bots*** to subvert the ticketing process. In a Senate Hearing on the BOTS Act in September 2016, Senator Moran explained,

> When you're trying to pick up tickets for the next big event, you're no longer only competing against other eager fans when tickets are released, ***you're now focused—forced to compete against an army of sophisticated ticket bots that overwhelm the ticketing website with brute force, scoop up as many tickets as possible and then resell them on a secondary market at a significant mark-up.***

S. Hrg. 114-614, 2016 WL 4773371 (Sep. 13, 2016) (emphasis added).

On November 30, 2016, a unanimous Senate passed the BOTS Act. Shortly thereafter, a Senate Report explained the BOTS Act's purpose before sending it back to the House. 2016 WL 7115899, at *4 (2016). The Report emphasized, "***this legislation [the BOTS Act] aims to prohibit the use of bots***[.]" *Id.* (emphasis added). Far from stifling the secondary ticket market, the Senate Report explained the BOTS Act "would have a positive impact on the secondary ticket sellers . . ." *Id.*

President Obama signed the BOTS Act into law on December 14, 2016. *See* Pub. L. No. 114-274. Portions of the law are codified at 15 U.S.C. § 45c.

**b. The FTC Understood the BOTS Act is About Bots**

On April 7, 2017, the FTC put out its first statement on the BOTS Act, in the form of a blog post.[4] The post states, in pertinent part, "[i]t's no coincidence that it's called the BOTS Act ***because the law outlaws the use of computer software like bots that game the ticket system***." *Id*. (emphasis added). The blog post—issued just a few months after the BOTS Act was adopted—showcases the FTC's contemporaneously uniform position that the BOTS Act was about stopping the use of bots.[5]

In 2021, the FTC settled three actions under the BOTS Act with three recidivist bot users. *See* Compl., *U.S. v. Concert Specials, Inc.*, No. 2:21-cv-00214 (E.D.N.Y. Jan. 14, 2021); Compl., *U.S. v. Just In Time Tickets, Inc.*, No. 2:21-cv-00215 (E.D.N.Y. Jan. 14, 2021); Compl., *U.S. v. Cartisim Corp.*, No. 2:21-cv-00212 (E.D.N.Y. Jan. 14, 2021). In each of the three Complaints, the FTC emphasized each defendant bot user was implicated by the BOTS Act because they allegedly used bots to illegally buy up tens of thousands of tickets for popular events before the public could access them, then marked up those tickets to make millions of dollars. *See*, *e.g.*, *Cartisim*, Compl., ¶ 23 ("By using [] bots, Defendants were able to purchase multiple tickets across multiple Ticketmaster accounts within seconds—something that a consumer abiding by Ticketmaster's security, access control, and other technological measures would be unable to do."). *See also Just in Time*, Compl., ¶ 24; *Concert Specials*, Compl., ¶ 24 (making substantially similar allegations).

In a concurrence approving of the BOTS Act settlements, Acting FTC Chairwoman Rebecca K. Slaughter—a primary drafter of the Act—emphasized again that the BOTS Act is about bots, explaining, "[t]he Act's bipartisan sponsors sought to crack down on the abuses that unscrupulous

---

[4] *See* Lesley Fair, *BOTS Act: That's the Ticket!*, FED. TRADE COMM. (April 7, 2017), https://www.ftc.gov/business-guidance/blog/2017/04/bots-act-thats-ticket (RJN, Exhibit 2).

[5] A blog post is, of course, not precedential. A blog post cannot be used to prove actual knowledge or knowledge fairly implied. But, Ms. Fair's blog post, issued just a few months after the BOTS Act was enacted, showcases the contemporaneously uniform position that the BOTS Act is about bots.

actors inflict on consumers ***whose typing fingers were no match for algorithms*** in attempting to secure tickets online." 2021 WL 268279, at *1 (emphasis added).[6]

By contrast, the current FTC refuses even to call the BOTS Act by its common name. Instead, the FTC now misleadingly refers to it throughout its Complaint only as "the Better Online Ticket Sales Act," an intentional misdirection from its clear intent.

**c. President Trump Understands the BOTS Act is About Bots**

In March 2025, President Trump issued an Executive Order directing "the FTC [to] rigorously enforce the Better Online Tickets Sales Act, 15 U.S.C. 45c[.]"2025 WL 986449, at *14699, and an accompanying fact sheet. The fact sheet explained: "***the BOTS Act [is] meant to stop scalpers from using bots to purchase tickets***[.]" *Fact Sheet: President Donald J. Trump Will End Price – Gouging by Middlemen in the Entertainment Industry*, WHITE HOUSE (Mar. 31, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-will-end-price-gouging-by-middlemen-in-the-entertainment-industry/ (RJN, Exhibit 3) (emphasis added). The fact sheet, issued earlier this year, underscores that the President's current understanding of the BOTS Act is consistent with Congress's in passing the BOTS Act and the contemporaneous FTC's in providing guidance on same. Namely, the BOTS Act is meant to stop the use of bots.[7]

Minutes after President Trump issued his Executive Order on the BOTS Act, the FTC sent Key Investment Group a draft of the underlying Complaint.

---

[6] *Accord Hornbeck Offshore Transp., LLC v. U.S. Coast Guard*, 424 F.Supp.2d 37, 49-50 (D.D.C. 2006) ("inconsistency" between an agency's "earlier and later' pronouncements" "prevent[s] [the agency's] reasoning from being persuasive").

[7] *See also Trump is joined by Kid Rock for the signing of an EO targeting unfair scalping of concert tickets*, White House (Mar. 31, 2025), https://www.whitehouse.gov/videos/trump-is-joined-by-kid-rock-for-the-signing-of-an-eo-targeting-unfair-scalping-of-concert-tickets/ (RJN, Exhibit 1).

## II. Key Investment Group and Ticketmaster's Industry-Standard Business Practices

Ticketmaster is an online ticketing platform that allows users to find and buy tickets for "concerts, plays, and sporting events." Compl., ¶ 2. Ticketmaster collects fees on both direct ticket sales and from sales on its resale platform, TradeDesk, where individuals and companies can relist tickets. *See id.*; ¶ 40, Figure 1; ¶ 41, Attachment A.

The Complaint never alleges KIG uses bots. That is because KIG does not use bots. To the contrary, KIG engages in industry-standard business practices, in which humans log onto Ticketmaster and wait in "virtual waiting rooms" along with other consumers. The Complaint never alleges otherwise.

While KIG employees may use multiple accounts, each individual account controlled by KIG does not and has never knowingly exceeded Ticketmaster's ticket limits. The Complaint does not allege otherwise. To the contrary, KIG's use of multiple accounts underlies the Complaint's three supposed BOTS Act violations. But, as the Complaint itself concedes, this conduct does not violate the BOTS Act. Instead, ***Ticketmaster knowingly allows KIG to use multiple accounts and had actual knowledge that each such account was tied to KIG***. *See* Compl., ¶ 40, Figure 1; Attachment A.

On September 18, 2025, the FTC and a number of State Attorneys General filed a Complaint against Ticketmaster and its parent Live Nation. *FTC v. Live Nation Ent. Inc.*, 2:25-cv-08884 (C.D. Cal. Sept. 18, 2025) (the "Ticketmaster Complaint"). The FTC's allegations in the Ticketmaster Complaint directly contradict the FTC's allegations in the underlying Complaint here. To cite just one example, the Ticketmaster Complaint alleges that Ticketmaster, "***knowingly allow[ed], and in fact even encourage[d], brokers to use multiple Ticketmaster accounts to circumvent Ticketmaster's own security measures and access control systems***." Ticketmaster Compl., ¶ 15

(emphasis added).[8] In direct contrast, the gravamen of the Complaint in ***this*** action is Key Investment Group violated the BOTS Act "[b]y circumventing Ticketmaster's security measures, access control systems, or other technological controls or measures to buy tickets." Compl., ¶ 2.

The FTC cannot have it both ways. Either Ticketmaster allowed KIG's actions—as alleged in the Ticketmaster Complaint, and as shown in the external materials included in ***this*** Complaint, *see infra,* Section II(a)(i)—or Ticketmaster did not, as the FTC alleges here.

The contradictory allegations of the twin FTC Complaints underscore the absurdity of the FTC's allegations in this case. KIG cannot possibly "circumvent" when Ticketmaster (1) has actual knowledge of KIG's use of multiple accounts, (2) can and does tie all of those accounts to KIG, and (3) has made the affirmative choice to allow KIG to use multiple accounts. Without circumvention, there can be no BOTS Act violation. That should be the beginning and the end of the matter. For any or all of these and the other reasons detailed below, the FTC's Complaint fails as a matter of law.

## ARGUMENT

### I. Key Investment Group Does Not Violate the BOTS Act

#### a. The BOTS Act Regulates the Use of Bots

The BOTS Act prohibits

> ***circumvent[ing]*** **a** ***security measure*****,** ***access control system, or other technological control or measure*** on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules.

15 U.S.C. § 45c(a)(1) (emphasis added). The BOTS Act does not define any of the italicized terms, all of which are key to understanding the statute's reach. Without clear definitions, whether the BOTS

[8] *See also FTC Sues Live Nation and Ticketmaster for Engaging in Illegal Ticket Resale Tactics and Deceiving Artists and Consumers about Price and Ticket Limits*, FED TRADE COMM. (Sep. 18, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/09/ftc-sues-live-nation-ticketmaster-engaging-illegal-ticket-resale-tactics-deceiving-artists-consumers (RJN, Exhibit 4) (Ticketmaster "turn[s] a blind eye as a matter of policy [to brokers,] offer[ing] technological support . . . through a software platform . . . which enables brokers to track and aggregate tickets purchased from multiple Ticketmaster accounts.").

Act applies to non-bot users is ambiguous at best. As such, courts are directed to look to legislative history for guidance. *See*, *e.g.*, *CGM, LLC v. BellSouth Telecom., Inc.*, 664 F.3d 46, 53 (4th Cir. 2011) ("In the face of ambiguities, we [] look to legislative intent.").

The BOTS Act's legislative history underscores that the Act is meant to prevent ***bots*** from "circumvent[ing] . . . security measure[s], access control system[s], or other technological control[s] or measure[s]." *See supra*, pp. 3-4. The legislative history also clarifies that the Act was aimed at the destruction of the majority of the secondary-ticket market that does not use bots. *Id*. Indeed, the intent of Congress in enacting the BOTS Act mirrors the then-contemporaneous understanding of the Act by the FTC. *Id.*, *supra,* pp. 5-6. To wit, at the time the BOTS Act was adopted, even FTC guidance explained that the Act was about bots. *Id.* The BOTS Act's legislative history is clear and consistent. In 2016, Congress repeatedly and unambiguously stated that the BOTS Act ***is about bots***. The FTC cannot now turn a blind eye to Congress's intent.

**b. The Complaint's Allegations—Which Do Not Include Bot-Use—Do Not Constitute BOTS Act Violations**

The FTC never alleges KIG uses bots to "circumvent a security measure, access control system, or other technological control or measure." 15 U.S.C. § 45c(a)(1). It cannot do so, because KIG does not and has never used bots.

In the absence of a BOTS Act violation as contemplated by Congress, the Complaint alleges KIG violated the BOTS Act by: (1) "Conceal[ing] IP addresses," Compl., ¶¶ 34-37; (2) "Creat[ing] sham Ticketmaster accounts and us[ing] thousands of credit card numbers," *id.*, ¶¶ 38-48; and (3) "[using] hundreds of SIM Cards and SIM Banks," *id.*, ¶¶ 49-50. Each of these allegations is based in the mistaken contemplation that it is a *per se* BOTS Act violation for a company to use more than one account to purchase tickets. As shown below, this position is absurd. It fails as a matter of law.

In any event, even if true, none of these allegations would allow KIG to "circumvent a security measure, access control system, or other technological control or measure," as the BOTS Act requires to establish liability. 15 U.S.C. § 45c(a)(1). *See infra*, Section II.

**i. Key Investment Group's Alleged Use of Multiple IP Addresses and Multiple Accounts Do Not Constitute BOTS Act Violations**

The Complaint alleges Ticketmaster "has maintained security measures, access control systems, or other technological controls or measures on its websites designed to prevent or block ticket purchasers from making multiple purchases for the same event from the same IP address" to "enforce posted event ticket purchase limits . . . ." Compl., ¶ 34. It goes on to allege KIG used "thousands of Ticketmaster accounts to purchase tickets . . . ." *Id.*, ¶ 40. These positions presume a BOTS Act violation accrues whenever an individual or entity purchases tickets from more than one account, whether or not that account abided by Ticketmaster's per-account ticket limits. This is false.

Every computer has a unique IP address. *See id.*, ¶ 34 ("An IP address is a unique string of numbers separated by periods that Ticketmaster uses to identify a computer or affiliated computers making purchases."). The Complaint alleges here that through the use of multiple IP addresses from a single computer, KIG violated the BOTS Act. But the practical implication of using multiple IP addresses is only that KIG uses multiple accounts. It makes no practical difference whether those accounts stemmed from one or multiple computers. They are separate accounts.

Whether or not KIG used "fictitious Ticketmaster accounts . . . virtual and traditional credit card numbers [for those accounts], proxy or spoofed IP addresses [to use multiple accounts from a single computer, or] SIM banks," *id.*, ¶ 2, the Complaint confirms Ticketmaster knew since at least 2018 that each such account was connected to KIG, and allowed KIG to continue to use the KIG-linked accounts. *Id.*, ¶ 40, Figure 1. The FTC's contention that KIG "hid[] their true IP addresses from Ticketmaster," *id.*, ¶ 36, is contradicted by the Ticketmaster chart incorporated in its Complaint.

To be clear, the FTC's position as articulated in the Complaint is that a company (***any*** company) or an individual (***any*** individual) who purchases tickets to a single Ticketmaster event from more than one computer, or from more than one account, violates the BOTS Act. Some hypotheticals:

- An executive at a multinational company purchases tickets to a concert from two company accounts on two computers for the company's executive team. Per the FTC, the company has violated the BOTS Act.
- A teenager buys tickets to a Taylor Swift concert from her cell phone and her laptop using two separate accounts. The FTC's position is the teenager has violated the BOTS Act.

In response, the FTC may attempt to pivot from or simply ignore these concrete examples. But these absurd results are the natural conclusion of the FTC's new BOTS Act interpretation.[9] Neither the hypothetical executive or teenager nor KIG can "purchase tickets more rapidly" than consumers who use a single account. *Id.*, ¶ 29. Whether these entities use one or multiple accounts, they do not "circumvent" anything.

Whether or not KIG took "steps to conceal [its] IP addresses when making ticket purchases," Compl., ¶ 35, the effect of those "steps" would only be that KIG employees purchased tickets using more than one account. But using more than one account is not a BOTS Act violation. Using more than one account does not "circumvent" a "security measure, access control system, or other technological control or measure." 15 U.S.C. § 45c. And, Ticketmaster is well aware that all of KIG's supposedly "fictional" accounts are linked to KIG, and can and does tie each such account directly to KIG. *See infra,* Section II(a)(i).

**ii. Key Investment Group's Alleged Use of SIM Cards and SIM Boxes Do Not Constitute BOTS Act Violations**

In addition to the industry-standard practice of using multiple accounts, the Complaint alleges KIG engages in the industry-standard practice of "us[ing] hundreds of SIM cards and SIM banks or

[9] It bears repeating that this is ***not*** how the FTC understood the BOTS Act in 2017. *Supra*, pp. 5-6.

boxes, which are devices that house dozens of SIM cards at a time . . . to facilitate the receipt and automate retrieval of account verification codes sent by Ticketmaster to many of the phone numbers associated with Defendants' many ticket-purchasing accounts." Compl., ¶ 50. Tellingly, the Complaint does ***not*** allege that this use allowed KIG to circumvent any security measure. *See id.*, ¶¶ 49-50. That is because SIM cards and SIM boxes are hardware (not software). Hardware alone cannot connect to Ticketmaster, and has no ability to circumvent.

A SIM card is a physical, removeable smartcard that stores and receives information. Every modern cellular phone contains a unique SIM card. Those SIM cards are what phones use to accept text messages. *Id.*, ¶ 49 (explaining that "Ticketmaster has sometimes required fans to enter codes sent via text message to the phone numbers associated with their Ticketmaster account."). The Complaint alleges that KIG uses SIM cards and SIM boxes—"devices that house dozens of SIM cards at a time"—to receive text messages from Ticketmaster. *Id.*, ¶ 50.

At base, the FTC's allegations about SIM devices are a reframing of the same core argument—namely, that KIG used multiple accounts. *Id.*, ¶ 49 Using multiple SIM cards or a SIM box is functionally the same as using multiple devices, with each SIM card allowing a user to access a different Ticketmaster account. *Id.*, ¶ 50. And, as discussed in more detail *infra*, Section II(a)(i), Ticketmaster actively permits KIG to run multiple accounts. As such, there can be no BOTS Act violation. *Id.*, ¶ 40, Figure 1; Attachment A.

In any event, the Complaint's sparse, two paragraph allegations concerning SIM cards and SIM boxes provide nothing but legal conclusions couched as facts. *Id.*, ¶¶ 49-50. These meager allegations do not adequately allege how, or why, Ticketmaster's use of SIM cards constitutes a BOTS Act violation. Without more, the allegations fail as a matter of law. *Iqbal*, 556 U.S. at 678.

## II. KIG Does Not "Circumvent"

### a. Circumvention Cannot Occur When Conduct is Understood and Permitted

Even if the BOTS Act could apply to non-bots users (it cannot), there can be no liability as a matter of law unless the defendant (a) "***circumvent*[s]** a security measure, access control system, or other technological control or measure" that (b) is "used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules." 15 U.S.C. § 45c(a)(1)(A) (emphasis added). The BOTS Act does not define the term "circumvent." Because the term is not defined, courts are instructed to (a) look to legislative history, *see supra*, Section I(a), and, if possible, (b) construe the term in accordance with "an established common-law meaning" and "its ordinary meaning at the time of the statute's enactment." *United States v. Sutton*, 126 F.4th 869, 876 (4th Cir. 2025). *See also Crespo v. Holder*, 631 F.3d 130, 133 (4th Cir. 2011) ("In interpreting the plain language of a statute, we give the terms their ordinary, contemporary, common meaning, absent an indication Congress intended [it] to bear some different import.").

Black's Law Dictionary defines "circumvent" as "[t]o ***avoid*** (a restrictive problem, rule, etc.), ***esp[ecially] by clever and sometimes dishonest means***." *Circumvent*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added). Likewise, Merriam-Webster defines "circumvent" as "to manage to get around ***especially by ingenuity or strategy***." *Circumvent*, MERRIAM-WEBSTER ONLINE DICTIONARY (emphasis added). Quite obviously, one neither "avoids," "get[s] around," "deceives," nor "tricks" when the other party is aware of and permits the action.

The same is true with respect to the common law meaning of the term "circumvent."[10] A party cannot "circumvent" a ticket issuer's "security measure, access control system, or other technological

[10] Black's Law Dictionary's other definitions are similarly consistent, defining "circumvent" as: (1) "[t]o ***avoid*** (an obstacle, etc.) by changing route;" (2) "[t]o gain advantage over or get the better of ***by craft, deceit, or fraud***; to ***outwit through artifice***;" and (3) "[t]o entrap or surround ***by stratagem or trickery***." *Circumvent*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added).

control or measure" if it acts with the issuer's knowledge and consent. 15 U.S.C. § 45c(a)(1)(A). By definition, one neither "avoids" nor "bypasses" nor "evades" a security measure when acting with the system operator's authorization or permission. Nor can there be any "deceit" when the ticket issuer knows precisely what is taking place. Accordingly, where the Complaint acknowledges that a ticket issuer understood and permitted the conduct at issue, there can be no circumvention.

Some corollaries: the Digital Millenium Copyright Act ("DMCA"), 17 U.S.C. § 1201, defines the nearly identical phrase "circumvent a technological measure" to mean "to avoid, bypass, remove, deactivate, or impair a technological measure, ***without the authority of the copyright owner.***" 17 U.S.C. § 1201(a)(3)(A) (emphasis added). *See*, *e.g.*, *Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1187, 1202 (Fed. Cir. 2004) (finding that because plaintiff, an electronic door opener manufacturer, "never restricted its customers' use of competing transmitters . . . [it] could not possibly meet its burden of proving that [defendant] trafficked in a device designed to circumvent a technological measure.").

Like the DMCA, other statutes regulating technological access similarly define "circumvent" as avoiding or bypassing "without authorization" or permission. *See*, *e.g.*, 22 U.S.C. § 6217(i) (international broadcasting statute defining "internet censorship circumvention tool" as "a software application . . . an individual can use to ***evade*** foreign government restrictions on internet access."). The use of similar language in similar statutes indicates that the term "circumvent" in the BOTS Act should be defined similarly.[11] Without circumvention, the Complaint fails as a matter of law.

[11] *See also Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1192 (D.C. Cir. 2009) ("Webster's [Dictionary] defines the word [circumvent] as 'to avoid by or as if by passing around'"); *BlueEarth Biofuels, LLC v. Hawaiian Elec. Co.*, 2011 WL 2116989, at *26 (D. Haw. May 25, 2011) (agreeing "that 'circumvent' means 'to evade or find a way around'"); *Slattery Skanska Inc. v. Am. Home Assurance Co.*, 67 A.D.3d 1, 15 (N.Y. App. Div. 2009) (holding that, "[i]n context, there can be no question that the plain meaning of circumvent intended by the policy is to bypass or avoid").

**i. Ticketmaster Knew of and Permitted KIG's Conduct**

The Complaint affirmatively concedes that Ticketmaster understood, permitted, and even encouraged the specific practices the FTC now alleges violate the BOTS Act. This fundamental deficiency precludes any BOTS Act liability as a matter of law.

The Complaint's overarching allegation is that KIG used multiple accounts to "circumvent" Ticketmaster's "security measures, access control systems, or other technological controls or measures that were designed to prevent ticket purchasers from exceeding posted event ticket limits." Compl., ¶ 48. These conclusory allegations ***are explicitly refuted*** by the sole Attachment to the FTC's Complaint and the Complaint's Figure 1.

That Attachment consists of a 2024 email chain between a Ticketmaster representative and a representative of KIG. In the email, the Ticketmaster representative confirms that KIG can use multiple accounts, and that any ticket limit is "applied per account." Compl., Attachment A, p. 1. The representative explains, "[a]s long as the purchases were made using different accounts and cards, it's within [Ticketmaster's] guidelines." *Id*.

Paragraph 41 of the Complaint selectively references its own Attachment, misconstruing its meaning. Specifically, the Complaint references KIG's question, as to whether using multiple accounts, but not Ticketmaster's response—***that it does not***. *See* Attachment A. The Court should disregard the FTC's deceptive reconstruction. "In the event of a conflict between the bare allegations in the complaint and any exhibit attached, the exhibit prevails." *Wells v. Fuentes*, 126 F.4th at 896.

Contra the FTC's selective referencing, the Attachment itself clarifies that Ticketmaster both understood and permitted the exact conduct the Complaint alleges violates the BOTS Act. To be clear, KIG cannot "circumvent" when Ticketmaster explicitly approves of KIG's conduct. And the Attachment confirms that Ticketmaster did approve of KIG's conduct.

The Complaint's allegations of supposed BOTS Act violations—regarding IP addresses, SIM cards, "sham" identities, different addresses, credit cards, and phone numbers—fare no better. *See generally* Compl., ¶¶ 34-50. The gravamen of each allegation is that the alleged conduct allowed employees of KIG to use multiple accounts. But, once again, information the FTC took from Ticketmaster and incorporated into its own Complaint belies these allegations.

The Complaint includes a "2018 PowerPoint prepared by Ticketmaster." *Id.*, ¶ 40, Figure 1. Figure 1 confirms Ticketmaster knew ***precisely*** how many Ticketmaster accounts KIG had, how many tickets it purchased, and how much Ticketmaster stood to lose if it allowed KIG, and other legitimate ticket brokers to use only a single account and "move to 8 ticket limit across the board."




| Broker | # of TM.com Accounts | Total # of concert tickets in possession | % of Resale Concert Inventory | % of Primary Concert Inventory | Total # of events with tickets | Sell-Through | R12 GTV | Potential GTV Loss | Potential AOI Loss |
|---|---|---|---|---|---|---|---|---|---|
| Reps & Company | 1,074 | 102,968 | 4% | 0.6% | 1,202 | 29% | $9.6M | $3.9M | $482K |
| KP3 Endeavors | 597 | 56,388 | 2% | 0.3% | 1,123 | 26% | $14.1M | $1.5M | $192K |
| Lavaseats Corp | 83 | 43,935 | 2% | 0.3% | 1,133 | 16% | $3.5M | $866K | $108K |
| Key Investment Group | 3,188 | 33,088 | 1% | 0.2% | 483 | 12% | $2.6M | $671K | $84K |
| Smash Entertainment | 1,403 | 10,028 | >0% | 0.1% | 294 | 40% | $1.0M | $750K | $94K |
| **Total** | **6,345** | **246,407** | **10%** | **1.4%** | **2,594** | **24%** | **$30.7M** | **$7.7M** | **$959K** |



Figure 1: Slide from 2018 PowerPoint prepared by Ticketmaster.

***Figure 1 conclusively demonstrates that Ticketmaster tracked KIG's ticket purchasing across all of its accounts—even those accounts using "fictitious" names, virtual credit cards, or accessed via rotating IP addresses—and actively permitted their use.***

KIG cannot "circumvent" when Ticketmaster approves. And the Complaint's Attachment A—an email exchange from 2024—demonstrates Ticketmaster never changed its behavior in this regard. The FTC's own pleading compels the Complaint's dismissal.

To state a claim under the BOTS Act, any "circumvent[ed]" technology must be "***used*** by the ticket issuer to ***enforce*** posted event ticket purchasing limits or to ***maintain*** the integrity of posted online ticket purchasing order rules." 15 U.S.C. § 45c(a)(1)(A) (emphasis added). But the Complaint is devoid of any allegations that Ticketmaster "***used***" any such technology to "***enforce***" or "***maintain***" its policies against KIG. To the contrary, the sole external information from Ticketmaster included with the Complaint acknowledges both Ticketmaster's years-long awareness of KIG's business practices and Ticketmaster's deliberate choice to refrain from acting against brokers like KIG in the face of this awareness. *See*, *e.g.*, Compl., ¶¶ 24, 26-27, 40, Figure 1, 41, Attachment A. "[B]y attaching exhibits inconsistent with its claims," the FTC has "ple[]d itself out of court." *Beyond Sys., Inc. v. Keynetics, Inc.*, 422 F. Supp. 2d. 523, 530 (D. Md. 2006).

**ii. The FTC's Allegations in a Parallel Complaint Against Ticketmaster Confirm the Underlying Complaint is Fatally Flawed**

The FTC filed the underlying Complaint on August 18, 2025. Exactly one month later, the FTC (and several State Attorneys General) filed another Complaint against Ticketmaster and its parent Live Nation. *FTC v. Live Nation Ent. Inc.*, 2:25-cv-08884 (C.D. Cal. Sept. 18, 2025).

In the Ticketmaster Complaint, the FTC alleges Ticketmaster has "repeatedly declined to implement methods to prevent brokers from amassing large numbers of tickets and listing them for sale by Ticketmaster." Ticketmaster Complaint, ¶ 102. Indeed, to the contrary, the FTC alleges that Ticketmaster "knowingly allow[s], and in fact even *encourage[s]*, brokers to use multiple Ticketmaster accounts to circumvent Ticketmaster's own security measures and access control systems." *Id.*, ¶ 15 (emphasis in original), and that "[a] senior Ticketmaster executive admitted in an internal email that copied Live Nation leadership, [Ticketmaster and Live Nation] '***turn a blind eye as a matter of policy.***'" *Id.*, ¶ 15 (emphasis added). The FTC in the Ticketmaster Complaint

emphasizes this fact, stating, in no uncertain terms: "**<u>Defendants Allow Brokers to Circumvent Posted Ticket Limits and Purchasing Rules</u>**" *Id.*, p. 32 (emphasis in original).

In these two Complaints—filed just one month apart—the FTC speaks from both sides of its mouth. KIG definitionally cannot circumvent if Ticketmaster "**<u>Allow[s] Brokers</u>**" to do exactly what the Complaint alleges KIG did. (Emphasis in original). The documents taken from Ticketmaster in this action confirm this fact. Compl., ¶ 40, Figure 1; Attachment A.

For BOTS Act liability to attach, KIG must "circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service ***that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules.***" 15 U.S.C. § 45c(a)(1)(A) (emphasis added). KIG definitionally cannot violate the BOTS Act if Ticketmaster "allow[s], and in fact even *encourage[s]*" KIG's alleged use of multiple accounts. Ticketmaster Compl., ¶ 15.

**b. Any Purchase Policy is Irrelevant to a BOTS Act Analysis**

The Complaint devotes much paper describing Ticketmaster's Purchase Policy. *See*, *e.g.*, Compl., ¶¶ 25-27; 41. Ticketmaster's Purchase Policy, which is incorporated into the Complaint by reference,[12] allows Ticketmaster to

> update this Purchase Policy . . . from time to time . . . To the extent that this Purchase Policy has been updated from a prior version of the Purchase Policy to which you previously agreed, the most recent version of the Purchase Policy to which you agreed supersedes and governs.[13]

The Complaint's proposition, that a defendant can violate the BOTS Act based on a Purchase Policy that can be changed by the ticket issuer, without warning, at any given time, is absurd.

[12] *See*, *e.g.*, *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (on a motion to dismiss, a court may "consider documents that are explicitly incorporated into the complaint by reference").

[13] *Standard Purchase Policy*, TICKETMASTER. (August 12, 2025), https://legal.ticketmaster.com/purchase-policy/ ("Ticketmaster's Purchase Policy").

"[C]ourts should avoid interpretations that 'would produce absurd results' contrary to congressional intent." *Akkus v. Rocket Mortg., LLC*, 715 F. Supp. 3d 726, 731 (D. Md. 2024) (Russell, III, C.J.).[14]

In any event, the BOTS Act cannot be implicated by any purported violation of a written purchase policy.[15] A purchase policy is not a "security measure, access control system, or other technological control or measure" that a party can "circumvent." 15 U.S.C. § 45c(a)(1)(A). Words in a policy do not implicate the BOTS Act. Instead, the BOTS Act is triggered (if at all) ***not by what Ticketmaster says, but by what it does***. Here, Ticketmaster made the active choice to allow KIG employees to purchase tickets using multiple accounts. *See supra,* Section II(a). As such, there can be no BOTS Act violation, no matter what any policy purports to say.

The second half of the statutory provision at issue clarifies this point. To violate the BOTS Act, an entity must "circumvent a security measure, access control system, or other technological control or measure . . . ***that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules***." 15 U.S.C. § 45c(a)(1)(A) (emphasis added). A purchase policy is not a shield. It has no power to "enforce" or "maintain the integrity" of anything.

Even assuming *arguendo* Ticketmaster's Purchase Policy had some bearing on a BOTS Act violation (it does not), the Complaint misrepresents the effect of the Purchase Policy on ticket limits. The FTC seems to believe Ticketmaster's Purchase Policy works on an institutional level, deriving a "total purchase number" by aggregating the number of tickets purchased by each KIG employee. *See, e.g.*, Compl., ¶¶ 30-33. But, Ticketmaster's Purchase Policy sets a maximum number of tickets that

---

[14] *See also RLM Commc'ns, Inc. v. Tuschen*, 831 F.3d 190, 200 (4th Cir. 2016) (declining to interpret statute in a manner where "an absurd result would follow").

[15] To be clear, KIG vigorously contests that it breached any portion of Ticketmaster's Purchase Policy.

can be purchased by a single account. The Complaint does not allege that the Purchase Policy prohibits an entity from using multiple accounts to purchase tickets not exceeding the maximum number for each account. The Complaint also does not allege that KIG employees purchased more than the maximum number of tickets allowed from each KIG-controlled account. In fact, the Complaint's only attachment affirmatively shows that KIG complies with the Purchase Policy. *See* Attachment A.

This is perhaps most neatly demonstrated by the Complaint's most prominent example. The Complaint's populist centerpiece is the allegation that KIG "used 49 different accounts to purchase 273 tickets to Taylor Swift's March 25, 2023, concert, at Allegiant Stadium, dramatically exceeding The Eras Tour's 2023 six-ticket limit." Compl., ¶ 32. However, dividing the number of purchased tickets by the number of accounts used by KIG employees shows a purchase average of 5.6 tickets per account—well within The Eras Tour's six-ticket limit. *Id.* So long as KIG's use of multiple accounts was approved by Ticketmaster—and the Complaint confirms both that it was and that Ticketmaster was aware that each account was linked directly to KIG—these purchases cannot possibly implicate the BOTS Act. The Complaint does not even implicate Ticketmaster's Purchase Policy—which, in any event, has no bearing on a BOTS Act violation.

## III. KIG Did Not Have Actual Knowledge or Knowledge Fairly Implied That its Actions Violated the Bots Act

As discussed *supra*, the FTC has not plausibly asserted a BOTS Act violation. But, even assuming *arguendo* KIG did violate the BOTS Act (to be sure, it did not), civil penalties cannot be assessed as a matter of law. The FTC Act only allows for civil penalties if an entity violated the BOTS Act "with actual knowledge or knowledge fairly implied ***on the basis of objective circumstances*** . . . ." 15 U.S.C. § 45(m)(1)(A) (emphasis added). At the time the BOTS Act was enacted, people of ordinary intelligence—*i.e.*, the BOTS Act's drafters, its supporters in and outside of Congress, the

FTC, the populace at large—believed the BOTS Act was meant to stop the behavior of people who use bots to "circumvent a security measure, access control system, or other technological control or measure[.]" 15 U.S.C. § 45c(a)(1)(A). Because KIG does not use bots, it would have been literally impossible for KIG to have had knowledge "on the basis of objective circumstances" that it violated the BOTS Act.

The FTC has not provided KIG a reasonable opportunity to understand the FTC's recent about-face. Instead, the FTC has thrust its new interpretation of the BOTS Act on KIG with no prior warning. Under these circumstances, KIG could not possibly have had knowledge "on the basis of objective circumstances" that it violated the BOTS Act. 15 U.S.C. § 45(m)(1)(A). The Complaint's five sparse allegations to the contrary—truncated in Paragraph 51—only underscore this point.

**a. KIG's Awareness of the BOTS Act Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users**

The Complaint's first contention is that "Defendants have been aware of the Better Online Ticket Sales Act since its enactment in December 2016, less than two months after the formation of Key Investment Group, and have since monitored its enforcement." Compl., ¶ 51(a). Exactly.

As discussed *supra*, pp. 3-6, when the BOTS Act was adopted in 2016, ***everyone***—Congress, the FTC, the public at large—understood the BOTS Act to be about regulating the behavior of bots.[16] Nobody at the time understood that the BOTS Act was meant to regulate non-bot behavior.

As a legitimate secondary-ticket broker, KIG closely followed (1) the legislative history surrounding passage of the BOTS Act, (2) contemporary news regarding the BOTS Act's reach, and (3) contemporaneous FTC guidance and Press Releases regarding the BOTS Act's reach. All of these

[16] *See, e.g.*, Ben Sisario, *Congress Moves to Stop Ticket Scalping, Banning Bots Used Online*, N.Y. TIMES (Dec. 8, 2016), https://www.nytimes.com/2016/12/08/business/media/ticket-scalping-bots-act.html; Dan Rys, *President Obama Signs Anti-Scalping Bill Into Law*, BILLBOARD (Dec. 15, 2016), https://www.billboard.com/music/music-news/president-obama-signs-bots-act-law-7625257/; *Obama Signs Bots Act Into Law*, IQ LIVE MUSIC INTELLIGENCE (Dec. 16, 2016), https://www.iqmagazine.com/2016/12/obama-signs-bots-act-law/ (All at RJN, Exhibit 5).

sources confirmed that the BOTS Act applied only to bots. KIG modeled its business accordingly, ensuring it did not use bots.

The FTC's recent *post-hoc* attempt to expand the BOTS Act's scope did not provide KIG with a retroactive understanding that KIG's legitimate business practices—designed intentionally not to use bots—violated the BOTS Act.

**b. KIG's Awareness of Three 2021 Consent Decrees Against Recidivist Bot Users Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users**

The Complaint next alleges KIG knew the BOTS Act applied to it because the FTC settled and issued consent decrees with respect to three recidivist bots users in 2021. Compl., ¶ 51(b).[17] *See Concert Specials*, No. 2:21-cv-00214; *Just In Time*, No. 2:21-cv-00215; *Cartisim*, No. 2:21-cv-00212. *See also supra*, pp. 5-6.

As an initial matter, consent decrees are not precedential, and thus cannot provide the knowledge required for civil penalties. *See*, *e.g.*, *Gascho v. Glob. Fitness Holdings, LLC*, 863 F. Supp. 2d 677, 694 (S.D. Ohio 2012) ("consent judgments are of little, if any, precedential value . . . although a consent judgment may contain analysis, courts do not view this analysis as precedential because the judgment does not reflect an adjudication by the court as to the underlying issues.") (cleaned up). *See also EEOC v. United Air Lines, Inc.*, 1995 WL 103658, at *4 (N.D. Ill. Mar. 3, 1995) ("courts fully understand that [consent] decrees do not purport to be definitive statements of the parties' legal rights and will accord them little or no weight in the determination of the rights of persons not party to them.") (citation omitted). As such, KIG could *ipso facto* not have acquired actual knowledge or knowledge fairly implied from the non-litigated settlements.

---

[17] The Complaint refers to the consent decree as "enforcement actions," likely to obscure the fact that the settlements were not litigated, and have no precedential value.

In any event, the central allegation of each consent decree was that the defendants used bots to scoop up thousands of tickets. *See*, *e.g.*, *Cartisim*, ECF 1, ¶ 23 ("By using the Tixdrop and Tixman ticket bots, Defendants were able to purchase multiple tickets across multiple Ticketmaster accounts within seconds . . . ."); *Just In Time*, ECF 1, ¶ 24 ("By using the Tixman and Automatick ticket bots, Defendants were able to purchase multiple tickets across multiple Ticketmaster accounts within seconds . . . ."); *Concert Specials*, ECF 1, ¶ 24 ("By using the Tixdrop and Automatick ticket bots, Defendants were able to purchase multiple tickets across multiple Ticketmaster accounts within seconds . . . .").[18]

KIG's takeaway from these consent decrees was the same as what the consent decrees themselves emphasized. Namely, to violate the BOTS Act, an entity must use bots.[19]

**c. KIG's Receipt of a Notification Regarding the Three 2021 BOTS Act Consent Decrees Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users**

The Complaint next alleges KIG knew the BOTS Act applied to it because "in March 2021, [Emburse,] one of Key Investment Group's credit card issuers notified the company that it would deactivate its accounts upon reasonable suspicion or detection of Better Online Ticket Sales Act violations." Compl., ¶ 51(c). This allegation is curious.

Far from asserting that it believed KIG violated the BOTS Act, Emburse provided a form notice to KIG (and likely to every other ticket broker it worked with) "that the DOJ and FTC announced three settlements . . . resolving alleged violations of the Better Online Ticket Sales (BOTS) Act."[20]

---

[18] *See also* Concurring Statement of Acting-FTC Chair Rebecca Slaughter, *supra*, pp. 5-6.

[19] While the consent decrees did contain additional allegations not directly related to bots, the centrality of bots use in the consent decrees indicated that, without the use of bots, there could be no BOTS Act violation.

[20] The relevant email, incorporated into the FTC's Complaint by reference, makes this clear. *See* RJN, Exhibit 6.

Case 1:25-cv-02716-GLR Document 33-1 Filed 09/15/25 Page 30 of 34

A form notice informing KIG of the three consent decrees the FTC settled with three recidivist bots users does nothing to indicate that Emburse believed ***KIG's*** behavior violated the BOTS Act. Indeed, ***the FTC does not allege that Emburse actually did deactivate KIG's accounts in 2021*** (it did not). Any implication to the contrary is nothing more than another attempt at obfuscation.

**d. KIG's Request for Legal Advice Regarding a Routine Bank Audit Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users**

The Complaint next alleges KIG "sought legal advice after one of [its] banks commissioned an examination of the company's books and records that ultimately questioned whether the company's use of thousands of Ticketmaster accounts based on sham identities violated Ticketmaster's published ticket purchase policies." Compl., ¶ 51(d). This allegation is disingenuous.

"[R]etention of counsel does not show a party knew its conduct was prohibited[.]" *United States v. Stratics Networks, Inc.*, 721 F. Supp. 3d 1080, 1101 (S.D. Cal. 2024) (citation omitted). If anything, retention of counsel shows that KIG took the matter of the audit seriously, and wished to ensure full compliance.

In any event, as shown *supra*, Section II(a)(ii), any purported "violat[ion of] Ticketmaster's published ticket purchase policies," Compl., ¶ 51(d), does not show knowledge of a BOTS Act violation.

And, a bank "questioning" whether KIG's behavior "violated Ticketmaster's published Ticketmaster purchase policies," *id.*, is not the same thing as the bank alleging that KIG violated the same. In fact, ***the FTC does not allege that the bank at issue ended business with KIG or determined that KIG engaged in any BOTS Act violation following the audit*** (it did not). Any implication to the contrary is nothing more than an attempt at obfuscation.

**e. A Washington State Consent Decree Prohibiting the Use of Bots Does Not Demonstrate Knowledge That the BOTS Act Applied to Non-Bot Users**

The FTC's final push to convince the Court KIG had requisite knowledge that it committed a BOTS Act violation without the use of bots is curious. To prove knowledge, the FTC references a prior consent decree between Taylor Kurth (a Defendant in this case) and ***Washington State, over a Washington State statute, the "Washington[] Ticket Sellers Act, RCW 19.345.020.***" Compl., ¶ 51(e) (emphasis added). The FTC claims the settlement—in which Mr. Kurth agreed not to use bots—provides knowledge that the ***federal*** BOTS Act applies to non-bot users.

This argument is bizarre. The Washington State Complaint alleged Mr. Kurth violated the Washington State statute by using bots to purchase tickets. *See Washington v. Kurth*, No. 18-2-02894-9 (King Cnty. Feb. 2, 2018). At the time, Mr. Kurth ***did*** use bots. He agreed in the state consent decree not to use bots on a go-forward basis. *Id.*

At the time, Mr. Kurth was not associated with KIG in any way. In ***this*** Complaint, the FTC does ***not*** allege that Mr. Kurth or any of the other Defendants used bots. To be sure, the Defendants do not use bots. How Mr. Kurth's prior Washington State consent decree about bots provides constructive knowledge that KIG violated the BOTS Act while not using bots is anybody's guess.

**f. The Rule of Lenity Mandates Any Ambiguity as to Civil Penalties be Construed in Favor of KIG**

As shown above, the Complaint fails to plausibly allege that KIG had "actual knowledge or knowledge fairly implied on the basis of objective circumstances" that it violated the BOTS Act without using bots. 15 U.S.C. § 45(m)(1)(A). As such, civil penalties cannot be imposed.

To be clear, this situation is not ambiguous. No amount of misconstrual and deception on the part of the FTC can change history. But, even assuming *arguendo* that the question of knowledge is a close call (it is not), the rule of lenity requires that civil penalties not be assessed.

"Under the rule of lenity, th[e Supreme] Court has long held, statutes imposing penalties are to be 'construed strictly' against the government and in favor of individuals." *Bittner v. United States*, 598 U.S. 85, 101 (2023) (citation omitted). Indeed, "where text, structure, and history fail to establish that the Government's position is unambiguously correct—we apply the rule of lenity and resolve the ambiguity in [defendant's] favor." *United States v. Granderson*, 511 U.S. 39, 54 (1994). The *Bittner* Court emphasized that "the rule of lenity applies to civil penalties." *Bittner*, 598 U.S. at 102 (citation omitted).

Here, the FTC's straw-grasping for evidence that KIG had the requisite knowledge for civil penalties signifies that it is—at best—a very close call. In close calls, the rule of lenity dictates the tie goes to the defense. Thus, even in the unlikely event that the Court finds the question of whether KIG had the requisite knowledge to be ambiguous, civil penalties cannot be assessed.

## IV. The BOTS Act is Unconstitutionally Vague as to KIG and Other Non-Bot Users

As explained above, the BOTS Act does not implicate KIG. Thus, the Court need not reach the constitutional issue haunting the FTC's new interpretation of the BOTS Act. But there is a major constitutional flaw with the FTC's newly expansive reading. To wit, the BOTS Act is unconstitutionally vague as to KIG and other legitimate secondary-ticket brokers that do not use bots. As such, the Act violates the Fifth and Fourteenth Amendments solely as to individuals and entities, like KIG, that do not use bots.

To be clear, KIG does not contend that the BOTS Act is void for vagueness ***as to bots users***. The BOTS Act clearly implicates bad actors who use bots to circumvent security measures in order to purchase hundreds or thousands of tickets in one go. But the law is, at best, ambiguous as to individuals and entities who do not use bots. Given that purported ambiguity, the Court should find the law void for vagueness as applied to non-bot users.

"There are 'at least two connected but discrete' due process concerns that underlie the void for vagueness doctrine." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 276 (D. Md. 2025) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). A "conviction or punishment fails to comply with due process if [1] the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or [2] is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Fox Television Stations*, 567 U.S. at 253 (2012) (quotation omitted).

***First***, no "person of ordinary intelligence" would be able to ascertain that the statute would apply to non-bots users. *Id.* at 253. Indeed, until the FTC's current attempt to expand the statute's breadth, the legislature that enacted the BOTS Act, the public-at-large, a prior FTC Commissioner who worked on drafting the Act, and even the FTC itself believed the BOTS Act to implicate only those bad actors who used bots. *See supra*, pp. 3-6.

"[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). ***KIG was given no reasonable opportunity to do so here***.

The FTC may argue in response that it provided KIG with a "reasonable opportunity" to understand the FTC's new interpretation of the BOTS Act during the Civil Investigative Demand process. But an investigation that—if the FTC had its way—would have resulted in tens of millions of dollars in civil penalties and the effective shut-down of KIG's business is not a "reasonable opportunity" by any stretch of the imagination.

***Second***, the FTC's reimagining of the BOTS Act to implicate KIG smacks of discriminatory intent. The secondary-ticket market provides a valuable service, but it is not a fount of popularity. By

its Complaint here and in the parallel Ticketmaster Complaint, the FTC has made it clear that it has no love for the ticketing industry. But the FTC cannot discriminately expand a statute beyond its limited scope due to animus or an attempt at populist regard.

There are broader implications here. The FTC may be trying to expand the Act to restrict the behavior of ticket resellers because it does not like their behavior, but the overbroad reach of a newly expanded BOTS Act implicates a far larger population.

The FTC's new interpretation of the BOTS Act could easily catch any individual or entity (secondary-ticket broker or not) in its grasp. ***Pursuant to the FTC's new understanding, any person or entity person who uses two or more Ticketmaster accounts to purchase tickets to a concert or a show commits a per se BOTS Act violation, and can be liable for tens or hundreds of thousands of dollars in civil penalties***.

If the FTC had its way, a statute meant to limit bad actors who use malicious bots could be used against virtually anyone. ***The potential implications of this extraordinary regulatory overreach—and the potential misuse of same by a government agency—are vast.***

For all the reasons explained above, the FTC's Complaint fails. The BOTS Act does not implicate KIG's legitimate business practice. But, if the Court chooses to reach the constitutional issue, it should conclude that the BOTS Act is unconstitutionally void for vagueness as applied to KIG and other non-bot users, and therefore violates the due process clauses of the Fifth and Fourteenth Amendments.

## V. The FTC's Reimagined Reading of the BOTS Act Violates the Major Questions Doctrine

> It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. ***Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to confer the power the agency has asserted.***

*W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022) (emphasis added) (citations omitted).

The Fourth Circuit recently explained that, to implicate the Major Questions Doctrine, "the question must have significant political and economic consequences." *N. Carolina Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 296 (4th Cir. 2023). Both "significant political and economic consequences" are present here. The President himself has taken an interest in strict enforcement of the BOTS Act (albeit, only as to bots), *supra*, p. 6. By contrast, the FTC's expansive reading of the BOTS Act runs directly counter to that of the President. While the FTC is an independent Agency, and is allowed to diverge from the President's views, the divergent opinions of the Executive and the FTC as to the BOTS Act's scope implicate broad political concerns.

And, the economic implications of the FTC's rereading of the BOTS Act are vast. If countenanced, a newly expanded BOTS Act would upend a multi-billion dollar industry, and impose potential liability of tens or hundreds of thousands of dollars on any American who purchases tickets using more than one account.

In *Fisheries*, the Fourth Circuit noted that courts in this Circuit "are more hesitant to recognize new-found powers in old statutes against a backdrop of an agency failing to invoke them previously." *Fisheries*, 76 F.4th at 297. The BOTS Act was adopted in 2016. Over the last decade, it has ***never*** been invoked against an entity or individual who does not use bots. The FTC's wish to do so now resolutely fails.

"[E]nabling legislation is generally not an open book to which the agency may add pages and change the plot line. We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *W. Virginia*, 597 U.S. at 723 (cleaned up). But making major policy decisions is exactly what the FTC is attempting to do here. A statute written with the explicit

Congressional intent of "prohibit[ing] the use of bots," 2016 WL 7115899, at *4, is being coopted by an administrative agency intent on "chang[ing] the plot line." *W. Virginia*, 597 U.S. at 723.

Put simply, the FTC is attempting to arrogate for itself expansive powers Congress did not provide. What was meant to be a statute that "would have a positive impact on the secondary ticket sellers," 2016 WL 7115899, at *4, would become, if the FTC has its way, the death-knell for a $17 billion industry. The FTC should not be allowed to effectively kill the secondary-ticket market without express Congressional authority, something it has not been provided.

## CONCLUSION

The FTC's Complaint fails to allege a cognizable BOTS Act violation. No amendment can cure this fatal defect. As such, KIG respectfully requests that the Court dismiss the Complaint with prejudice.

Dated: November 24, 2025

Respectfully submitted,

By: */s/ Bezalel A. Stern*

Bezalel A. Stern (D. Md. Bar. No. 20667)
Joshua N. Drian (*pro hac vice*)
MANATT, PHELPS & PHILLIPS, LLP
1050 Connecticut Ave. NW, Suite 600
Washington, D.C. 20036
Tel.: (202) 585-6500
bstern@manatt.com
jdrian@manatt.com

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>***Plaintiff,***<br><br>**v.**<br><br>**KEY INVESTMENT GROUP LLC, et al.,**<br><br>***Defendants.*** | **Case No. 1:25-cv-02716-GLR** |

**DEFENDANTS' REQUEST FOR ORAL ARGUMENT**

Defendants respectfully request that the Court allow oral argument on their Motion to Dismiss. Defendants requests that each side be permitted forty-five (45) minutes to present, or such other time as may be useful to the Court.

Dated: November 24, 2025

Respectfully submitted,

*/s/ Bezalel A. Stern*
Bezalel A. Stern (D. Md. Bar. No. 20667)
Joshua N. Drian (*pro hac vice*)
MANATT, PHELPS & PHILLIPS, LLP
1050 Connecticut Ave. NW, Suite 600
Washington, D.C. 20036
Tel.: (202) 585-6500
bstern@manatt.com
jdrian@manatt.com

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br>*Plaintiff,*<br>**v.**<br>**KEY INVESTMENT GROUP LLC, et al.,**<br>*Defendants.* | **Case No. 1:25-cv-02716-GLR** |

**DEFENDANTS' REQUEST FOR JUDICIAL NOTICE**

PLEASE TAKE NOTICE that Key Investment Group, TotalTickets.com LLC, Totally Tix LLC, Front Rose Tix LLC, WLK Investments LLC, Yair D. Rozmaryn, Elan N. Rozmaryn, and Taylor Kurth (collectively, "KIG"), by and through undersigned counsel, respectfully request that the Court take judicial notice of the following documents, in connection with KIG's Motion to Dismiss the Federal Trade Commission's Complaint. True and correct copies of the documents are attached hereto as **Exhibits 1-6**,

KIG's Motion to Dismiss references materials not subject to reasonable dispute. Those materials are either: (1) directly referenced in the Complaint, (2) publicly available from federal government sources, or (3) are matters of public record whose accuracy cannot reasonably be questioned. Specifically, KIG requests judicial notice of:

**Exhibit 1:** White House Video regarding the execution of Executive Order 14254 titled *Trump is joined by Kid Rock for the signing of an EO targeting unfair scalping of concert tickets*, dated March 31, 2025 and available at https://www.whitehouse.gov/videos/trump-is-joined-by-kid-rock-for-the-signing-of-an-eo-targeting-unfair-scalping-of-concert-tickets/ (last accessed

November 23, 2025).

**Exhibit 2**: The Federal Trade Commission's blog post titled *BOTS Act: That's the Ticket!*, dated April 7, 2017 and available at https://www.ftc.gov/business-guidance/blog/2017/04/bots-act-thats-ticket (last accessed November 20, 2025).

**Exhibit 3**: The White House Fact Sheet on the BOTS Act titled *Fact Sheet: President Donald J. Trump Will End Price-Gouging by Middlemen in the Entertainment Industry*, dated March 31, 2025 and available at https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-will-end-price-gouging-by-middlemen-in-the-entertainment-industry/ (last accessed November 20, 2025).

**Exhibit 4:** The Federal Trade Commission's blog post titled *FTC Sues Live Nation and Ticketmaster for Engaging in Illegal Ticket Resale Tactics and Deceiving Artists and Consumers about Price and Ticket Limits*, dated September 18, 2025 and available at https://www.ftc.gov/news-events/news/press-releases/2025/09/ftc-sues-live-nation-ticketmaster-engaging-illegal-ticket-resale-tactics-deceiving-artists-consumers (last accessed November 20, 2025).

**Exhibit 5**: The New York Times article titled *Congress Moves to Stop Ticket Scalping, Banning Bots Used Online*, dated December 8, 2016 and available at https://www.nytimes.com/2016/12/08/business/media/ticket-scalping-bots-act.html (last accessed November 19, 2025); Billboard article titled *President Obama Signs Anti-Scalping Bill Into Law*, dated December 15, 2016 and available at https://www.billboard.com/music/music-news/president-obama-signs-bots-act-law-7625257/ (last accessed November 24, 2025); IQ Live Music Intelligence article titled *Obama Signs Bots Act Into Law*, dated December 16, 2016 and available at https://www.iqmagazine.com/2016/12/obama-signs-bots-act-law/ (last accessed

November 19, 2025).

**Exhibit 6**: Email dated March 10, 2021 from support@emburse.com with the subject "BOTS Act Notification – Emburse Cards."

## LEGAL STANDARDS

Under the Federal Rules of Evidence, a Court may "judicially notice a fact that is not subject to reasonable dispute" when such facts "(1) [are] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).[1]

**Exs. 1-4**: As the Fourth Circuit has made clear, courts "routinely take judicial notice of information contained on state and federal government websites." *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017).

**Ex. 5**: This principle extends to other publicly available materials, with courts "routinely tak[ing] judicial notice of newspaper articles . . . and press releases in order to assess what the market knew at particular points in time, even where the materials were not specifically referenced in the complaint." *In re Human Genome Scis. Inc. Secs. Litig.*, 933 F. Supp. 2d 751, 758 (D. Md. 2013).

**Ex. 6**: "[A] court may properly consider documents explicitly incorporated into the complaint by reference . . . without converting the motion to dismiss to one for summary judgment." *State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*, 381 F. Supp. 3d 536, 552 (D. Md. 2019) (quotation omitted). *See also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (on a motion to dismiss, a court may "consider documents that are explicitly incorporated into the complaint by reference").

[1] FED R. EVID. 201(c)(2) (The court "must take judicial notice if a party requests it and the court is supplied with the necessary information.").

Case 1:25-cv-02716-GLR Document 63-3 Filed 11/24/25 Page 4 of 4

The above-referenced exhibits are precisely the type of materials courts in this Circuit routinely judicially notice.

**WHEREFORE**, KIG respectfully requests the Court take judicial notice of Exhibits 1-6, attached hereto.

Dated: November 24, 2025

Respectfully submitted,

*/s/ Bezalel A. Stern*
Bezalel A. Stern (D. Md. Bar. No. 20667)
Joshua N. Drian (*pro hac vice*)
MANATT, PHELPS & PHILLIPS, LLP
1050 Connecticut Ave. NW, Suite 600
Washington, D.C. 20036
Tel.: (202) 585-6500
bstern@manatt.com
jdrian@manatt.com

*Counsel for Defendants*

# EXHIBIT 1

The WHITE HOUSE

VIDEOS

# Trump is joined by Kid Rock for the signing of an EO targeting unfair scalping of concert tickets

March 31, 2025




President Trump is joined in the Oval Office by Kid Rock for the signing of an executive order targeting unfair scalping of concert tickets:
“This is a great first step.”

## EXPLORE MORE VIDEOS

# EXHIBIT 2

FEDERAL TRADE COMMISSION
PROTECTING AMERICA'S CONSUMERS

Business Blog

# BOTS Act: That's the ticket!

By: Lesley Fair | April 7, 2017

It used to be a rite of passage: spending the night in a line outside the box office to score tickets to the Stones, Springsteen, or [insert your favorite group here]. The convenience of internet ticket sales ended the sleeping-on-the-sidewalk ritual. But online ticket sales raised another concern: Were prospective buyers losing out to computer programs that scooped up the best seats only to resell them at inflated prices? Congress responded to that issue by passing the Better Online Ticket Sales Act of 2016.

It's no coincidence that it's called the BOTS Act because the law outlaws the use of computer software like bots that game the ticket system. Specifically, the BOTS Act makes it illegal to "circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules."

The BOTS Act addresses more than just buying tickets illegally. Congress also made it illegal to sell tickets obtained in violation of the statute if the seller participated in the illegal purchase or knew or should have known that the tickets were acquired in violation of the law.

The law applies to public concerts, theater performances, sporting events, and similar events at venues with seating capacity of over 200. The State AGs and the FTC have enforcement authority.

That's a brief recap that could fit on the back of a ticket. If you have clients interested in this issue, you'll want to read the BOTS Act in its entirety. And remember that many states also have laws relating to ticket sales.

**Tags:** Consumer Protection | Bureau of Consumer Protection | Advertising and Marketing | Online Advertising and Marketing | Advertising and Marketing Basics

# EXHIBIT 3

The WHITE HOUSE

FACT SHEETS

# Fact Sheet: President Donald J. Trump Will End Price-Gouging by Middlemen in the Entertainment Industry

The White House

March 31, 2025

**SUPPORTING AMERICA'S LIVE ENTERTAINMENT INDUSTRY:** Today, President Donald J. Trump signed an Executive Order to protect fans from exploitative ticket scalping and bring commonsense reforms to America's live entertainment ticketing industry.

- The Order directs the Federal Trade Commission (FTC) to:
  - Work with the Attorney General to ensure that competition laws are appropriately enforced in the concert and entertainment industry.
  - Rigorously enforce the Better Online Ticket Sales (BOTS) Act and promote its enforcement by state consumer protection authorities.
  - Ensure price transparency at all stages of the ticket-purchase process, including the secondary ticketing market.
  - Evaluate and, if appropriate, take enforcement action to prevent unfair, deceptive, and anti-competitive conduct in the secondary ticketing market.
- The Order directs the Secretary of the Treasury and Attorney General to ensure that ticket scalpers are operating in full compliance with the Internal Revenue Code and other applicable law.
- Treasury, the Department of Justice, and the FTC will also deliver a report within 180 days summarizing actions taken to address the issue of unfair practices in the live concert and entertainment industry and recommend additional regulations or legislation needed to protect consumers in this industry.

**ADDRESSING UNFAIR PRACTICES IN THE TICKET MARKETPLACE:** President Trump is committed to making arts and entertainment that enrich Americans' lives as accessible as possible.

- America's live concert and entertainment industry has a total nationwide economic impact of $132.6 billion and supports 913,000 jobs. But it has become blighted by unscrupulous middle-men who impose egregious fees on fans with no benefit to artists.
- Ticket scalpers use bots and other unfair means to acquire large quantities of face-value tickets, then re-sell them at an enormous markup on the secondary market, price-gouging consumers and depriving fans of the opportunity to see their favorite artists without incurring extraordinary expenses.
    - By some reports, fans have paid as much as 70 times the face value of a ticket price to obtain a ticket.
    - When this occurs, the artists do not receive any additional profit—it goes solely to the scalper and the ticketing agency.
- While the BOTS Act—meant to stop scalpers from using bots to purchase tickets—has been on the books for over 8 years, the FTC has only once taken action to enforce this law.

**PROTECTING AMERICAN CONSUMERS:** President Trump believes that Americans shouldn't be subjected to exploitative pricing and unfair fees.

- This Executive Order tackles an issue President Trump highlighted on the campaign trail, where he vowed to work on combating high ticket prices and described the current climate, where fans are priced out, as "very unfortunate."
- It builds on other actions President Trump has already taken since returning to office to protect American consumers.
    - He terminated New York City's congestion pricing scheme that hurt everyday Americans such as workers and small business owners.
    - He signed an Executive Order to empower patients with clear, accurate, and actionable healthcare pricing information.
    - He formally directed the whole administration to focus on price relief for American families to defeat the cost-of-living crisis.

# EXHIBIT 4

FEDERAL TRADE COMMISSION
PROTECTING AMERICA'S CONSUMERS

For Release

# FTC Sues Live Nation and Ticketmaster for Engaging in Illegal Ticket Resale Tactics and Deceiving Artists and Consumers about Price and Ticket Limits

## Agency alleges Ticketmaster used deceptive pricing tactics and earned hundreds of millions selling tickets acquired illegally by brokers, costing consumers billions of dollars in inflated prices and additional fees

September 18, 2025

**Tags:** Consumer Protection | Regional Offices | Midwest Region | Bureau of Consumer Protection | deceptive/misleading conduct | Entertainment | Advertising and Marketing

The Federal Trade Commission and seven states sued Live Nation and Ticketmaster for tacitly coordinating with brokers and allowing them to harvest millions of dollars worth of tickets in the primary market. Live Nation and Ticketmaster then sell the illegally harvested tickets at a substantial markup in the secondary market, causing consumers to pay significantly more than the face value of the ticket.

The FTC further alleged in a complaint that California-based Ticketmaster LLC and its parent company Live Nation Entertainment, Inc., (collectively "Ticketmaster") deceived artists and consumers by engaging in bait-and-switch pricing through advertising lower prices for tickets than what consumers must pay to purchase tickets; deceptively claimed to impose strict limits on the number of tickets that consumers could purchase for an event, even though ticket brokers routinely and substantially exceeded those limits; and sold millions of tickets, often at much higher cost to consumers, on its resale platform that those brokers obtained in excess of artists' ticket limits.

"President Donald Trump made it clear in his March Executive Order that the federal government must protect Americans from being ripped off when they buy tickets to live events," said FTC Chairman Andrew N. Ferguson. "American live entertainment is the best in the world and should be accessible to all of us. It should not cost an arm and a leg to take the family to a baseball game or attend your favorite musician's show. The Trump-Vance FTC is working hard to ensure that fans have a shot at buying fair-priced tickets, and today's lawsuit is a monumental step in that direction."

Ticketmaster is the leading provider of tickets for concerts—controlling about 80% or more of major concert venues' primary ticketing—and it also has a growing share of ticket resales in the secondary market. From 2019 to 2024 alone, consumers spent more than $82.6 billion purchasing tickets from Ticketmaster.

The FTC alleges that in public, Ticketmaster maintains that its business model is at odds with brokers that routinely exceed ticket limits. But in private, Ticketmaster acknowledged that its business model and bottom line benefit from brokers preventing ordinary Americans from purchasing tickets to the shows they want to see at the prices artists set.

The FTC's complaint against Ticketmaster alleges that:

- Despite implementing security measures, Ticketmaster is aware that brokers routinely bypass such measures by creating thousands of Ticketmaster accounts and using proxy IP addresses in order to purchase event tickets.
- Ticketmaster nevertheless allows brokers to post these illegally obtained tickets for resale on its platform, then profits from the additional fees and markups it unilaterally adds to the resale tickets.
- In fact, a senior Ticketmaster executive admitted in an internal email that copied Live Nation leadership, that the companies "turn a blind eye as a matter of policy" to brokers' violations of posted ticket limits. For example, an internal review showed that just five brokers controlled 6,345 Ticketmaster accounts and possessed 246,407 concert tickets to 2,594 events.
- Ticketmaster and Live Nation even offer technological support to brokers through a software platform called TradeDesk, which enables brokers to track and aggregate tickets purchased from multiple Ticketmaster accounts into a single interface for simpler resale management. Through TradeDesk, Ticketmaster can identify which high-volume brokers are exceeding ticket limits through the use of hundreds, or even thousands, of Ticketmaster accounts.

- The companies also have consistently declined to deploy additional technology that would more effectively prevent brokers from evading ticket limits because such tactics would decrease their revenue, according to internal company documents. For example, the company in 2021 opted against using third-party identity verification because it was "too effective."
- In addition, Ticketmaster deceived the American people by advertising list prices for tickets that were substantially lower than the actual cost consumers paid after fees and markups were added. The FTC alleged that Ticketmaster hid the mandatory fees, which are as high as 44% of the cost of the ticket, that it didn't add the fees to the price of tickets until the very end of the transaction, and still failed to clearly detail the extra fees before consumers paid for the tickets. The fees totaled $16.4 billion from 2019-2024.
- Despite publicly claiming that they support consumers knowing the "full cost of their tickets from the start," company executives acknowledged internally that Ticketmaster engaged in deceptive pricing and deliberately continued that approach after internal research showed consumers were less likely to purchase tickets when they are informed of the true cost upfront.

The FTC alleges that these practices violate the FTC Act's prohibition on deceptive acts or practices in the marketplace and the Better Online Ticket Sales Act. The FTC is seeking civil penalties against Ticketmaster and any additional monetary relief that that the court finds appropriate.

The Commission vote authorizing the staff to file the complaint was 2-0-1, with Commissioner Melissa Holyoak recused due to her previous work as Utah's Solicitor General. The complaint was filed in the U.S. District Court for the Central District of California.

**NOTE:** The Commission files a complaint when it has "reason to believe" that the named defendants are violating or are about to violate the law and it appears to the Commission that a proceeding is in the public interest. The case will be decided by the court.

The lead staffers on this matter are Elizabeth C. Scott, Taylor H. Arana, and Claire E.W. Stewart from the FTC's Midwest Regional Office.

The Attorneys General of Virginia, Utah, Florida, Tennessee, Nebraska, Illinois and Colorado joined the FTC in bringing this action.

The Federal Trade Commission works to promote competition and protect and educate consumers. The FTC will never demand money, make threats, tell you to transfer money, or promise you a prize. Learn more about consumer topics at consumer.ftc.gov, or report fraud, scams, and bad business practices at ReportFraud.ftc.gov. Follow the FTC on social media, read consumer alerts and the business blog, and sign up to get the latest FTC news and alerts.

# Contact Information

## Media Contact

Juliana Gruenwald Henderson
Office of Public Affairs
202-326-2924

# EXHIBIT 5

The New York Times https://www.nytimes.com/2016/12/08/business/media/ticket-scalping-bots-act.html

# Congress Moves to Curb Ticket Scalping, Banning Bots Used Online

**By Ben Sisario**

Dec. 8, 2016

With public attention focused on the scourge of online ticket scalping, Congress has passed a bill outlawing bots, or computer programs that let users scoop up the best tickets and resell them at inflated prices.

But will this law be enough to tame an $8 billion secondary ticket market that is increasingly global?

On Wednesday, the House of Representatives passed the Better Online Ticket Sales Act, or BOTS Act, with bipartisan support, following the bill's passage a week ago in the Senate. It will now go to the White House for President Obama's signature.

The bill accomplishes what advocates like Lin-Manuel Miranda, the creator of "Hamilton," have long pushed for. It would make it illegal to circumvent the security measures of ticketing websites, which bots often do, and would give enforcement authority to the Federal Trade Commission. Critics say bots feed a high-priced resale market that pushes tickets out of reach of ordinary consumers, particularly for hot events like "Hamilton."

Ticketmaster has estimated that bots have been used to buy 60 percent of the most desirable tickets to many shows.

Senator Chuck Schumer, Democrat of New York, who was a sponsor of the bill and campaigned for its passage with Mr. Miranda and others, cheered the action by the House.

“With this soon-to-be-new law that will eliminate ‘bots’ and slap hackers with a hefty fine, we can now ensure those who want to attend shows in the future will not have to pay outrageous, unfair prices,” Mr. Schumer said in a statement.

Yet in the trenches of the music industry, there is doubt about how much impact the act will have. The world of bots is shadowy and little understood, with much of the software being developed and even operated overseas, complicating enforcement. And there is an enormous incentive for scalping, which is legal and now largely integrated into the mainstream concert business through sites like StubHub and even Ticketmaster.

“There is only one way to stop the scalping industry, and that’s to make it illegal,” said Seth Hurwitz, an independent concert promoter and the owner of the 9:30 Club in Washington. “Anything else is just Whac-a-Mole, and grandstanding by politicians.”

The passage of the BOTS Act is the result of years of frustration among members of the public as well as artists and producers irritated by an industry that profits from their work. In an interview, Jeffrey Seller, the lead producer of “Hamilton,” called scalping “a usurious, parasitic business that only serves to create a new profit center between the artist and the consumer.”

This year, an investigation by the New York State attorney general found abuses like a single scalper buying more than 1,000 tickets in under a minute for a U2 concert at Madison Square Garden. Ticket bots are illegal in New York, and last month Gov. Andrew M. Cuomo signed a law increasing penalties for their use.

In Britain and Europe, there has been significant political momentum to reform ticketing laws. The British government commissioned a major report on the scalping industry there, and lawmakers in Italy are considering proposals to curtail ticket reselling after reports that the head of the Italian branch of Live Nation, the global concert company, was funneling tickets directly to the secondary market.

In the United States, that progress has been much slower. While few spoke against the BOTS Act — the National Association of Ticket Brokers, which bars bots among its members, welcomed the bill — ticket scalping has become a standard part of the entertainment economy, and services like StubHub are often welcomed by fans for their convenience. Economists frequently endorse secondary markets as a true demonstration of supply and demand.

Supporters of the BOTS Act believe it could aid law enforcement in ways that were unavailable before. In 2010, federal prosecutors charged a group of men operating as Wiseguy Tickets with fraud for evading online ticketing safeguards in acquiring more than a million tickets that were resold for $25 million in profit. But the case hinged on whether the men had violated federal laws or merely run afoul of TicketMaster's terms of service, and the Wiseguy operators received only probation.

The BOTS Act would make it illegal to bypass an online security system like TicketMaster's.

"Laws don't stop every crime, but the fact that there are new civil penalties for circumventing the technology that tries to keep tickets in the hands of fans will create a disincentive," said Daryl P. Friedman, the chief advocacy and industry relations officer of the National Academy of Recording Arts and Sciences, the organization behind the Grammy Awards, which lobbied for the bill.

Yet even the BOTS Act's biggest supporters acknowledge that as much as they welcome the proposed law, it alone will not end the problems of online ticket scalping.

"Is this the exact bill I would write? No. Is it imperfect? Of course," said Mr. Seller, the "Hamilton" producer. "Is it better than nothing? You bet."

---

A version of this article appears in print on , Section B, Page 5 of the New York edition with the headline: Bill Is Passed to Ban Bots That Ticket Scalpers Use

billboard

billboard

MUSIC NEWS

12/15/2016

# PRESIDENT OBAMA SIGNS ANTI-SCALPING BILL INTO LAW

President Obama makes bots illegal, freeing up tickets for fans over profits.

By **Dan Rys**




Barack Obama speaks at the opening Keynote during the 2016 SXSW Music, Film + Interactive Festival at Long Center on March 11, 2016 in Austin, Texas.
NEILSON BARNARD/GETTY IMAGES FOR SXSW

TRENDING ON BILLBOARD




The specter of Donald Trump may be hanging over the Oval Office, but President Obama isn't done just yet. Today, Obama signed into law the Better Online Ticket Sales Act, or the BOTS Act of 2016, which, according to a statement from the White House Press Secretary, will "prohibit the circumvention of control measures used by Internet ticket sellers to ensure equitable consumer access to tickets for certain events."

EXPLORE

(HTTPS://WWW.BILLBOARD.COM/ARTIST/) (https://www.billboard.com/artist/)

SEE LATEST VIDEOS, CHARTS AND NEWS

In simpler terms: the law will make it much easier for fans to buy tickets to shows at face value right when they go on sale.

ADVERTISEMENT

Agregar al Carrito

The battle against bots is one that has been raging for some time within the industry, as artists, managers and promoters alike all pushed back against technologies that snapped up large swaths of tickets before flipping them on secondary markets for

vastly inflated prices, cutting out both regular fans and cash-strapped die-hards in the process. The BOTS Act will make those practices illegal and outlaw the sale of tickets obtained through such technologies "if the seller participated in, had the ability to control, or should have known about the violation."

ADVERTISEMENT




"On behalf of artists, venues, teams, and especially fans, Ticketmaster is pleased that the BOTS Act is now a federal law," reads a Ticketmaster statement commending the law. "Ticketmaster worked closely with legislators to develop the BOTS Act and we believe its passage is a critical step in raising awareness and regulating the unauthorized use of Bots."

The bill was originally introduced in February 2015 by U.S. Representatives Paul D. Tonko (D-N.Y.) and Marsha Blackburn (R-Tenn.). But tensions around the issue intensified (/articles/business/7416096/ticket-bots-illegal-software-music-stars) over the course of this year, when tickets for tours by Adele (/artist/278035/adele/chart) and Bruce Springsteen (/artist/298448/bruce-springsteen/chart) disappeared almost instantly after being made available for sale — only to appear at much higher price points on the secondary market — and Hamilton founder Lin-Manuel Miranda decried the practice in a New York Times op-ed in June titled, "Stop The Bots From Killing Broadway."

ADVERTISEMENT



Earlier this month, the legislation cleared its final hurdle before reaching the president, passing the House of Representatives (/articles/news/7605100/congress-cracks-down-ticket-bots) on Dec. 7. The issue has also cropped up overseas, with companies like StubHub (/articles/business/7408697/british-secondary-ticket-study-competition-markets-authority) and Live Nation (/articles/business/7573495/live-nation-italian-secondary-ticketing-market) becoming the target of investigations in Britain and Italy, among others.

President Donald Trump Inauguration (/inauguration)

# Obama signs Bots Act into law

The use of ticket-buying software is now a crime in the entire United States, following the passage into the law of the Bots Act on Wednesday

NEWS By IQ | 16 December 2016



© PETE SOUZA

**The Better Online Ticket Sales (Bots) Act, which proscribes the use of ticket bots, has been signed into law by US president Barack Obama.**

A statement by the White House's press secretary reveals the bill, "which prohibits the circumvention of control measures used by Internet ticket sellers to ensure equitable consumer access to tickets for certain events", was presented to and approved by Obama *(pictured)*, along with 20 other pieces of proposed legislation, on Wednesday (14 December).

Several major ticket agencies, including Ticketfly and Ticketmaster, have previously spoken of their support for the bill. A statement from Ticketmaster reads: "On behalf of

artists, venues, teams and especially fans, Ticketmaster is pleased that the Bots Act is now a federal law. Ticketmaster worked closely with legislators to develop the Bots Act, and we believe its passage is a critical step in raising awareness and regulating the unauthorised use of bots."

Similar legislation had already been introduced in New York, but the passage of the Bots Act extends the ban nationwide. The use of bots has also been criminalised in Ontario, with the UK looking likely to soon follow suit.

# "The Bots Act Is A Critical Step In Raising Awareness And Regulating The Unauthorised Use Of Bots"

IQ LIVE MUSIC INTELLIGENCE

as they look to tackle the exact same issues.

"However, one note of caution. This legislation was also supported by companies who run secondary ticketing services, and who benefit directly from mass-scale ticket touting. That in itself highlights why, in the UK, further measures than simply outlawing the misuse of bots will be needed to properly clean up ticket resale – and why we urgently need the British government to enforce existing consumer law and enact recommendations made in Professor Michael Waterson's review of secondary ticketing."

A sister bill, the Boss Act (Better Oversight of Secondary Sales and Accountability in Concert Ticketing), which aims to increase transparency in both the primary and secondary market, was introduced to Congress in May but yet to find the support to progress any further.

Obama will hand over the reins to president-elect Donald Trump on 20 January 2017. Shortly after his election, American and Latin American industry figures gave *IQ* their predictions for what Trump's presidency will mean for the live music business.

*Get more stories like this in your inbox by signing up for IQ Index, IQ's free email digest of essential live music industry news.*

SHARE THIS

# EXHIBIT 6

24

**From:** Emburse Card Support <support@emburse.com>
**Date:** March 10, 2021 at 5:23:58 PM EST
**To:** WAG@totaltickets.com
**Subject: BOTS Act Notification - Emburse Cards**

Hello William,

You may have seen that the DOJ and FTC announced three settlements last month resolving alleged violations of the Better Online Ticket Sales (BOTS) Act [1] [2]. These are the first enforcement actions that the department and the FTC have brought under the BOTS Act.

We want to bring awareness that should Emburse or our banking partners reasonably suspect or detect that you are using our cards in a method that is in violation of the BOTS Act, we retain the right to deactivate your account with little warning. Under Section 3.3 of your Issuing Agreement, you may not use Emburse cards to conduct illegal Card Transactions.

If you have any questions and/or concerns regarding whether your use of our cards to purchase tickets would fall under a potential violation, we recommend that you speak with proper legal counsel.

[1] https://www.justice.gov/opa/pr/justice-department-and-ftc-announce-first-enforcement-actions-violations-better-online-ticket

[2] https://uscode.house.gov/view.xhtml?req=granuleid%3AUSC-prelim-title15-section45c&num=0&edition=prelim

[3] https://stripe.com/legal#service-requirements-limitations-and-restrictions

Regards,

Emburse Cards

If you don't want to hear from me again, please let me know..

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>***Plaintiff,***<br><br>**v.**<br><br>**KEY INVESTMENT GROUP LLC, et al.,**<br><br>***Defendants.*** | **Case No. 1:25-cv-02716-GLR** |

**[PROPOSED] ORDER GRANTING**
**DEFENDANTS' MOTION TO DISMISS**

Upon consideration of Defendants Key Investment Group, TotalTickets.com LLC, Totally Tix LLC, Front Rose Tix LLC, WLK Investments LLC, Yair D. Rozmaryn, Elan N. Rozmaryn, and Taylor Kurth's Motion to Dismiss ("Motion"), Plaintiff the Federal Trade Commission's Response thereto, Defendants' Reply, and other relevant portions of the Record, it is this __________ day of ___________________, 2026

**ORDERED**, that the Motion is **GRANTED**,

and it is further **ORDERED**, that the Complaint shall be and hereby is **DISMISSED WITH PREJUDICE.**

______________________________
Hon. George L. Russell, III
Chief Judge, United States District Court
for the District of Maryland

# EXHIBIT 11

Case 1:25-cv-02716-GLR Document 35 Filed 09/12/25 Page 1 of 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

FEDERAL TRADE COMMISSION,

*Plaintiff*

v.

KEY INVESTMENT GROUP, LLC, et al.,

*Defendants*.

No. 1:25-cv-02716-GLR

**MOTION OF SENATOR MARSHA BLACKBURN AND SENATOR BEN RAY LUJÁN FOR LEAVE TO FILE BRIEF AS AMICI CURIAE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Senator Marsha Blackburn, joined by Senator Ben Ray Luján, and pursuant to L.R. 105.12, through their undersigned counsel, hereby respectfully move for leave to file as amici curiae in support of the Plaintiff, the Federal Trade Commission ("the Commission"). The proposed brief is attached hereto.

Movant Senator Marsha Blackburn represents the State of Tennessee, which, as home to Nashville (nicknamed "Music City") and a vibrant creative economy, is uniquely susceptible to the harms of predatory ticket-scalping practices. As the lead Republican sponsor and a primary architect of the Better Online Ticket Sales Act ("BOTS Act"), 15 U.S.C. § 45c, Senator Blackburn has a strong interest in the proper interpretation and robust enforcement of this statute. Amicus Senator Ben Ray Luján, who voted in favor of the BOTS Act while serving in the House of Representatives, shares that strong interest in the proper interpretation and application of the law.

Amici's interests stems from their legislative mandate to protect American consumers and the integrity of the interstate live-entertainment marketplace. The alleged violation in this matter,

specifically the exploitation of digital ticketing services by scalpers to buy up and resell event tickets at significant markups, is well within the scope of conduct the legislators who sponsored and supported the BOTS Act intended to prohibit.

An amicus brief from Senator Blackburn and Senator Luján is desirable because it provides the Court with useful legislative context to aid in rendering the correct interpretation of the BOTS Act and its broad scope. Because this litigation centers on a novel question regarding what constitutes "circumvent[ion]" under the Act, Senator Blackburn's perspective as a leading drafter, and Senator Luján's perspective as a supporter of the bill, offer unique insights that could assist the Court in resolving the Defendants' pending motion to dismiss.

Amici can clarify the legislative intent animating the statute's use of the word "circumvent" and the intended conduct that the legislation targeted. This context may assist the Court as it evaluates the breadth of Congress's mandate to the FTC for enforcement in this area. This context is particularly important given Defendants' erroneous speculation about what the drafters "believed" when crafting the BOTS Act. *See* ECF 33-1 ("Defs. Mem.") at 20–21 (claiming that "the BOTS Act's drafters . . . believed the BOTS Act was [only] meant to stop the behavior of people who use bots"). This proposed amicus brief affords the law's leading drafter and sponsor, Senator Blackburn, with the opportunity to disabuse the Court of Defendants' misrepresentations. Furthermore, Amici provide perspectives on how bulk-buying and scalping operations siphon wealth from creators and consumers and impede access to live events, thereby harming the economies and constituents of their respective states.

This brief is filed in support of the Plaintiff, the Federal Trade Commission. Amici argue that the FTC's enforcement action against Key Investment Group is a faithful application of the BOTS Act as intended by Congress and expressed in the law's plain text.

Pursuant to the requirements of the Court, Amici affirm that no Party's counsel authored the amicus brief in whole or in part, and no Party or its counsel contributed money to fund the preparation or submission of the brief.

Dated: December 31, 2025

Respectfully submitted,

*/s/ James R. Wedeking*

James R. Wedeking (Md. No. 18469)
**BOYDEN GRAY PLLC**
800 Connecticut Ave, NW
Washington, DC 20006
Telephone: 202.955.0620
jwedeking@boydengray.com

Michael A. Fragoso*
T. Zachary Horton*
Peter Lee Hamilton*
**TORRIDON LAW PLLC**
801 17th Street NW, Suite 1100
Washington, DC 20006
Telephone: 202.249.6900
mfragoso@torridonlaw.com
tzhorton@torridonlaw.com
phamilton@torridonlaw.com

**Pro hac vice pending*

***Attorneys for Amici Curiae***

**CERTIFICATE OF SERVICE**

I hereby certify that on this 31st day of December 2025, the foregoing was filed with the Court electronically by using the CM/ECF system, and service was effected electronically to all counsel of record.

Dated: December 31, 2025

*/s/ James R. Wedeking*

JAMES R. WEDEKING

# EXHIBIT 12

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>*Plaintiff*<br><br>v.<br><br>KEY INVESTMENT GROUP, LLC, et al.,<br><br>*Defendants*. | No. 1:25-cv-02716-GLR |

**BRIEF OF AMICI CURIAE SENATOR MARSHA BLACKBURN AND SENATOR BEN RAY LUJÁN IN SUPPORT OF THE FEDERAL TRADE COMMISSION'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

INTERESTS OF AMICI CURIAE ........................................................ 1

INTRODUCTION ........................................................ 1

ARGUMENT ........................................................ 2

I. THE STATUTE'S PLAIN TEXT IS NOT LIMITED TO BOTS. ........................................ 3

II. THE STATUTE'S PLAIN TEXT DOES NOT DEPEND ON HOW VIGOROUSLY A TICKET ISSUER ENFORCES ITS POLICIES, NOR DOES IT CREATE A LOOPHOLE FOR COLLUSIVE CONDUCT. ........................................ 6

III. EVEN IF LEGISLATIVE HISTORY WERE RELEVANT, AMICI DRAFTED THE BOTS ACT BROADLY TO COMBAT UNFAIR TICKET SCALPING. ................ 8

IV. DEFENDANTS' CONSTRICTIVE READING WOULD ALLOW TICKET SCALPERS TO END-RUN THE LAW AND HARM ORDINARY CONSUMERS. ........................................ 12

CONCLUSION ........................................................ 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.*,
331 U.S. 519 (1947)....................5

*Conroy v. Aniskoff*,
507 U.S. 511 (1993)....................8

*FDIC v. Meyer*,
510 U.S. 471 (1994)....................9

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004)....................5

*Matal v. Tam*,
582 U.S. 218 (2017)....................4

*Milner v. Dep't of Navy*,
562 U.S. 562 (2011)....................9

*Miranda v. Garland*,
34 F.4th 338 (4th Cir. 2022)....................6

*Oncale v. Sundowner Offshore Servs., Inc.*,
523 U.S. 75 (1998)....................9

*Owens v. Balt. City State's Att'ys Off.*,
767 F.3d 379 (4th Cir. 2014)....................5

*Pa. Dep't of Corr. v. Yeskey*,
524 U.S. 206 (1998)....................9

*Republic Franklin Ins. Co. v. Albemarle Cnty. Sch. Bd.*,
670 F.3d 563 (4th Cir. 2012)....................4

*United States v. Cleveland Indians Baseball Co.*,
532 U.S. 200 (2001)....................7

*United States v. Mills*,
485 F.3d 219 (4th Cir. 2007)....................9

*United States v. Minker*,
350 U.S. 179 (1956)....................5

*United States v. Mo. Pac. R.R. Co.*,
278 U.S. 269 (1929) .......... 9

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .......... 5

**Statutes**

15 U.S.C. § 45c(a)(1)(A) .......... 3, 7, 8

15 U.S.C. § 45c(a)(1)(B) .......... 3, 7

15 U.S.C. § 45c(a)(2) .......... 4

17 U.S.C. § 1201(a)(3)(A) .......... 7

Pub. L. No. 114-274, 130 Stat. 1401(2016) .......... 4, 6, 7, 13

**Other Authorities**

Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) .......... 5, 7

Arsenic Prevention and Protection from Lead Exposure in Juice Act of 2012, H.R. 3984, 112th Cong. (2012) .......... 5

*Circumvent*, BLACK'S LAW DICTIONARY (12th ed. 2024) .......... 3

*Circumvent*, MERRIAM-WEBSTER DICTIONARY (11th ed. rev. 2025) .......... 3, 7

Clare Y. Cho, Cong. Rsch. Serv., R48179, TICKETS FOR LIVE ENTERTAINMENT EVENTS (2025) .......... 12,13

Congressman Frank Pallone, Jr., *Pallone, DeLauro Proposal for Arsenic Levels in Apple Juice Adopted by FDA* (July 12, 2013) .......... 4, 5

Congressman Paul Tonko, *Tonko, Blackburn Lead Bipartisan Effort to Level Online Ticket Sales Playing Field for Fans of Live Entertainment* (Apr. 28, 2016) .......... 11

Dave Brooks, *Is It a Bot, or Not? Ticketing's Next Big Legal Fight Could Reshape the Resale Industry*, BILLBOARD (Aug. 29, 2025) .......... 13

Digital Citizens Alliance, *When It Comes to Digital Markets, Trust Can't Be Secondary* (May 2025) .......... 14

*Examining the Better Online Ticket Sales Act of 2016: Hearing Before the Subcomm. on Consumer Prot., Prod. Safety, Ins., & Data Sec. of the S. Comm. on Com., Sci., & Transp.*, 114th Cong. (2016) .......... 10, 11, 12

Exec. Order No. 14,254, 90 Fed. Reg. 14,699 (Apr. 3, 2025) ....................................................15

Nat'l Indep. Ticket Operators Ass'n, NITO TICKET RESALE STUDY (2024) ................................14

N.Y. State Off. of the Att'y Gen., OBSTRUCTED VIEW: WHAT'S BLOCKING NEW YORKERS FROM GETTING TICKETS (2016) ...................................................................13

Phillip Leslie & Alan Sorensen, *The Welfare Effects of Ticket Resale* (Nat'l Bureau of Econ. Rsch., Working Paper No. 15476 (2009)....................................................14

Press Release, White House, *Fact Sheet: President Donald J. Trump Will End Price-Gouging by Middlemen in the Entertainment Industry* (Mar. 31, 2025) .................14, 15

Senator Amy Klobuchar, *Klobuchar-Backed Bipartisan Legislation to Protect Consumers from Ticket Bots Passes Senate* (Dec. 2, 2016) ...................................................11

Senator Marsha Blackburn, *The FTC Has Failed To Enforce The BOTS Act* (Dec. 2, 2022) ..........................................................................................................14

Senator Richard Blumenthal, *Senate Approves Blumenthal Bill to Crack Down on Unfair Ticket Bots* (Dec. 1, 2016)........................................................................11

U.S. Gov't Accountability Off., GAO-18-347, *Event Ticket Sales: Market Characteristics and Consumer Protection Issues* (2018) ......................................................14

## INTERESTS OF AMICI CURIAE

Amici Curiae are two sitting members of the United States Senate:

Senator Marsha Blackburn (Tennessee)
Senator Ben Ray Luján (New Mexico)

As members of the United States House of Representatives in 2016, both Amici voted to enact the Better Online Ticket Sales Act of 2016, which then-Representative Blackburn had drafted and sponsored. As legislators, Amici have a special interest in the law's sound interpretation in federal court, and accordingly, they support the Federal Trade Commission (the "Commission") in opposing Defendants' motion to dismiss, which is grounded in an erroneous, unduly narrow interpretation of the law that they helped to enact.

## INTRODUCTION

Amici and their fellow legislators drafted and voted to pass the Better Online Ticket Sales Act of 2016 ("BOTS Act") to help protect ordinary American consumers from rapacious online ticket scalpers. These bad actors buy up tickets with no intention of using them. They then re-sell the tickets on secondary markets with eye-popping markups. Their unearned profits come out of the pockets of ordinary Americans who just want to attend a performance by a favorite artist or cheer on their team at the big game. Scalpers ply their shady trade using various sophisticated techniques and schemes to bypass the security measures in place to combat their underhanded practices and to maintain access to events for ordinary Americans. Some scalpers use bots to buy large numbers of tickets before fans have a fighting chance. Others, like Defendants here, use manpower and trickery to do the same thing.

In March 2025, President Donald Trump directed the FTC to take action and rigorously enforce the law that Amici helped pass. That law prohibits scalpers from using *any* means to "circumvent" the online controls of ticket issuers that are designed to prevent violations of their

Case 1:25-cv-02716-GLR Document 95-1 Filed 09/22/25 Page 295 of 464

rules—especially limits on the number of tickets a customer may buy for a given event. Defendants have violated this law. Using internet protocol ("IP") proxy services, subscriber identity module ("SIM") card banks, and many thousands of fake Ticketmaster accounts with thousands of different credit cards, Defendants circumvented Ticketmaster's rules limiting the number of tickets that can be purchased for a given event from the same IP address or using the same identifying information. In doing so, Defendants reaped enormous windfall profits—including nearly $7 million between November 2022 and December 2023 alone. The Commission subsequently brought this case.

This Court should deny Defendants' motion to dismiss. The operative text of the BOTS Act does not limit its application to scalpers who use bots. In fact, the law's key provision does not reference bots at all. And contrary to Defendants' representations, Amici—as drafter (Senator Blackburn) and supporter (Senator Luján) of the law—did *not* believe the BOTS Act was confined solely to use of bot technology. If the Court holds for Defendants, the law that Amici worked hard to enact with overwhelming bipartisan support would be easily evaded to the detriment of American eventgoers, who would be forced to keep paying exorbitant markups to scalpers. This Court should not countenance Defendants' circumvention.

## ARGUMENT

The BOTS Act is clear that online ticket scalping in violation of ticket issuers' posted rules is illegal.[1] It is illegal whether scalpers use bots or not. And it is illegal whether ticket issuers actively enforce their policies or not. Amici drafted the BOTS Act broadly to prevent scalpers like Defendants from evading purchase limits to buy up tickets before event-going consumers have a

[1] Amici take no issue with referring to the BOTS Act by its short title. *See* Defs. Mem. 6 (complaining that exclusively using the spelled-out title is "intentional misdirection"); *id.* at 1 n.1 (similar). As explained herein, the title does not limit the operative text. *See infra*, pp. 4–6. Defendants' complaints are themselves misdirection.

fair chance. This Court should not condone Defendants' attempt to circumvent the law by doing manually what they concede they cannot do with the aid of bots. The motion to dismiss should be denied.

## I. THE STATUTE'S PLAIN TEXT IS NOT LIMITED TO BOTS.

Defendants' primary argument is that the BOTS Act applies only to scalpers who use bots. *See* ECF No. 33-1 ("Defs. Mem."), at 2 n.2, 3–6, 8–9, 13. But the text of the statute plainly applies regardless of scalpers' methods. It applies equally to tech-savvy scalpers who use sophisticated bots and to low-tech scalpers who break the rules the old-fashioned way.

The BOTS Act declares:

> [I]t shall be unlawful for any person to circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules.

15 U.S.C. § 45c(a)(1)(A). The statute continues that it is also unlawful "to sell or offer to sell any event ticket . . . obtained" in this way. *Id.* § 45c(a)(1)(B).

By its plain terms, the BOTS Act prohibits "circumvent[ion]" of ticket issuers' means of enforcing "posted event ticket purchasing limits" and "purchasing order rules." *Id.* § 45c(a)(1)(A). As Defendants apparently agree, the operative verb "circumvent" has a plain—and broad—meaning: "To avoid (a restrictive problem, rule, etc.), esp. by clever and *sometimes* dishonest means." *Circumvent*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added); *see also Circumvent*, MERRIAM-WEBSTER DICTIONARY (11th ed. rev. 2025) ("to manage to get around especially by ingenuity or stratagem"); Defs. Mem. 13 (quoting these dictionary definitions).[2]

---

[2] These dictionary definitions can be reduced to a single word: Bypass. To circumvent something is to bypass it. The terms are synonymous. Although "circumvent" may refer to dishonest conduct, it is not limited to such. Even if dishonesty were required for conduct to constitute circumvention, the allegations here—including the use of fictitious accounts and concealed IP addresses—obviously qualify. *See, e.g.*, Compl. ¶¶ 28, 35, 39–40, 42–44.

Defendants' alleged conduct falls squarely within this plain meaning. The Commission alleges that Defendants used various clever tactics to "avoid" Ticketmaster's ticket-purchase controls, including "thousands of fictitious Ticketmaster accounts, thousands of virtual and traditional credit card numbers, proxy or spoofed IP addresses, and SIM banks." ECF No. 1 ("Compl."), at ¶ 2; *see id.* ¶¶ 28–29, 34–50. Nothing about the word "circumvent" limits the means by which Defendants "avoid" or "manage to get around" Ticketmaster's controls exclusively to the use of bots.

If Amici and their fellow legislators had intended to limit the BOTS Act's application to bot users, they could—and would—have said so. But they did not. *Cf. Matal v. Tam*, 582 U.S. 218, 232 (2017) ("If Congress had wanted to confine the reach of the disparagement clause in the way that Tam suggests, it would have been easy to do so."). Indeed, the BOTS Act's very next subsection carves out an exception for "investigat[ion]," "enforcement," and "research" activities that involve the "use [of] any computer software or system." 15 U.S.C. § 45c(a)(2); *cf. Matal*, 582 U.S. at 232 (inclusion of a limitation in a "neighboring provision" evinces congressional intent *not* to limit other provisions without the express textual limitation). This Court should not read into the text an implicit limitation that Congress conspicuously chose not to include.

Without a foothold in the statutory text, Defendants cling to the statute's short title, "the BOTS Act." *See* Defs. Mem. 1 n.1 ("This Act may be cited as the 'Better Online Ticket Sales Act of 2016' ***or the 'BOTS Act of 2016*.'**" (quoting Pub. L. No. 114-274, § 1, 130 Stat. 1401, 1401–04 (2016) (emphasis in original))); *ibid.* ("The acronym . . . indicates that the BOTS Act is about bots."); *id.* at 2 n.2 ("[T]he BOTS Act unambiguously applies only to bots users."); *id.* at 23 & n.19 (similar). "But titles are not generally meant to take the place of the substantive provisions of the text." *Republic Franklin Ins. Co. v. Albemarle Cnty. Sch. Bd.*, 670 F.3d 563, 569 (4th Cir.

2012). Indeed, it is a cardinal rule of statutory interpretation that "a title . . . should *never* be allowed to override the plain words of a text." Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 222 (2012) (emphasis added); *see Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.*, 331 U.S. 519, 528–29 (1947) ("[T]itles are not meant to take the place of the detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis. . . . [T]hey cannot undo or limit that which the text makes plain." (citations omitted)); *see also, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 483 (2001) (clarity of statutory text "eliminates the interpretive role of the title"); *United States v. Minker*, 350 U.S. 179, 185 (1956) (refusing to allow a statutory title to limit the otherwise "unqualified use" of a statutory word because, "read as ordinary English," it did not admit of a "narrowing reading"); *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 394 (4th Cir. 2014) ("[A]s the Supreme Court has long held, a statute's title provides little assistance to courts interpreting statutory provisions.").

If a *full* title cannot limit the meaning of the text, surely a *short* title—indeed, an acronym—cannot limit the text either. Besides, it makes no sense to ignore deliberate, negotiated statutory language in favor of a punchy short title. As legislators, Amici often pitch bills using memorable acronyms that are merely suggestive of their subject matter. They may help inform the public of the bill's primary objective, but titles have no bearing on the legislation's full scope. *Cf. Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004) (explaining that a statute's caption may refer to the "most common example" of something covered by the law's operative text, but it cannot limit that text when the text "plainly reaches beyond" it).[3]

[3] Consider, for example, the proposed Arsenic Prevention and Protection from Lead Exposure in Juice Act of 2012, H.R. 3984, 112th Cong. (2012). Like the BOTS Act, which applies to more than scalping through use of bots, the APPLE Juice Act of 2012 regulates more than just apple juice. Indeed, just as the BOTS Act never says "bots" in its operative text, the APPLE Juice Act never used the word "apple"—it said "fruit juice" instead—and for good reason. The bill was aimed not only at apple juice with reportedly high arsenic levels, it targeted *grape* juice, too. *See* Press Release, Office of Congressman Frank Pallone, Jr., *Pallone, DeLauro Proposal for Arsenic Levels in Apple Juice Adopted by FDA* (July 12, 2013), tinyurl.com/APPLEJuiceAct (explaining that the legislators "introduced their

Further, if the Court were to consider the short title in interpreting the BOTS Act, it should also consider the *full* title, "An Act To prohibit the *circumvention* of control measures used by Internet ticket sellers *to ensure equitable consumer access* to tickets for any given event," along with the relevant section header, "Unfair and deceptive acts and practices *relating to circumvention* of ticket access control measures." Pub. L. No. 114-274, pmbl., 130 Stat. at 1401 (emphases added); *cf. Miranda v. Garland*, 34 F.4th 338, 355 (4th Cir. 2022) ("[I]f we are to consider the heading of [the relevant subsection], we must also consider the heading of the title under which that section falls."). Both clearly indicate a broad scope not limited to bots.

## II. THE STATUTE'S PLAIN TEXT DOES NOT DEPEND ON HOW VIGOROUSLY A TICKET ISSUER ENFORCES ITS POLICIES, NOR DOES IT CREATE A LOOPHOLE FOR COLLUSIVE CONDUCT.

As a fallback argument, Defendants claim that only acts actively prosecuted by ticket issuers can constitute "circumvent[ion]" under the BOTS Act. *See* Defs. Mem. 16 ("KIG cannot 'circumvent' when Ticketmaster approves."); *id.* at 13–15 (same); *id.* at 1 (similar). This is just another attempt to read an implicit limitation into the text where no such limitation exists.

Yet again, the ordinary meaning of the statutory term "circumvent" forecloses Defendants' argument. Circumvention does not turn on a "system operator's authorization or permission." *See id.* at 14. If, for example, Ticketmaster failed to enforce its rules against bot usage, that would not change whether a scalper is using bots to "circumvent" Ticketmaster's controls.[4] By using bots

---

legislation, the APPLE Juice Act, on the heels of a January 2012 Consumer Reports revelation that alarmingly high levels of inorganic arsenic exist in apple *and grape juice*" (emphasis added)).

[4] Defendants point to a Ticketmaster PowerPoint slide to claim that the ticket issuer "actively permitted" brokers like Defendants to purchase tickets through "accounts using 'fictitious' names, virtual credit cards, or accessed via rotating IP addresses." Defs. Mem. 16 fig. 1. But that same slide clearly refers to this conduct as "violating fictitious account rules." *Ibid.* This does *not* show that the company "actively" granted permission, let alone that it had dismantled the security measures (*e.g.*, controls preventing multiple purchases from the same IP address, *see* Compl. ¶ 34) that Defendants undoubtedly circumvented (*e.g.*, by using an IP proxy service, *see id.* ¶ 35) regardless of permission. By the same token, a single e-mail from a single "Ticketmaster Fan Support" representative, *see* Defs. Mem. 15 (citing ECF No. 1-1, Ex. A), plainly does not represent the company's considered views, nor does it negate the conclusion that Defendants circumvented Ticketmaster's controls.

(or other means), a user "manages to get around" ticket-issuer controls, permission or acquiescence notwithstanding. *Circumvent*, MERRIAM-WEBSTER DICTIONARY (11th ed. rev. 2025). That is still unlawful circumvention, plain and simple.[5]

An analogy to trespass is instructive. If a property owner turns a blind eye to trespass, that does not mean the trespasser has not climbed over the fence. He *has* climbed over the fence—but with tacit permission. In trespass, of course, permission is a defense. But the BOTS Act includes no such exception. That is because violating the BOTS Act harms *event-going consumers*—not ticket issuers like Ticketmaster. Any lack of enforcement or blind-eye treatment by Ticketmaster cannot absolve scalpers of BOTS Act liability. Holding otherwise would create an atextual exemption for collusive conduct between scalpers and ticket issuers that would harm the very people that the BOTS Act was plainly intended to protect—ordinary Americans who want to see their favorite performers or sports teams at reasonable prices. *See* Pub. L. No. 114-274, pmbl., 130 Stat. at 1401 (indicating Act's focus on "ensur[ing] equitable *consumer* access to tickets" (emphasis added)); *see also* 15 U.S.C. § 45c(a)(1)(B) (law applies to resale platforms too).

In search of a textual basis for their position, Defendants assert the statutory phrase "is used" really means "is *actually* used." *See* Defs. Mem. 1 ("To conclude KIG violated the BOTS

---

[5] In addition to dictionary definitions of the term, Defendants appeal to a *statutory* definition of the phrase "circumvent a technological measure" from the Digital Millenium Copyright Act ("DMCA")—a completely unrelated statute codified in a different title of the U.S. Code—which specifically requires lack of permission. *See* Defs. Mem. 14; *compare* 17 U.S.C. § 1201(a)(3)(A) (the DMCA definition in Title 17), *with* 15 U.S.C. § 45c(a)(1)(A) (BOTS Act use of the term 'circumvent' in Title 15). But a statutory definition lifted from an unrelated title of the U.S. Code says precious little about the meaning of the term in another title. *See United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 213 (2001) ("The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them . . . has all the tenacity of original sin and must constantly be guarded against." (citation omitted)); *ibid.* (refusing to afford the same meaning to an identical phrase used in both Title 42 and Title 26); Scalia & Garner, *supra*, at 172 ("[T]he presumption of consistent usage can hardly be said to apply across the whole *corpus juris*. Frequently when a court is called on to construe a statutory word or phrase, counsel for one side will argue that it must bear the well-established or unavoidable meaning that the same word or phrase has in a different statute altogether. Without more, this argument does not have much force[.]"). If anything, the DMCA definition demonstrates that Congress conspicuously chose *not* to condition the BOTS Act on lack of permission.

Act, the Court must find . . . that Ticketmaster *actually* enforced [its] ticket limits or maintained the integrity of [its] rules." (cleaned up) (emphasis added)). But that is not how an ordinary English speaker would understand the phrase in context. Rather, the phrase "is used" indicates purpose. For example, one might say, "This fire extinguisher *is used* to put out kitchen fires," even though the extinguisher has sat unused beneath the kitchen sink for years on end. In the same way, the BOTS Act prohibits circumventing a "control or measure . . . that *is used* by the ticket issuer to enforce" and "maintain the integrity of" its posted rules—that is, a "control or measure" that exists for that *purpose*. 15 U.S.C. § 45c(a)(1)(A) (emphasis added). Because the Complaint adequately alleges that Ticketmaster has controls and measures "designed" to serve these purposes, Compl. ¶¶ 34, 38; *see id.* ¶ 49, and that Defendants circumvented these controls and measures, *see id.* ¶¶ 35–37, 39–40, 42–48, 50, the Commission has stated viable BOTS Act violations.[6]

## III. EVEN IF LEGISLATIVE HISTORY WERE RELEVANT, AMICI DRAFTED THE BOTS ACT BROADLY TO COMBAT UNFAIR TICKET SCALPING.

There is no textual basis for Defendants' artificially narrow reading of the statute. So, Defendants all-too-readily venture beyond the text into the fraught domain of legislative history.[7] This is a mistake twice over.

*First*, legislative history comes into play only to assist in resolving textual ambiguities. *See Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011) ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it."); *see also United States v. Mo. Pac. R.R.*

[6] Defendants' contrary reading would yield absurd results. Scalpers would escape liability whenever a ticket issuer becomes so overwhelmed by the sheer number of circumventions that it cannot police them all. Moreover, ticket issuers and scalpers could collude to evade the statute by agreeing not to enforce security measures, access control systems, or other technological controls or measures. Nothing in the statute turns on enforcement sufficiency, let alone authorizes or requires a court to invent an *ad hoc* balancing test to determine how much enforcement is enough. Rather, a court need only consider whether a ticket issuer put security measures in place and whether a scalper circumvented those measures. 15 U.S.C. § 45c(a)(1)(A). Nothing more.

[7] *See Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) ("[T]he use of legislative history [is] the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends.").

Case 1:25-cv-02716-GLR Document 36 Filed 12/31/25 Page 14 of 24

*Co.*, 278 U.S. 269, 278 (1929) ("[W]here the language of an enactment is clear . . . the words employed are to be taken as the final expression of the meaning intended" and "in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed."). As explained above, *supra* sections I–II, the BOTS Act is unambiguous. It applies broadly to *any* means used to "circumvent" ticket issuer rules—not just the bots that many legislators, Amici included, were particularly concerned about in 2016. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) ("[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." (cleaned up)); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) ("[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").

Attempting to escape the plain text, Defendants briskly posit that the BOTS Act text is ambiguous merely because the term "circumvent" is not defined by the statute. *See* Defs. Mem. 13 ("The BOTS Act does not define the term 'circumvent.' Because the term is not defined, courts are instructed to . . . look to legislative history . . . ."); *see also id.* at 8–9 (similar). That violates Statutory Interpretation 101: "In the absence of [a statutory] definition, we construe a statutory term in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994) (relying on a definition from BLACK'S LAW DICTIONARY to discern ordinary meaning); *see also United States v. Mills*, 485 F.3d 219, 222 (4th Cir. 2007) ("It is a cornerstone of statutory interpretation that an undefined term is construed in accordance with its ordinary or natural meaning." (cleaned up)). And again, as explained above, *supra* sections I–II, the ordinary meaning

of the statutory term "circumvent" easily resolves this case without any need to resort to legislative history.

*Second*, even assuming legislative history is relevant to resolving some latent ambiguity, Defendants' presentation of that history is incorrect. They claim that "the BOTS Act's drafters . . . believed the BOTS Act was [only] meant to stop the behavior of people who use bots." Defs. Mem. 20–21; *see id.* at 21 ("Nobody at the time understood that the BOTS Act was meant to regulate non-bot behavior."); *id.* at 9 ("The BOTS Act's legislative history is clear and consistent. In 2016, Congress repeatedly and unambiguously stated that the BOTS Act ***is about bots***." (emphasis in original)). That is wrong. Amici include the BOTS Act's drafters, and that is not what they believed. Defendants misrepresent their views.

When Amicus Senator Blackburn introduced the BOTS Act and Congress unanimously passed it into law, legislators drew attention to the problem of online ticket scalpers. The problem troubling Amici and their fellow lawmakers was not just scalpers using bots to gain an unfair advantage—though, to be sure, that was a significant concern. The root problem was that ticket scalpers did not play by the rules; they cheated and enriched themselves at the expense of the ordinary American consumer. By evading ticket-issuer rules like ticket-purchase limits—whatever their means of doing so—to snatch up and accumulate hoards of tickets, online scalpers forced many Americans into secondary markets where scalpers then resold their tickets at exorbitant markups. In short, unscrupulous scalpers gained at American eventgoers' expense.[8]

[8] Advocates for the BOTS Act at the Senate subcommittee hearing that considered the bill raised these same concerns. *See, e.g.*, *Examining the Better Online Ticket Sales Act of 2016: Hearing Before the Subcomm. on Consumer Prot., Prod. Safety, Ins., & Data Sec. of the S. Comm. on Com., Sci., & Transp.*, 114th Cong. at 7 (2016) (statement of Bob Bowlsby, Commissioner, Big 12 Conference) ("Whether it's an individual lurking outside the perimeter of an arena or a sophisticated computer operator unleashing a torrent of bots, the bottom line is this: the hard-earned money of our fans spent on tickets to our sporting events should benefit our schools and our student athletes, not third parties who seek to make a quick buck off our most passionate supporters."); *id.* at 12 (prepared statement of Jeffrey Seller, Producer, "Hamilton") ("[W]e are here together to ask for your help in passing the BOTS Act to punish abusers of a system designed for consumers and fans, not just for those looking to 'game the system' and make a quick buck.").

When the BOTS Act passed, Amicus Senator Blackburn, the bill's House co-sponsor, explained this problem and how the BOTS Act addressed it:

> Scalpers . . . purchase tickets in mass quantities and sell them at a drastically inflated rate, which unfairly prices most fans of live entertainment out of the market. The entertainers go to great lengths to build relationships with their fans and ensure that they will have access to shows, but scalpers are decimating this experience. The BOTS Act will allow FTC enforcement . . . against proven online scalpers. It is time to end these anti-consumer tactics and level the online ticket playing field for fans of live entertainment.

Press Release, Office of Congressman Paul Tonko, *Tonko, Blackburn Lead Bipartisan Effort to Level Online Ticket Sales Playing Field for Fans of Live Entertainment* (Apr. 28, 2016), tinyurl.com/Tonko-Bbn. To be sure, Senator Blackburn also noted that bots were in Congress's crosshairs because scalpers were often "taking advantage of [them] to circumvent restrictions put in place by online ticketing agents." *Ibid.* But as this statement itself implies, using bots is just *one* way—albeit a common way—of circumventing ticket-issuer restrictions. *See ibid.*; *see also* Press Release, Office of Senator Richard Blumenthal, *Senate Approves Blumenthal Bill to Crack Down on Unfair Ticket Bots* (Dec. 1, 2016), tinyurl.com/Blum-PR (noting that "*[o]ne* of the chief reasons" for ticket scarcity in primary markets is "the use of 'ticket bots'" (emphasis added)); Press Release, Office of Senator Amy Klobuchar, *Klobuchar-Backed Bipartisan Legislation to Protect Consumers from Ticket Bots Passes Senate* (Dec. 2, 2016), tinyurl.com/Klob-PR ("The Better Online Ticket Sales (BOTS) Act of 2016 would prohibit the use of ticket bots *and other online measures* in order to deliberately circumvent security protocols that limit or restrict online ticket purchases." (emphasis added)). The problem that Amici and their congressional colleagues clearly targeted was the use of unfair practices to snatch up tickets and then price-gouge event-going Americans as the date of the ticketed event approached. *See Examining the Better Online Ticket Sales Act of 2016: Hearing Before the Subcomm. on Consumer Prot., Prod. Safety, Ins., & Data*

*Sec. of the S. Comm. on Com., Sci., & Transp.*, 114th Cong. at 21 (2016) (Sen. MORAN: "The goal here is to create the circumstance in which you can't acquire a huge magnitude of the tickets that are available and, therefore, control or corner the market with your resale of those tickets.").

## IV. DEFENDANTS' CONSTRICTIVE READING WOULD ALLOW TICKET SCALPERS TO END-RUN THE LAW AND HARM ORDINARY CONSUMERS.

Defendants concede, as they must, that the BOTS Act forbids the use of bots to violate enforced ticket-issuer policies, amass tickets, and resell them. *See* Defs. Mem. 1, 3–4, 8–9. But they invite the Court to adopt an untenable reading of the BOTS Act that would open the door to easy end-runs around that conceded prohibition. The Court should refuse that invitation.

On Defendants' view, online ticket scalpers can comply with the law by either (1) persuading ticket issuers to relax enforcement of their policies, *see id.* at 13, 17–19, or (2) use manual labor instead of bots to do the very same thing, *see id.* at 7, 9–12. Neither tactic should be condoned.[9]

The first should be rejected because, as explained above, *supra* section II, scalping prohibitions do not turn on how vigorously a ticket issuer enforces its policies. In addition, Defendants' interpretation would condone collusive conduct. Ticket issuers, preferring to continue collecting secondary-market transaction fees from brokers who use bots or legions of fictitious accounts, could keep nice-sounding policies on paper but turn a blind eye to their violations in practice. *See, e.g.*, Clare Y. Cho, Cong. Rsch. Serv., R48179, TICKETS FOR LIVE ENTERTAINMENT EVENTS 3 (2025) ("Ticketers in the primary and secondary markets obtain revenue from fees that are paid by consumers."); *cf.* Compl. ¶ 40 fig. 1 (Ticketmaster slide noting "[s]erious economic impact if we we [sic] move to 8 ticket limit across the board" and listing "brokers violating

[9] On Defendants' view, scalpers' compliance with the BOTS Act could also be moral luck: If, of its own accord, a ticket issuer turns a blind eye to violations of its policies or lacks the resources to enforce its policies, scalpers abusing the ticket issuer's platform could, by happenstance, be in compliance with the law as Defendants strain to read it.

fictitious account rules on large scale" along with the "Potential GVT [*i.e.*, Gross Transaction Value] Loss" (likely lost revenue) and "Potential AOI [*i.e.*, Adjusted Operating Income] Loss" (likely lost profits) if Ticketmaster enforced stricter ticket limits). Immunizing scalpers merely because of collusive ticket-issuer conduct would render the BOTS Act a paper tiger.

As for scalpers' second tactic, engaging in substantially the same fraudulent conduct using human effort instead of automated bots is an unabashed end-run around the statute's clear objective of "ensur[ing] equitable consumer access to tickets for any given event." Pub. L. No. 114-274, pmbl., 130 Stat. at 1401. Indeed, one Defendant in this case previously used bots for ticket scalping, but after facing state prosecution, he simply joined Defendant KIG in an obvious attempt to circumvent the BOTS Act while continuing to engage in large-scale online ticket scalping. *See* Defs. Mem. 25. It is not difficult to imagine devious brokers devising new ways to circumvent ticket-issuer controls or measures—for example, by offshoring ticket purchasing to countries with inexpensive labor.[10]

Adopting Defendants' incorrect construction of the BOTS Act would impose serious and substantial real-world costs on Americans who enjoy attending live performances and sporting events. Almost 40% of Americans report buying event tickets on the secondary market. *See* Digital Citizens Alliance, *When It Comes to Digital Markets, Trust Can't Be Secondary* (May 2025), tinyurl.com/DigCitAllce. "Seventy-five percent of Americans who purchased reseller tickets said online secondary markets lead to speculators hoarding products." *Ibid.* Their

[10] *Cf.* N.Y. State Off. of the Att'y Gen., Obstructed View: What's Blocking New Yorkers from Getting Tickets 17 (2016), tinyurl.com/NYAGRpt (explaining a hybrid bot–human scalper scheme involving bots that transmit "CAPTCHAs they encounter on Ticketmaster . . . to armies of 'typers,' human workers in foreign countries where labor is less expensive," who then enable the bots to "bypass ticket vendors' defenses"); *id.* at 21 (noting that some scalpers "use multiple computers or mobile devices" or "employ dozens of people" instead of bots); Dave Brooks, *Is It a Bot, or Not? Ticketing's Next Big Legal Fight Could Reshape the Resale Industry*, Billboard (Aug. 29, 2025), perma.cc/9XMY-8RRZ (quoting cyber expert Jérôme Segura: "Whether you use bots or an army of humans, you're still doing something that's harmful. What really matters is the intent: is it to purchase a number of tickets like a regular fan, or is it to hoard inventory and scalp it for profit?").

intuitions are amply justified: It is well-documented that unregulated ticket-resale markets incentivize "costly rent-seeking behavior," which "reduce[s] overall social welfare." Phillip Leslie & Alan Sorensen, *The Welfare Effects of Ticket Resale*, at 1 (Nat'l Bureau of Econ. Rsch., Working Paper No. 15476, 2009).

When ticket scalpers buy up tickets in primary markets—whether with bots or armies of humans using fictitious accounts, IP proxy services, and SIM banks—they force ordinary consumers into secondary markets, where "[t]icket resale prices can be significantly higher than primary market prices." U.S. Gov't Accountability Off., GAO-18-347, *Event Ticket Sales: Market Characteristics and Consumer Protection Issues*, at 12 (2018), tinyurl.com/GAO-tix. One study, for instance, found that ticket buyers on average paid 203% of face value for their tickets in the secondary market. *See* Nat'l Indep. Ticket Operators Ass'n, NITO TICKET RESALE STUDY 1–2 (2024), perma.cc/UE6A-WBF6. These markups represent massive wealth transfers from American consumers to unscrupulous online ticket speculators and their platform enablers—precisely what the BOTS Act sought to stop.

For too long, the Commission failed to enforce the BOTS Act with vigor. *See* Press Release, Office of Senator Marsha Blackburn, *The FTC Has Failed To Enforce The BOTS Act* (Dec. 2, 2022), tinyurl.com/FTC-BOTS. In March 2025, President Trump directed the Commission to "[r]igorously enforce" the BOTS Act "to protect fans from exploitative ticket scalping." Press Release, White House, *Fact Sheet: President Donald J. Trump Will End Price-Gouging by Middlemen in the Entertainment Industry* (Mar. 31, 2025), tinyurl.com/WHFctsht; *see* Exec. Order No. 14,254 § 2(b), (d), 90 Fed. Reg. 14,699, 14,699 (Apr. 3, 2025). This Court should not hinder that overdue enforcement by allowing Defendants so easily to circumvent the law.

## CONCLUSION

Because the Commission's Complaint adequately alleges BOTS Act violations, Amici respectfully submit that the Court should deny Defendants' motion to dismiss.

Dated: December 31, 2025

Respectfully submitted,

*/s/ James R. Wedeking*
James R. Wedeking (Md. No. 18469)
**BOYDEN GRAY PLLC**
800 Connecticut Ave, NW
Washington, DC 20006
Telephone: 202.955.0620
jwedeking@boydengray.com

Michael A. Fragoso*
T. Zachary Horton*
Peter Lee Hamilton*
**TORRIDON LAW PLLC**
801 17th Street NW, Suite 1100
Washington, DC 20006
Telephone: 202.249.6900
mfragoso@torridonlaw.com
tzhorton@torridonlaw.com
phamilton@torridonlaw.com

**Pro hac vice pending*

***Attorneys for Amici Curiae***

# EXHIBIT 13

**LATHAM & WATKINS LLP**
Michael H. Rubin (Bar No. 214636)
*michael.rubin@lw.com*
Scott D. Joiner (Bar No. 223313)
*scott.joiner@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: (415) 391-0600

Alexander C.K. Wyman (Bar No. 295339)
*alex.wyman@lw.com*
Will Schildknecht (Bar No. 348372)
*will.schildknecht@lw.com*
Max A. Shapiro (Bar No. 334929)
*max.shapiro@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: (424) 653-5500

**SIDLEY AUSTIN LLP**
Benjamin M. Mundel (*pro hac vice forthcoming*)
*bmundel@sidley.com*
1501 K Street, N.W.
Washington, DC 20005
Telephone: (202) 736-8000

Attorneys for Defendants
Live Nation Entertainment, Inc. and Ticketmaster L.L.C.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

FEDERAL TRADE COMMISSION; ATTORNEY GENERAL OF COLORADO; OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS; THE PEOPLE OF THE STATE OF ILLINOIS; STATE OF NEBRASKA; STATE OF TENNESSEE; STATE OF UTAH; UTAH DIVISION OF CONSUMER PROTECTION; COMMONWEALTH OF VIRGINIA,

Plaintiffs,

v.

LIVE NATION ENTERTAINMENT, INC. and TICKETMASTER L.L.C.,

Defendants.

Case No. 2:25-cv-08884-MEMF-MAA

**NOTICE OF DEFENDANTS' MOTION TO DISMISS COMPLAINT FOR PERMANENT INJUNCTION, MONETARY RELIEF, CIVIL PENALTIES, AND OTHER RELIEF; MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Date: February 19, 2026
Time: 10:00 a.m.
Place: Courtroom 8B

Hon. Maame Ewusi-Mensah Frimpong

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT on February 19, 2026 at 10:00 a.m. or as soon thereafter as the matter may be heard before the Honorable Maame Ewusi-Mensah Frimpong, in the United States District Court for the Central District of California located at 350 W. First Street, Los Angeles, CA 90012, Courtroom 8B, Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C. will and hereby do move this Court for an Order dismissing Plaintiffs' Complaint for Permanent Injunction, Monetary Relief, Civil Penalties, and Other Relief ("Complaint"). Defendants respectfully submit this Motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

This Motion requests that the Complaint be dismissed on the basis that Plaintiffs failed to adequately allege their claims under Federal Rules of Civil Procedure 8(a) and 9(b). This Motion is based on this Notice, the accompanying Memorandum of Law, the concurrently filed Declaration of Alexander C.K. Wyman, all pleadings on file in this action, and such oral argument as may be presented on this motion.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on December 19, 2025.

Dated: January 6, 2026

Respectfully submitted,

LATHAM & WATKINS LLP
Michael H. Rubin
Scott D. Joiner
Alexander C.K. Wyman
Will Schildknecht
Max A. Shapiro

SIDLEY AUSTIN LLP
Benjamin M. Mundel

By *<u>/s/ Michael H. Rubin</u>*
Michael H. Rubin

Attorneys for Defendants
Live Nation Entertainment, Inc. and
Ticketmaster L.L.C.

# TABLE OF CONTENTS

Page

INTRODUCTION ........ 12

BACKGROUND ........ 13

A. Ticketmaster's Business ........ 13

B. Ticketmaster Supports And Announces Its Intention To Implement All-In Pricing ........ 13

C. Ticketmaster Is An Industry-Leader In Combating Ticket Harvesting And Scalping ........ 14

D. Congress Enacted The BOTS Act To Protect Platforms From Bad Actors That Use Technological Exploits To Circumvent Purchase Limits ........ 15

E. The FTC Initiates The Instant Lawsuit ........ 16

LEGAL STANDARD ........ 16

ARGUMENT ........ 17

I. THE BOTS ACT CLAIM (COUNT III) MUST BE DISMISSED ........ 17

A. Ticketmaster Provides A Platform And Does Not Itself Sell Or Offer To Sell Tickets Listed By Third Parties ........ 18

B. Plaintiffs Fail To Allege Any Particular Ticket On Ticketmaster's Platform Was Obtained Through Circumvention Of Any Specific Technological Control ........ 21

C. Plaintiffs Fail To Adequately Allege Ticketmaster Knew Or Should Have Known That Any Particular Ticket Listed On Its Platform Was Purchased In Violation Of The BOTS Act ........ 24

D. At Minimum, The Claim For Civil Penalties Must Be Dismissed Because The FTC Fails To Adequately Allege Ticketmaster Knew Its Conduct Violated The BOTS Act ........ 25

E. The State Plaintiffs Cannot Join the FTC's BOTS Act Claim ........ 26

II. THE SECTION 5 CLAIMS (COUNTS I - II) MUST BE DISMISSED ........ 27

A. The FTC's Claim Regarding Ticketmaster's Fee Disclosures (Count I) Fails ........ 27

1. The FTC Fails To Adequately Allege Ongoing Or Imminent Misconduct ........ 27

2. Prior Disclosures Did Not Violate Section 5 In Any Event ........ 28

B. The FTC's Claim Regarding Ticketmaster's Ticket Limit Disclosures (Count II) Fails ........ 29

1. The FTC Fails To Adequately Allege Ticketmaster's Ticket Limit Disclosures Are False Or Misleading ........ 29

2. The FTC Fails To Adequately Allege Ticketmaster's Ticket Limit Disclosures Are Material ........ 30

III. THE STATE-LAW CLAIMS (COUNTS IV - X) MUST BE DISMISSED ........ 31

CONCLUSION ........ 33

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Aliano v. Ferriss*,
988 N.E.2d 168 (Ill. App. Ct. 2013) ........ 31, 32

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 16, 24

*Bell v. 1220 Mgmt. Grp., L.L.C.*,
2018 WL 3054795 (S.D. Fla. June 20, 2018) ........ 32

*Bobo v. Optimum Nutrition, Inc.*,
2015 WL 13102417 (S.D. Cal. Sept. 11, 2015) ........ 29

*Chadwick v. Bonneville Billing & Collections, Inc.*,
2021 WL 1140206 (D. Utah Mar. 25, 2021) ........ 33

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
543 U.S. 157 (2004) ........ 23

*Davis v. HSBC Bank*,
691 F.3d 1152 (9th Cir. 2012) ........ 29

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) ........ 24

*Est. of Graham v. Sotheby's, Inc.*,
178 F. Supp. 3d 974 (C.D. Cal. 2016), *aff'd in part, rev'd in part and remanded on other grounds sub nom. Close v. Sotheby's, Inc.*,
894 F.3d 1061 (9th Cir. 2018) ........ 20

*Fabozzi v. StubHub, Inc.*,
2012 WL 506330 (N.D. Cal. Feb. 15, 2012) ........ 20

*Facebook, Inc. v. Power Ventures*,
844 F.3d 1058 (9th Cir. 2016) ........ 22

*Freeman v. Time, Inc.*,
68 F.3d 285 (9th Cir. 1995) ........ 29

*FTC v. Credit Bureau Ctr., LLC*,
937 F.3d 764 (7th Cir. 2019) .......... 28

*FTC v. Cyberspace.com LLC*,
453 F.3d 1196 (9th Cir. 2006) .......... 31

*FTC v. Evans Prods. Co.*,
775 F.2d 1084 (9th Cir. 1985) .......... 28

*FTC v. Facebook, Inc.*,
560 F. Supp. 3d 1 (D.D.C. 2021) .......... 23

*FTC v. Gill*,
265 F.3d 944 (9th Cir. 2001) .......... 28

*FTC v. Lights of Am., Inc.*,
760 F. Supp. 2d 848 (C.D. Cal. 2010) .......... 17, 27

*FTC v. Nudge, LLC*,
2022 WL 2132695 (D. Utah June 14, 2022) .......... 32

*FTC v. QYK Brands LLC*,
2024 WL 1526741 (9th Cir. Apr. 9, 2024) .......... 28

*FTC v. Stefanchik*,
559 F.3d 924 (9th Cir. 2009) .......... 27

*FTC v. Swish Mktg.*,
2010 WL 653486 (N.D. Cal. Feb. 22, 2010) .......... 23

*FTC v. Walmart Inc.*,
664 F. Supp. 3d 808 (N.D. Ill. 2023) .......... 23

*Gallegos v. LVNV Funding LLC*,
169 F. Supp. 3d 1235 (D. Utah 2016) .......... 33

*Hall v. Marriott Int'l, Inc.*,
344 F.R.D. 247 (S.D. Cal. 2023) .......... 29

*Hill v. StubHub, Inc.*,
219 N.C. App. 227 (2012) .......... 20

*Homebuyers Inc. v. Watkins*,
2019 WL 2361760 (Neb. Ct. App. June 4, 2019) .......... 32

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
362 F. Supp. 3d 510 (N.D. Ill. 2019)....................31

*Ind. Farm Bureau Ins. v. Shenzhen Anet Tech. Co.*,
2020 WL 7711346 (S.D. Ind. Dec. 29, 2020)....................20

*iSpot.tv, Inc. v. Teyfukova*,
2023 WL 3602806 (C.D. Cal. May 22, 2023) (Frimpong, J.)....................23

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
559 U.S. 573 (2010)....................26

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009)....................17

*Knievel v. ESPN*,
393 F.3d 1068 (9th Cir. 2005)....................14

*Lackey v. Stinnie*,
604 U.S. 192 (2025)....................27

*Morgan v. Twitter, Inc.*,
2025 WL 1248821 (9th Cir. Apr. 30, 2025)....................28

*People ex rel. Dunbar v. Gym of Am., Inc.*,
493 P.2d 660 (Colo. 1972)....................32

*Porras v. StubHub, Inc.*,
2012 WL 3835073 (N.D. Cal. Sept. 4, 2012)....................20

*Ratha v. Phatthana Seafood Co.*,
35 F.4th 1159 (9th Cir. 2022)....................24

*Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*,
706 P.2d 1028 (Utah 1985)....................33

*Roberts v. Sea-Land Servs., Inc.*,
566 U.S. 93 (2012)....................19

*Safeco Ins. Co. of Am. v. Burr*,
551 U.S. 47 (2007)....................26

*Southwest Airlines Co. v. Saxon*,
596 U.S. 450 (2022)....................21

*State Farm Fire & Cas. Co. v. Amazon.com, Inc.*,
835 F. App'x 213 (9th Cir. 2020) .......... 20

*Tiffany (NJ) Inc. v. eBay Inc.*,
600 F.3d 93 (2d Cir. 2010) .......... 25

*Tucker v. Sierra Builders*,
180 S.W.3d 109 (Tenn. Ct. App. 2005) .......... 31, 32

*United States v. Corrales-Vazquez*,
931 F.3d 944 (9th Cir. 2019) .......... 19

*United States v. Dish Network L.L.C.*,
954 F.3d 970 (7th Cir. 2020) .......... 26

*United States v. eBay Inc.*,
751 F. Supp. 3d 232 (E.D.N.Y. 2024) .......... 21

*Van Buren v. United States*,
593 U.S. 374 (2021) .......... 19, 22

*Viacom Int'l, Inc. v. YouTube, Inc.*,
676 F.3d 19 (2d Cir. 2012) .......... 25

*Y.Y.G.M. SA v. Redbubble, Inc.*,
75 F.4th 995 (9th Cir. 2023) .......... 25

*Yumul v. Smart Balance, Inc.*,
733 F. Supp. 2d 1117 (C.D. Cal. 2010) .......... 18

## STATUTES

15 U.S.C. § 45(m)(1)(A) .......... 26

15 U.S.C. § 45c .......... 12, 15, 27

15 U.S.C. § 45c(a)(1) .......... 17

15 U.S.C. § 45c(a)(1)(A) .......... *passim*

15 U.S.C. § 45c(a)(1)(B) .......... 16, 18, 21

15 U.S.C. § 45c(a)(1)(B)(ii) .......... 24

15 U.S.C. § 45c(b) .......... 26

15 U.S.C. § 45c(c)(1) ..... 26

15 U.S.C. § 45c(c)(4) ..... 26

15 U.S.C. § 45f(d)(4) ..... 27

15 U.S.C. § 53(b) ..... 28

15 U.S.C. § 57b(d) ..... 18

17 U.S.C. § 1201(a)(1)(A) ..... 23

17 U.S.C. § 1201(a)(3)(A) ..... 23

28 U.S.C. § 1367(c) ..... 31

28 U.S.C. § 1367(c)(3) ..... 31

Fla. Stat. § 501.204(1) ..... 31

Utah Code Ann. § 13-11-2(4) ..... 31

**RULES**

Fed. R. Civ. P. 9(b) ..... 17, 24, 27, 28

Fed. R. Civ. P. 12(b)(6) ..... 16

**TREATISES**

*Restatement (Second) of Contracts* § 24 (1981) ..... 19

**REGULATIONS**

16 C.F.R. §§ 464 *et seq.* ..... 14

90 Fed. Reg. 2066 ..... 13, 14

**OTHER AUTHORITIES**

*Circumvent*, *Black's Law Dictionary* (12th ed. 2024) ..... 23

*New Oxford American Dictionary* 1586 (3d ed. 2010) ..... 19

Rebecca Kelly Slaughter, Comm'r, FTC, *Prepared Remarks: "That's the Ticket" Workshop on Online Ticket Sales* (June 11, 2019), https://www.ftc.gov/system/files/documents/public_statements/1527238/slaughter_-_prepared_remarks_ftc_tickets_workshop_6-11-19.pdf .......... 14

*Sale*, *Black's Law Dictionary* (12th ed. 2024) .......... 19

*Sell*, *Black's Law Dictionary* (12th ed. 2024) .......... 19

## INTRODUCTION

This lawsuit, initiated by the Federal Trade Commission alongside the States of Colorado, Florida, Illinois, Nebraska, Tennessee, Utah, and Virginia ("State Plaintiffs"), reflects an egregious instance of agency overreach. Plaintiffs' primary allegation is that Live Nation Entertainment, Inc. and Ticketmaster L.L.C. (collectively, "Ticketmaster") violated the Better Online Ticket Sales Act ("BOTS Act" or "Act"), 15 U.S.C. § 45c. This statute is designed to *help* ticket issuers like Ticketmaster combat ticket harvesting and scalping, ensuring that tickets are accessible to genuine fans. Plaintiffs now ask this Court to take the unprecedented step of applying this law *against* a ticket issuer for its operation of a resale platform.

Plaintiffs' BOTS Act claim fails for several reasons under the statute's plain text. First, their theory assumes (without support) that Ticketmaster—rather than ticketholders who possess the tickets—"sells or offers to sell" unlawfully acquired tickets on the resale market. Second, Plaintiffs do not allege "circumvention" of any particular "technological control or measure," as mandated by the BOTS Act. Third, Plaintiffs fail to plausibly allege facts establishing that that Ticketmaster knew or should have known that any particular ticket on its resale platform was obtained through the circumvention of a technological control. Ultimately, Plaintiffs' theory boils down to the idea that Ticketmaster is liable under the BOTS Act merely for knowing that some brokers used multiple accounts or that some accounts possessed more tickets than the ticket limit permitted. But that theory does not amount to a violation of the statute Congress enacted. Plaintiffs cannot rewrite that statute through this litigation.

The FTC's Section 5 claims are equally deficient. The first theory—regarding Ticketmaster's presentation of fees—fails because, as the Complaint acknowledges, Ticketmaster now employs all-in pricing consistent with the Commission's Rule on Unfair or Deceptive Fees, effective May 2025. And the FTC's second theory—regarding Ticketmaster's disclosures about ticket limits—fails because the

Complaint identifies nothing false or misleading. These deficiencies also doom the state-law claims, which mirror the Section 5 claims and should be dismissed for the same reasons.

## BACKGROUND

### A. Ticketmaster's Business

Ticketmaster, a subsidiary of Live Nation Entertainment, is the nation's largest ticketing company, providing primary and secondary ticketing services for live events. Compl. ¶¶ 10, 33. In the primary market, tickets are first offered for sale during an "onsale." Ticketmaster facilitates these onsales on behalf of the event organizer (e.g., an artist, promoter, or venue) who determines the face value ticket price. *Id.* ¶ 36. The venue typically sets the fees, a portion of which are remitted to the ticketing company (here, Ticketmaster) for distributing tickets in the onsale. *Id.*

In the secondary market, ticketholders offer their ticket—the license to attend an event—to another person. *See id.* ¶ 33. In this context, Ticketmaster acts as the platform of exchange. These tickets are typically exchanged at prices determined by market demand, plus fees that Ticketmaster charges the buyer and seller. *See id.* ¶¶ 37, 39.

### B. Ticketmaster Supports And Announces Its Intention To Implement All-In Pricing

For years, major ticketing platforms (including Ticketmaster) displayed applicable fees and taxes at checkout, along with the face price of the ticket and the total the consumer would be charged. But as the FTC has acknowledged, Ticketmaster has long advocated for "all-in pricing," a practice in which the upfront price a fan sees on the ticketing platform includes any applicable fees. *See* 90 Fed. Reg. 2066, 2088, 2096 n.283 (Jan. 10, 2025). Unfortunately, Ticketmaster alone could not feasibly implement all-in pricing unless there was a "nationwide" rule requiring it because "adopting all-in pricing 'absent a mandate creates a first-mover disadvantage.'" *Id.* at 2088. As former FTC Commissioner Rebecca Kelly Slaughter

explained, Ticketmaster faced a "classic prisoner's dilemma": adopting all-in pricing while other ticketing marketplaces did not would shift sales to platforms listing a lower upfront price. Rebecca Kelly Slaughter, Comm'r, FTC, *Prepared Remarks: "That's the Ticket" Workshop on Online Ticket Sales* (June 11, 2019), https://www.ftc.gov/system/files/documents/public_statements/1527238/slaughter_-_prepared_remarks_ftc_tickets_workshop_6-11-19.pdf. Ticketmaster thus urged the FTC to issue a "nationwide rule[] to implement all-in pricing," which "would 'increase pricing transparency for fans and support competition in the ticketing industry.'" 90 Fed. Reg. at 2088.

In January 2025, the FTC did just that, promulgating the Trade Regulation Rule on Unfair or Deceptive Fees. *Id.* at 2066; 16 C.F.R. §§ 464 *et seq.* This rule, which effectively mandates all-in pricing for live events, became effective in May 2025. Compl. ¶ 63. Ticketmaster agreed to implement all-in pricing as of that date, and the Complaint does not allege Ticketmaster has done otherwise. *Id.*

### C. Ticketmaster Is An Industry-Leader In Combating Ticket Harvesting And Scalping

For certain live events, Ticketmaster limits the number of tickets that can be purchased by a single account. *Id.* ¶¶ 66-67. These purchase limits, set by event organizers, help get tickets to real fans and discourage scalping. *See id.* ¶ 65; Declaration of Alexander C.K. Wyman ("Wyman Decl.") Ex. 1 at 5.[1] Ticketmaster's Terms of Use and Purchase Policy prohibit circumventing these ticket purchase limits. Compl. ¶¶ 68-69. If a purchaser exceeds or attempts to exceed purchase limits, Ticketmaster "reserve[s] the right to cancel … any or all orders and tickets, in addition to prohibiting [the purchaser's] ticket purchasing abilities." *Id.* ¶ 69.

[1] Ticketmaster: Purchase Policy (effective Jan. 1, 2021), https://legal.ticketmaster.com/wp-content/uploads/2025/06/Purchase-Policy-%E2%80%93-Last-Update-January-1-2021.pdf. The Complaint references the policy, Compl. ¶¶ 68-69, and thus the Court may consider it because it is incorporated by reference. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *see also* Defendants' Request for Judicial Notice.

Ticketmaster's efforts to enforce these per-account event ticket limits extend beyond its policies. The Complaint concedes that Ticketmaster has invested in a wide "array of security measures for enforcing event ticket limits." Compl. ¶ 71; *see also id.* ¶¶ 74, 76. Many of these measures aim to prevent scalpers and brokers from using automated ticket purchasing technology, or "bots," to quickly acquire large quantities of tickets for resale at inflated prices, a practice known as "ticket harvesting." These measures include virtual waiting rooms and queuing systems, automated blocking of repeat or coordinated purchase attempts, and account verification codes. *Id.* ¶¶ 70-71, 76.

Despite Ticketmaster's efforts, scalpers persist in using technology to step in front of fans to obtain an outsized share of tickets and resell them at marked up prices in a multibillion-dollar resale market. *Id.* ¶¶ 74, 76. For instance, brokers create hundreds or thousands of Ticketmaster accounts to buy more tickets without exceeding the per-account ticket limit. *Id.* ¶ 74. Scalpers also use software that allows them to log into multiple accounts at the same time to bypass screening and verification measures. *Id.* ¶ 76.

### D. Congress Enacted The BOTS Act To Protect Platforms From Bad Actors That Use Technological Exploits To Circumvent Purchase Limits

Recognizing the growing problem of automated ticket purchasing tactics, Ticketmaster has advocated for legislative and regulatory change. One such change was the BOTS Act (2016), 15 U.S.C. § 45c. Congress recognized that "[t]he market for live event tickets has encountered challenges from scalpers who use software to circumvent the safeguards primary ticket sellers use to limit ticket purchases." S. Rep. No. 114-391, at 1 (2016). The BOTS Act accordingly makes it unlawful to acquire tickets by circumventing a "technological control or measure" used by a ticket issuer like Ticketmaster to enforce limits on ticket purchases. 15 U.S.C. § 45c(a)(1)(A). The Act also makes it unlawful for anyone who knows a ticket was

acquired through such circumvention to sell or offer to sell the ill-gotten ticket. *Id.* § 45c(a)(1)(B).

Until this case, the FTC has enforced the BOTS Act according to Congress's direction, targeting scalpers and ticket brokers that allegedly use bots, proxy servers, fictitious identities, and other technological exploits to bypass Ticketmaster's technological controls. The FTC has never enforced the Act against a ticket issuer or platform—nor even suggested it could—until this case.

**E. The FTC Initiates The Instant Lawsuit**

Plaintiffs, which consist of the FTC and seven states, filed this action on September 18, 2025. The Complaint asserts ten claims. Plaintiffs assert a BOTS Act claim alleging Ticketmaster is liable for selling unlawfully acquired tickets. Compl. ¶¶ 119-25 (Count III). Plaintiffs also assert claims under Section 5 of the FTC Act and state-law analogues challenging Ticketmaster's prior pricing displays and statements regarding ticket purchase limits. *Id.* ¶¶ 111-18 (Counts I-II) (FTC Act); *id.* at pp. 59-73 (Counts IV-X) (state-law claims). They allege Ticketmaster historically "displayed deceptively low ticket prices" by adding fees later in the purchasing process, *id.* ¶ 12, and that its ticket limits are deceptive because Ticketmaster "routinely allow[s] ticket brokers to exceed ticket limits." *Id.* ¶ 14.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," nor do "'legal conclusion[s] couched as … factual allegation[s].'" *Id.*

Because the Complaint asserts a unified course of deceptive conduct regarding pricing and ticket limits, the allegations sound in fraud and must satisfy Federal Rule of Civil Procedure 9(b). *See FTC v. Lights of Am., Inc.*, 760 F. Supp.

Case 1:25-cv-02716-GLR Document 96-4 Filed 09/25/26 Page 326 of 464

2d 848, 854 (C.D. Cal. 2010) ("Rule 9(b) applies to claims for violation of the FTC Act."); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009) (dismissing consumer protection claims under Rule 9(b)). Rule 9(b) requires fraud to be pled with "particularity"—i.e., "'the who, what, when, where, and how' of the misconduct charged." *Kearns*, 567 F.3d at 1124.

## ARGUMENT

### I. THE BOTS ACT CLAIM (COUNT III) MUST BE DISMISSED

This Court should dismiss the claim that Ticketmaster, a ticket issuer, violated the BOTS Act. Compl. ¶¶ 119-25. Congress enacted the BOTS Act in 2016 to curb certain abuses in the online ticketing marketplace caused by ticket harvesting and scalping. The Act makes it unlawful for any person:

> (A) to circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules; or
>
> (B) to sell or offer to sell any event ticket in interstate commerce obtained in violation of subparagraph (A) if the person selling or offering to sell the ticket either—
>
>> (i) participated directly in or had the ability to control the conduct in violation of subparagraph (A); or
>>
>> (ii) knew or should have known that the event ticket was acquired in violation of subparagraph (A).

15 U.S.C. § 45c(a)(1).

The Act thus prohibits two interrelated practices. Subparagraph (A) prohibits conduct in the context of *buying* a ticket, specifically acquiring a ticket through circumvention of technological controls or measures used by ticket issuers. *Id.* § 45c(a)(1)(A). Subparagraph (B) proscribes conduct in the context of *selling* a ticket, specifically selling a ticket obtained through such circumvention where the seller either (i) participated directly in or had the ability to control the circumvention, or (ii) knew or should have known the ticket they are selling was acquired through

such circumvention. *Id.* § 45c(a)(1)(B). Plaintiffs allege only that Ticketmaster violated subparagraph (B). Compl. ¶¶ 124-25. But this claim is fundamentally flawed.

As an initial matter, the BOTS Act has a three-year statute of limitations. *See* 15 U.S.C. § 57b(d). Yet much of the alleged conduct occurred between 2018 through 2022—more than three years before Plaintiffs initiated this action. *See, e.g.*, Compl. ¶¶ 87-88, 92-99. The allegations that fall outside the limitations period cannot support Plaintiffs' claim for relief. *See Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1117, 1133-34 (C.D. Cal. 2010) (dismissing claims "to the extent they allege conduct outside the applicable statutes of limitations").

As to the allegations that fall within the limitations period, the Complaint fails to state a claim. To state a claim under subparagraph (B) of the BOTS Act, Plaintiffs must adequately allege that: (1) Ticketmaster "sell[s] or offer[s] to sell" tickets; (2) those tickets were "obtained in violation of subparagraph (A)," meaning they were acquired through the "circumvent[ion]" of a "technological control or measure"; and (3) Ticketmaster "knew or should have known" the tickets were "acquired in violation of subparagraph (A)." 15 U.S.C. § 45c(a)(1)(B). The Complaint fails to adequately allege any of these required elements.

### A. Ticketmaster Provides A Platform And Does Not Itself Sell Or Offer To Sell Tickets Listed By Third Parties

First, the Complaint fails to allege that Ticketmaster "sells or offers to sell" tickets under subparagraph (B) of the BOTS Act. 15 U.S.C. § 45c(a)(1)(B). Rather, tickets are offered and sold by those who possess them—that is, the consumers or brokers who list them on the resale market.

Starting with the text, the word "sell" is undefined and thus takes its "ordinary meaning" in the "context" in which it appears. *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100-01 (2012). The ordinary meaning of "sell" is to convey an interest for consideration. *See, e.g.*, *New Oxford American Dictionary* 1586 (3d ed. 2010) ("give

or hand over (something) in exchange for money"); *Sell*, *Black's Law Dictionary* (12th ed. 2024) ("To transfer (property) by sale"); *Sale*, *Black's Law Dictionary* (12th ed. 2024) ("The transfer of property or title for a price"). In turn, an "offer to sell" means expressing a willingness to convey an interest for consideration. *See Restatement (Second) of Contracts* § 24 (1981) ("An offer is the manifestation of willingness to enter into a bargain[.]"). These definitions are consistent with everyday usage: when someone sells a good to another person, they hand over the good in exchange for payment. But the person must own or possess an item to sell it. In the context of ticket resales under subparagraph (B), "sell or offer to sell" thus targets individuals, such as consumers or brokers, who possess an ill-gotten ticket and either convey or attempt to convey the rights associated with the ticket to another person for consideration.

The statute's structure reinforces this reading. Consistent with Congress's efforts to curtail abuses by scalpers, subparagraphs (A) and (B) work together to target both aspects of scalpers' operations. Subparagraph (A) targets scalpers who nefariously acquire tickets by circumventing ticket issuers' technical ticket limit controls, and subparagraph (B) targets the sale of tickets nefariously acquired in excess of those limits. Interpreting the statute this way makes it "work[] as a seamless whole." *United States v. Corrales-Vazquez*, 931 F.3d 944, 950 (9th Cir. 2019). Extending subparagraph (B) to the very ticket issuers whose technological controls are being circumvented would "disrupt[ that] careful structure." *Id.*; *see also Van Buren v. United States*, 593 U.S. 374, 389-90 (2021) (rejecting government's reading of a statute that creates structural inconsistencies).

Applying this straightforward interpretation, the Complaint fails to demonstrate that Ticketmaster "sell[s] or offer[s] to sell" tickets in the resale market. The Complaint acknowledges that Ticketmaster merely provides a platform where "*consumers* … list tickets for resale." Compl. ¶ 37 (emphasis added). It is therefore the "consumer" selling the ticket; Ticketmaster neither owns nor possesses the resold

ticket. Ticketmaster's Purchase Policy confirms: "If you purchase a resale ticket through our Site, you will be purchasing that ticket from either (a) a reseller who is not an Event Organizer, such as other fans, season ticket holders, or professional resellers, or (b) in limited circumstances, the Event Organizer." Wyman Decl. Ex. 1 at 3.

Judicial analysis of ticketing platforms' resale services confirms what the Act's text makes clear: resale platforms, like Ticketmaster, are not "sellers" or "offerors." *See, e.g.*, *Fabozzi v. StubHub, Inc.*, 2012 WL 506330, at *1 n.1 (N.D. Cal. Feb. 15, 2012) ("Although Plaintiff uses the phrase 'ticket reseller' to describe Stubhub, Stubhub does not actually buy or sell tickets; rather, it is a marketplace for third-party users to buy and sell tickets."); *Hill v. StubHub, Inc.*, 219 N.C. App. 227, 248 (2012) (statute that prohibited "sell[ing] or offer[ing] to sell" tickets greater than a specified price did not apply to StubHub because it was not "a ticket seller nor the ticket seller's agent"); *see also Porras v. StubHub, Inc.*, 2012 WL 3835073, at *3 (N.D. Cal. Sept. 4, 2012) ("StubHub is a virtual marketplace allowing users to purchase tickets from anonymous third parties."). Courts likewise hold platform operators are not sellers in a wide variety of contexts. *See, e.g.*, *Ind. Farm Bureau Ins. v. Shenzhen Anet Tech. Co.*, 2020 WL 7711346, at *6 (S.D. Ind. Dec. 29, 2020) ("[M]yriad burgeoning federal and state court cases agree that an online marketplace operator is not a 'seller' of a third-party vendor's products[.]" (citing cases)); *State Farm Fire & Cas. Co. v. Amazon.com, Inc.*, 835 F. App'x 213, 216 (9th Cir. 2020) (Amazon was not the "seller" of hoverboards purchased on the marketplace); *Est. of Graham v. Sotheby's, Inc.*, 178 F. Supp. 3d 974, 998 (C.D. Cal. 2016), *aff'd in part, rev'd in part and remanded on other grounds sub nom. Close v. Sotheby's, Inc.*, 894 F.3d 1061 (9th Cir. 2018) (similar for eBay); *United States v. eBay Inc.*, 751 F. Supp. 3d 232, 240 (E.D.N.Y. 2024) (same).

Because Ticketmaster does not "sell or offer to sell" tickets, it cannot be liable under subparagraph (B).

**B. Plaintiffs Fail To Allege Any Particular Ticket On Ticketmaster's Platform Was Obtained Through Circumvention Of Any Specific Technological Control**

Plaintiffs also fail to properly allege predicate subparagraph (A) violations as required by subparagraph (B). Subparagraph (B) imposes liability only for tickets sold "in violation of subparagraph (A)." 15 U.S.C. § 45c(a)(1)(B). That means the ticket underlying the subparagraph (B) claim must have been obtained through the "circumvent[ion]" of a "technological control or measure" used "to enforce posted event ticket purchasing limits." *Id.* § 45c(a)(1)(A). Plaintiffs do not even attempt to satisfy this requirement because they fail to connect their claims to any technological control that was circumvented to obtain a single specific ticket.

***1. Technological Control.*** As an initial matter, Plaintiffs ignore the "technological control or measure" element. The BOTS Act does not define the phrase, but it appears as a catch-all at the end of a list: "security measure, access control system, *or other technological control or measure*." *Id*. (emphasis added). The scope of "technological control or measure" is therefore "'defined by reference' to the specific" statutory examples that precede it. *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022). Accordingly, like a "security measure" or "access control system," a "technological control or measure" is an affirmative safeguard implemented to restrict access to a space or resource, such as onsales and tickets, by preventing, delaying, or detecting automated or excessive purchase attempts. 15 U.S.C. § 45c(a)(1)(A). The Complaint itself identifies technological controls like automatic IP address blocking and account-verification codes. Compl. ¶ 76; *see also* S. Rep. No. 114-391, at 1 (2016) (citing CAPTCHAs and virtual queues as examples of controls).

Plaintiffs, however, do not tether their claim to any technological controls or measures that were circumvented. Instead, the Complaint broadly alleges Ticketmaster is liable because the tickets listed for resale were purchased in violation of ticket limits. *See, e.g.*, Compl. ¶¶ 66-69. But ticket limits are not "technological

control[s] or measure[s]." The statute expressly distinguishes them: it refers to a "*technological control or measure* … that is used by the ticket issuer to enforce posted event *ticket purchasing limits*." 15 U.S.C. § 45c(a)(1)(A) (emphasis added). The "technological control[s] or measure[s]" are thus the mechanisms "used" to "enforce" ticket limits. The critical question is not whether a purchaser violated ticket limits, but whether they circumvented a technological control to do so.

Courts routinely enforce similar statutory distinctions. For example, in *Van Buren*, the Supreme Court held that language in the Computer Fraud and Abuse Act ("CFAA") regarding "exceed[ing] authorized access" specifies a "distinct way[] of obtaining information unlawfully"—an authorized user must bypass restrictions to obtain information "located in particular areas of the computer" that "are off limits to him." 593 U.S. at 389, 396. By specifying a particular "manner" of access, the statute does not sweep in "every violation of a computer-use policy." *Id.* at 384-85, 394. For the same reason, the Ninth Circuit held that "the phrase 'exceeds authorized access' in the CFAA does not extend to violations of use restrictions"; thus, "a violation of the terms of use of a website—without more—cannot establish liability." *Facebook, Inc. v. Power Ventures*, 844 F.3d 1058, 1066-67 (9th Cir. 2016). These cases reinforce what the BOTS Act's text makes plain: the statute does not apply to all violations of ticket limits (which are no different than use policies and terms); it targets a particular manner of such violations—those that result from the circumvention of technological controls.

Plaintiffs fail to connect their BOTS Act claim to a particular technological control or measure. By conflating technological controls and ticket limits, Plaintiffs read "technological control or measure" out of the Act, contrary to "the settled rule" that statutes must be construed "to give every word some operative effect." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 167 (2004). To the extent Plaintiffs assume a violation of ticket limits reflects a circumvention of some unidentified technological control, that conclusory assumption flouts their obligation to plead

facts supporting each element of their claim. *See FTC v. Swish Mktg.*, 2010 WL 653486, at *4 (N.D. Cal. Feb. 22, 2010) ("A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'"); *FTC v. Walmart Inc.*, 664 F. Supp. 3d 808, 825 (N.D. Ill. 2023) (dismissing FTC's "conclusory allegations" of required elements); *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 18 (D.D.C. 2021) (same).

***2. Circumvention.*** Plaintiffs also ignore their obligation to allege the "circumvent[ion]" of the ticket issuer's technological control. 15 U.S.C. § 45c(a)(1)(A). In ordinary parlance, "circumvent" means evading or avoiding a particular restriction. *See, e.g.*, *Circumvent*, *Black's Law Dictionary* (12th ed. 2024) ("To avoid (a restrictive problem, rule, etc.), esp[ecially] by clever and sometimes dishonest means"). That follows how Congress has used the term in other contexts involving technological circumvention. The Digital Millennium Copyright Act ("DMCA"), for example, prohibits "circumvent[ing] a technological measure" that protects copyrighted works, and defines "circumvent" to mean "avoid, bypass, remove, deactivate, or impair a technological measure." 17 U.S.C. § 1201(a)(1)(A), (a)(3)(A). Accordingly, the failure to allege circumvention of a technological control requires dismissal. *See, e.g.*, *iSpot.tv, Inc. v. Teyfukova*, 2023 WL 3602806, at *5-7 (C.D. Cal. May 22, 2023) (Frimpong, J.) (dismissing DMCA claim for failure to allege circumvention of a technological measure).

The Complaint fails to allege any specific acts of circumvention. To the contrary, Plaintiffs' theory is that Ticketmaster "*allow*[*s*] ticket brokers to exceed ticket limits," Compl. ¶¶ 14-15, 17, and that although it has "technological and other means to prevent brokers from evading ticket limits," it "do[es] not use them," *id.* ¶ 90. This theory forecloses a BOTS Act claim: if Ticketmaster (as Plaintiffs allege) allowed brokers to exceed ticket limits, then the brokers necessarily did not "circumvent" technological controls to do so. Because Plaintiffs have not "properly pleaded circumvention," the BOTS Act claim must be dismissed.

***3. Specific Ticket.*** Plaintiffs also fail to identify a specific ticket they allege Ticketmaster sold in violation of the BOTS Act. Instead, they allege aggregate violations. *See, e.g.*, Compl. ¶ 103 (alleging generally Ticketmaster has "offered to sell and sold millions of secondary market tickets acquired by brokers who circumvented their enforcement measures"). But the alleged wrongdoing must be tied to concrete facts, not generalized practices or hypothetical transactions. *See Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014). This requirement has particular force where, as here, both lawful and unlawful conduct are plausible explanations for why a broker could possess multiple Ticketmaster accounts or why they may possess, in aggregate, more tickets than the posted event ticket limit during an onsale. Without identifying which tickets Ticketmaster allegedly "sold" that were allegedly tainted, the Complaint leaves Ticketmaster and the Court to speculate about the specific basis for liability. Rule 8 does not permit that, much less Rule 9(b). *Id.* at 1000; *Iqbal*, 556 U.S. at 678.

**C. Plaintiffs Fail To Adequately Allege Ticketmaster Knew Or Should Have Known That Any Particular Ticket Listed On Its Platform Was Purchased In Violation Of The BOTS Act**

Even if Plaintiffs had identified tickets listed on Ticketmaster's platform acquired in violation of subparagraph (A), they do not plausibly allege that Ticketmaster "knew or should have known" that any specific ticket was so acquired. 15 U.S.C. § 45c(a)(1)(B)(ii). The "knew or should have known" standard requires more than allegations that a defendant should have known about unlawful conduct *generally*. *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159 (9th Cir. 2022) ("Sweeping generalities . . . are too attenuated to support an inference that [defendant] knew or should have known of the specifically alleged [] violations."). Instead, to hold a platform liable for knowledge of unlawful listings, courts require plaintiffs to specify the listing defendant allegedly knew or should have known to be unlawful. *See Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1000-01 (9th Cir. 2023); *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 107 (2d Cir. 2010); *Viacom Int'l,*

*Inc. v. YouTube, Inc.*, 676 F.3d 19, 33 (2d Cir. 2012) (estimate that "75-80% of all YouTube streams contained copyrighted material" was insufficient to satisfy the knowledge element under the DMCA).

The Complaint offers no plausible allegation that Ticketmaster knew or should have known any specific ticket resold on its platform was acquired through a BOTS Act violation. Instead, Plaintiffs point to the number of accounts certain brokers maintained and the number of tickets they held across all accounts in 2018 and 2019 (before the applicable limitations period) to suggest that Ticketmaster knew or should have known tickets resold by those brokers in 2023 and 2024 were obtained in violation of the BOTS Act. *See* Compl. ¶¶ 104-05. Plaintiffs also cite to Ticketmaster's suite of ticket management tools for resellers to suggest it must know when the users of these tools have violated technological controls. *Id.* But alleging that brokers had multiple accounts or aggregated ticket holdings above a per-account limit does not plausibly establish that any of those tickets were originally acquired through the circumvention of a technological control. Nor does it demonstrate that Ticketmaster knew or should have known of such circumvention when the specific ticket was listed for sale.

### D. At Minimum, The Claim For Civil Penalties Must Be Dismissed Because The FTC Fails To Adequately Allege Ticketmaster Knew Its Conduct Violated The BOTS Act

The claim for civil monetary penalties is independently flawed. The FTC seeks "civil penalties" under Section 5(m)(1)(A) of the FTC Act, Compl. ¶¶ 1, 163, which allows for civil penalties against any party who "violates any rule under this subchapter … with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A). "Knowledge" is "fairly implied" only when the defendant "should have known [its] act was unlawful" based on "the text" of the law itself. *United States v. Dish Network L.L.C.*, 954 F.3d 970, 978-79 (7th Cir. 2020). A mistake or uncertainty regarding the law precludes liability. *Jerman v. Carlisle,*

*McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 583-84 (2010). Thus, the FTC must allege not only knowledge (or deliberate ignorance) of an underlying BOTS Act violation (which it has not), but also that Ticketmaster acted "with actual knowledge or knowledge fairly implied on the basis of objective circumstances" that its conduct violated the Act.

The FTC does not attempt to meet this standard, nor could it. The BOTS Act's text does not address liability for ticket issuers or platforms. The text, legislative history, and the FTC's own past enforcement practices indicate that the statutory scheme is intended to *support* platforms. There is no basis in the Act for Plaintiffs' theory that Ticketmaster violates the Act by "allow[ing]" scalpers to obtain tickets or "turn[ing] a blind eye." Compl. ¶¶ 90, 107. None of the alleged actions or inactions by Ticketmaster regarding abuse prevention are mentioned in, or directly implied by, "[t]he [BOTS Act's] text." *Dish Network*, 954 F.3d at 979. "Where, as here, the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007).

**E. The State Plaintiffs Cannot Join the FTC's BOTS Act Claim**

Congress granted primary enforcement authority of the BOTS Act to the FTC. 15 U.S.C. § 45c(b). States may bring civil actions only if the FTC has not already done so. *Id.* § 45c(c)(1), (4). Because the FTC has instituted this action, states are precluded from bringing a BOTS Act claim "during the pendency of such action … against any defendant named in the Complaint … for the [same] violation." *Id*. The states cannot evade this statutory prohibition by purporting to "join" the FTC's claim. Compl. ¶ 125. When Congress intends to allow such joinder, it says so. *See, e.g.*, 15 U.S.C. § 45f(d)(4) (authorizing states to join actions by the FTC under the INFORM Consumers Act). Congress's decision not to replicate that authority in Section 45c is decisive. *See Lackey v. Stinnie*, 604 U.S. 192, 205 (2025).

## II. THE SECTION 5 CLAIMS (COUNTS I - II) MUST BE DISMISSED

The FTC also claims Ticketmaster's pricing disclosures and ticket purchase limits are "deceptive" practices under Section 5 of the FTC Act. Compl. ¶¶ 111-18. To state a claim for deceptive acts or practices, a plaintiff must allege (1) a material "representation, omission, or practice" that (2) "is likely to mislead consumers acting reasonably under the circumstances." *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009). These allegations must satisfy the heightened pleading requirement under Rule 9(b). *See Lights of Am.*, 760 F. Supp. 2d at 854. Here, the Complaint's allegations regarding Ticketmaster's ticket price disclosures and purchase limits fail to state a claim under Rule 9(b) or even under Rule 8(a).

### A. The FTC's Claim Regarding Ticketmaster's Fee Disclosures (Count I) Fails

The FTC's first Section 5 claim concerns Ticketmaster's fee disclosures. According to the FTC, Ticketmaster "displayed deceptively low ticket prices to consumers and charged much more," by showing "a list price in the search results that does not reflect the actual cost to consumers at checkout," then adding "substantial mandatory fees not included in the list price." Compl. ¶ 12. This claim fails because the FTC does not allege: (1) ongoing or imminent misconduct; and (2) false or misleading conduct.

#### 1. <u>The FTC Fails To Adequately Allege Ongoing Or Imminent Misconduct</u>

The FTC brings its Section 5 claims under Section 13(b) of the FTC Act. *See* Compl. ¶ 1. But that provision allows the FTC to obtain an injunction only if the defendant "*is violating*, or *is about to violate*, any provision of law enforced by the [FTC]." 15 U.S.C. § 53(b) (emphasis added). By "requir[ing] that the defendant must be 'violating' or 'about to violate' the law," Section 13(b)'s text "require[s]" the FTC to demonstrate "the existence of ongoing or imminent unlawful conduct." *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 772-73 (7th Cir. 2019); *FTC v. QYK*

*Brands LLC*, 2024 WL 1526741, at *3 (9th Cir. Apr. 9, 2024). Section 13(b) "may not be used to remedy a past violation that is not likely to recur." *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1089 (9th Cir. 1985).

That dooms the FTC's ability to predicate a Section 5 claim on Ticketmaster's fee disclosures. The FTC's theory rests on allegations about Ticketmaster's outdated displays in which ticket prices did not include fees. But the Complaint concedes Ticketmaster has implemented all-in pricing as of May 2025. *See* Compl. ¶ 63. The FTC does not and cannot claim otherwise, nor can it plausibly allege that Ticketmaster is on the brink of imminently returning to its old practices, as Ticketmaster implemented all-in pricing in response to the FTC's rule mandating all-in pricing that Ticketmaster forcefully championed. *See id*. Because the FTC cannot show that Ticketmaster "is violating, or is about to violate" the law with respect to its fee disclosures, this claim should be dismissed.

2. Prior Disclosures Did Not Violate Section 5 In Any Event

Even if Ticketmaster's prior disclosures were relevant, the FTC has failed to adequately allege that the disclosures were deceptive. To be deceptive, the display must be false or misleading. *See FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001). Rule 9(b) requires that plaintiffs plead "*what* is false or misleading" and "*why* it is false." *Morgan v. Twitter, Inc.*, 2025 WL 1248821, at *3 (9th Cir. Apr. 30, 2025) (emphasis added). The act or practice alleged to be deceptive must be considered from the perspective of "consumers acting reasonably under the circumstances." *Davis v. HSBC Bank*, 691 F.3d 1152, 1168 (9th Cir. 2012). Rather than identify with particularity what about Ticketmaster's fee display was false or misleading—much less *why* it was misleading—the FTC's allegations confirm that Ticketmaster's pricing display was not false or misleading.

The FTC concedes Ticketmaster displayed the face value price at the outset of the transaction and the final price, inclusive of fees, before purchase. *See* Compl. ¶ 40 ("Ticketmaster shows the list price for the available tickets" on the ticket

selection page), ¶ 52 (noting disclosure of fees "at the end" of the purchase flow). Where the higher total price is conspicuously disclosed by the end of the transaction, courts have found the price is not deceptive. *Hall v. Marriott Int'l, Inc.*, 344 F.R.D. 247, 265 (S.D. Cal. 2023) (finding advertised rates "on the first page of Marriott's booking process" not deceptive because additional fees were "clearly and conspicuously disclosed by the end of the booking transaction"). The Complaint also concedes that when a consumer sought to buy a ticket, they were presented with a disclosure accompanying the face value price that the final price would include fees. *See* Compl. ¶ 46 (discussing +Fees notice at ticket selection). Qualifying language that unambiguously clarifies an allegedly misleading statement defeats a deception claim. *See Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995) (finding a sweepstakes promotion not deceptive where qualifying language "expressly and repeatedly" appeared regarding requirements for winning sweepstakes); *see also Bobo v. Optimum Nutrition, Inc.*, 2015 WL 13102417, at *5 (S.D. Cal. Sept. 11, 2015) ("a reasonable consumer … cannot look at only one statement to the exclusion of everything else and claim he has been misled").

**B. The FTC's Claim Regarding Ticketmaster's Ticket Limit Disclosures (Count II) Fails**

The FTC also claims that Ticketmaster's ticket limit disclosures are deceptive under Section 5. According to the FTC, Ticketmaster "deceptively represent[s] that [it] impose[s] strict ticket limits," yet "routinely allow[s] ticket brokers to exceed [them]." Compl. ¶¶ 14, 116. This claim also fails.

1. <u>The FTC Fails To Adequately Allege Ticketmaster's Ticket Limit Disclosures Are False Or Misleading</u>

Plaintiffs cannot plausibly allege that Ticketmaster's posted ticket-limit disclosures are false or misleading. The Complaint concedes that Ticketmaster posts ticket purchase limits at the event organizers' direction. Compl. ¶ 66 ("For primary market sales … artists determine the number of tickets that a consumer can buy[.]");

*id.* ¶ 67 ("For each event, Ticketmaster … displays the ticket limit alongside other event information in the ticket browsing flow."). The Complaint does not allege, nor could it, that Ticketmaster represented it could detect every ticket purchase violation or take action against every ticket purchase limit violator. Instead, Ticketmaster "reserve[s] the right," but is not obliged, to cancel tickets it suspects of being acquired in excess of ticket purchase limits. *Id.* ¶ 69.

And Ticketmaster does attempt to identify violations. The Complaint concedes that Ticketmaster successfully blocked attempts to exceed ticket purchase limits, including attempts from the same IP address. *See id.* ¶ 71. Plaintiffs have therefore failed to adequately allege how or why Ticketmaster's ticket purchase limits are false or misleading.

2. <u>The FTC Fails To Adequately Allege Ticketmaster's Ticket Limit Disclosures Are Material</u>

Plaintiffs likewise fail to allege that the existence of a ticket purchase limit was material to any consumer's decision to participate in an onsale for a particular event. Nor can they. A representation is material if it "involves information that [would be] important to consumers and, hence, likely to affect their choice of, or conduct regarding that service." *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006). Yet Plaintiffs concede that the primary market corresponds to the *original* sale of the ticket, which is handled by a single issuer, such as Ticketmaster. *See* Compl. ¶ 33. Because of this, the consumer would not—and could not—choose to purchase a primary ticket from a different issuer based on differences in ticket purchase limits.

The Complaint also concedes that "[f]or high-demand events, [] face value prices are often only available to consumers on the primary market." *Id.* ¶ 72. Therefore, a reasonable consumer would not opt to purchase from the secondary market instead, where resale prices are higher. *See id.* ¶ 73. Accordingly, there is no allegation that the ticket purchase limits themselves changed consumer behavior.

## III. THE STATE-LAW CLAIMS (COUNTS IV - X) MUST BE DISMISSED

The State Plaintiffs also assert claims under state deceptive-practices laws. Because the federal claims should be dismissed, the Court should decline supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(c).[2] Even if the Court retains jurisdiction, the state-law claims fail for the same reasons as the Section 5 claims. *See* Compl. pp. 59-73; *cf. In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 539 (N.D. Ill. 2019) ("Courts applying [state] law have held that consumer protection claims based on the same factual allegations as a failed antitrust claim must likewise be dismissed."). In Florida and Utah, the deceptive-practice statutes expressly incorporate the FTC Act standards by reference. *See* Fla. Stat. § 501.204(1); Utah Code Ann. § 13-11-2(4). And Illinois, Tennessee, and Colorado interpret their deceptive-practice statutes to mirror the FTC Act standards. *See Aliano v. Ferriss*, 988 N.E.2d 168, 176 (Ill. App. Ct. 2013); *Tucker v. Sierra Builders*, 180 S.W.3d 109, 116 (Tenn. Ct. App. 2005); *People ex rel. Dunbar v. Gym of Am., Inc.*, 493 P.2d 660, 668-69 (Colo. 1972).[3]

Like the Section 5 claims, the state causes of action collapse into two core theories: (1) alleged pricing disclosures that purportedly misled consumers about total ticket prices; and (2) alleged misrepresentation about and failures to enforce

---

[2] Under that statute, when the court "has dismissed all claims over which it has original jurisdiction," which here would be the BOTS Act and FTC Act claims, the Court "may decline to exercise supplemental jurisdiction" over the state-law claims. 28 U.S.C. § 1367(c)(3).

[3] Courts have not analyzed the Nebraska Uniform Deceptive Trade Practices Act ("NDTPA") alongside the FTC Act, but Nebraska courts' interpretation of the NDTPA demonstrates that these claims fail for the same reasons discussed above. *See Homebuyers Inc. v. Watkins*, 2019 WL 2361760, at *9 (Neb. Ct. App. June 4, 2019) ("[NDTPA] provides relief from future damage, not past damage"). Nebraska's NDTPA theory rests on allegations about Ticketmaster's prior fee displays, which the Complaint concedes were superseded when Ticketmaster implemented all-in pricing. Nebraska also cites a grab bag of subsections, Compl. ¶ 136, but does not plead non-conclusory facts showing, for example, how Ticketmaster's challenged statements caused a likelihood of confusion as to source or sponsorship under (a)(2); misrepresented characteristics or quality of goods or services under (a)(5); or advertised goods "with intent not to sell them as advertised" under (a)(10).

ticket limits. Colorado, Florida, Illinois, Nebraska, and Utah each allege both theories as a basis for liability under their respective state consumer protection statutes. Compl. pp. 59-73. Tennessee's claim focuses solely on Ticketmaster's representation regarding purchase limits. Compl. ¶ 143. Because the Complaint fails to allege that either Ticketmaster's fee disclosures or ticket limit disclosures violate the FTC Act, *see supra* Section II, each of Florida, Illinois, Tennessee, Utah, Colorado, and Nebraska's related state claims also fail. *See Bell v. 1220 Mgmt. Grp., L.L.C.*, 2018 WL 3054795, at *1 n.1 (S.D. Fla. June 20, 2018) (motion to dismiss order "analyz[ing] the FDUTPA and FTC Act claims concurrently" because "FDUTPA incorporates the FTC Act"); *Aliano*, 988 N.E.2d at 176 (Illinois court applying FTC standard to state law deceptive conduct claim); *Tucker*, 180 S.W.3d at 116 (Tennessee courts "look to the federal law" defining "deceptive" to determine how they should be applied); *FTC v. Nudge, LLC*, 2022 WL 2132695, at *13 (D. Utah June 14, 2022) (holding that "the standards for analyzing deceptive act or practice claims under [Utah law] are generally the same as for misrepresentation claims under § 5").

The Utah Consumer Sales Practices Act ("UCSPA") claim also fails. A UCSPA claim requires more than "simply repackaged" deception allegations. *Chadwick v. Bonneville Billing & Collections, Inc.*, 2021 WL 1140206, at *4 (D. Utah Mar. 25, 2021). "[A] court must assess the circumstances of each particular case in light of the twofold purpose of the doctrine, prevention of oppression and of unfair surprise." *Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1041 (Utah 1985); *Gallegos v. LVNV Funding LLC*, 169 F. Supp. 3d 1235, 1245 (D. Utah 2016) ("The standard for proving unconscionability [under the UCSPA] is high"). Here, the Complaint merely "repackage[s] the . . . allegedly deceptive conduct and call[s] it unconscionable." *Chadwick*, 2021 WL 1140206, at *4; Compl. ¶¶ 151-62. That is insufficient to state a claim.

## CONCLUSION

The Complaint should be dismissed with prejudice.

Dated: January 6, 2026

Respectfully submitted,

LATHAM & WATKINS LLP
Michael H. Rubin
Scott D. Joiner
Alexander C.K. Wyman
Will Schildknecht
Max A. Shapiro

SIDLEY AUSTIN LLP
Benjamin M. Mundel

By */s/ Michael H. Rubin*
Michael H. Rubin

*Attorneys for Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C.*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants Live Nation Entertainment, Inc. and Ticketmaster L.L.C., certifies that this brief contains 6,995 words, which complies with the word limit of L.R. 11-6.1.

Dated: January 6, 2026

LATHAM & WATKINS LLP

By */s/ Michael H. Rubin*
Michael H. Rubin

*Attorneys for Defendants*
*Live Nation Entertainment, Inc. and*
*Ticketmaster L.L.C.*

# EXHIBIT 14

**LOCAL COUNSEL**

James M. Donovan (Cal. Bar No. 64756)
*jmdonovan@thedonovanoffices.com*
Michael J. Glenn (Cal. Bar No. 89654)
*mglenn@thedonovanoffices.com*

915 Wilshire Boulevard, Suite 1610
Los Angeles, CA 90017
Telephone: (213) 629-4861

**TORRIDON LAW PLLC**

Michael A. Fragoso*
*mfragoso@torridonlaw.com*
T. Zachary Horton*
*tzhorton@torridonlaw.com*
Peter Lee Hamilton*
*phamilton@torridonlaw.com*

801 17th Street NW, Suite 1100
Washington, DC 20006
Telephone: (202) 249-6900

**Pro hac vice forthcoming*

Attorneys for Amici Curiae
SENATORS MARSHA BLACKBURN, RICHARD BLUMENTHAL, JOHN CORNYN, JOSH HAWLEY, JOHN KENNEDY, BEN RAY LUJÁN, AND BERNIE MORENO

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**LIVE NATION ENTERTAINMENT, INC.**, *et al.*,<br><br>Defendants. | Case No. 2:25-cv-08884-MEMF-MAA<br><br>**NOTICE OF MOTION AND UNOPPOSED MOTION OF AMICI CURIAE SENATOR MARSHA BLACKBURN, ET AL. FOR LEAVE TO FILE AN AMICUS CURIAE BRIEF IN SUPPORT OF THE FEDERAL TRADE COMMISSION'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>NO HEARING NOTICED<br><br>Courtroom 8B, Hon. Maame Ewusi-Mensah Frimpong |

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that Movants United States Senators Marsha Blackburn, Richard Blumenthal, John Cornyn, Josh Hawley, John Kennedy, Ben Ray Luján, and Bernie Moreno respectfully move this Court for leave to file an amicus curiae brief, attached hereto as Exhibit 1, in support of the Plaintiff, the Federal Trade Commission ("FTC"), in opposing the Defendants' Motion to Dismiss, *see* ECF No. 55 ("Defs. Mot."); ECF No. 64 ("FTC Opp."). Pursuant to Local Rule 7-15, Movants believe that this Motion for Leave can be decided without a hearing and thus waive their right to oral argument.

Pursuant to Local Rule 7-3, the undersigned Counsel has met and conferred with the parties to seek consent for the filing of this Motion and accompanying proposed amicus brief. All Plaintiffs have consented to this Motion. The Defendants indicated that they do not oppose this Motion.

**LEGAL STANDARD**

District courts have "broad discretion" respecting amici curiae. *Stross v. Glass Homes, Inc.*, No. 2:21-cv-06436, 2022 WL 21310031, at *1 (C.D. Cal. Apr. 4, 2022) (Frimpong, J.) (quotation omitted). "There are no strict prerequisites that must be established prior to qualifying for amicus status; an individual seeking to appear as amicus must merely make a showing that his participation is useful to or otherwise desirable to the court." *Id*. (quoting *WildEarth Guardians v. Haaland*, No. 2:19-cv-09473, 2021 WL 4263831, at *10 (C.D. Cal. Sept. 20, 2021) (cleaned up)). "Courts have granted amicus status 'when the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide.'" *Id*. (quoting *Cmty. Ass'n for Restoration of Env't v. DeRuyter Bros. Dairy*, 54 F. Supp. 2d 974, 975 (E.D. Wash. 1999)).

When the "matter is one of public interest," or when it requires the court to construe a statute, public servants are ordinarily granted leave to file as amici. *Miracle v. Hobbs*, 333 F.R.D. 151, 156 (D. Ariz. 2019) (granting legislators leave to file as amici); *see also, e.g., United States v. City of Columbus, Ohio*, No. 2:99-cv-1097, 2000 WL 1745293, at *1 (S.D. Ohio Nov. 20, 2000) (granting motion for leave to participate as amici curiae filed on behalf of 14 United States Representatives because the case involved "matters of great public interest and concern" and even though "not all the movant members of Congress occupied such positions at the time the statute was promulgated"); *Int'l*

*Swaps & Derivatives Ass'n v. U.S. Commodity Futures Trading Comm'n*, 887 F. Supp. 2d 259, 282–83 (D.D.C. 2012) (granting leave for "two amicus curiae briefs from members of Congress that were involved in the development of the Dodd–Frank Act" and "consider[ing] amici's interpretations of both the legislative history and statutory text"); *Wilderness Soc'y v. Trump*, No. 1:17-cv-02587, 2019 WL 11556601, at *3 (D.D.C. Mar. 20, 2019) (granting leave to Members of Congress "because their proposed submissions speak to the limited issue" before the court on a motion to dismiss).

Recognizing the value that amici briefs can provide, this Court has found it "'preferable to err on the side of' permitting such [amicus] briefs." *Stross*, 2022 WL 21310031, at *1 (quoting *Neonatology Assocs., P.A. v. C.I.R.*, 293 F.3d 128, 133 (3d Cir. 2002)). "If an amicus brief that turns out to be unhelpful is filed, the [Court] ... can then simply disregard the amicus brief. On the other hand, if a good brief is rejected, the [Court] will be deprived of a resource that might have been of assistance." *Id*. (quoting *Neonatology Assocs., P.A. v. C.I.R.*, 293 F.3d 128, 133 (3d Cir. 2002)).

**<u>IDENTITY AND INTEREST OF *AMICI CURIAE*</u>**

Movant United States Senator Marsha Blackburn represents the State of Tennessee, which, as home to Nashville (nicknamed "Music City") and a vibrant creative economy, is uniquely susceptible to the harms of predatory ticket-scalping practices. As the lead Republican sponsor in the United States House of Representatives and a primary architect of the Better On-line Ticket Sales Act of 2014, H.R. 708, 114th Cong. (2015), as well as the Better On-line Ticket Sales Act of 2016, H.R. 5104, 114th Cong. (2015–2016), Senator Blackburn was one of the leading voices in the House supporting the passage of the Senate-driven legislation, S. 3183, 114th Cong. (2015–2016), that ultimately became the Better Online Ticket Sales Act of 2016 (the "BOTS Act"), 15 U.S.C. § 45c. Given her constituency and her significant involvement in the drafting and passage of the BOTS Act, Senator Blackburn possesses unique insights on both the legislative history of the statute and the impact of predatory ticketing pricing on ordinary consumers, and she has a strong interest in the Act's proper interpretation and robust enforcement.

Senators Richard Blumenthal, John Cornyn, Josh Hawley, John Kennedy, Ben Ray Luján, and Bernie Moreno share Senator Blackburn's interest in the Act's interpretation and enforcement. Movant Senators have a legislative mandate to protect American consumers and the integrity of the

interstate live-entertainment marketplace. Movants actively support or helped design, draft, and pass the BOTS Act to prohibit conduct like that alleged of Defendants (collectively, "Ticketmaster") here.[1] Like Senator Blackburn, Senator Ben Ray Luján voted in favor of the BOTS Act while serving in the House of Representatives. Meanwhile, in the upper chamber, Senator Blumenthal co-sponsored the Senate version of the BOTS Act, and Senator Cornyn voted to pass the Senate version of the Act into law. Senators Kennedy, Hawley, and Moreno all currently serve as legislators representing constituents who are directly affected by Ticketmaster's conduct. Accordingly, Movant Senators all have a strong interest in the proper interpretation and application of the law, as well as a unique understanding of the legislative history that informs and supports that interpretation.

## REASON TO GRANT LEAVE TO FILE

Movant Senators' proposed amicus brief, *see* Exhibit 1 ("Prop. Br."), would aid this Court's disposition of Ticketmaster's Motion to Dismiss, *see generally* Defs. Mot. The proposed brief offers the Senators' unique legislative perspectives on the interpretation and enforcement of the BOTS Act, both according to its plain text and in light of its relevant legislative history. The brief responds directly to Ticketmaster's assertions about the legislative intent behind the BOTS Act, which the Senators—having drafted and passed into law—are uniquely positioned to expound. The Motion for Leave should be granted.

In relevant part, Ticketmaster moves to dismiss the FTC's Complaint, ECF No. 1 for failure to state a claim under the BOTS Act. Ticketmaster asserts (1) that it does not "sell or offer to sell" resale tickets within the meaning of the Act, and (2) that ticket scalpers cannot "circumvent" Ticketmaster's "technological controls" within the meaning of the Act if Ticketmaster allegedly "allowed" them to do so. *See* Defs. Mot. at 17–23. The proposed amicus brief explains that the BOTS Act's plain text, which Movants drafted and passed, clearly applies to ticket platforms like Ticketmaster that knowingly enable ticket scalpers. *See* Prop. Br." at [3–4]. The proposed brief rebuts Ticketmaster's contrived

---

[1] Neither Senator Moreno nor Senator Hawley were in office in 2016. Accordingly, they were not involved in the drafting and passage of the BOTS Act. However, they share their colleagues' consumer-protection mandate as fellow legislators, and they likewise have an interest in the law's proper interpretation and enforcement.

assertion that the BOTS Act was passed "To Protect *Platforms* From Bad Actors." Defs. Mot. at 15–16 (emphasis added); *see* Prop. Br. at [11–15] (explaining that Congress passed the BOTS Act to protect American *consumers*, not platforms). And it explains the harmful effects that Ticketmaster's constrictive reading would have on ordinary consumers. *See* Prop. Br. at [15–17]. Because the proposed brief offers "useful" arguments and provides "unique information" and legislative "perspective" on the meaning and application of the BOTS Act, the motion for leave to file should be granted. *See Stross*, 2022 WL 21310031, at *1.

The Motion for Leave should also be granted because this case involves "matters of great public interest and concern." *City of Columbus*, 2000 WL 1745293, at *1; *see also Miracle*, 333 F.R.D. at 156 (similar). Just yesterday, the Senate Subcommittee on Consumer Protection, Technology, and Data Privacy of the Committee on Commerce, Science, and Transportation held a widely publicized hearing to "discuss live performance ticket sale practices" and "fees charged by primary and secondary sellers." *See* Hearing Before the Subcomm. on Consumer Prot., Prod. Safety, Ins., & Data Sec. of the S. Comm. on Com., Sci., & Transp., *Fees Rolled on All Summer Long: Examining the Live Entertainment Industry* (Jan. 28, 2026) ("Subcomm. Hearing") (recording available at tinyurl.com/FeesRolled); *see also, e.g.*, Taijuan Moorman, *Kid Rock, Live Nation Exec to Testify about Ticketmaster Pricing*, USA TODAY (Jan. 22, 2026) (available at tinyurl.com/SenHrgCovg) (news coverage publicizing the hearing). The discussion featured high-profile witnesses like Ticketmaster's General Counsel, Dan Wall, and Robert Richie ("Kid Rock"), among others, and it touched repeatedly on this very case. *See* Subcomm. Hearing at [20:43, 53:10, 1:14:10, 1:52:23]. Responding to Movant Senator Blackburn, for instance, Kid Rock criticized Ticketmaster's triple dip fees collected whenever the company sells scalped tickets—a fact alleged in the FTC's Complaint, ECF No. 1 at ¶¶ 16, 77. *See* Subcomm. Hearing at [33:53]. The hearing's lively discussion plainly demonstrates the intense "public interest" in live-event ticket pricing and the enforcement of the BOTS Act against platforms like Ticketmaster. *Miracle*, 333 F.R.D. at 156. For this reason, too, the Motion for Leave to File the proposed brief should be granted. *See id.*

## CONCLUSION

For the foregoing reasons, Movant Senators respectfully request this Court's leave to appear as amici curiae and deem the proposed amicus brief filed.

Dated: January 29, 2026

Respectfully submitted,

*/s/ Michael J. Glenn*

Michael J. Glenn (SBN 89654)
James M. Donovan (SBN 64756)
**LAW OFFICES OF JAMES M. DONOVAN**
915 Wilshire Boulevard, Suite 1610
Los Angeles, CA 90017
Telephone: (213) 629-4861
*jmdonovan@thedonovanoffices.com*
*mglenn@thedonovanoffices.com*

Michael A. Fragoso*
T. Zachary Horton*
Peter Lee Hamilton*
**TORRIDON LAW PLLC**
801 17th Street NW, Suite 1100
Washington, DC 20006
Telephone: (202) 249-6900
mfragoso@torridonlaw.com
tzhorton@torridonlaw.com
phamilton@torridonlaw.com

**Pro hac vice forthcoming*

***Attorneys for Amici Curiae***

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Movants Senator Marsha Blackburn, Senator Richard Blumenthal, Senator John Cornyn, Senator John Kennedy, Senator Josh Hawley, Senator Ben Ray Luján, and Senator Bernie Moreno certifies that this document contains 1,596 words, which complies with the word limit of L.R. 11-6.1.

Dated: January 29, 2026

*/s/ Michael J. Glenn*
Michael J. Glenn (SBN 89654)

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of January 2026, I electronically filed the foregoing motion for leave to file together with the accompanying *amicus curiae* brief, with the Clerk of the Court for the United States District Court for the Central District of California by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Notice of this filing will be sent by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Michael J. Glenn*
Michael J. Glenn (SBN 89654)

# EXHIBIT 15

# Exhibit 1

**LOCAL COUNSEL**

James M. Donovan (Cal. No. 64756)
*jmdonovan@thedonovanoffices.com*
Michael J. Glenn (Cal. No. 89654)
*mglenn@thedonovanoffices.com*

915 Wilshire Boulevard, Suite 1610
Los Angeles, CA 90017
Telephone: (213) 629-4861

**TORRIDON LAW PLLC**

Michael A. Fragoso*
*mfragoso@torridonlaw.com*
T. Zachary Horton*
*tzhorton@torridonlaw.com*
Peter Lee Hamilton*
*phamilton@torridonlaw.com*

801 Seventeenth Street NW, Suite 1100
Washington, DC 20006
Telephone: (202) 249-6900

**Pro hac vice forthcoming*

Attorneys for Amici Curiae
SENATORS MARSHA BLACKBURN, RICHARD BLUMENTHAL, JOHN CORNYN, JOSH HAWLEY, JOHN KENNEDY, BEN RAY LUJÁN, AND BERNIE MORENO

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**LIVE NATION ENTERTAINMENT, INC.**, *et al.*,<br><br>Defendants. | Case No. 2:25-cv-08884-MEMF-MAA<br><br>**[PROPOSED] BRIEF OF AMICI CURIAE SENATOR MARSHA BLACKBURN, ET AL. IN SUPPORT OF THE FEDERAL TRADE COMMISSION'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

# TABLE OF CONTENTS

**Page**

INTERESTS OF AMICI CURIAE ........................................................................ 1

INTRODUCTION ........................................................................ 1

ARGUMENT ........................................................................ 2

I. THE STATUTE'S PLAIN TEXT PROHIBITS ANYONE—INCLUDING PLATFORMS—FROM KNOWINGLY ENABLING TICKET SCALPERS. ........................ 3

A. TICKETMASTER "SELLS OR OFFERS TO SELL" TICKETS. ........................ 4

B. SCALPERS VIOLATE SUBPARAGRAPH (A) WHEN THEY COLLUDE WITH PLATFORMS LIKE TICKETMASTER. ........................ 8

1. Scalpers "circumvent" Ticketmaster's technological controls by using multiple accounts to evade ticket limits. ........................ 9

2. Platform–scalper collusion does not foreclose circumvention. ........................ 10

II. CONGRESS ENACTED THE BOTS ACT TO PROTECT CONSUMERS, NOT TICKETING PLATFORMS. ........................ 11

III. TICKETMASTER'S CONSTRICTIVE READING OF THE LAW WOULD ALLOW TICKET PLATFORMS TO COLLUDE WITH TICKET SCALPERS AND HARM ORDINARY CONSUMERS. ........................ 15

CONCLUSION ........................................................................ 18

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Albrecht v. United States*,
273 U.S. 1 (1927) .......... 6

*Brauer v. ExamOne World Wide Inc.*,
683 F. Supp. 3d 1054 (C.D. Cal. 2023) .......... 6

*Est. of Graham v. Sotheby's, Inc.*,
178 F. Supp. 3d 974 (C.D. Cal. 2016) .......... 7

*Fabozzi v. StubHub, Inc.*,
No. C-11-4385, 2012 WL 506330, (N.D. Cal. Feb. 15, 2012) .......... 7

*Federal Trade Commission v. Key Investment Group, LLC*,
No. 1:25-cv-02716-GLR (D. Md. Nov. 24, 2025) .......... 10

*Hill v. StubHub, Inc.*,
727 S.E.2d 550 (N.C. Ct. App. 2012) .......... 7

*Ind. Farm Bureau Ins. v. Shenzhen Anet Tech. Co.*,
No. 19-cv-00168, 2020 WL 7711346 (S.D. Ind. Dec. 29, 2020) .......... 7

*Pinter v. Dahl*,
486 U.S. 622 (1988) .......... 6, 7

*Porras v. StubHub, Inc.*,
No. C-12-1225, 2012 WL 3835073 (N.D. Cal. 2012) .......... 7

*Roberts v. Sea-Land Servs., Inc.*,
566 U.S. 93 (2012) .......... 5

*State Farm Fire & Cas. Co. v. Amazon.com, Inc.*,
390 F. Supp. 3d 964 (W.D. Wis. 2019) .......... 7

*State Farm Fire & Cas. Co. v. Amazon.com, Inc.*,
835 F. App'x 213 (9th Cir. 2020) .......... 7

*United States v. eBay Inc.*,
751 F. Supp. 3d 232 (E.D.N.Y. 2024) .......... 7

## Statutes and Rules

7 U.S.C. § 136j(a)(1) .......... 8

15 U.S.C. § 45c(a)(1)(A) .......... 3, 9

15 U.S.C. § 45c(a)(1)(B)(i) .......... 8

15 U.S.C. § 80a-12 .......... 7

49 U.S.C. § 41712(c)(1) .......... 7

Pub. L. No. 114-274, pmbl., 130 Stat. 1401 (2016) .......... 11, 12

Pub. L. No. 114-274, § 3(3), 130 Stat. 1401 (2016) .......... 6

Fed. R. Civ. P. 12(b)(6) .......... 6

**Other Authorities**

*Circumvent*, Black's Law Dictionary (12th ed. 2024) .......... 9

*Circumvent*, Merriam-Webster Dictionary (11th ed. rev. 2025) .......... 9, 11

Com., Sci., & Transp., *Moran Bill to Improve Consumer Access to Entertainment Events Passes* (Dec. 1, 2016) .......... 14

Congressman Paul Tonko, *Tonko, Blackburn Lead Bipartisan Effort to Level Online Ticket Sales Playing Field for Fans of Live Entertainment* (Apr. 28, 2016) .......... 13

Digital Citizens Alliance, *When It Comes to Digital Markets, Trust Can't Be Secondary* (May 2025) .......... 16

U.S. Gov't Accountability Off., GAO-18-347, *Event Ticket Sales: Market Characteristics and Consumer Protection Issues* (2018) .......... 17

*Examining the Better Online Ticket Sales Act of 2016: Hearing Before the Subcomm. on Consumer Prot., Prod. Safety, Ins., & Data Sec. of the S. Comm. on Com., Sci., & Transp.*, 114th Cong., S. Hrg. 114-614 (2016) .......... 12

Exec. Order No. 14,254, 90 Fed. Reg. 14,699 (Apr. 3, 2025) .......... 17

Nat'l Indep. Ticket Operators Ass'n, NITO Ticket Resale Study (2024) .......... 17

*Oversight of the Federal Trade Commission: Hearing Before the S. Comm. on Com., Sci. & Transp.*, 114th Cong., S. Hrg. 114-631 (2016) .......... 13

Phillip Leslie & Alan Sorensen, *The Welfare Effects of Ticket Resale* (Nat'l Bureau of Econ. Rsch., Working Paper No. 15476, 2009) .......... 17

Press Release, Sen. Charles E. Schumer, *Schumer Introduces New Senate Bill That Puts An End To Unfair Cyber Scalping* (Mar. 28, 2016) .......... 13

Press Release, Sen. Maria Cantwell, *Cantwell Backs Bill to Benefit Washington Music and Sports Fans* (Sept. 21, 2016) .......... 13

Press Release, Sen. Richard Blumenthal, *Senate Approves Blumenthal Bill to Crack Down on Unfair Ticket Bots* (Dec. 1, 2016) ... 14

Press Release, White House, *Fact Sheet: President Donald J. Trump Will End Price-Gouging by Middlemen in the Entertainment Industry* (Mar. 31, 2025) ... 17

**INTERESTS OF AMICI CURIAE**

Amici Curiae are seven sitting members of the United States Senate:

Senator Marsha Blackburn (Tennessee)
Senator Richard Blumenthal (Connecticut)
Senator John Cornyn (Texas)
Senator Josh Hawley (Missouri)
Senator John Kennedy (Louisiana)
Senator Ben Ray Luján (New Mexico)
Senator Bernie Moreno (Ohio)

Most Amici, as members of the United States House of Representatives and Senate in 2016, voted to enact the Better Online Ticket Sales Act of 2016, which then-Representative Blackburn had drafted and co-sponsored. As legislators, all Amici have a special interest in the law's sound interpretation in federal court, and accordingly, they support the Federal Trade Commission (the "Commission") in opposing Defendants' motion to dismiss, which is grounded in an erroneous, unduly narrow interpretation of the law that they helped to enact.

**INTRODUCTION**

Amici and their fellow legislators actively support, drafted, or voted to pass the Better Online Ticket Sales Act of 2016 ("BOTS Act") to help protect ordinary American consumers from rapacious online ticket scalpers and their platform enablers like Ticketmaster. Ticket scalpers buy up tickets with no intention of using them. Then, with the help of their platform enablers, they list the tickets for sale on secondary markets with eye-popping markups. At each step in this process—when scalpers buy tickets in the primary market, when tickets are sold in the secondary market, and when real American consumers buy those tickets in the secondary market—ticket platforms like Ticketmaster collect fees. Scalpers' unearned profits and platforms' "triple dip" fees come out of the pockets of ordinary Americans who just want to attend performances by favorite artists or cheer on their teams. Amici expressly designed the BOTS Act to counteract this profiteering at American eventgoers' expense.

In March 2025, President Donald Trump made his desire known that the Commission rigorously enforce the law that Amici helped draft and pass. That law prohibits ticket-harvesting scalpers from "circumventing" ticket platforms' controls to exceed limits on the number of tickets that a customer may buy for a given event. The law also prohibits *anyone*—scalper, platform, or anyone else—from "selling or offering to sell" tickets when they "knew or should have known" that the tickets were procured through scalper circumvention. Defendants (collectively, "Ticketmaster") have violated this law. Ticket scalpers freely circumvent Ticketmaster's controls limiting the number of tickets that can be purchased for a given event, using internet protocol ("IP") proxy services, subscriber identity module ("SIM") card banks, and many thousands of fake Ticketmaster accounts with thousands of different credit cards to do so. Despite knowing that large-scale scalpers have easily circumvented these controls, Ticketmaster continues to sell their illicitly procured tickets on its resale platform—and reaps massive profits from doing so.

This Court should deny Ticketmaster's motion to dismiss. As the Commission has squarely alleged, Ticketmaster has violated the BOTS Act by selling or offering to sell what it clearly knew or should have known to be ill-gotten tickets on its secondary-market platform. The BOTS Act contains no implicit immunity for platforms: It protects *consumers*, not the platforms who harm them by colluding with scalpers to collect three layers of fees. If the Court holds for Ticketmaster, the law that Amici worked hard to enact with overwhelming bipartisan support would be defanged to the detriment of American eventgoers, who would be forced to keep paying exorbitant markups to scalpers and fees to Ticketmaster. This Court should not buy the arguments that Ticketmaster is selling.

**ARGUMENT**

The BOTS Act is clear that online ticket scalping in violation of ticket issuers' posted rules is illegal. It is equally clear that enabling scalpers by knowingly selling their ill-gotten tickets is also illegal. Amici framed the BOTS Act broadly to prevent scalpers from buying up tickets before

consumers have a fair chance and to prevent platforms like Ticketmaster from facilitating their operations. This Court should not condone Ticketmaster's attempts to evade responsibility for platforming scalpers who harm American event-going consumers. The motion to dismiss should be denied.

## I. THE STATUTE'S PLAIN TEXT PROHIBITS ANYONE—INCLUDING PLATFORMS—FROM KNOWINGLY ENABLING TICKET SCALPERS.

The plain text of the BOTS Act clearly prohibits two kinds of conduct. *First*, subparagraph (A) declares it

> unlawful for any person to circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules.

15 U.S.C. § 45c(a)(1)(A). *Second*, subparagraph (B) declares it unlawful

> to sell or offer to sell any event ticket . . . obtained in violation of subparagraph (A) if the person selling or offering to sell the ticket either —
>
> (i) participated directly in or had the ability to control the conduct in violation of subparagraph (A); or
>
> (ii) knew or should have known that the event ticket was acquired in violation of subparagraph (A).

*Id.* § 45c(a)(1)(B).

Subparagraph (B) prohibits platforms from knowingly enabling commercial ticket scalpers. Ticketmaster violated that provision by selling tickets that it knew to have been obtained in violation of subparagraph (A). The Commission's complaint details how scalpers violate subparagraph (A): Using thousands of (often fake) Ticketmaster accounts and sophisticated technology like IP proxy services and SIM banks, scalpers exceed posted ticket limits across myriad small transactions. ECF No. 1 ("Compl.") ¶¶ 74, 76, 82. Then, using Ticketmaster's TradeDesk platform, scalpers aggregate their ill-gotten tickets in plain view. *See id.* ¶¶ 84–87. Ticketmaster sells those tickets even though it knows they were illicitly procured. *See id.* ¶ 48 (for secondary-market transactions, Ticketmaster

"voids the first ticket" and "reissues a new ticket, with unique identifying information, to the second purchaser"); *id.* ¶ 33 ("Ticketmaster is the merchant of record for all . . . resale tickets sold on its platform."); *id.* ¶ 39 (Ticketmaster can "unilaterally increase" the price of resale tickets); *id.* ¶¶ 15, 71, 75, 90, 103–04 (detailing Ticketmaster's tolerance of scalpers and blind-eye policy towards scalped tickets). That is a BOTS Act violation, plain and simple.

Against all this, Ticketmaster offers two main arguments. *See* ECF No. 55 ("Defs. Mem."), at 17–23. *First*, Ticketmaster claims that a resale platform cannot be susceptible to subparagraph (B) liability because it "does not itself sell or offer to sell tickets listed by third parties." *Id.* at 18 (capitalization altered). *Second*, it suggests that there cannot be a predicate subparagraph (A) violation where (1) scalpers evade ticket issuers' ticket limits by using multiple accounts, *see id.* at 24–25, or (2) the platform "allow[s]" them "to exceed ticket limits," *id.* at 23. These arguments lack merit.

**A. TICKETMASTER "SELLS OR OFFERS TO SELL" TICKETS.**

Ticketmaster argues that platforms cannot be subject to BOTS Act liability because they do not "sell or offer to sell" tickets on the secondary markets that they enable. This argument—premised upon the dubious, atextual premise that one "must own or possess an item to sell it," *id.* at 19—is wrong at least three times over. *First*, it depends upon a stunted, artificially narrow understanding of the word "sell," obviously at odds with the ordinary usage. *Second*, Ticketmaster's argument ignores myriad authorities—from the Supreme Court and Congress alike—that support the common, broad understanding of the word "sell." And *third*, Ticketmaster's narrow reading of the word "sell" disrupts the BOTS Act's carefully reticulated structure.

***Ordinary Meaning.*** Ticketmaster agrees that because "the word 'sell' is undefined," it "thus takes its 'ordinary meaning' in the 'context' in which it appears." *Id.* at 18 (quoting *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100–01 (2012)). And in context, the ordinary meaning of the word "sell" is indeed "to convey an interest for consideration." *Id.* But that ordinary meaning does *not*

require the seller to "own or possess" the thing sold. *Id.* at 19. In "everyday usage," *id.*, we often speak of people "selling" things that they do not possess or own. Consider:

- A salesman employed at a brick-and-mortar store can "sell" a product that is only in-stock online. He neither owns it (it belongs to the retail company), nor possesses it (it is not in the physical store for him to possess as a custodian). But in ordinary usage, we have no trouble saying, "He *sells* that product."
- A stock trader "sells" a security short. He does not own the stock, and although he nominally "borrows" it, it never enters his possession—rather, a broker takes shares from someone else's account and transfers them to the buyer on the seller's account. Again, in ordinary usage, we would still say that the trader engaged in "selling."
- A thief heists jewels and asks a black-market dealer to fence them. The thief hides the jewels for safekeeping, and the fence attempts to "sell" them. But the fence obviously does not own the jewels, and neither does he possess them. Here again, we have no trouble speaking of the fence as "offering to sell" something he neither owns nor possesses.
- A real estate agent is said to "sell" a house, even though he neither owns nor possesses the house in question. Again, no English speaker would bat an eye if someone said, "A realtor sold my house."
- An auctioneer "sells" an all-inclusive vacation. He does not (and cannot) own or possess the experience that he is said to have "sold."
- A drop-shipper "sells" a product owned by a third-party supplier and shipped directly from that supplier to the buyer. Again, it is perfectly normal English to say that the drop-shipper "sold" the product, despite never owning or possessing it.

In each of the examples above, the verb "sell" is immediately recognizable according to its ordinary English meaning—to convey (or undertake to convey) something of value for consideration—notwithstanding the obvious fact that in each situation, the seller neither owns not possesses the item in question. So too, Ticketmaster—as an online ticket resale platform—quite obviously "sells" (and "offers to sell") event tickets, even if we assume, for argument's sake, that it never owns nor possesses the event tickets in question.[1]

***Judicial and Congressional Authority.*** Case law bolsters this commonsense usage. "In common parlance, a person may offer or sell property without necessarily being the person who transfers title to, or other interest in, that property." *Pinter v. Dahl*, 486 U.S. 622, 642–43 (1988); *cf. Albrecht v. United States*, 273 U.S. 1, 11 (1927) ("One may obviously . . . sell and cause to be delivered a thing of which he has never had possession[.]"). So, for example, the Supreme Court held that someone who merely a *brokered* a deal could be held liable under § 12(1) of the Securities Act of 1933, which prohibits "[a]ny person" from "offer[ing] or sell[ing] a security" in violation of registration requirements. *Pinter*, 486 U.S. at 641–43; *see id.* at 642–43 ("ordinary understanding" of the terms "offer or sell" is not limited to one who owns or possesses a property interest); *see also, e.g.*, *State Farm Fire & Cas. Co. v. Amazon.com, Inc.*, 390 F. Supp. 3d 964, 973 (W.D. Wis. 2019) ("Amazon did not own the product that [a third-party] sold to [the plaintiff's insured,] [b]ut . . . that

[1] In any event, the facts pleaded in the complaint give rise to the reasonable inference that Ticketmaster does, in fact, "possess" the event tickets that it sells on its resale platform. *See Brauer v. ExamOne World Wide Inc.*, 683 F. Supp. 3d 1054, 1058 (C.D. Cal. 2023) (Frimpong, J.) ("When evaluating a complaint under Rule 12(b)(6), the court must accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff." (quotation omitted)). For example, the Commission alleges that "[w]hen Ticketmaster *delivers* resale tickets to a secondary-market purchaser, it voids the first ticket that it sold on the primary market and *reissues a new ticket*, with unique identifying information, to the secondary purchaser." Compl. ¶ 48 (emphases added); *see also id.* ¶ 33 ("Ticketmaster is the merchant of record for all primary and resale tickets sold on its platform."). The reasonable inference to be drawn from these allegations is that Ticketmaster possesses each "event ticket"—defined by the BOTS Act as "any physical, electronic, or other form of . . . *evidence* indicating that the [buyer]" has the right of admittance, *see* Pub. L. No. 114-274, § 3(3), 130 Stat. 1401, 1403 (2016) (emphasis added)—before conveying it to the secondary-market buyer. Simply put, if Ticketmaster "reissues a new ticket"—the "evidence" of the buyer's right to enter—for every secondary market transaction on its platform, it is reasonable to infer that Ticketmaster necessarily possesses, and thus, "sells" it.

is a mere technicality . . . [because] Amazon otherwise serves all the traditional functions of both retail seller and wholesale distributor.”).[2]

Courts are not the only expositors of English usage. Legislators like Amici have used the word “sell” in many other laws, and these uses are also instructive as to the word’s ordinary meaning. Quite often, Congress uses the word “sell” in statutes that clearly apply to actors who do *not* necessarily own or possess the thing that they are selling. *See, e.g.*, 49 U.S.C. § 41712(c)(1) (“It shall be an unfair or deceptive practice . . . for any ticket agent . . . offering to *sell* tickets . . . to fail to disclose . . . the name of the air carrier.” (emphasis added)); *id.* § 40102(a)(45) (defining “ticket agent” as one who “as a principal *or agent sells, offers for sale*, negotiates for, or holds itself out as selling, providing, or arranging for, air transportation” (emphasis added)); 15 U.S.C. § 80a-12 (Investment Company Act) (“unlawful for any . . . principal underwriter [of a registered open-end investment company], *or any broker or dealer* . . . to *sell* or otherwise dispose of any security issued by the [company]” under certain conditions); 7 U.S.C. § 136j(a)(1) (“unlawful . . . to distribute or sell” an unregistered pesticide); *id.* § 136(gg) (defining “distribute or sell” to mean to “distribute, sell, offer for sale, . . . [or] release for shipment”). These broad congressional uses of the term “sell”

---

[2] Ticketmaster cites several nonbinding cases having nothing to do with the BOTS Act to support its contention that it is not a ticket “seller.” *See* Defs. Mem. at 20. These mostly unpublished and state-court cases are inapposite in any event. For instance, Ticketmaster first cites a footnote from *Fabozzi v. StubHub, Inc.*, which, in dictum, merely clarified a party’s conflicting factual allegations. No. C-11-4385, 2012 WL 506330, at *1 n.1 (N.D. Cal. Feb. 15, 2012). Ticketmaster’s other cases are no better. In each, the particular statutory context of the term “seller” made clear that it took a narrower meaning than its ordinary usage, reflecting legislatures’ allocation of legal responsibility to those who own or possess the item sold. *See Hill v. StubHub, Inc.*, 727 S.E.2d 550, 555, 561, 563–64 (N.C. Ct. App. 2012) (state law limiting fees that may be added to ticket’s face value applied only to the tickets’ “owner” who “set the price of the tickets,” and not to StubHub, which—at that time—merely “provided an independent brokerage function”); *Porras v. StubHub, Inc.*, No. C-12-1225, 2012 WL 3835073, at *2 (N.D. Cal. 2012) (law prohibited ticket resellers and brokers—who actually buy and deliver tickets—from misrepresenting their ability to deliver tickets); *Ind. Farm Bureau Ins. v. Shenzhen Anet Tech. Co.*, No. 19-cv-00168, 2020 WL 7711346, at *2–6 (S.D. Ind. Dec. 29, 2020) (strict liability for product defects allocated to third-party vendors responsible for those defects); *State Farm Fire & Cas. Co. v. Amazon.com, Inc.*, 835 F. App’x 213, 216 (9th Cir. 2020) (similar); *Est. of Graham v. Sotheby’s, Inc.*, 178 F. Supp. 3d 974, 998 (C.D. Cal. 2016) (similar); *United States v. eBay Inc.*, 751 F. Supp. 3d 232, 239–40 (E.D.N.Y. 2024) (similar). Here, Amici and their colleagues drafted and passed the BOTS Act with a “broader view[ ] about what it means to ‘sell’ something.” *eBay*, 751 F. Supp. 3d at 239.

suggest that the term commonly denotes more than just "hand[ing] over [a] good" that a party already "own[s] or possess[es]" "in exchange for payment." *See* Defs. Mem. at 19.

***Statutory Structure.*** Ticketmaster claims that "subparagraphs (A) and (B) work together to target both aspects of scalpers' operations," with subparagraph (A) targeting their buying, and subparagraph (B) targeting their selling. *Id.* "Extending subparagraph (B) to . . . ticket issuers," Ticketmaster complains, "would disrupt that careful structure." *Id.* (cleaned up). But how exactly? Ticketmaster does not say.

It is, in fact, *Ticketmaster's* contorted reading that "disrupt[s]" the law's "careful structure." *Id.* The BOTS Act's prohibitions in subparagraphs (A) and (B) are asymmetric: While subparagraph (A) does indeed target scalpers and their bulk-buying operations, *see id.*, subparagraph (B)—by design—casts a wider net. To be sure, the subparagraph (B) prohibition on "sell[ing] or offer[ing] to sell" captures scalpers who "participated directly in or had the ability to control the conduct" of illicitly procuring tickets. 15 U.S.C. § 45c(a)(1)(B)(i). But it *also* captures their platform enablers, like Ticketmaster, and others who "knew or should have known that [an] event ticket" was illicitly procured. *Id.* § 45c(a)(1)(B)(ii). Ticketmaster's atextual attempt to cast subparagraphs (A) and (B) as symmetrical prohibitions on the buying and selling operations of *scalpers alone* unduly cabins this carefully structured statutory scheme, and the court should reject it.

**B. SCALPERS VIOLATE SUBPARAGRAPH (A) WHEN THEY COLLUDE WITH PLATFORMS LIKE TICKETMASTER.**

As a fallback, Ticketmaster argues that even if it "sells" scalpers' tickets on the secondary market, the Commission's claim is still doomed because there are no predicate subparagraph (A) violations in any event. But the Commission *has* amply alleged predicate violations: The complaint details how ticket scalpers abuse Ticketmaster's platform to snatch up tickets, using thousands of often-fake accounts and various technologies to end-run Ticketmaster's means of implementing ticket-purchase limits. This conduct constitutes "circumvent[ion]" of "technological controls"

within the plain meaning of the BOTS Act, regardless of Ticketmaster's blind-eye permission to exceed ticket limits.

**1. Scalpers "circumvent" Ticketmaster's technological controls by using multiple accounts to evade ticket limits.**

By its plain terms, the BOTS Act prohibits "circumvent[ion]" of ticket platforms' "technological control[s]" for enforcing "posted event ticket purchasing limits" and "purchasing order rules." *Id.* § 45c(a)(1)(A). As Ticketmaster apparently agrees, the operative verb "circumvent" has a plain—and broad—meaning: "To avoid (a restrictive problem, rule, etc.), esp. by clever and sometimes dishonest means." *Circumvent*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also Circumvent*, MERRIAM-WEBSTER DICTIONARY (11th ed. rev. 2025) ("to manage to get around especially by ingenuity or stratagem"); Defs. Mem. at 23 (quoting BLACK'S LAW DICTIONARY).[3]

Scalpers' alleged predicate conduct falls squarely within this plain meaning. The Commission alleges that ticket scalpers "bypass" Ticketmaster's ticket-purchase controls "by using multiple accounts" and, among other things, "software that allows one person to log into multiple accounts at once on the same computer without being detected by [Ticketmaster's] automatic controls." Compl. ¶ 76. Those controls include features on Ticketmaster's "website and app" that "automatically prevent" accountholders from exceeding "posted limit in a single transaction," *id.* ¶ 70, the use of texted "account verification codes," *id.* ¶ 76, and a "security measure[ ]" called the "TicketCounter system," which "automatically blocks multiple purchase attempts from the same IP address and analyzes patterns to identify multiple accounts acting in concert to evade purchase limits," *id.* ¶ 71. *See* Defs. Mem. at 21 (conceding that "[t]he Complaint . . . identifies technological controls like automatic IP address blocking and account-verification codes"). Scalpers obviously use multiple

---

[3] These dictionary definitions can be reduced to a single word: Bypass. To circumvent something is to bypass it. The terms are perfectly synonymous.

accounts, multi-account-enabling software, and SIM banks to "avoid" or "get around" these technological controls. *See* BLACK'S LAW DICTIONARY and MERRIAM-WEBSTER DICTIONARY, *supra*. Ticketmaster's conclusory claim that the Commission "conflate[s] technological controls and ticket limits" and "assume[s] [that] a violation of ticket limits reflects a circumvention of some unidentified technological control," Defs. Mem. at 22, simply blinks the complaint's actual allegations.

**2. Platform–scalper collusion does not foreclose circumvention.**

Against all this Ticketmaster offers one more argument: It claims that lax enforcement by ticket platforms—or, what is worse, platform *complicity* in ticket scalpers' schemes—negates the "circumvent[ion]" element of subparagraph (A). *See* Defs. Mem. at 23. If, as the Commission alleged, Ticketmaster "allowed brokers to exceed ticket limits," that "forecloses a BOTS Act claim" because "then the brokers necessarily did not 'circumvent' technological controls to do so." *Id.* As one of Ticketmaster's largest scalping clients recently put it, scalpers "cannot 'circumvent' when Ticketmaster approves."[4]

The ordinary meaning of the statutory term "circumvent" forecloses this argument. Circumvention does not turn on Ticketmaster's authorization or permission. A user who "manage[s] to get around" a ticket platform's controls "circumvents" those controls, permission or acquiescence notwithstanding. *Circumvent*, MERRIAM-WEBSTER DICTIONARY (11th ed. rev. 2025). And that is unlawful.

An analogy to trespass is instructive. If a property owner turns a blind eye to trespass, that does not mean the trespasser has not climbed over the fence. He *has* climbed over the fence—but

---

[4] *See* Defs. Mem. of Law in Support of Mot. to Dismiss, ECF No. 33-1 at 16, *Federal Trade Commission v. Key Investment Group, LLC*, No. 1:25-cv-02716-GLR (D. Md. Nov. 24, 2025) (making the same argument); *see* Compl. ¶ 83 fig. 8 (Key Investment Group listed in internal Ticketmaster presentation among "brokers violating fictitious account rules on large scale").

with tacit permission. In trespass, of course, permission is a defense. But the BOTS Act includes no such exception. That is because violating the BOTS Act harms *event-going consumers*—not ticket platforms like Ticketmaster, who, far from being harmed, even *benefit* from fees on scalped tickets' secondary-market sales. *See* Compl. ¶ 77 (explaining that when Ticketmaster "sell[s] a secondary market ticket that was purchased on their primary market, [it] collect[s] three sets of fees on the same ticket[.]"); *id.* ¶ 16 (highlighting Ticketmaster's incentive to allow commercial scalping so that it "can 'triple dip' on fees").

For this reason, Ticketmaster's lack of enforcement or blind-eye treatment cannot negate scalpers' subparagraph (A) culpability. Holding otherwise would create an atextual exemption for collusive conduct between scalpers and ticket platforms that would harm the very people that the BOTS Act was plainly intended to protect—ordinary Americans who want to see their favorite performers or sports teams at reasonable prices. *See* Pub. L. No. 114-274, pmbl., 130 Stat. 1401, 1401 (2016) (indicating Act's focus on "ensur[ing] equitable *consumer* access to tickets" (emphasis added)).

## II. CONGRESS ENACTED THE BOTS ACT TO PROTECT CONSUMERS, NOT TICKETING PLATFORMS.

Ticketmaster claims that, in enacting the BOTS Act, Congress was worried about platforms like Ticketmaster. *See* Defs. Mem. at 15 ("Congress enacted the bots act to protect *platforms* from bad actors . . . ." (emphasis added) (capitalization altered)). Wrong. Amici and their fellow legislators were concerned with everyday *Americans*—Americans who want to be able to purchase tickets to see their favorite teams and artists live at reasonable prices. *See* BOTS Act of 2016, Pub. L. No. 114-274, pmbl., 130 Stat. 1401, 1401 (2016) ("An Act To prohibit the circumvention of control measures used by Internet ticket sellers *to ensure equitable **consumer** access* to tickets for any given event." (emphases added)); S. Rep. No. 114-391, at 1 (2016) ("The purpose of [the bill] is . . . to ensure equitable *consumer* access to tickets for any given event.") (emphasis added).

Ticketmaster's fanciful account of Congress's intent in enacting the BOTS Act flies in the face of the Act's legislative history.

From the beginning, the BOTS Act has been about *consumer* protection, not *platform* protection. When Amicus Senator Blackburn, the bill's House co-sponsor, introduced the BOTS Act and Congress unanimously passed it into law in 2016, legislators drew attention to the problem of online ticket scalpers and the harms they imposed on American consumers. The primary problem troubling Amici and their fellow lawmakers was that ticket scalpers cheated and enriched themselves and their platform enablers at the expense of the ordinary American consumer. By circumventing platforms' technological controls enforcing ticket-purchase limits to snatch up and accumulate hoards of tickets, online scalpers forced many Americans onto secondary markets, like Ticketmaster's platform, where they buy scalped tickets at exorbitant markups and with even more fees heaped on top. In short, unscrupulous scalpers and profiteering platforms gained at American eventgoers' expense.

The legislative record is replete with statements evincing legislators' focus on protecting consumers, not platforms. Senator Amy Klobuchar, for example, explained that she was a co-sponsor of the Act expressly "because it protects *consumers*." *Examining the Better Online Ticket Sales Act of 2016: Hearing Before the Subcomm. on Consumer Prot., Prod. Safety, Ins., & Data Sec. of the S. Comm. on Com., Sci., & Transp.* ("S. Subcomm. Hearing"), 114th Cong., S. Hrg. 114-614, at 52 (2016) (question submitted by Hon. Amy Klobuchar to Jeremy Liegl) (emphasis added). Senator Blumenthal likewise emphasized his track record in "fighting to protect *consumers* from ticket scalpers." *Id.* at 3 (Statement of Hon. Richard Blumenthal) (emphasis added). The list goes on. *See, e.g.*, *id.* at 24 (Statement of Hon. Claire McCaskill) (expressing concern that scalpers "are stealing money from legitimate customers"); *Oversight of the Federal Trade Commission: Hearing Before the S. Comm. on Com., Sci. & Transp.*, 114th Cong., S. Hrg. 114-631, at 44 (2016) (Statement of Hon. Maria Cantwell) ("[The BOTS Act] is about empowering *consumers*." (emphasis added)); Press Release,

Sen. Maria Cantwell, *Cantwell Backs Bill to Benefit Washington Music and Sports Fans* (Sept. 21, 2016) (available at tinyurl.com/CantwlPR) ("This legislation gives *consumers* a fair shake when making [a ticket] purchase." (emphasis added)); Press Release, Sen. Charles E. Schumer, *Schumer Introduces New Senate Bill That Puts An End To Unfair Cyber Scalping* (Mar. 28, 2016) (available at tinyurl.com/SchumBOTS) ("[T]his legislation would help ensure *consumers* are given equitable access to tickets." (emphasis added)).[5]

When the BOTS Act passed, Amicus Senator Blackburn explained that the Act was designed "to end [scalpers'] anti-consumer tactics and level the online ticket playing field for fans of live entertainment." Press Release, Office of Congressman Paul Tonko, *Tonko, Blackburn Lead Bipartisan Effort to Level Online Ticket Sales Playing Field for Fans of Live Entertainment* (Apr. 28, 2016) (available at tinyurl.com/Tonko-Bbn). Other legislators made similar remarks, underscoring the consumer focus of the new law. *See*, *e.g.*, *id.* (Rep. Tonko: "This legislation . . . empower[s] *consumers* to fight back against price manipulators in the ticket industry." (emphasis added)); Press Release, S. Comm. on Com., Sci., & Transp., *Moran Bill to Improve Consumer Access to Entertainment Events Passes* (Dec. 1, 2016) (available at tinyurl.com/SCommPR) (Senator Jerry Moran: "This bill helps level the playing field for *consumers* and takes aim at artificially inflated prices." (emphasis added)); Press Release, Sen. Richard Blumenthal, *Senate Approves Blumenthal Bill to Crack Down on Unfair Ticket Bots* (Dec. 1, 2016) (available at tinyurl.com/BlumPR2) ("*Consumers* deserve access to tickets at affordable prices and a fair chance to buy them before scalpers buy them in bulk." (emphasis added)).

---

[5] Private citizens advocating for the BOTS Act at the Senate Subcommittee hearing that considered the bill also emphasized the bill's consumer-protection focus. *See, e.g.*, S. Subcomm. Hearing, *supra*, at 12 (prepared statement of Jeffrey Seller, Producer, "Hamilton") ("[W]e are here together to ask for your help in passing the BOTS Act to punish abusers of a system designed for *consumers and fans*, not just for those looking to 'game the system' and make a quick buck." (emphasis added)); *id.* at 9 (prepared statement of Bob Bowlsby, Commissioner, Big 12 Conference) ("[W]e should denounce . . . forced competition on Internet ticket sites between ardent *fans* and faceless scalpers who seek to profit from those *fans'* passion for college athletics." (emphases added)).

Conspicuously missing from this legislative record is any real concern for the impact of ticket-scalper practices on ticket platforms. In fact, contrary to Ticketmaster's suggestion that Congress was really looking out for platforms' interests, the record shows that legislators were leery of platforms' motivations. For instance, at a hearing before the Consumer Protection, Product Safety, Insurance, & Data Security Subcommittee of the Senate Committee on Commerce, Science, and Transportation, then-Chairman John Thune observed:

> As leading companies in the live events industry [*i.e.*, Ticketmaster and Stubhub] representing primary and secondary ticket sellers respectively, it would seem that [scalpers' use of] ticket bots might actually help your bottom lines. For primary ticket issues, for instance, bots move tickets quickly, and in the secondary market, they help create inventory. And, of course, in both cases, they do so at the expense of the ticket buying public, which, again, as we pointed out earlier, makes the consumer experience both more frustrating and expensive.

S. Subcomm. Hearing, *supra*, at 38 (Statement of Hon. John Thune). Similarly, Senator Claire McCaskill had the following colloquy with the then–General Counsel of Stubhub, Tod Cohen:

> Senator MCCASKILL. . . . [L]et's talk about the ticket services that are making money coming and going. Let's see if I have this right. Live Nation owns Ticketmaster, correct?
>
> Mr. COHEN. Yes.
>
> Senator MCCASKILL. And they also own TicketNow, correct?
>
> Mr. COHEN. They do.
>
> Senator MCCASKILL. So someone can . . . buy a large inventory of tickets to a concert, and then they can turn around and place those tickets for sale on TicketNow, correct?
>
> Mr. COHEN. Yes, and . . . they could place them for sale on our platform as well as other competitors. . . .
>
> Senator MCCASKILL. So Live Nation is making money coming and going, correct? They're making money—they're making the fees on the first sale, and then they're turning around and making a fee on the second sale also.
>
> Mr. COHEN. That is true.

*Id.* at 25. Clearly, Amici and their colleagues were concerned with consumer welfare, not corporate welfare for ticket platforms who *benefit* from scalpers' secondary-market transactions.[6]

Ticketmaster musters no contrary evidence of Congress's supposed desire to "[p]rotect [p]latforms." *See* Defs. Mem. at 15–16 (citing no concrete evidence in the legislative record). This Court should reject Ticketmaster's baseless assertion and apply the BOTS Act in accord with its plain text and obvious purpose of protecting American consumers.

**III. TICKETMASTER'S CONSTRICTIVE READING OF THE LAW WOULD ALLOW TICKET PLATFORMS TO COLLUDE WITH TICKET SCALPERS AND HARM ORDINARY CONSUMERS.**

Ticketmaster's strained interpretation of the BOTS Act should be rejected because it would condone—and indeed, incentivize—collusive conduct between platforms and scalpers.

As the complaint explains, ticket platforms like Ticketmaster collect fees on both primary and secondary-market transactions. *See* Compl. ¶¶ 16, 77; *see also, e.g.*, Clare Y. Cho, Cong. Rsch. Serv., R48179, Tickets for Live Entertainment Events 3 (2025) ("Ticketers in the primary and secondary markets obtain revenue from fees that are paid by consumers."). Thus, a *single* ticket generates *three* layers of Ticketmaster fees when it is scalped: First, the scalper pays a fee on the initial primary-market purchase; then, when the scalped ticket is sold (with a markup), Ticketmaster collects two more fees: one fee from the scalper listing the ticket, and another from the buying consumer. Compl. ¶ 77. Because of these cumulative fees, platforms have a strong financial incentive to allow scalpers to operate at scale: The more primary-market tickets that scalpers can buy, the more tickets will be sold on the secondary market, and the more fees Ticketmaster will be able to collect—to the tune of hundreds of millions, or even *billions*, of dollars. *See id.* ¶¶ 16, 37, 39, 78; *cf. id.* ¶ 103; S. Subcomm. Hearing, *supra*, at 38 (Statement of Hon. John Thune).

---

[6] *See also* S. Subcomm. Hearing, *supra*, at 26 (Sen. Blumenthal suggesting "that there may be elements of the [ticketing] industry that are complicit in these kinds of unfair markups and denial of access").

These incentives motivate platform–scalper collusion. At artists' requests, platforms make paper promises about ticket limits, but—to continue collecting "triple dip" fees—they are all too willing to turn a blind eye to their policies' violations in practice. *See* Compl. ¶¶ 11, 14–16, 66–67, 82, 90–93. Adopting Ticketmaster's incorrect construction of the BOTS Act would let scalpers and their platform enablers entirely off the hook precisely when they most need to be held to account. If, as Ticketmaster urges, it negates the Act's "circumvent[ion]" element when Ticketmaster colludes with scalpers to "allow" them to maneuver around its technological controls, *see* Defs. Mem. at 23, then the BOTS Act becomes a paper tiger: Ticketmaster's permission absolves scalpers of subparagraph (A) liability, and without a subparagraph (A) predicate, Ticketmaster itself is absolved of subparagraph (B) liability. Fortunately, that is not the law, and Ticketmaster cannot issue itself a golden ticket.

Ticketmaster's erroneous interpretation of the Act would impose serious and substantial real-world costs on hardworking Americans who save up to enjoy attending live performances and sporting events. Almost 40% of Americans report buying event tickets on the secondary market. *See* Digital Citizens Alliance, *When It Comes to Digital Markets, Trust Can't Be Secondary* (May 2025), tinyurl.com/DigCitAllce. "Seventy-five percent of Americans who purchased reseller tickets said online secondary markets lead to speculators hoarding products." *Id.* Their intuitions are amply justified: It is well-documented that unregulated ticket-resale markets incentivize "costly rent-seeking behavior," which "reduce[s] overall social welfare." Phillip Leslie & Alan Sorensen, *The Welfare Effects of Ticket Resale*, at 1 (Nat'l Bureau of Econ. Rsch., Working Paper No. 15476, 2009).

When ticket scalpers buy up tickets in primary markets, they force ordinary consumers into secondary markets, where "[t]icket resale prices can be significantly higher than primary market prices." U.S. Gov't Accountability Off., GAO-18-347, *Event Ticket Sales: Market Characteristics and Consumer Protection Issues*, at 12 (2018), tinyurl.com/GAO-tix. One study, for instance, found

that ticket buyers on average paid 203% of face value for their tickets in the secondary market. *See* Nat'l Indep. Ticket Operators Ass'n, NITO TICKET RESALE STUDY 1–2 (2024), perma.cc/UE6A-WBF6. These markups represent massive wealth transfers from American consumers to unscrupulous online ticket speculators and their fee-collecting platform enablers—precisely what the BOTS Act sought to stop.

For too long, the Commission failed to enforce the BOTS Act with vigor. *See* Press Release, Office of Senator Marsha Blackburn, *The FTC Has Failed To Enforce The BOTS Act* (Dec. 2, 2022), tinyurl.com/FTC-BOTS. In March 2025, President Trump made his desire known that the Commission "[r]igorously enforce" the BOTS Act "to protect fans from exploitative ticket scalping." Press Release, White House, *Fact Sheet: President Donald J. Trump Will End Price-Gouging by Middlemen in the Entertainment Industry* (Mar. 31, 2025), tinyurl.com/WHFctsht; *see* Exec. Order No. 14,254 § 2(b), (d), 90 Fed. Reg. 14,699, 14,699 (Apr. 3, 2025). This Court should not hinder that overdue enforcement by allowing Ticketmaster to continue platforming commercial ticket scalpers.

**CONCLUSION**

Because the Commission's complaint adequately alleges BOTS Act violations, Amici respectfully submit that the Court should deny Defendants' motion to dismiss.

Dated: January 30, 2026

Respectfully submitted,

*/s/ James M. Donovan*

James M. Donovan (SBN 64756)
Michael J. Glenn (SBN 89654)
**LAW OFFICES OF JAMES M. DONOVAN**
915 Wilshire Boulevard, Suite 1610
Los Angeles, CA 90017
Telephone: (213) 629-4861
*jmdonovan@thedonovanoffices.com*
*mglenn@thedonovanoffices.com*

Michael A. Fragoso*
T. Zachary Horton*
Peter Lee Hamilton*
**TORRIDON LAW PLLC**
801 Seventeenth Street NW, Suite 1100
Washington, DC 20006
Telephone: (202) 249-6900
mfragoso@torridonlaw.com
tzhorton@torridonlaw.com
phamilton@torridonlaw.com

**Pro hac vice forthcoming*

***Attorneys for Amici Curiae***

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-25-2716 |
| KEY INVESTMENT GROUP LLC., et al., | * | |
| | * | |
| Defendants. | * | |

***

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Defendants Front Rose Tix LLC, Key Investment Group LLC, Taylor Kurth, Elan N. Rozmaryn, Yair D. Rozmaryn, Totally Tix LLC, Totaltickets.com LLC, and WLK Investments LLC's Motion to Dismiss (ECF No. 33) and Senators Marsha Blackburn and Ben Ray Lujan's Motion for Leave to File Amicus Curiae Brief (ECF No. 35). The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2025). For the reasons set forth below, the Court will deny the Motion to Dismiss and grant the Motion for Leave.

## I. BACKGROUND[1]

### A. Factual Background

Beginning on or around October 2016, Defendants Front Rose Tix LLC, Key Investment Group LLC, Taylor Kurth, Elan N. Rozmaryn, Yair D. Rozmaryn, Totally Tix

[1] Unless otherwise noted, the Court takes the following facts from the Complaint and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

LLC, Totaltickets.com LLC, and WLK Investments LLC (collectively "Defendants") bought tickets from Ticketmaster, a well-known ticket-issuer, and then sold those tickets to consumers on different websites at higher prices. (Compl. ¶ 2, ECF No. 1). Ticketmaster has certain security measures so that consumers can purchase tickets at a reasonable price. (See id. ¶¶ 24–27). Ticketmaster's security measures include, as one example, a "Purchase Policy" which imposes ticket limits and prohibits the purchase of tickets with accounts containing false or misleading information. (Id. ¶¶ 25–28). Plaintiff, the Federal Trade Commission ("FTC"), alleges that Defendants bypass these security measures by using a host of methods to buy more tickets at a faster pace than ordinary consumers. (Id. ¶¶ 28–29).

Specifically, the FTC alleges Defendants bypass Ticketmaster's security measures by using thousands of fictitious names, addresses, and phone numbers; thousands of credit card numbers (including some linked to accounts in the names of Key Investment Group employees, or friends and family of Key Investment Group officers or employees); IP proxy services to utilize multiple IP addresses; hundreds of SIM cards; and SIM banks, also known as SIM boxes. (Id. ¶ 28). In addition to opening their own allegedly fictitious Ticketmaster accounts and using the accounts of friends and family members, Defendants have purchased hundreds of Ticketmaster accounts from individuals unrelated to Defendants. (Id. ¶ 43). In total, the FTC alleges that Defendants created, purchased, or otherwise obtained from third parties more than 13,000 Ticketmaster accounts. (Id. ¶ 42).

With tickets in hand from Ticketmaster, Defendants then sell these tickets at higher prices to consumers on secondary websites who otherwise may have been able to purchase

these same exact tickets at the posted price had Defendants not bypassed Ticketmaster's security measures. (See id. ¶¶ 30–33). Specifically, beginning on November 1, 2022 and continuing through December 30, 2023, the FTC alleges that Defendants purchased more than 107,265 tickets online through Ticketmaster. (Id. ¶ 23). Around that same time, Defendants sold these tickets on secondary websites, netting approximately $5,661,787.49 in revenue. (Id. ¶30).

As stated, because Defendants allegedly circumvent Ticketmaster's security measures, Defendants can purchase tickets "more rapidly and in a greater volume" than an ordinary consumer purchasing a single ticket through Ticketmaster. (Id. ¶29). The FTC offers several real-world examples of this practice and its consequences. (Id. ¶¶ 31–33). For example, Defendants allegedly used 49 different accounts to purchase 273 tickets to Taylor Swift's March 25, 2023 concert at Allegiant Stadium, exceeding The Eras Tour's 2023 six-ticket limit; Defendants then resold these tickets, making $119,227.21 in revenue. (Id. ¶ 32). As another example, for a Bruce Springsteen show at MetLife Stadium on September 1, 2023, Defendants used 277 different accounts to purchase 1,530 tickets, exceeding Springsteen and the E Street Band's four-ticket limit; Defendants resold these tickets, making $20,900.84 in revenue. (Id. ¶ 33).

For all these reasons, the FTC alleges that it has reason to believe that Defendants are violating and will continue to violate Section 2(a) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(a) and Section 5(a) FTC Act, 15 U.S.C. § 45(a) (Id. ¶¶1, 51). As further support, the FTC explains that in February 2018, Defendant Taylor Kurth entered a consent decree with the State of Washington regarding his use of software to circumvent, thwart,

or interfere with or evade a security measure, access control system, or other control or measure on Ticketmaster's websites in violation of Washington's Ticket Sellers Act, and yet Kurth and his co-Defendants, who allegedly know of the consent agreement, have continued to use business practices designed to circumvent Ticketmaster's posted ticket purchase policies. (Id. ¶ 51). As a result, the FTC seeks a permanent injunction to prevent future violations of the FTC Act and the Better Online Ticket Sales Act in accordance with the FTC Act, 15 U.S.C. § 53(b), and Section 2(b) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(b), along with civil penalties for each violation of the Better Online Ticket Sales Act in accordance with Section 2(b) of that Act, 15 U.S.C. § 45c(b), and Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A). (Id. at 17).[2]

**B. Procedural History**

On August 18, 2025, the FTC filed a Complaint against Front Rose Tix LLC, Key Investment Group LLC, Taylor Kurth, Elan N. Rozmaryn, Yair D. Rozmaryn, Totally Tix LLC, Totaltickets.com LLC, and WLK Investments LLC. (ECF No. 1). The one-count Complaint alleges violations of the Better Online Ticket Sales Act and the FTC Act (Compl. ¶¶ 52, 53). On November 24, 2025, Defendants filed a Motion to Dismiss. (ECF No. 33). The FTC filed an Opposition on December 24, 2025. (ECF No. 34). On January 16, 2026, Defendants filed a Reply. (ECF No. 51).

[2] Unless otherwise noted, citations to the page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

## II. DISCUSSION

### A. <u>Motion for Leave to File Amicus Curiae Brief</u>

Before reaching the merits of Defendants' Motion to Dismiss, the Court will first address the pending Motion for Leave to file Amicus Curiae Brief filed by United States Senators Marsha Blackburn and Ben Ray Lujan. (Mot. Leave File Amicus Curiae Br., ECF No. 35). Amici Senators move for leave to file an amicus brief seeking to provide guidance as to the interpretation and purpose of the Better Online Ticket Sales Act of 2016, 15 U.S.C. § 45c. (Mot. Leave File Amicus Curiae Br. at 6, ECF No. 35-1).

There is no Federal Rule of Civil Procedure applicable to motions for leave to appear as amicus curiae in a federal district court. <u>Am. Humanist Ass'n v. Md.-Nat'l Cap. Park & Plan. Comm'n</u>, 303 F.R.D. 266, 269 (D.Md. 2014). Accordingly, district courts have discretion to permit amicus briefs and often look to Rule 29 of the Federal Rules of Appellate Procedure for guidance, which applies to amicus briefs at the federal appeals level. <u>Id.</u> Rule 29 indicates that amici should state "the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case." Fed.R.App.P. 29(b)(2). District courts have granted leave to file when amicus curie "provide helpful analysis of the law, they have a special interest in the subject matter of the suit, or existing counsel is in need of assistance." <u>Am. Humanist Ass'n</u>, 303 F.R.D. at 269 (quotation omitted). On the other hand, if the Court does not find the "proffered information timely and useful," the motion "should not be granted." <u>Id.</u> (quotation omitted). Here, the Court finds that the proposed brief is relevant and helpful and will grant

the Motion (ECF No. 35). The Court considers the Amicus Curiae Brief in its analysis of the Motion to Dismiss.

**B. Motion to Dismiss**

**1. Standard of Review**

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual

Case 1:25-cv-02716-GLR Document 96-4 Filed 09/25/26 Page 385 of 464

allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 268 (4th Cir. 2005). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

**2. Analysis**

Defendants assert the FTC fails to allege a cognizable violation of the Better Online Ticket Sales Act of 2016 ["BOTS Act" or "Act"], 15 U.S.C. § 45C. (Defs.' Mem. L. Supp. Mot. Dismiss ["Mot."] at 1, ECF No. 33-1). Specifically, Defendants argue that the BOTS Act is inapplicable here because Defendants do not use bots. (Id. at 1). Further, Defendants argue that Ticketmaster does not enforce or maintain security measures; to the contrary, Defendants insist that Ticketmaster encourages Defendants' behavior as it relates to ticket purchases. (Id.). Defendants also raise a host of constitutional issues, including that the BOTS Act is unconstitutionally vague as to non-bot users and violates the major questions doctrine. (Id. at 32–34). The FTC counters that the BOTS Act is neither unconstitutionally vague nor does it violate the major questions doctrine. (Pl.'s Mem. L. Opp'n Defs.' Mot. Dismiss ["Opp'n"] at 28–30, ECF No. 34). Additionally, the FTC argues that "[a]cronym aside, the words 'bot' or 'bots' do not appear in the Act" and urges the Court to "decline Defendants' invitation to read an unwritten substantive pleading requirement into the Act's text, based simply on an acronym for the Act's title." (Id. at 21). The Court will review each argument in turn.

**a. Whether the BOTS Act Applies to "Non-Bot Users"**

The Court will first address Defendants' argument that the BOTS Act is inapplicable here because Defendants do not use bots. (Mot. at 8–19). The BOTS Act makes it unlawful for "any person . . . to circumvent a security measure, access control system, or other technological control or measure on an Internet website . . . used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules[.]" 15 U.S.C. § 45c(a)(1)(A). Defendants rely on the statute's acronym to show the Act applies exclusively to bots or bot-users. (Mot. at 7 n.1, 4–19). Defendants then insist that "whether the BOTS Act applies to non-bot users is ambiguous at best. As such, courts are directed to look to legislative history for guidance." (Id. at 15). Defendants then turn to the Act's legislative history and conclude that Congress did not intend for the BOTS act to apply to "non-bot users" and maintains that the FTC "cannot now turn a blind eye to Congress's intent." (Id.).

The Court finds Defendants' approach to statutory interpretation unpersuasive. Matters of statutory interpretation are within the sound province of the judiciary. Loper Bright Enters. v. Raimondo, 603 U.S. 369, 385 (2024) (citing Marbury v. Madison, 5 U.S. 137, 177 (1803)). "[T]he starting point for any issue of statutory interpretation . . . is the language of the statute itself.'" Redeemed Christian Church of God v. Prince George's Cnty., 17 F.4th 497, 508 (4th Cir. 2021) (quoting D.B. v. Cardall, 826 F.3d 721, 734 (4th Cir. 2016)). And "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." West Virginia v. Env't Prot. Agency, 597 U.S. 697, 721 (2022) (quotation

omitted). "Principles of statutory construction require 'a court to construe all parts to have meaning' and, accordingly, avoid constructions that would reduce some terms to mere surplus[ ]age." In re Total Realty Mgmt., LLC, 706 F.3d 245, 251 (4th Cir. 2013) (quoting PSINet, Inc. v. Chapman, 362 F.3d 227, 232 (4th Cir. 2004)); Child Trends, Inc. v. United States Dep't of Educ., 795 F.Supp.3d 700, 723 (D. Md. 2025).

Here, 15 U.S.C. § 45c does not define nor include the word "bots." Rather, the statute makes it unlawful for "any person" to "circumvent a security measure . . . on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules." 15 U.S.C. § 45c(a)(1)(A). The statute unambiguously applies to "any person" and not just to "bots." See id. Additionally, the harms at issue, exorbitant ticket prices because of bad actors manipulating and re-selling tickets and circumventing posted security measures, could be caused either by "bots," or humans who write the code behind the "bots," or individuals who work in concert to recreate what bots otherwise accomplish. Put simply, the Court is not persuaded by Defendants' narrow reading of the statute. Further, courts have rejected relying on a statute's name or acronym as evidence of the law's plain meaning because "it is the statutory language, and not the statutory provision's title or popular name, that controls." United States v. Terrazas Siles, 397 F.Supp.3d 812, 825 (E.D.Va. 2019), aff'd sub nom., United States v. Terrazas-Silas, 811 F.App'x 845 (4th Cir. 2020); see Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co., 331 U.S. 519, 528–29 (1947) (discussing the "wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text"). The Court's inquiry, however, does not end there.

As the United States Court of Appeals for the Fourth Circuit recently explained when interpreting a provision of the Internal Revenue Code, even where "[t]he statute's text is clear, [and] we needn't reach its legislative history," in any event, a look at the statute's legislative history "lends no support to the [Defendants'] position." Bank of Am. Corp. v. United States, 148 F.4th 171, 179–80 (4th Cir. 2025). Here too. The Court need not reach the text's legislative history to determine whether it exclusively applies to "bots," but even so, Defendants' position still does not warrant dismissal. As Amici Senators explain, "the operative text of the BOTS Act does not limit its application to scalpers who use bots. In fact, the law's key provision does not reference bots at all." (Amicus Br. at 7, ECF No. 35-1). Further, and most critically, "contrary to Defendants' representations, Amici—as drafter (Senator Blackburn) and supporter (Senator Luján) of the law—did not believe the BOTS Act was confined solely to use of bot technology." (Id.). Rather, "the problem troubling Amici and their fellow lawmakers was not just scalpers using bots to gain an unfair advantage—though, to be sure, that was a significant concern." (Id. at 15). Instead, "[t]he root problem was that ticket scalpers did not play by the rules; they cheated and enriched themselves at the expense of the ordinary American consumer." (Id.). The legislative history of the BOTS Act does not support a narrow reading as Defendants suggest. As a result, the Court will deny Defendants' Motion to Dismiss on this basis.

**b. Whether Defendants Circumvented Security Measures**

Defendants next advance a series of other arguments in support of dismissal, including, for example, that the FTC fails to allege that Defendants circumvented a security measure in violation of the BOTS Act because Ticketmaster condones its behavior. (Mot.

Case 1:25-cv-02716-GLR Document 64 Filed 09/22/26 Page 389 of 464

at 19–21). The statute's applicability, however, does not depend on how vigorously a ticket issuer enforces its policies.

Indeed, whether Ticketmaster condoned or encouraged Defendants' behavior seems, at best, issues of fact best suited for summary judgment briefing and discovery. The same goes for Defendants' arguments around their use of SIM Cards, SIM Boxes, and multiple IP Address and accounts. (Mot. at 10–18). At this very early stage, the question is whether the FTC adequately alleges that Defendants circumvented Ticketmaster's security measures. It does. (See e.g., Compl. ¶ 28 ("When purchasing tickets from Ticketmaster, Defendants have regularly circumvented security measures, access control systems, and other technological controls or measures on Ticketmaster's websites by, among other things, using: computer software and technologies designed to do so; thousands of fictitious names, addresses, and phone numbers; thousands of credit card numbers (including some linked to accounts in the names of Key Investment Group employees, or friends and family of Key Investment Group officers or employees); IP proxy services to utilize multiple IP addresses; hundreds of SIM cards; and SIM banks, also known as SIM boxes.")). Defendants may be correct that, ultimately, the FTC will fail to "establish" liability (see Mot. at 16), but that is not the inquiry at this stage of the litigation and the Court will decline to dismiss on this basis.

**c. Whether the BOTS Act is Void for Vagueness**

Defendants next argue that the BOTS Act is unconstitutionally vague as applied to "non-bot users." (Mot. at 32–34). A statute is impermissibly vague if it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what

conduct it prohibits;" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." United States v. Whorley, 550 F.3d 326, 333 (4th Cir. 2008) (citation omitted). To satisfy constitutional muster, statutory prohibitions must simply "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with." Id. (citation omitted). A statute need not spell out every possible factual scenario with "celestial precision" to avoid being struck down on vagueness grounds. Id. (citation omitted).

Here, the Court finds that the BOTS Act is not unconstitutionally vague as applied to non-bot users. As this Court has explained, the law applies to "any person" who engages in circumventing ticket-issuers' security measures. See 15 U.S.C. § 45c(a)(1)(A). The Court takes the law to mean what it says. The Act provides enough context and does not fail to provide "people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." Whorley, 550 F.3d at 333 (citation omitted). The law aims to stop exorbitant ticket prices on secondary websites, and the FTC's enforcement of the BOTS Act, at least at this stage of the litigation, does not appear arbitrary or discriminatory. As a result, the Court rejects Defendants' invitation to find the law unconstitutionally vague as applied to non-bot users.

For these same reasons, the Court also rejects Defendants' argument that "civil penalties cannot be assessed as a matter of law" because Defendants did not know they violated the BOTS Act. (Mot. at 26). Specifically, Defendants argue that the FTC Act "only allows for civil penalties if an entity violated the BOTS Act 'with actual knowledge or knowledge fairly implied on the basis of objective circumstances.'" (Id. (quoting 15

Case 1:25-cv-02716-GLR Document 64 Filed 09/29/26 Page 391 of 464

U.S.C. § 45(m)(1)(A)). Because Defendants assert that they do not use bots, Defendants argue "it would have been literally impossible for [Defendants] to have had knowledge 'on the basis of objective circumstances' that it violated the BOTS Act." (Id. at 27). The FTC counters that Defendants had knowledge of the Act, received warnings from vendors about compliance with the act, and monitored the Act and FTC enforcement actions. (Compl. ¶ 51; Opp'n at 12). The Court declines to find that civil penalties cannot be assessed as a matter of law because the plain text of the BOTS Act does not limit its enforcement only to "bots" but rather applies to "any person." 15 U.S.C. § 45c(a)(1)(A). Accordingly, Defendants' arguments around its lack of knowledge about the potential violations are unpersuasive. As a result, the Court declines to dismiss on this basis.

**d. Whether the BOTS Act Violates the Major Questions Doctrine**

Defendants also argue that the BOTS Act violates the major-questions doctrine (Mot. at 34–36). This rule requires clear congressional authorization for agency action in "extraordinary cases" when the "history and breadth" and "economic and political significance" of the action at issue gives us "'reason to hesitate before concluding that Congress' meant to confer such authority" to act on the agency. West Virginia, 597 U.S. at 721 (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159–60 (2000)). "As its name suggests, the major-questions doctrine applies only when the question at issue—i.e., the authority the agency is claimed to have—is a major one. That is, the question must have significant political and economic consequences." North Carolina Coastal Fisheries Reform Grp. v. Capt. Gaston LLC, 76 F.4th 291, 296 (4th Cir. 2023).

Here, the BOTS Act seeks to curtail a specific problem of exorbitant ticket prices that harm consumers buying tickets on secondary websites. See 15 U.S.C. § 45c. Further, in contrast to Biden v. Nebraska, 600 U.S. 477, 500–07 (2023), where the Court found the major questions doctrine applicable because it involved the Secretary of Education's decision to free 43 million borrowers from their obligations to repay $430 billion in student loans, here, the BOTS Act is much more narrow and simply aims to "prohibit the circumvention of control measures used by Internet ticket sellers to ensure equitable consumer access to tickets for any given event," 15 U.S.C. § 45c(a)(1)(A). It does not seek to regulate large swaths of the economy nor is it particularly politically significant or controversial. (See Amicus Br. at 15 (noting that Congress passed the BOTS Act unanimously)). In sum, the Court agrees with the FTC that this case "involves neither ambiguous statutory text" nor "extravagant statutory power over the national economy." (Opp'n at 29 (quoting West Virginia, 597 U.S. at 724)). As a result, the Court declines to dismiss on this basis.

## III. CONCLUSION

For the foregoing reasons, the Court will deny the Motion to Dismiss (ECF No. 33) and grant the Motion for Leave to file Amicus Curiae Brief (ECF No. 35). A separate Order follows.

Entered this 28th day of April, 2026.

/s/
George L. Russell, III
Chief United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-25-2716 |
| KEY INVESTMENT GROUP LLC., et al., | * | |
| | * | |
| Defendants. | * | |

***

**<u>ORDER</u>**

For the reasons stated in the foregoing Memorandum Opinion, it is this 28th day of April, 2026, by the United States District Court for the District of Maryland, hereby:

ORDERED that Defendants Front Rose Tix LLC, Key Investment Group LLC, Taylor Kurth, Elan N. Rozmaryn, Yair D. Rozmaryn, Totally Tix LLC, Totaltickets.com LLC, and WLK Investments LLC's Motion to Dismiss (ECF No. 33) is DENIED;

IT IS FURTHER ORDERED that Defendants shall ANSWER the Complaint in accordance with the Local Rules and Federal Rules of Civil Procedure;

IT IS FURTHER ORDERED that Senators Marsha Blackburn and Ben Ray Lujan's Motion for Leave to File Amicus Curiae Brief (ECF No. 35) is GRANTED; and

IT IS FURTHER ORDERED that the Clerk shall PROVIDE a copy of this Order to all counsel of record.

/s/
George L. Russell, III
Chief United States District Judge

# EXHIBIT 17

**From:** Zach Horton <tzhorton@torridonlaw.com>
**Sent:** Thursday, April 30, 2026 9:02 AM
**To:** Cohen, Jonathan <jcohen2@ftc.gov>; Michael A. Fragoso <mfragoso@torridonlaw.com>; Peter L. Hamilton <phamilton@torridonlaw.com>
**Subject:** Re: Thanks!

---

Our pleasure, Jonathan. We look forward to good news in Ticketmaster likewise!

Zach

Zach Horton
Associate

Torridon Law PLLC

801 17th Street, NW, Suite 1100
Washington, DC 20006
Direct: 202.864.3788
tzhorton@torridonlaw.com

---

**From:** Cohen, Jonathan
**Sent:** Wednesday, 29 April 2026 21:24:44
**To:** Michael A. Fragoso ; Peter L. Hamilton ; Zach Horton
**Subject:** Thanks!

**EXTERNAL EMAIL:** Please exercise caution when opening attachments or clicking on links.

I just wanted to express my gratitude for the substantial contribution that you and your clients made to the fantastic KIG result. We really appreciate it.
And we hope for good news in Ticketmaster soon.
Best,

**Jonathan Cohen**
Chief Litigation Counsel
Bureau of Consumer Protection | Federal Trade Commission
600 Pennsylvania Avenue, N.W., HQ-462 Washington, D.C. 20580
(202) 326-2551 | jcohen2@ftc.gov

Confidentiality Notice:

This communication is from Torridon Law PLLC and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this correspondence in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you properly received this e-mail as a client, co-counsel or retained expert of Torridon Law PLLC, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

**This message has been scanned by Torridon's email security systems for threats and malicious content.**

No image available for this record.

# EXHIBIT 18

**MANATT, PHELPS & PHILLIPS, LLP**
Bezalel A. Stern (D. Md. Bar No. 20667)
Joshua N. Drian (*pro hac vice*)
1050 Connecticut Ave. NW, Suite 600
Washington, D.C. 20036
Tel.: (202) 585-6500
Email: bstern@manatt.com
jdrian@manatt.com

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

**FEDERAL TRADE COMMISSION,**

***Plaintiff,***

**v.**

**KEY INVESTMENT GROUP LLC, et al.,**

***Defendants.***

**Case No. 1:25-cv-02716-GLR**

Hon. George L. Russell, III, Chief District Court Judge

**DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES**

**JURY TRIAL REQUESTED**

Defendants Key Investment Group, LLC, TotalTickets.com LLC, Totally Tix LLC, Front Rose Tix LLC, WLK Investments, LLC, Yair D. Rozmaryn, Elan N. Rozmaryn, and Taylor Kurth (collectively, "Defendants") by and through their undersigned counsel, hereby answer the allegations in the Complaint for Permanent Injunction, Civil Penalty, and Other Relief ("Complaint") filed by Plaintiff the Federal Trade Commission ("Plaintiff"), and assert their defenses as follows.

All admissions made herein are made as of the date of this filing, unless otherwise stated. Defendants reserve the right to amend or supplement their Answer and Affirmative Defenses. In collectively admitting an allegation, Defendants do not admit that any individual Defendant has personal knowledge about, participated in, or had authority over the admitted subject matter, only that Defendants do not challenge the allegation's accuracy.

## GENERAL DENIAL

Defendants deny each and every allegation of the Complaint not specifically admitted herein.

## ANSWERS TO PLAINTIFF'S SPECIFIC ALLEGATIONS[1]

Subject to their Defenses, Defendants plead as follows to the specific allegations contained in the numbered paragraphs of the Complaint.

1. Defendants admit Plaintiff seeks a permanent injunction and civil penalties pursuant to Section 2(b) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(b) and Sections 5(m)(1)(A) and 13(b) of the FTC Act, 15 U.S.C. §§ 45(m)(1)(A) and 53(b). The remaining allegations in Paragraph 1 consist of legal conclusions to which no response is required. To the

[1] The section headings used in the Complaint are repeated in this Answer solely as a matter of convenience and do not constitute an admission. To the extent the headers or sub-headers are construed to assert any allegations, Defendants deny those allegations.

extent that a specific response is required, Defendants deny the remaining allegations in Paragraph 1.

**SUMMARY OF THE CASE**

2. Defendants admit that certain of the Defendants have purchased tickets from Ticketmaster for performances and events and resold or offered to resell purchased tickets on Ticketmaster and other websites. The remaining allegations in Paragraph 2 consist of legal conclusions to which no response is required. To the extent a specific response is required, Defendants deny the remaining allegations in Paragraph 2.

**JURISDICTION AND VENUE**

3. Admit

4. Admit.

**PLAINTIFF**

5. Defendants admit that the FTC is an agency of the United States Government. The remaining allegations in Paragraph 5 consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 5.

**DEFENDANTS**

6. Defendants admit the allegations in the first and third sentences of Paragraph 6. Defendants admit that Key Investment Group does business as Epic Seats and TotalTickets.com LLC and deny the remaining allegations in this sentence. The remaining allegations in Paragraph 6 consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the remaining allegations in Paragraph 6.

7. Defendants admit TotalTickets.com LLC is a Florida limited liability company and deny the remaining allegations in the first sentence of Paragraph 7. Defendants admit the

allegations in the second and third sentences of Paragraph 7. Defendants deny the allegations in the fourth sentence of Paragraph 7.

8. Defendants deny the allegations in the first two sentences of Paragraph 8. Defendants admit that, at certain points in time, Totally Tix has purchased and sold tickets to consumers in the United States and deny the remaining allegations in Paragraph 8.

9. Defendants admit the allegations in the first two sentences of Paragraph 9. The remaining allegations in Paragraph 9 are denied.

10. Defendants admit the allegations in the first and third sentences of Paragraph 10. The remaining allegations in Paragraph 10 are denied.

11. Defendants admit the allegations in the first sentence of Paragraph 11. Defendants admit that Yair Rozmaryn is a member and a manager of Front Rose Tix and a manager of TotalTickets.com. The remaining allegations in Paragraph 11 are denied.

12. Defendants admit the allegations in the first sentence of Paragraph 12. Defendants admit that Elan Rozmaryn is a member and manager of Front Rose Tix and a manager of TotalTickets.com and resides in Baltimore County, Maryland. The remaining allegations in Paragraph 12 are denied.

13. Defendants admit that Taylor Kurth resides in Middlesex County, Massachusetts. The remaining allegations in Paragraph 13 are denied.

**COMMON ENTERPRISE**

14. The allegations in Paragraph 14 consist of legal conclusions to which no response is required. To the extent that a specific response is required, Defendants deny the allegations in Paragraph 14.

## COMMERCE

15. Denied.

## THE BETTER ONLINE TICKET SALES ACT[2]

16. Defendants admit that the language quoted in Paragraph 16 is a partial, incomplete quote from the BOTS Act. To the extent Plaintiff makes any further allegations in Paragraph 16, they consist of legal conclusions to which no response is required. Defendants refer to the BOTS Act for a complete statement of its contents and otherwise deny the remaining allegations in Paragraph 16.

17. Defendants admit that the language quoted in Paragraph 17 is a partial, incomplete quote from the BOTS Act. To the extent Plaintiff makes any further allegations in Paragraph 17, they consist of legal conclusions to which no response is required. Defendants refer to the BOTS Act and Public Law for a complete statement of its contents and otherwise deny the remaining allegations in Paragraph 17.

18. The allegations in Paragraph 18 consist of legal conclusions to which no response is required. To the extent a specific response is required, Defendants refer to the respective statutes identified in Paragraph 18 for a complete statement of their contents and otherwise deny the allegations in Paragraph 18.

## DEFENDANTS CIRCUMVENT CONTROL MEASURES ON TICKETMASTER'S WEBSITES TO OBTAIN TICKETS AND THEN SELL OR OFFER TO SELL THOSE TICKETS TO CONSUMERS

19. Admitted only to the extent that some of the Corporate Defendants purchase tickets from ticket issuers. Otherwise, denied.

[2] For purposes of this Answer, Defendants will refer to the statute as the BOTS Act.

20. Defendants admit that Defendant Yair D. Rozmaryn is the Chief Executive Officer of Key Investment Group, and otherwise deny the allegations in Paragraph 20.

21. Defendants admit that Defendant Elan N. Rozmaryn is the Chief Financial Officer of Key Investment Group, and otherwise deny the allegations in Paragraph 21.

22. Denied.

23. Defendants admit that, between November 1, 2022, and the present, some Corporate Defendants have purchased event tickets from Ticketmaster, and otherwise denies the allegations in Paragraph 23.

24. Defendants admit that Ticketmaster makes certain tickets available for sale on its website. The remaining allegations in Paragraph 24 consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 24.

25. The allegations in Paragraph 25 purport to quote from and characterize a "Purchase Policy" purportedly maintained by Ticketmaster, which document speaks for itself. No response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 25.

26. The allegations in Paragraph 26 purport to quote from and characterize a "Purchase Policy" purportedly maintained by Ticketmaster, which document speaks for itself. No response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 26.

27. The allegations in Paragraph 27 purport to quote from and characterize a "Purchase Policy" purportedly maintained by Ticketmaster, which document speaks for itself. No response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 27.

28. Denied.

29. Denied.

30. Defendants admit that some of the Corporate Defendants have sold or offered to sell tickets purchased from Ticketmaster on other websites. Denied as Defendants have not always profited from such sales, selling tickets at a loss or failing to sell tickets at all. Otherwise, denied.

31. Denied, as any ticket limit referenced in Paragraph 31 was on a per-account basis.

32. Denied, as any ticket limit referenced in Paragraph 32 was on a per-account basis.

33. Denied, as any ticket limit referenced in Paragraph 33 was on a per-account basis.

**DEFENDANTS CONCEAL THEIR IP ADDRESS**

34. Defendants admit that an IP address is a unique string of numbers separated by periods and associated with computers or computer networks. The remainder of the allegations in Paragraph 34 are denied.

35. Denied.

36. Denied.

37. Denied.

**DEFENDANTS CREATE SHAM TICKETMASTER ACCOUNTS AND USE THOUSANDS OF CREDIT CARD NUMBERS**

38. Defendants deny the allegations in the first sentence of Paragraph 38. Defendants admit that, during all relevant times, Ticketmaster has had knowledge of and approved of Defendants' ticket-buying practices on Ticketmaster's website. Defendants otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 38, and on that basis, denies them.

39. Denied.

40. Defendants admit that Ticketmaster had actual knowledge and approved of Key Investment Group's purchasing practices. Otherwise, denied.

41. Defendants admit that Key Investment Group received a Civil Investigative Demand from the FTC in 2023. The allegations in Paragraph 41 otherwise purport to quote from and characterize Attachment A to the Complaint, which document speaks for itself. No response is required. To the extent a response is required, denied.

42. Defendants deny the first and fourth sentences of Paragraph 42. Defendants admit that some of the Corporate Defendants have utilized accounts using names other than their own, and that Ticketmaster knew of, approved of, and allowed this practice. Defendants deny the remaining allegations in Paragraph 42.

43. The allegations in Paragraph 43 purport to quote from and characterize one or more unidentified documents, which documents (if they exist at all) speak for themselves. No response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 43.

44. Defendants admit that some of the Corporate Defendants have utilized accounts using addresses different from Defendant Key Investment Group's business address, and that Ticketmaster knew of, approved of, and allowed this practice. Defendants deny the remaining allegations in Paragraph 44.

45. Defendants admit that some of the Corporate Defendants have utilized phone numbers different from Defendant Key Investment Group's business phone number in connection with accounts, and that Ticketmaster knew of, approved of, and allowed this practice. Defendants deny the remaining allegations in Paragraph 45.

46. Defendants admit that some of the Corporate Defendants have utilized various credit card numbers, including virtual credit card numbers, and that Ticketmaster knew of, approved of, and allowed this practice. Defendants deny the remaining allegations in Paragraph 46.

47. Denied.

48. Denied.

**DEFENDANTS USE HUNDREDS OF SIM CARDS AND SIM BANKS**

49. Defendants admit that Ticketmaster sometimes requests that codes sent via text message be entered in connection with Ticketmaster accounts. The quotations in Paragraph 49 purport to quote from and characterize statements on Ticketmaster's website, which speaks for itself. No response is required. To the extent a response is required, Defendants deny such allegations.

50. Denied.

**THE FTC HAS REASON TO BELIEVE THAT DEFENDANTS ARE VIOLATING OR WILL CONTINUE TO VIOLATE THE BETTER ONLINE TICKET SALES ACT AND THE FTC ACT**

51. Denied.

**COUNT I – VIOLATIONS OF THE BETTER ONLINE TICKET SALES ACT AND THE FTC ACT**

52. Denied.

53. Denied.

**CONSUMER INJURY**

54. Denied.

**CIVIL PENALTIES**

55. The allegations in Paragraph 55 consist of legal conclusions to which no response is required. To the extent a response is required, denied.

56. The allegations in Paragraph 56 consist of legal conclusions to which no response is required. To the extent that a specific response is required, denied.

## PRAYER FOR RELIEF

Defendants deny that Plaintiff is entitled to any relief, in law or in equity, requested or not, including that which is requested in the Plaintiff's Prayer for relief. Further, no Defendant has ever had actual knowledge or knowledge fairly implied on the basis of objective circumstances that any act or practice was or is unfair or deceptive and was or is prohibited by the BOTS Act.

## AFFIRMATIVE DEFENSES

Defendants allege, assert, and state the following as separate and distinct defenses to the Complaint. By virtue of alleging these further defenses, Defendants do not assume any burden of proof, persuasion, or production not otherwise legally assigned to it.

### FIRST AFFIRMATIVE DEFENSE
### (Consent)

Plaintiff's claims are barred, in whole or in part, because Ticketmaster knew of, approved of, and consented to Defendants' purported conduct.

### SECOND AFFIRMATIVE DEFENSE
### (Good Faith)

Plaintiff's claims are barred, in whole or in part, by Defendants' good faith and the absence of intentional misconduct and reckless or negligent conduct.

### THIRD AFFIRMATIVE DEFENSE
### (No Consumer Harm)

Plaintiff's claims for relief are barred, in whole or in part, because Defendants did not harm consumers through their alleged conduct.

### FOURTH AFFIRMATIVE DEFENSE
### (Lack of Knowledge)

Even if Defendants' purchasing policies are found to violate the BOTS Act, Defendants are not liable for civil penalties, in whole or in part, due to their lack of actual knowledge or knowledge fairly implied.

**FIFTH AFFIRMATIVE DEFENSE**
**(Comparative Fault)**

Defendants are not liable for civil penalties or any other monetary relief attributable to the responsibility, negligence, or fault of any other person or entity, whether named or unnamed in the Complaint, and any such relief shall be apportioned accordingly.

**SIXTH AFFIRMATIVE DEFENSE**
**(Offsets – Consumer Benefit)**

Any finding of monetary liability, including any restitution award, should be offset to account for the benefits that Defendants' customers received

**SEVENTH AFFIRMATIVE DEFENSE**
**(Offsets – Refunds)**

Any finding of monetary liability, including any restitution award, should be offset to account for refunds paid to customers.

**EIGHTH AFFIRMATIVE DEFENSE**
**(Further Limitation on Damages)**

Consistent with Ticketmaster's Purchasing Policy, any finding of monetary liability, including any restitution award, should be limited to instances where Defendants purportedly exceeded any ticket purchase limit on a per account basis.

**NINTH AFFIRMATIVE DEFENSE**
**(Waiver, Equitable Estoppel, Laches, and Unclean Hands)**

Plaintiff's claims are barred, in whole or in part, by the doctrines of waiver, equitable estoppel, laches, and unclean hands.

**TENTH AFFIRMATIVE DEFENSE**
**(Statute of Limitations)**

Plaintiff's claims are barred to the extent they seek relief based on alleged violations or harms that occurred outside of the applicable limitations periods.

**ELEVENTH AFFIRMATIVE DEFENSE**
**(Standing/Mootness)**

Plaintiff lacks standing to seek injunctive relief because Defendants are not currently violating or about to violate the BOTS Act.

**TWELFTH AFFIRMATIVE DEFENSE**
**(Due Process – Unconstitutional Vagueness)**

Plaintiff's claims are barred, in whole or in part, because the BOTS Act is unconstitutionally vague as applied by Plaintiff to Defendants' alleged conduct. The BOTS Act only regulates the "circumvent[ion]" of a "security measure, access control system, or other technological control or measure" that is "used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules." 15 U.S.C. § 45c. The BOTS Act does not define circumvention or any of these other terms. *Id.* Applying the BOTS Act here to prohibit Defendants' alleged conduct violates the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

**THIRTEENTH AFFIRMATIVE DEFENSE**
**(Due Process – Lack of Fair Notice)**

Plaintiff's claims are barred, in whole or in part, because the FTC failed to provide fair notice that Defendants' alleged conduct violated the law as required by the Due Process Clause. The FTC failed to provide fair notice to Defendants that (i) it considered the use of manual purchasing agents to violate the BOTS Act; (ii) it believes a ticket issuer's knowing consent to Defendants' multiple accounts could still give rise to a BOTS Act violation; (iii) in determining whether a BOTS Act violation occurred, the FTC would assess the aggregate number of tickets purchased by a commercial entity, rather than on a per-account basis even where the ticket issuer affirmatively represents its purchasing policy to the contrary, and (iv) it considered other acts taken (a) by those who do not use bots, and (b) despite the ticket issuer's knowledge and approval to violate the BOTS Act.

**FOURTEENTH AFFIRMATIVE DEFENSE**
**(Excessive Fines)**

The monetary relief sought is unconstitutional and excessive under the United States Constitution and specifically under the Excessive Fines Clause of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment.

**FIFTEENTH AFFIRMATIVE DEFENSE**
**(Equal Protection)**

The Complaint violates the Equal Protection Clause because Plaintiff is selectively, arbitrarily, and unequally enforcing the BOTS Act and the FTC Act against Defendants.

**SIXTEENTH AFFIRMATIVE DEFENSE**
**(First Amendment)**

Plaintiff's claims are barred, in whole or in part, because they would violate Defendants' right to free speech. Many of the allegations in the Complaint constitute protected speech through which Defendants communicate with customers, business partners, and the general public. Plaintiff thus improperly seeks to impose liability based on protected speech.

**SEVENTEENTH AFFIRMATIVE DEFENSE**
**(Major Questions)**

Plaintiff's claims are barred, in whole or in part, because they seek to radically expand Plaintiff's power to regulate the ticket resale industry out of existence without the approval of Congress. Plaintiff's proposed interpretation of the BOTS Act would enable it to unilaterally determine the meaning of, and enforce, private ticketing websites' terms of service. The major questions doctrine precludes Plaintiff from assuming this authority absent clear statutory authorization.

**ADDITIONAL AFFIRMATIVE DEFENSES**

The Complaint does not describe the claims or facts with sufficient particularity to permit Defendants to ascertain what other defenses may exist at this time. Defendants will rely on any

and all further defenses that become available or appear during discovery in this action and specifically reserves the right to assert any additional defenses.

**PRAYER**

WHEREFORE, having fully answered Plaintiff's Complaint, Defendants pray for judgment as follows:

1. That Plaintiff's Complaint be dismissed in its entirety with prejudice;
2. That the Court enter judgment against Plaintiff and in favor of Defendants on all causes of action;
3. That Defendants be awarded their costs and expenses, including attorneys' fees, incurred in this action; and
4. That Defendants be awarded such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Defendants demand a trial by jury on all issues so triable.

Dated: May 13, 2026

Respectfully submitted,

*/s/ Bezalel A. Stern*

Bezalel A. Stern (D. Md. Bar No. 20667)
Joshua N. Drian (*pro hac vice*)
MANATT, PHELPS & PHILLIPS, LLP
1050 Connecticut Ave. NW, Suite 600
Washington, D.C. 20036
Tel.: (202) 585-6500
Email: bstern@manatt.com
jdrian@manatt.com

*Counsel for Defendants*

# EXHIBIT 19

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Maryland

Federal Trade Commission
*Plaintiff*
v.
Key Investment Group LLC, et al.,
*Defendant*

Civil Action No. 1:25-cv-02716-GLR

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

To: Senator Marsha Blackburn, Office of Senator Marsha Blackburn, 100 Peabody Place, Suite 1135, Memphis, TN 38103

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Schedule.

| Place: via electronic production or at Manatt, Phelps, & Phillips LLP, 1700 M Street NW, 4th Floor, Washington, DC 20036 | Date and Time: 07/21/2026 12:00 pm |
|---|---|

❐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 06/30/2026

*CLERK OF COURT*

OR

/s/ Bezalel Stern

*Signature of Clerk or Deputy Clerk* *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Key Investment Group LLC, who issues or requests this subpoena, are:

Bezalel Stern, 1700 M Street NW, 4th Floor, Washington, DC 20036, bstern@manatt.com, 202-585-6500

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 1:25-cv-02716-GLR

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________

on *(date)* ____________ .

❒ I served the subpoena by delivering a copy to the named person as follows: ______________________

______________________ on *(date)* ____________ ; or

❒ I returned the subpoena unexecuted because: ______________________

______________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ____________ .

My fees are $ ____________ for travel and $ ____________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ____________

______________________
*Server's signature*

______________________
*Printed name and title*

______________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**SCHEDULE FOR SUBPOENA TO SENATOR MARSHA BLACKBURN**

*Federal Trade Commission v. Key Investment Group LLC, et al.,*

U.S. District Court for the District of Maryland, Case No. 1:25-cv-2716-GLR

**DEFINITIONS**

1. The term "Action" means the District of Maryland case styled *FTC v. Key Investment Group*, Case No. 1:25-cv-02716-GLR.

2. The term "BOTS Act" means the Better Online Ticket Sales Act, codified at 15 U.S.C. § 45c.

3. The term "California Action" means the Central District of California case styled *FTC v. Live Nation Entertainment*, 25-cv-08884-MEMF-MAA.

4. The terms "Communication" and "Communications" mean any contact between two or more persons or entities. This includes, without limitation, written contacts by means such as letters, e-mail messages, social media posts and messages (*e.g.*, Facebook, Instagram, Twitter, Snapchat, WhatsApp, Telegram, comments, and direct messages), and any all other memoranda, text messages or SMS messages between any portable devices such as mobile telephones and computers, fax, or any other Documents, as well as oral contact by such means as face-to-face meetings or telephone conversations.

5. The term "Concerning" means relating to, regarding, referring to, describing, evidencing, constituting, discussing, memorializing, or supporting.

6. The term "Defendants" means the Defendants in the Action.

7. The term "Document" or "Documents" means The terms "Document" or "Documents" are used in their customary broad sense and encompass, without limitation, all non-identical copies and drafts of: account books, affidavits, appointment books, audio cassettes, audio recordings, bills, cables, calendars, catalogs, charts, checks, communications, CDs, contracts,

copyrights, declarations, diaries, drawings, DVDs, e-mail messages, fax cover sheets, faxes, films, financial statements, graphs, Internet postings and webpages, interoffice communications, invoices, items or objects containing or displaying writing, laser discs, ledger sheets, letters, memoranda, microfiche, microfilms, notes – including, without limitation, notes and minutes of conversations or meetings – plans, patents, phonorecords, photographs, receipts, records, reports, resolutions, trademarks, video recordings, and any and all information that is contained or stored on or via computer disk, diskette, hard drive, magnetic tape, server, network, cloud storage, the internet, or, as set forth in Federal Rule of Civil Procedure 34, other electronically stored information – including, without limitation, writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations – stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form.

8. The term "FTC" or "Federal Trade Commission" mean the Federal Trade Commission, its Commissioners, the Director of its Bureau of Consumer Protection, its employees, agents, representatives, and any other person or entity acting on its behalf.

9. The term "MAIN Event Ticketing Act" means Bill S. 196 introduced on January 22, 2025 by Senator Marsha Blackburn, available at https://www.congress.gov/bill/119th-congress/senate-bill/196/text, as well as all prior and subsequent versions.

10. The term "Third Party" or "Third Parties" means any individual, agency, or other entity other than You, the FTC, or the Defendants in the Action.

11. The term "Ticketmaster" means Ticketmaster LLC, its parent, Live Nation Entertainment, Inc., and includes all subsidiaries, affiliates, and other entities in its control, including but not limited to TradeDesk and Ticketmaster Resale.

12. The terms "You" and "Your" means United States Senator Ben Ray Luján, in his official and/or individual capacities, as well as his employees, agents, representatives, staff members, and any other person acting on his behalf.

13. Any word used in the singular shall be construed as plural and vice versa when necessary to facilitate the most comprehensive answer to any of these Requests.

**INSTRUCTIONS**

1. Unless otherwise specified, the responsive time period for these Requests is December 1, 2016 to the present.

2. All Requests are intended to refer to Documents in your possession, care, custody, or control, whether or not specifically stated within the Request.

3. The production of Documents shall comply with the requirements of Rule 45 of the Federal Rules of Civil Procedure and Local Rule 104 of the United States District Court for the District of Maryland (together with Appendix A (Discovery Guidelines) and the Standing Orders of the Court).

4. The Documents requested herein shall be produced as they are kept in the usual course of business or organized and labeled to respond to the categories in these Requests.

5. Documents maintained in the ordinary course of business in hard copy format shall be produced in hard copy format with a unique Bates number affixed to each page. Electronically Stored Information ("ESI") shall be produced in TIFF format with a unique Bates number affixed to each page, subject to any agreement between the parties to this Action or Order of the Court with respect to the production of ESI.

6. These Requests concern, refer, relate, and apply to any Documents in Your possession, custody or control, including, without limitation, Documents in the possession of Your employees, agents, staff members, representatives, and any other person(s) under Your control.

7. If You cannot comply with any specific Request in full, You shall comply with it to the extent possible and explain why full compliance is not possible.

8. If You object to any of the Requests herein, or to a portion thereof, You must state with specificity all grounds for Your objection. Any ground not stated in an objection within the time provided by the Federal Rules, or any extensions thereof, shall be deemed to be waived.

9. If You object to any one of these Requests on the grounds of privilege, overbreadth, vagueness, or a similar ground, You are instructed for each such document request not to refuse to reveal which if any Documents will be disclosed but rather to make such disclosure in a timely manner as narrowed to conform with the objection.

10. No ambiguity claimed with respect to any of the instructions, definitions or requests herein shall be used as a basis for refusing to respond to these Requests. In the event of any such claim, the affected response(s) shall clearly set forth: (i) the purportedly ambiguous language; and (ii) the interpretation of the language relied upon in such response(s).

11. You are required to produce the original of each of the requested Documents herein. If the original of a document is not in Your possession, custody or control or otherwise available to You, then You are required to produce an exact copy of the original that is in Your possession, custody or control or otherwise available to You. In addition to the foregoing, You also are required to produce: (i) every non-identical copy of a document (whether different from the original because of stamps, notes, or other marks made upon such copy or otherwise); and (ii) every note, "post-it,"

facsimile transfer cover page and other document that accompanied or is or was affixed to any document requested herein.

12. These requests seek production of all Documents in their entirety, without alteration or redaction. Complete Documents, including all attachments, coversheets, appendices, notes, "post-its", facsimile cover pages and other Documents that accompanied or was affixed to any Document requested herein shall be produced if any part of the Document is responsive to a request.

13. Documents attached to each other or contained in a file, folder or similar binder should not be separated.

14. If You have no Documents in response to a specified Request, You shall so state.

15. If You withhold production of any Document requested herein based on a claim of privilege, You shall comply with the procedures set forth in Rule 45 of the Federal Rules of Civil Procedure.

16. In accordance with Rule 45 of the Federal Rules of Civil Procedure, where a claim of privilege is asserted in objecting to any Request or part thereof, and information is not provided on the basis of such assertion:

a. In asserting the privilege, You shall, in the objection to the Request, or part thereof, identify with specificity the nature of the privilege (including work product) that is being claimed; and

b. The following information should be provided in the objection, if known or reasonably available, unless divulging such information would cause disclosure of the allegedly privileged information:

i. For oral Communications:

1. The name of the Person or Persons making the Communication and the names of the Person or Persons present while the Communication was made, and, where not apparent, the relationship of the Person or Persons present to the Person or Persons making the Communication;

2. The date, time, and place of the Communication; and

3. The general subject matter of the Communication.

ii. For Documents:

1. The type of Document;

2. The general subject matter of the Document; and

3. Such information as is sufficient to identify the Document, including where appropriate, the author, addressee, custodian and any other recipient of the Document, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other.

17. In the event any Document called for by any of the Requests herein was formerly in Your possession, custody, or control and has been lost, destroyed or discarded, that Document is to be identified by stating the following: (i) the date the Document was created; (ii) the sender(s) or author(s) of the Document; (iii) the addressee(s); (iv) the recipient(s); (v) the present custodian; (vi) persons to whom copies were furnished or to whom the Document was shown or its contents described; (vii) a description of any attachment or appendices; (viii) the number of pages; (ix) a brief description of the general subject matter of the Document; (x) the specific Request(s) to which the Document is responsive; (xi) the manner of its loss, destruction or discard; and (xii) the

persons authorizing or carrying out such loss, destruction or discard and (xiii) all reasons for the Document's loss, destruction, or discard.

18. Instead of producing the Documents requested herein at the date, time and place stated in the first paragraph of these Requests, You may provide a true and correct copy of the Documents by hand delivery, e-mail, mail, or overnight delivery, so long as the copies are: (i) complete and as legible as the originals; (ii) produced in the manner described in these Requests; and (iii) received by counsel prior to or on the date stated in the first paragraph of these Requests.

19. You must restate each Request prior to the response provided.

20. These Requests are continuing. Any Document obtained or located subsequent to production that would have been produced had it been available or its existence known is to be supplied forthwith without further request.

**DOCUMENTS REQUESTED**

All Documents detailed in Appendix A.

## APPENDIX A

**Request No. 1**

All internal Documents and Communications Concerning Defendants.

**Request No. 2**

All Documents and Communications between You and Senator Ben Ray Luján Concerning Defendants.

**Request No. 3**

All Documents and Communications between You and the FTC Concerning Defendants.

**Request No. 4**

All Documents and Communications between You and any Third Party Concerning Defendants.

**Request No. 5**

All internal Documents and Communications Concerning the Amicus Brief You and Senator Ben Ray Luján filed in the Action.

**Request No. 6**

All Documents and Communications between You and the FTC Concerning the Amicus Brief You and Senator Ben Ray Luján filed in the Action.

**Request No. 7**

All Documents and Communications between You and any Third Party Concerning the Amicus Brief You and Senator Ben Ray Luján filed in the Action.

**Request No. 8**

All internal Documents and Communications Concerning the Amicus Brief You filed in the California Action.

**Request No. 9**

All Documents and Communications between You and the FTC Concerning the Amicus Brief You filed in the California Action.

**Request No. 10**

All Documents and Communications between You and any Third Party Concerning the Amicus Brief You filed in the California Action.

**Request No. 11**

All internal Documents and Communications Concerning the BOTS Act.

**Request No. 12**

All Documents and Communications between You and the FTC Concerning the BOTS Act.

**Request No. 13**

All internal Documents and Communications Concerning the MAIN Event Ticketing Act.

**Request No. 14**

All Documents and Communications with the FTC Concerning the MAIN Event Ticketing Act.

**Request No. 15**

All Documents and Communications with any Third Party Concerning the MAIN Event Ticketing Act.

**Request No. 16**

All Documents and Communications between You and Ticketmaster.

# EXHIBIT 20

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Maryland

Federal Trade Commission
*Plaintiff*
v.
Key Investment Group LLC, et al.,
*Defendant*

Civil Action No. 1:25-cv-02716-GLR

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

To: Senator Ben Ray Lujan, Office of Senator Ben Ray Lujan, 500 Marquette Ave. NW, Suite 1460, Albuquerque, NM 87102

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Schedule.

| Place: via electronic production or at Manatt, Phelps, & Phillips LLP, 1700 M Street NW, 4th Floor, Washington, DC 20036 | Date and Time: 07/21/2026 12:00 pm |
|---|---|

❒ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 06/30/2026

*CLERK OF COURT*

OR

/s/ Bezalel Stern

*Signature of Clerk or Deputy Clerk* *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Key Investment Group LLC, who issues or requests this subpoena, are:

Bezalel Stern, 1700 M Street NW, 4th Floor, Washington, DC 20036, bstern@manatt.com, 202-585-6500

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 1:25-cv-02716-GLR

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________________

on *(date)* ______________ .

❒ I served the subpoena by delivering a copy to the named person as follows: ______________________________

______________________________________________ on *(date)* ______________ ; or

❒ I returned the subpoena unexecuted because: ______________________________

______________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ______________ .

My fees are $ ____________ for travel and $ ____________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**SCHEDULE FOR SUBPOENA TO SENATOR BEN RAY LUJÁN**

*Federal Trade Commission v. Key Investment Group LLC, et al.,*

U.S. District Court for the District of Maryland, Case No. 1:25-cv-2716-GLR

**DEFINITIONS**

1. The term "Action" means the District of Maryland case styled *FTC v. Key Investment Group*, Case No. 1:25-cv-02716-GLR.

2. The term "BOTS Act" means the Better Online Ticket Sales Act, codified at 15 U.S.C. § 45c.

3. The term "California Action" means the Central District of California case styled *FTC v. Live Nation Entertainment*, 25-cv-08884-MEMF-MAA.

4. The terms "Communication" and "Communications" mean any contact between two or more persons or entities. This includes, without limitation, written contacts by means such as letters, e-mail messages, social media posts and messages (*e.g.*, Facebook, Instagram, Twitter, Snapchat, WhatsApp, Telegram, comments, and direct messages), and any all other memoranda, text messages or SMS messages between any portable devices such as mobile telephones and computers, fax, or any other Documents, as well as oral contact by such means as face-to-face meetings or telephone conversations.

5. The term "Concerning" means relating to, regarding, referring to, describing, evidencing, constituting, discussing, memorializing, or supporting.

6. The term "Defendants" means the Defendants in the Action.

7. The term "Document" or "Documents" means The terms "Document" or "Documents" are used in their customary broad sense and encompass, without limitation, all non-identical copies and drafts of: account books, affidavits, appointment books, audio cassettes, audio recordings, bills, cables, calendars, catalogs, charts, checks, communications, CDs, contracts,

copyrights, declarations, diaries, drawings, DVDs, e-mail messages, fax cover sheets, faxes, films, financial statements, graphs, Internet postings and webpages, interoffice communications, invoices, items or objects containing or displaying writing, laser discs, ledger sheets, letters, memoranda, microfiche, microfilms, notes – including, without limitation, notes and minutes of conversations or meetings – plans, patents, phonorecords, photographs, receipts, records, reports, resolutions, trademarks, video recordings, and any and all information that is contained or stored on or via computer disk, diskette, hard drive, magnetic tape, server, network, cloud storage, the internet, or, as set forth in Federal Rule of Civil Procedure 34, other electronically stored information – including, without limitation, writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations – stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form.

8. The term "FTC" or "Federal Trade Commission" mean the Federal Trade Commission, its Commissioners, the Director of its Bureau of Consumer Protection, its employees, agents, representatives, and any other person or entity acting on its behalf.

9. The term "MAIN Event Ticketing Act" means Bill S. 196 introduced on January 22, 2025 by Senator Marsha Blackburn, available at https://www.congress.gov/bill/119th-congress/senate-bill/196/text, as well as all prior and subsequent versions.

10. The term "Third Party" or "Third Parties" means any individual, agency, or other entity other than You, the FTC, or the Defendants in the Action.

11. The term "Ticketmaster" means Ticketmaster LLC, its parent, Live Nation Entertainment, Inc., and includes all subsidiaries, affiliates, and other entities in its control, including but not limited to TradeDesk and Ticketmaster Resale.

12. The terms "You" and "Your" means United States Senator Ben Ray Luján, in his official and/or individual capacities, as well as his employees, agents, representatives, staff members, and any other person acting on his behalf.

13. Any word used in the singular shall be construed as plural and vice versa when necessary to facilitate the most comprehensive answer to any of these Requests.

**INSTRUCTIONS**

1. Unless otherwise specified, the responsive time period for these Requests is December 1, 2016 to the present.

2. All Requests are intended to refer to Documents in your possession, care, custody, or control, whether or not specifically stated within the Request.

3. The production of Documents shall comply with the requirements of Rule 45 of the Federal Rules of Civil Procedure and Local Rule 104 of the United States District Court for the District of Maryland (together with Appendix A (Discovery Guidelines) and the Standing Orders of the Court).

4. The Documents requested herein shall be produced as they are kept in the usual course of business or organized and labeled to respond to the categories in these Requests.

5. Documents maintained in the ordinary course of business in hard copy format shall be produced in hard copy format with a unique Bates number affixed to each page. Electronically Stored Information ("ESI") shall be produced in TIFF format with a unique Bates number affixed to each page, subject to any agreement between the parties to this Action or Order of the Court with respect to the production of ESI.

6. These Requests concern, refer, relate, and apply to any Documents in Your possession, custody or control, including, without limitation, Documents in the possession of Your employees, agents, staff members, representatives, and any other person(s) under Your control.

7. If You cannot comply with any specific Request in full, You shall comply with it to the extent possible and explain why full compliance is not possible.

8. If You object to any of the Requests herein, or to a portion thereof, You must state with specificity all grounds for Your objection. Any ground not stated in an objection within the time provided by the Federal Rules, or any extensions thereof, shall be deemed to be waived.

9. If You object to any one of these Requests on the grounds of privilege, overbreadth, vagueness, or a similar ground, You are instructed for each such document request not to refuse to reveal which if any Documents will be disclosed but rather to make such disclosure in a timely manner as narrowed to conform with the objection.

10. No ambiguity claimed with respect to any of the instructions, definitions or requests herein shall be used as a basis for refusing to respond to these Requests. In the event of any such claim, the affected response(s) shall clearly set forth: (i) the purportedly ambiguous language, and (ii) the interpretation of the language relied upon in such response(s).

11. You are required to produce the original of each of the requested Documents herein. If the original of a document is not in Your possession, custody or control or otherwise available to You, then You are required to produce an exact copy of the original that is in Your possession, custody or control or otherwise available to You. In addition to the foregoing, You also are required to produce: (i) every non-identical copy of a document (whether different from the original because of stamps, notes, or other marks made upon such copy or otherwise); and (ii) every note, "post-it,"

facsimile transfer cover page and other document that accompanied or is or was affixed to any document requested herein.

12. These requests seek production of all Documents in their entirety, without alteration or redaction. Complete Documents, including all attachments, coversheets, appendices, notes, "post-its", facsimile cover pages and other Documents that accompanied or was affixed to any Document requested herein shall be produced if any part of the Document is responsive to a request.

13. Documents attached to each other or contained in a file, folder or similar binder should not be separated.

14. If You have no Documents in response to a specified Request, You shall so state.

15. If You withhold production of any Document requested herein based on a claim of privilege, You shall comply with the procedures set forth in Rule 45 of the Federal Rules of Civil Procedure.

16. In accordance with Rule 45 of the Federal Rules of Civil Procedure, where a claim of privilege is asserted in objecting to any Request or part thereof, and information is not provided on the basis of such assertion:

a. In asserting the privilege, You shall, in the objection to the Request, or part thereof, identify with specificity the nature of the privilege (including work product) that is being claimed; and

b. The following information should be provided in the objection, if known or reasonably available, unless divulging such information would cause disclosure of the allegedly privileged information:

i. For oral Communications:

1. The name of the Person or Persons making the Communication and the names of the Person or Persons present while the Communication was made, and, where not apparent, the relationship of the Person or Persons present to the Person or Persons making the Communication;

2. The date, time, and place of the Communication; and

3. The general subject matter of the Communication.

ii. For Documents:

1. The type of Document;

2. The general subject matter of the Document; and

3. Such information as is sufficient to identify the Document, including where appropriate, the author, addressee, custodian and any other recipient of the Document, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other.

17. In the event any Document called for by any of the Requests herein was formerly in Your possession, custody, or control and has been lost, destroyed or discarded, that Document is to be identified by stating the following: (i) the date the Document was created; (ii) the sender(s) or author(s) of the Document; (iii) the addressee(s); (iv) the recipient(s); (v) the present custodian; (vi) persons to whom copies were furnished or to whom the Document was shown or its contents described; (vii) a description of any attachment or appendices; (viii) the number of pages; (ix) a brief description of the general subject matter of the Document; (x) the specific Request(s) to which the Document is responsive; (xi) the manner of its loss, destruction or discard; and (xii) the

persons authorizing or carrying out such loss, destruction or discard and (xiii) all reasons for the Document's loss, destruction, or discard.

18. Instead of producing the Documents requested herein at the date, time and place stated in the first paragraph of these Requests, You may provide a true and correct copy of the Documents by hand delivery, e-mail, mail, or overnight delivery, so long as the copies are: (i) complete and as legible as the originals; (ii) produced in the manner described in these Requests; and (iii) received by counsel prior to or on the date stated in the first paragraph of these Requests.

19. You must restate each Request prior to the response provided.

20. These Requests are continuing. Any Document obtained or located subsequent to production that would have been produced had it been available or its existence known is to be supplied forthwith without further request.

**DOCUMENTS REQUESTED**

All Documents detailed in Appendix A.

## APPENDIX A

**Request No. 1**

All internal Documents and Communications Concerning Defendants.

**Request No. 2**

All Documents and Communications between You and Senator Marsha Blackburn Concerning Defendants.

**Request No. 3**

All Documents and Communications between You and the FTC Concerning Defendants.

**Request No. 4**

All Documents and Communications between You and any Third Party Concerning Defendants.

**Request No. 5**

All internal Documents and Communications Concerning the Amicus Brief You and Senator Marsha Blackburn filed in the Action.

**Request No. 6**

All Documents and Communications between You and the FTC Concerning the Amicus Brief You and Senator Marsha Blackburn filed in the Action.

**Request No. 7**

All Documents and Communications between You and any Third Party Concerning the Amicus Brief You and Senator Marsha Blackburn filed in the Action.

**Request No. 8**

All internal Documents and Communications Concerning the Amicus Brief You filed in the California Action.

**Request No. 9**

All Documents and Communications between You and the FTC Concerning the Amicus Brief You filed in the California Action.

**Request No. 10**

All Documents and Communications between You and any Third Party Concerning the Amicus Brief You filed in the California Action.

**Request No. 11**

All internal Documents and Communications Concerning the BOTS Act.

**Request No. 12**

All Documents and Communications between You and the FTC Concerning the BOTS Act.

**Request No. 13**

All internal Documents and Communications Concerning the MAIN Event Ticketing Act.

**Request No. 14**

All Documents and Communications with the FTC Concerning the MAIN Event Ticketing Act.

**Request No. 15**

All Documents and Communications with any Third Party Concerning the MAIN Event Ticketing Act.

**Request No. 16**

All Documents and Communications between You and Ticketmaster.

# EXHIBIT 21

MORGAN J. FRANKEL
COUNSEL
PATRICIA MACK BRYAN
DEPUTY COUNSEL
THOMAS E. CABALLERO
SENIOR ASSISTANT COUNSEL
VIVIAN M. RIVERA
ASSISTANT COUNSEL

TELEPHONE: (202) 224–4435
FAX: (202) 224–4777

# United States Senate

OFFICE OF SENATE LEGAL COUNSEL
WASHINGTON, DC 20510-7250

July 15, 2026

**BY E-mail** (bstern@manatt.com)
Bezalel Stern, Esq.
Manatt, Phelps, & Phillips, LLP
1700 M Street NW, 4th Floor
Washington, D.C., 20036

Re: Subpoenas in *Federal Trade Commission v. Key Investment Group, LLC, et al.*, Case No. 1:25-cv-02716 (D. Md.)

Dear Mr. Stern:

We are writing with regard to the subpoenas issued to the Offices of United States Senators Marsha Blackburn and Ben Ray Luján ("Senators" or "Members"), seeking the production of documents in the above-referenced case. The subpoenas were served on July 1, 2026 and require production on July 21, 2026. The subpoenas, which request the same 16 categories of documents from each Senator, were forwarded to our office for response.

The subpoenas issued to Senators Blackburn and Luján relate to their participation as amici curiae in the above-referenced enforcement action by the Federal Trade Commission (FTC) against defendants for alleged violations of the Better Online Ticket Sales (BOTS) Act, 15 U.S.C. § 45c(a), and the FTC Act, 15 U.S.C. § 45(a). As members of the U.S. House of Representatives in 2016, both Members voted to enact the BOTS Act. In addition, then-Representative Blackburn had sponsored similar legislation in the House on this topic. *See* H.R. 5104, 114th Cong. (2016) (passed by House, Sept. 12, 2016). With leave granted by the court, the Senators submitted their amici brief in support of the FTC's opposition to defendants' motion to dismiss, addressing the legal issue of the scope of the application of the BOTS Act. On April 28, 2026, the district court denied the motion to dismiss. These subpoenas to the Senators followed.[1]

On behalf of Senators Blackburn and Luján, we hereby object to the subpoenas pursuant to Federal Rule of Civil Procedure 45(d)(2)(B), because the subpoenas seek privileged records and impose an undue burden on the Senators. *See* Fed. R. Civ. P. 45(d)(3)(A)(iii) & (iv).

First, the subpoenas seek documents that are absolutely protected from compelled production by the Speech or Debate Clause, art. 1, § 6, cl. 1, of the United States Constitution.

---

[1] We note the subpoena issued to **Senator Blackburn** mistakenly defines the terms "You" and "Your" as "United States **Senator Ben Ray Luján**, in his official and/or individual capacities, as well as his employees, agents, representatives, staff members, and any other person acting on his behalf." (Definitions, p. 3.)

*See Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 499-505 (1975); *Gravel v. United States*, 408 U.S. 606, 615-20 (1972). That Clause "insure[s] that the legislative function the Constitution allocates to Congress may be performed independently," *Eastland*, 421 U.S. at 502, "without regard to the distractions of private civil litigation or the perils of criminal prosecution." *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 415 (D.C. Cir. 1995). To further this goal of legislative independence, the Clause protects from judicial inquiry activities that are an "integral part of the deliberative and communicative processes . . . with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625.

The Speech or Debate Clause provides Members of Congress with an absolute privilege against being compelled to give testimony regarding, or produce documents from, activities that fall within the legislative sphere. *See Howard v. Office of Chief Admin. Officer of U.S. House of Representatives*, 720 F.3d 939, 946 (D.C. Cir. 2013) (The Clause provides "a testimonial and non-disclosure privilege that prevents a protected [legislative] party from being compelled to answer questions about legislative activity or produce legislative materials."); *Brown & Williamson Tobacco Corp.*, 62 F.3d at 421 ("A party is no more entitled to compel congressional testimony – or production of documents – than it is to sue congressmen."); *Minpeco, S.A. v. Conticommodity Services, Inc.*, 844 F.2d 856, 858-59 (D.C. Cir. 1988) (quashing subpoenas duces tecum on Speech or Debate Clause grounds and noting that "discovery procedures can prove just as intrusive" to Members and staff as a lawsuit). Accordingly, "once it is determined that Members are acting within the 'legitimate legislative sphere' the Speech or Debate Clause is an *absolute* bar to interference." *Eastland*, 421 U.S. at 503 (emphasis added). In addition, given "the central importance of the Clause for preventing intrusion by [the] Executive and Judiciary into the legislative sphere" the Supreme Court has held that waiver by a Member of Congress of the Clause's protections, assuming such waiver is even legally possible, can "be found only after explicit and unequivocal renunciation of the protection." *United States v. Helstoski*, 442 U.S. 477, 490-91 (1979).

Here, the subpoenas seek documents and communications relating to specific legislation that Senators Blackburn and Luján introduced, sponsored, and/or voted on during their time in Congress or that is currently pending before the Senate. For instance, Request No. 11 seeks all "internal" documents and communications concerning the BOTS Act, which both Members voted to enact as members of the U.S. House of Representatives in 2016. Request No. 13 similarly seeks all "internal" documents and communications concerning the Mitigating Automated Internet Networks for Event Ticketing (MAIN Event Ticketing) Act, S. 196, 119th Cong. (2025), legislation introduced by Senators Blackburn and Luján in this Congress, reported to the Senate by the Senate Committee on Commerce, Science, and Transportation, *see* S. Rep. No. 119-57 (2025), a committee on which both Senator Blackburn and Senator Luján serve, and currently pending before the Senate. Such activities, and the documents and communications arising from them, are "quintessential legislative activity" protected by the Clause. *See In re Sealed Case,* 80 F.4th 355, 371 (D.C. Cir. 2023) (affirming district court holding that "communications with Members and staff about legislation . . . were squarely 'legislative acts' within the meaning of *Gravel*."); *see also Eastland*, 421 U.S. at 504 (explaining that "consideration and passage or rejection of proposed legislation" is "integral" to legislative activity). Indeed, in fulfilling their official duties and responsibilities as Members of Congress,

Senators Blackburn and Luján, like all Members, gather information and consult with numerous sources, including other Members, staff, executive branch agencies, and others, to inform them in carrying out their legislative duties of considering and voting on proposed legislation. The Senators' communications and deliberations about legislation are integral parts of their legislative activities, as they constitute "deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation . . ." *Gravel*, 408 U.S. at 625; U.S. Const. art. I, § 6, cl. 1.[2] Accordingly, the subpoenas' attempt to compel production of such documents from Senators Blackburn and Luján is barred by the Speech or Debate Clause.

Second, the subpoenas present an undue burden because they request materials that are not relevant to the claims in this action, seek an overly broad scope of documents, and seek documents from a nonparty that should be sought from a party to the action. *See North Carolina Right to Life v. Leake*, 231 F.R.D. 49, 51 (D.D.C. 2005) ("Undue burden is determined by reference to factors such as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed. Moreover, non-party status is also relevant in considering the burden.") (internal question marks and citations omitted).

The subpoenas seek documents that are not are not relevant to the claims or defenses at issue in the lawsuit. *See Goodyear Tire & Rubber Co. v. Kirk's Tire & Auto Servicenter of Haverstraw, Inc.*, 211 F.R.D. 658, 662 (D. Kan. 2003) ("relevance" one of the factors considered in determining whether subpoena presents "undue burden"). It is unclear how any factual discovery regarding the Senators' amici brief in this action addressing a purely legal issue before the court, let alone an amici brief filed in a separate, unrelated case in federal district court in California, are at all relevant to the claims or defenses at issue in this case. Indeed, "[t]he mere filing of an amicus brief . . . does not open oneself to broad discovery demands." *North Carolina Right to Life, Inc.*, 231 F.R.D. at 51. Furthermore, the amici brief of the Senators in this case was submitted in support of the FTC's opposition to defendants' motion to dismiss and addressed a purely legal question involving the interpretation of the BOTS Act, and that motion has been decided by the district court. If defendants wish to obtain information about the legislative history of the BOTS Act, they should seek it from appropriate and publicly-available legislative sources, like those relied upon in the amici brief, such as the Congressional Record, congressional committee reports, and congressional hearing transcripts – not from subpoenas to nonparty Members of Congress. There is simply no basis for any of the discovery sought from Senators Blackburn and Luján in this matter, nor is there any basis for the intrusive and irrelevant discovery sought in these subpoenas.

The subpoenas also impose an undue burden by requesting an overly broad scope of documents. The subpoenas demand production of documents from the Senators falling within 16 categories, each of which seeks "all documents or communications" falling within its category, including "internal" communications and communications with "Third Parties," which the

---

[2] Internal deliberations and communications about legislation do not lose their privileged nature under the Clause simply because they are preliminary to or facilitate the filing of an amicus brief. *Cf. Pittston Coal Grp. v. Int'l Union, United Mine Workers of Am.*, 894 F. Supp. 275, 278 n.5 (W.D. Va. 1995).

subpoenas define as "any individual, agency, or other entity other than You, the FTC, or the Defendants in this Action." Among the broad categories of documents demanded by the subpoenas are all documents and communications concerning defendants (Request Nos. 1-4), the amicus brief filed in this matter (Request Nos. 5-7), an amicus brief filed by Senators Blackburn and Lujan, among other Senators, in a separate California case (Request Nos. 8-10), the BOTS Act (Request Nos. 11, 12), and the MAIN Event Ticketing Act (Request Nos. 13-15), spanning an overly burdensome period of ten years and without any limitation scope or to matters relevant to the claims or defenses asserted in this action. Request No. 16 seeks all documents and communications over the past decade between the Senators and Ticketmaster, again without any limitation in scope or relevance. While seeking such broad discovery without any showing of particular relevance would raise undue burden concerns for any third party, such sweeping requests for the documents and communications of Members of Congress are particularly burdensome and intrusive, *see Minpeco*, S.A., 844 F.2d at 859 (noting that "[d]iscovery procedures can prove just as intrusive" to Members and congressional staff, and "distract them from their legislative work," as civil actions against them directly), and constitutes an improper "fishing expedition into congressional files." *Id.* at 863. Furthermore, several requests explicitly seek the production of communications with the FTC, the plaintiff in this case. Such records, if relevant and production is not overly burdensome, should be sought from the FTC itself through party discovery. Seeking to compel production of any such records from a third-party, particularly United States Senators, imposes an undue and unnecessary burden.

Third, the subpoenas encompass documents and communications that are protected from disclosure by the attorney-client privilege and attorney work-product doctrine. Specifically, the subpoenas seek documents and communications relating to the amici briefs filed both in this action and the separate action in California. *See* Request Nos. 5, 7, 8, 10. These documents constitute or reflect confidential communications between and among the Senators and their attorneys for the purpose of securing legal advice relating to the amici briefs filed in those cases. *See In re Lindsey*, 148 F.3d 1100, 1103 (D.C. Cir. 1998) ("The attorney-client privilege protects confidential communications made between clients and their attorneys when the communications are for the purpose of securing legal advice or services.") (citing *In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984)); *see also In re Sealed Case*, 29 F.3d 715, 719 (D.C. Cir. 1994) (common-interest privilege "protects communications between a lawyer and two or more clients regarding a matter of common interest.") Moreover, these requests encompass protected written work product of the attorneys who represented the amici Senators in those cases. *See Rockwell Int'l. Corp. v. U.S. Dep't. of Justice*, 235 F.3d 598, 604-05 (D.C. Cir. 2021) ("The attorney work-product privilege protects 'the files and the mental impressions of an attorney . . . reflected, of course, in interviews, statements, memoranda, correspondence, *briefs* . . . and countless other tangible and intangible ways.'") (emphasis added); *see also Coastal States Gas Corp. v. Dep't. of Energy*, 617 F.2d 854, 864 (D.C. Cir. 1980) (attorney-work product doctrine "provides a working attorney with a 'zone of privacy' within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories.") There is no basis to vitiate the attorney-client privilege and work product protection that protects these documents from discovery.

Fourth, under the Standing Rules of the Senate, which are promulgated pursuant to the Rulemaking Clause of the Constitution, art. I, § 5, cl. 2, Senate committees, Members, and employees cannot provide either testimony or nonpublic documents regarding their Senate responsibilities absent permission from the Senate itself. *See* Rule XI, Standing Rules of the

Senate. No such permission has been granted by the Senate in this matter. Before authorizing any production of documents under Senate rules, the Senate considers whether a request presents a strong showing of direct relevance, need, and unavailability from other sources and intrudes into privileged matters. Such authorization, which is analogous to the use by Executive Branch agencies of *Touhy* regulations (*see U.S. ex rel. Touhy v. Ragen,* 340 U.S. 462 (1951)), protects Members, congressional committees, and their staff from a voluminous number of requests that would otherwise interfere with the work of the Senate without any corresponding benefit to our system of justice. Here, none of the predicates for authorizing the production of Senate documents appear to have been satisfied.

Finally, the doctrine of sovereign immunity insulates the Senate and its Members from judicial enforcement of subpoenas in cases in which they are not a party. *See Rockefeller v. Bingaman*, 234 F. App'x 852, 855 (10th Cir. 2007) (Members of Congress, "acting in their official capacities, enjoy the envelope of the Congress' sovereign immunity[.]" (quoting district court); *Aero Tech, Inc. v. Great American Insurance Co.*, No. 22-476 WJ/GJF, 2023 WL 5002618, at *5 (D. Okla. Aug. 3, 2023) (noting that "the Tenth Circuit expressly endorsed the Eighth Circuit's decision to 'construe *federal* sovereign immunity as covering non-party subpoenas served on *federal officers and agencies*.'") (quoting *Bonnet v. Harvest (U.S.) Holdings, Inc.*, 741 F.3d 1155, 1161-62 (10th Cir. 2014)). While the enforcement of Rule 45 subpoenas against federal executive *agencies* finds a necessary waiver of sovereign immunity in the Administrative Procedures Act, 5 U.S.C. § 702, *see Linder v. Calero-Portocarrero*, 251 F.3d 178, 181 (D.C. Cir. 2001) (citing *Houston Business Journal, Inc. v. Office of the Comptroller*, 86 F.3d 1208, 1212 (D.C. Cir. 1996)), *U.S. Environmental Protection Agency v. General Electric Co.*, 197 F.3d 592, 597-98 (2d Cir. 1999) (citations omitted), the Senate is not an agency under the APA, 5 U.S.C. §§ 701(b), 702, and, thus, Senators retain sovereign immunity from judicial enforcement of subpoenas.

Sincerely,

Vivian M. Rivera

cc: The Honorable Marsha Blackburn
The Honorable Ben Ray Luján

# EXHIBIT 22

**From:** Bruno, Matthew
**Sent:** Thursday, July 30, 2026 7:48 PM
**To:** Rivera, Vivian (Legal); Stern, Bez
**Cc:** Drian, Joshua; Caballero, Thomas (Legal)
**Subject:** Re: FTC v. Key Investment Group, LLC, et al., Case No. 1:25-cv-02716 (D. Md.) - Subpoenas

Vivian:

Based on your refusal to meaningfully engage with us, we are clearly at an impasse and will be moving to compel.

All rights reserved.

Matt

**Matthew F. Bruno**
Partner

**Manatt, Phelps & Phillips,** LLP
7 Times Square
New York, NY 10036
**D** (212) 790-4525 **F** (212) 790-4545
MBruno@manatt.com

manatt.com

---

**From:** Rivera, Vivian (Legal) <Vivian_Rivera@legal.senate.gov>
**Sent:** Thursday, 30 July 2026 16:30:51
**To:** Bruno, Matthew <MBruno@manatt.com>; Stern, Bez <BStern@manatt.com>
**Cc:** Drian, Joshua <JDrian@manatt.com>; Caballero, Thomas (Legal) <Thomas_Caballero@legal.senate.gov>
**Subject:** RE: FTC v. Key Investment Group, LLC, et al., Case No. 1:25-cv-02716 (D. Md.) - Subpoenas

**[EXTERNAL] Please do not reply, click links, or open attachments unless you recognize the source of this message and know the content is safe.**

---

Matt:

We were frankly surprised by the continued breadth of your revised requests and the lack of any explanation for seeking the requested documents. The revised requests, although numbering only six, are anything but "targeted and precise." They remain exceedingly broad, burdensome, and untethered to issues in the case. You don't even attempt to explain or justify any of your requests, such as, for example, your request for all communications, over a period of almost 10 years, that anyone on the Senators' staffs may have had with anyone in the world concerning the

interpretation of legislation the Senators supported. Conceding you are not seeking privileged materials you are not otherwise entitled to receive, *see* FRCP 26 (b)(1) ("Parties may obtain discovery regarding any nonprivileged matter . . . ."), cannot be viewed as any kind of accommodation, let alone a "meaningful" one. Moreover, here the exercise of searching for responsive documents is particularly disproportionate, as virtually all, if not all, of the documents sought in several, if not all, of your requests are privileged in our view.

That is why your revised requests for documents do not provide a basis for reaching an accommodation.

Vivian

---

**From:** Bruno, Matthew <MBruno@manatt.com>
**Sent:** Wednesday, July 29, 2026 3:57 PM
**To:** Rivera, Vivian (Legal) <Vivian_Rivera@legal.senate.gov>; Stern, Bez <BStern@manatt.com>
**Cc:** Drian, Joshua <JDrian@manatt.com>; Caballero, Thomas (Legal) <Thomas_Caballero@legal.senate.gov>
**Subject:** Re: FTC v. Key Investment Group, LLC, et al., Case No. 1:25-cv-02716 (D. Md.) - Subpoenas

Thanks, Vivian:

This is a very disappointing response, especially when we simplified our requests down to six targeted and precise topics. We also were very clear that we have no interest in seeking privileged documents or communications, so continuing to stand on those objections is confusing, especially when we know there to be non-privileged communications. Rather than propose alternative requests, you simply complain about the form of the request altogether. If you do not intend to engage in a meaningful effort to find areas that the parties can agree to, please let me know by tomorrow and we will move to compel.

All rights reserved.

Matt

**Matthew F. Bruno**
Partner

**Manatt, Phelps & Phillips,** LLP
7 Times Square
New York, NY 10036
**D** (212) 790-4525 **F** (212) 790-4545
MBruno@manatt.com

**manatt.com**

---

**From:** Rivera, Vivian (Legal) <Vivian_Rivera@legal.senate.gov>
**Sent:** Wednesday, July 29, 2026 3:35 PM
**To:** Bruno, Matthew <MBruno@manatt.com>; Stern, Bez <BStern@manatt.com>
**Cc:** Drian, Joshua <JDrian@manatt.com>; Caballero, Thomas (Legal) <Thomas_Caballero@legal.senate.gov>
**Subject:** RE: FTC v. Key Investment Group, LLC, et al., Case No. 1:25-cv-02716 (D. Md.) - Subpoenas

**[EXTERNAL] Please do not reply, click links, or open attachments unless you recognize the source of this message and know the content is safe.**

Counsel:

Thanks for your email. We had thought, based on our conversation last week, that you were going to narrow your documentary requests and explain how those requests were relevant to claims and defenses in this action. Your proposed revised requests do not meaningfully narrow the scope of the documents sought, nor have you provided any explanation or legal authority supporting the relevance of the requests. Seeking "non-privileged" documents does not reflect a serious effort on either score. As we explained in our letter and on the phone, the overwhelming majority of documents sought by the subpoenas are absolutely protected from compelled disclosure under the Speech or Debate Clause, as they constitute communications integral to the Senators' legislative activities regarding the BOTS Act and the pending MAIN Event Ticketing Act. Limiting your requests to "non-privileged" documents does not alleviate the substantial burden of identifying and reviewing materials to locate the few documents that may not be constitutionally privileged, and therefore does not mitigate the undue burden, nor does it seek to demonstrate the relevance of the requested materials.

Regards,
Vivian

Vivian M. Rivera
Office of Senate Legal Counsel

---

**From:** Bruno, Matthew <MBruno@manatt.com>
**Sent:** Thursday, July 23, 2026 6:24 PM
**To:** Stern, Bez <BStern@manatt.com>; Rivera, Vivian (Legal) <Vivian_Rivera@legal.senate.gov>
**Cc:** Drian, Joshua <JDrian@manatt.com>; Caballero, Thomas (Legal) <Thomas_Caballero@legal.senate.gov>
**Subject:** RE: FTC v. Key Investment Group, LLC, et al., Case No. 1:25-cv-02716 (D. Md.) - Subpoenas

Vivian and Tom:

Thank you both again for a productive conferral. As promised, below are our proposed revised requests to address the points discussed on our call. We look forward to hearing from you by next Wednesday, July 29, and remain available to discuss these requests, as needed.

**Request No. 1**

All non-privileged Documents and Communications demonstrating Your understanding as to what constitutes "circumvent[ion]" under the BOTS Act.

**Request No. 2**

All non-privileged Documents and Communications concerning Your contention that "the BOTS Act was [not] confined solely to use of bot technology," as set forth on pages 2 through 6 of the Amicus Brief You filed in the Action.

**Request No. 3**

All non-privileged Documents and Communications showing any change in Your understanding or interpretation of the BOTS Act since its enactment.

**Request No. 4**

All non-privileged Documents and Communications between You and any third-party concerning the interpretation and enforcement of the BOTS Act.

**Request No. 5**

All non-privileged Documents and Communications between You and any third-party, including but not limited to the FTC, concerning Defendants.

**Request No. 6**

All non-privileged Documents and Communications between You and any third-party, including but not limited to the FTC, concerning the Amicus Brief You filed in the Action.

**Matthew Bruno**
Partner

**Manatt, Phelps & Phillips,** LLP
7 Times Square
New York, NY 10036
**D** (212) 790-4525 **F** (212) 790-4545
MBruno@manatt.com

manatt.com

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply email and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.

---

**From:** Stern, Bez <BStern@manatt.com>
**Sent:** Monday, July 20, 2026 2:45 PM
**To:** Rivera, Vivian (Legal) <Vivian_Rivera@legal.senate.gov>
**Cc:** Drian, Joshua <JDrian@manatt.com>; Bruno, Matthew <MBruno@manatt.com>; Caballero, Thomas (Legal) <Thomas_Caballero@legal.senate.gov>
**Subject:** RE: FTC v. Key Investment Group, LLC, et al., Case No. 1:25-cv-02716 (D. Md.) - Subpoenas

Vivian

Thank you for getting back to me so promptly. 4pm ET on Wednesday works for us. I will circulate a Zoom invite shortly

Bez

**Bezalel Stern**
Partner

**Manatt, Phelps & Phillips,** LLP
1700 M ST NW
4th Floor
Washington, DC 20036
**D** (202) 624-3381 **F**
BStern@manatt.com

manatt.com

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply email and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.

---

**From:** Rivera, Vivian (Legal) <Vivian_Rivera@legal.senate.gov>
**Sent:** Monday, July 20, 2026 12:25 PM
**To:** Stern, Bez <BStern@manatt.com>
**Cc:** Drian, Joshua <JDrian@manatt.com>; Bruno, Matthew <MBruno@manatt.com>; Caballero, Thomas (Legal) <Thomas_Caballero@legal.senate.gov>
**Subject:** RE: FTC v. Key Investment Group, LLC, et al., Case No. 1:25-cv-02716 (D. Md.) - Subpoenas

**[EXTERNAL] Please do not reply, click links, or open attachments unless you recognize the source of this message and know the content is safe.**

---

Mr. Stern-

Thanks for your email. We represent the Senators in their official capacities and understand the subpoenas to seek records of their official work.

As far as the meet and confer, I am unavailable today and tomorrow, but am available Wednesday afternoon between 2-5 pm EDT or on Thursday after 10:30 am EDT. Please let me know if either of those times works for you.

Vivian

Vivian M. Rivera
Office of Senate Legal Counsel

---

**From:** Stern, Bez <BStern@manatt.com>
**Sent:** Saturday, July 18, 2026 9:54 AM
**To:** Rivera, Vivian (Legal) <Vivian_Rivera@legal.senate.gov>
**Cc:** Drian, Joshua <JDrian@manatt.com>; Bruno, Matthew <MBruno@manatt.com>
**Subject:** RE: FTC v. Key Investment Group, LLC, et al., Case No. 1:25-cv-02716 (D. Md.) - Subpoenas

Ms. Rivera

Additionally, prior to our Meet & Confer please let us know if you are representing the Senators in both their personal and professional capacities.

Thank you

Bez

**Bezalel Stern**

Partner

**Manatt, Phelps & Phillips,** LLP
1700 M ST NW
4th Floor
Washington, DC 20036
**D** (202) 624-3381 **F**
BStern@manatt.com

**manatt.com**

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply email and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.

---

**From:** Stern, Bez
**Sent:** Friday, July 17, 2026 6:12 PM
**To:** 'Rivera, Vivian (Legal)' <Vivian_Rivera@legal.senate.gov>
**Cc:** Drian, Joshua <JDrian@manatt.com>; Bruno, Matthew <MBruno@manatt.com>
**Subject:** RE: FTC v. Key Investment Group, LLC, et al., Case No. 1:25-cv-02716 (D. Md.) - Subpoenas

Ms. Rivera

Please let me know when on Monday or Tuesday you have availability for a Meet & Confer on your attached letter

Bez

**Bezalel Stern**
Partner

**Manatt, Phelps & Phillips,** LLP
1700 M ST NW
4th Floor
Washington, DC 20036
**D** (202) 624-3381 **F**
BStern@manatt.com

**manatt.com**

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply email and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.

---

**From:** Rivera, Vivian (Legal) <Vivian_Rivera@legal.senate.gov>
**Sent:** Wednesday, July 15, 2026 4:30 PM
**To:** Stern, Bez <BStern@manatt.com>
**Subject:** FTC v. Key Investment Group, LLC, et al., Case No. 1:25-cv-02716 (D. Md.) - Subpoenas

**[EXTERNAL] Please do not reply, click links, or open attachments unless you recognize the source of this message and know the content is safe.**

---

Dear Mr. Stern:

Please see attached letter regarding the subpoenas issued to United States Senators Marsha Blackburn and Ben Ray Luján in the above-referenced case.

Thank you,
Vivian

Vivian M. Rivera
Office of Senate Legal Counsel
United States Senate
Washington, D.C. 20510

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| KEY INVESTMENT GROUP, LLC,<br><br>Movant,<br><br>v.<br><br>SENATOR BEN RAY LUJÁN and SENATOR MARSHA BLACKBURN<br><br>Respondents. | ) | Case No. 1:26-mc-00115-CRC |

**MOTION OF RESPONDENT SENATORS LUJÁN AND BLACKBURN TO STAY BRIEFING ON MOVANT KEY INVESTMENT GROUP'S MOTION TO COMPEL COMPLIANCE WITH THIRD-PARTY SUBPOENAS**

Respondent United States Senators Ben Ray Luján and Marsha Blackburn, through undersigned counsel, hereby respectfully move this Court to stay further briefing on Movant Key Investment Group's (KIG) Motion to Compel Compliance with Third-Party Subpoenas pending the Court's determination on the August 20, 2026 Minute Order to show cause why this matter should not be transferred to the District of Maryland. Pursuant to LCvR 7(m), Respondents' counsel conferred with Movant KIG's counsel regarding this motion, and Movant's counsel has stated that Movant opposes this motion. The grounds for this motion are set forth below.

1. This matter involves third-party subpoenas to Senator Luján and Senator Blackburn issued by the defendants in a civil action pending in the District of Maryland, *FTC v. Key Investment Group LLC, et al.*, No. 1:25-cv-02716-GLR (D. Md.).

2. The subpoenas demand the production of records by the Senators at a place of compliance in the District of Columbia.

3. In response to the subpoenas, Senate Legal Counsel, on behalf of the Respondent Senators, sent a letter asserting objections to the subpoenas pursuant to Rule 45(d)(2)(B).

4. Counsel for Movant KIG and Respondent Senators conferred regarding the subpoenas and the objections raised thereto, but were unable to resolve the dispute. KIG then filed the motion to compel in this matter on August 11, 2026. ECF No. 1.

5. Pursuant to Local Civil Rules 7(b) & (d), Respondents' opposition memorandum is currently due on August 25, 2026, and Movant's reply memorandum is due 7 days afterwards, on September 1, 2026.

6. On August 20, 2026, the Court entered a Minute Order directing Movant KIG "to show cause . . . by September 3, 2026 why this matter should not be transferred to the District of Maryland court that is presiding over the underlying litigation," pursuant to Federal Rule of Civil Procedure 45(f). The Minute Order also provided that "Respondents may file any reply to Movant's response by September 20, 2026."

7. A court possesses the inherent authority to control its docket and to manage the proceedings before it, including "the power to stay proceedings," which "is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936); *see also Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."). As part of this authority, a court may stay proceedings in an entire case or any parts thereof, including the briefing of motions submitted to the court.

8. In its August 20 Minute Order, the Court raised the issue of transferring the motion to compel to another District Court, requesting that Movant show cause why the matter

should not be so transferred. The orderly proceeding of this matter, as well as the efficient use of time and effort by counsel, would be well served by staying any further briefing on the motion to compel pending a resolution of the Court's Order to show cause and a determination of which court will be hearing that motion.

9. Should the Court decline to transfer the motion to compel, Respondents request that the Court then set an appropriate schedule for the filing of Respondents' opposition and Movant's reply memorandum on that motion. *See* LCvR 7(b) (providing that an opposition may be filed "at such other time as the Court may direct").

Accordingly, for the foregoing reasons, Respondents respectfully request that the Court stay further briefing on Movant's motion to compel until the Court has resolved the Minute Order to show cause regarding the transfer of the motion to compel to the District of Maryland.[1]

Respectfully submitted,

*/s/ Morgan J. Frankel*
Morgan J. Frankel, Bar #342022
Senate Legal Counsel

Patricia Mack Bryan, Bar #335463
Deputy Senate Legal Counsel

Thomas E. Caballero
Senior Assistant Senate Legal Counsel

Vivian M. Rivera
Assistant Senate Legal Counsel

Office of Senate Legal Counsel
642 Hart Senate Office Building
Washington, D.C. 20510-7250
(202) 224-4435 (tel), (202) 224-3391 (fax)

Dated: August 21, 2026

Attorneys for Respondents

[1] Should the Court deny this motion, Respondent Senators respectfully request that they be granted three (3) business days from the Court's denial to file their opposition memorandum to the motion to compel.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KEY INVESTMENT GROUP, LLC,<br><br>Movant,<br><br>v.<br><br>SENATOR BEN RAY LUJÁN and SENATOR MARSHA BLACKBURN<br><br>Respondents. | Case No. 1:26-mc-00115-CRC |

**[Proposed] ORDER**

Upon consideration of the Motion of Respondent Senators Luján and Blackburn to Stay Briefing on Movant Key Investment Group's Motion to Compel Compliance with Third-party Subpoenas, all papers filed in support thereof and opposition thereto, and the entire record herein, it is hereby

ORDERED that Respondents' Motion to Stay is GRANTED; and it is further

ORDERED that briefing on the Motion to Compel, ECF No. 1, is stayed until the Court has resolved the Minute Order to show cause as to why this matter should not be transferred to the District of Maryland.

Dated: ______________

______________________________
CHRISTOPHER R. COOPER
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KEY INVESTMENT GROUP LLC,<br><br>Movant,<br><br>v.<br><br>SENATOR BEN RAY LUJÁN and SENATOR MARSHA BLACKBURN<br><br>Respondents. | Case No. 1:26-mc-00115-CRC |

**MOVANT KEY INVESTMENT GROUP LLC'S**
**RESPONSE TO ORDER TO SHOW CAUSE**

In accordance with the Court's Minute Order to Show Cause, dated August 20, 2026, directing Movant Key Investment Group LLC to show cause "why this matter should not be transferred to the District of Maryland court that is presiding over the underlying litigation," Movant respectfully submits that, under the circumstances, transfer to the District of Maryland is warranted and appropriate pursuant to Rule 45(f) of the Federal Rules of Civil Procedure. Movant therefore consents to the transfer of this matter to the District of Maryland as set forth in the Court's Order to Show Cause.

Under the Advisory Committee notes, "transfer may be warranted in order to avoid disrupting the issuing court's management of the underlying litigation, as when that court has already ruled on issues presented by the motion or the same issues are likely to arise in discovery in many districts." Fed. R. Civ. P. 45 Advisory Committee's Notes to 2013 Amendment. In determining whether transfer is warranted under Rule 45(f), "courts consider several factors, including the complexity, procedural posture, duration of pendency, and the nature of the issues pending before, or already resolved by, the issuing court in the underlying litigation." *Duck v. U.S.*

*Securities and Exchange Commission*, 317 F.R.D. 321, 323 (D.D.C. 2016) (granting transfer). Here, each of these factors are present and support transferring KIG's motion to compel to the District of Maryland.

Chief Judge Russell has been presiding over the underlying action since its inception and is familiar with the full scope of issues involved, as is Magistrate Judge Austin, who has been referred all of the discovery disputes that have been raised by the parties. As the Court previously indicated, the subject matter of the Subpoenas at-issue are "heavily intertwined with the underlying dispute." In fact, since submitting the underlying motion to compel before this Court, KIG intends to file a separate discovery motion in the underlying action, seeking to compel the Federal Trade Commission to produce documents and communications involving Senators Marsha Blackburn and Ben Ray Luján, which the FTC continues to refuse.[1] Thus, the same issues are likely to be raised in the District of Maryland regardless, and efficient management of the underlying litigation and judicial economy strongly counsel in favor of transfer. *See Georgetown Univ., v. John Carfora, et al.*, 2026 WL 2211247, at *2 (D.D.C. Jul. 31, 2026) (transferring subpoena-related motion because "the issuing court is likely better positioned to resolve the subpoena-related motion and transfer is likely to promote judicial economy and the efficient progress of the underlying litigation."); *Victim Serv., Inc. v. Consumer Fin. Prot. Bureau*, 298 F. Supp. 3d 26, 29 (D.D.C. 2018) (transferring subpoena-related motion where the issuing court was "in a better position to rule on the ... motion ... due to [its] familiarity with the full scope of the issues involved as well as any implications the resolution of the motion will have on the underlying litigation.") (internal citations and quotations omitted).

---

[1] Rather than agree to produce documents responsive to KIG's request, the FTC limited the scope only to documents and communications concerning the Senators' *amicus* brief—a topic that KIG never even requested.

Further, Chief Judge Russell and Magistrate Judge Austin's familiarity with the issues underlying the Subpoenas is particularly critical here to allow for swift resolution of this Motion in accordance with the underlying case's expedited timeline, which currently contemplates the close of fact discovery on October 2, 2026.

For these reasons, transfer to the District of Maryland is warranted, and Movant respectfully requests that the Court order this matter transferred.

Dated: August 24, 2026
Washington, D.C.

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP

By: */s/ Joshua N. Drian*

Joshua N. Drian, Bar No. 1009917
Bezalel A. Stern, Bar No. 1025745
1700 M Street NW, 4th Floor
Washington, D.C. 20036
Phone: (202) 585-6500
jdrian@manatt.com
bstern@manatt.com

*Counsel for Key Investment Group LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of August, 2026, I caused to be served a true and correct copy of Key Investment Group LLC's Response to Order to Show Cause to be filed and served via CM/ECF on the following:

Morgan J. Frankel
Patricia M. Bryan
Thomas E. Caballero
Office of Senate Legal Counsel
642 Hart Senate Office Building
Washington, DC 20510
Email: morgan_frankel@legal.senate.gov
Email: pat_bryan@legal.senate.gov
Email: thomas_caballero@legal.senate.gov

Vivian M. Rivera
Office of Senate Legal Counsel
120 Constitution Ave NE
Suite 642
Washington, DC 20002
Email: vivian_rivera@legal.senate.gov

*Counsel for Senators Ben Ray Luján and Marsha Blackburn*

I further certify that on this 24th day of August, 2026, I caused to be served a true and correct copy of Key Investment Group LLC's Response to Order to Show Cause via e-mail on the following:

Molly Rucki
P. Connell McNulty
Simon Barth
Lauren Rivard
Federal Trade Commission
600 Pennsylvania Ave., NW
Mailstop CC-6316
Washington, DC 20580
202-326-3774
Email: mrucki@ftc.gov
Email: pmcnulty@ftc.gov
Email: sbarth@ftc.gov
Email: lrivard@ftc.gov

*Counsel for Plaintiff Federal Trade Commission*

Dated: August 24, 2026

Respectfully submitted,

*/s/ Joshua N. Drian*
Joshua N. Drian

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KEY INVESTMENT GROUP, LLC,<br><br>Movant,<br><br>v.<br><br>SENATOR BEN RAY LUJÁN and SENATOR MARSHA BLACKBURN<br><br>Respondents. | Case No. 1:26-mc-00115-CRC |

**REPLY OF RESPONDENT SENATORS LUJÁN AND BLACKBURN TO MOVANT KEY INVESTMENT GROUP'S RESPONSE TO ORDER TO SHOW CAUSE**

Pursuant to the Court's August 20, 2026 Minute Order, Respondent United States Senators Ben Ray Luján and Marsha Blackburn, through undersigned counsel, respectfully submit this reply to Movant Key Investment Group's Response to Order to Show Cause.

If the Court is inclined to transfer the Motion to Compel to the District of Maryland, Respondent Senators have no objection. Respondents wish to make clear, however, that it is entirely appropriate for this Court to hear and resolve this matter, which involves third-party subpoenas duces tecum, returnable in the District of Columbia, issued to two United States Senators by Key Investment Group (KIG), the defendant in a civil enforcement action by the Federal Trade Commission. The instant Motion to Compel does not require this Court to develop an extensive understanding of the factual record or merits of that underlying litigation.[1]

The principal issue raised by KIG's Motion to Compel is purely jurisdictional and entirely

[1] The FTC's complaint against KIG alleges violations of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(a), and the Federal Trade Commission Act, 15 U.S.C. § 45(a).

independent of the merits of the underlying case: namely, whether the subpoenas to the Senators seek to compel the production of documents that are absolutely privileged under the Speech or Debate Clause of the Constitution, art. I, § 6, cl.1. The Court can resolve that discrete threshold question without consideration of the record or merits of the underlying litigation. Indeed, courts in this Circuit have acquired substantial familiarity and experience adjudicating matters requiring application of the legislative privilege doctrine in third-party discovery disputes. Through those cases, this Circuit has had the opportunity to develop a substantial body of precedent governing the application of the Speech or Debate Clause to demands for document production from Congress. *See, e.g., Minpeco, S.A. v. Conticommodity Services, Inc.*, 844 F.2d 856 (D.C. Cir. 1988); *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408 (D.C. Cir. 1995); *Judicial Watch, Inc. v. Schiff*, 998 F.3d 989 (D.C. Cir. 2021); *Musgrave v. Warner*, 104 F.4th 355 (D.C. Cir. 2024).

Nevertheless, while Respondents believe this Court is well-suited to hear this matter, Respondents do not object should the Court determine that transfer of KIG's Motion to Compel to the District of Maryland is appropriate.

Respectfully submitted,

*/s/ Morgan J. Frankel*
Morgan J. Frankel, Bar #342022
Senate Legal Counsel

Patricia Mack Bryan, Bar #335463
Deputy Senate Legal Counsel

Thomas E. Caballero
Senior Assistant Senate Legal Counsel

Vivian M. Rivera
Assistant Senate Legal Counsel

Office of Senate Legal Counsel
642 Hart Senate Office Building
Washington, D.C. 20510-7250
(202) 224-4435 (tel), (202) 224-3391 (fax)

Dated: September 4, 2026

Attorneys for Respondents

**Extracting Case Data ...**
Processing *case* table ...
Processing *document* table ...
Processing *party* table ...
Processing *attorney* table ...
Processing *answer* table ...
Processing *js56* table ...
Processing *motion* table ...
Processing *schedule* table ...
Processing *filer* table ...
Processing *applicable_party* table ...
Processing *dkttext* table ...
Processing *dktpart* table ...
Processing *dktentry* table ...
Processing *schd_person* table ...
Processing *person* table ...

Generating public docket sheet.
Generating non-public docket sheet.
Sending e-mail to MDD_InterDistrictTransfer@mdd.uscourts.gov,kathryn_nader@mdd.uscourts.gov

**... Extraction Completed**